**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 23-198** |
| **JOSEPH LAFORTE** | : | |
| **JOSEPH COLE BARLETA** | | |
| **JAMES LAFORTE** | : | |

**GOVERNMENT'S TRIAL MEMORANDUM**

The United States of America, by its undersigned counsel, hereby submits its Trial Memorandum in advance of the trial of defendants Joseph LaForte ("LaForte"), James LaForte ("Jimmy LaForte"), and Joseph Cole Barleta ("Cole Barleta"). Trial is scheduled to commence on October 15, 2024 and will last four to five weeks.

## I.   Introduction

The government expects the evidence at trial to prove beyond a reasonable doubt that the defendants agreed to commit – and in fact committed – a pattern of racketeering activity through an association-in-fact enterprise consisting of the defendants and others with ties to defendant Joseph LaForte. The main purpose of this enterprise was to enrich themselves through illegal conduct, including by running and maintaining control over a merchant cash advance ("MCA") company known as Complete Business Solutions Group Inc. d/b/a Par Funding ("Par Funding") and its affiliates. Par Funding was a Philadelphia-based business that used fraudulent representations and omissions to induce individuals to invest in Par Funding and that used extortionate means to collect payments from merchant-customers to whom Par Funding and its affiliates loaned money via MCAs. LaForte operated Par Funding's day-to-day operations and

functioned as its president and CEO, Cole Barleta served as CFO and had managerial authority, and LaForte's brother, Jimmy LaForte, worked in sales and collections and had managerial authority.

The illegal schemes that composed the racketeering conspiracy include predicate acts of securities fraud, wire fraud, extortionate collection of debt, obstruction of justice, witness tampering, and witness retaliation.

II.   **Defendants' Misrepresentations and Omissions to Investors**

The defendants' numerous affirmative misrepresentations and omissions to Par Funding's investors form the basis of the wire fraud and securities fraud violations.

*First*, the defendants' concealment of LaForte's role at Par Funding and his criminal history, along with the concealment of his brother's criminal history, was essential to Par Funding's "efforts to raise capital" from investors. The concealment was critical because information relating to the prior criminal convictions and sentences of LaForte and his brother was publicly available on the internet under their legal names. Trial evidence, including LaForte's own emails, will establish that LaForte was acutely aware that early investors declined to invest in Par Funding due to LaForte's unsavory background. To gain investors, LaForte and his brother assumed aliases and concealed their true identities from Par Funding's investors and employees for years. Numerous investors will testify that they would not have invested in Par Funding had the truth about LaForte's identity, criminal history, and role been disclosed.

After the criminal histories of the LaForte brothers and reputed ties to an organized crime entity were published in an article by Bloomberg L.P. and elsewhere in December 2018,[1] LaForte

---

[1] On December 20, 2018, Bloomberg L.P. published a news article titled "Fall Behind on

ramped up his efforts to conceal the negative information about his background, including through a publicity campaign, use of a reputational manager to bury unwanted information on the internet, and the issuance of false and misleading legal letters. The concealment of LaForte's involvement in Par Funding was so critical that both LaForte and Cole committed perjury in various civil litigations—and suborned the perjury of Par Funding employees—in an effort to continue to conceal LaForte's control and ownership of the company.

*Second*, the defendants lied to investors about the rigor of Par Funding's underwriting process. Between 2016 and 2020, Par Funding's underwriting process became weaker and weaker so the company could fund more and more MCAs and, in turn, the defendants could obtain greater and greater commissions. By early 2020, the time it took to underwrite a file at Par Funding decreased from several days to only a few hours. LaForte directed Par Funding employees to process files more quickly, and underwriting requirements that existed in 2015 were routinely bypassed in 2019 and 2020. For example, although the defendants touted that Par Funding was committed to onsite inspections of every potential customer, that process was largely discontinued in late 2019, and where red flags were generated by the onsite inspection process, MCA applications were nonetheless approved. Likewise, Par Funding's underwriting requirement to obtain lease agreements and business licenses for MCA customers became increasingly ignored. Furthermore, LaForte regularly wielded the power to opt MCA customers

---

These Loans? You Might Get a Visit from Gino," which described the criminal convictions of defendants Joseph LaForte and James LaForte, including the prison time they each served "for stealing $14 million in a real estate scam." As part of the article, Bloomberg interviewed LaForte, who expressed concern about his online reputation: "Google my name. Look what comes up: mugshots." The Bloomberg article also identified defendant James LaForte as an associate of the Gambino Crime family, who, in addition to his brother's $14 million real estate scam, previously "served time for loan sharking and having someone's car torched."

out of the underwriting process entirely. For MCA customers that provided cash kickbacks to himself, or that entered "reload agreements" (i.e., MCAs renewed with existing customers for larger amounts), LaForte would instruct the underwriting department to prepare contracts without any underwriting. LaForte would also pass out cash bonuses to underwriting employees based on targeted numbers of MCA agreements, which encouraged sloppy underwriting. Par Funding employees will testify as to how the underwriting process degraded, and the government will also present emails exchanged among the defendants, videos of investor presentations, and marketing brochures.

*Third*, the defendants lied to investors when they stated that Par Funding's default rate was "1%" or far below the MCA industry average. The defendants were careful not to make these false claims in their written promotional material but made them orally during investor meetings and promotional events. Investors will testify that they were swayed by this claim and that it was material to their investment decision. An outside auditor who reviewed Par Funding's financials disagreed with the company's bad debt calculation and issued an adverse opinion. Par Funding employees will testify that the default rate determination was an entirely subjective exercise controlled by LaForte, with the assistance of Cole Barleta. On numerous occasions, LaForte would instruct employees to cause cash to be deposited into Par Funding accounts that was credited to MCA customers who were in default; in reality, these cash deposits were cash kickbacks that LaForte received from some of Par Funding's customers with which he had undisclosed self-dealings (and were not payments from the defaulted customers). These activities, among others, concealed the actual default rate and the true financial health of the company from investors.. Furthermore, LaForte would subjectively decide whether non-paying

customers who were in default should be reported to investors as being in default. The government will prove this scheme using the testimony of Par Funding employees, the expert testimony of Melissa Davis, emails exchanged among the defendants, and Par Funding business records.

*Fourth*, the defendants lied about the value and validity of an insurance policy issued by the insurance carrier Euler Hermes ("Euler") to Par Funding. In December 2018, Par Funding obtained $75 million of insurance coverage for Par Funding's MCA contracts. But this policy did not cover Par Funding's actual business or business model, which was based on the lending of money based on unspecified future accounts receivables. Rather, the Euler insurance policy covered traditional factoring arrangements where a specific invoice was pledged by an MCA customer to an MCA lender. This fatal mismatch became evident almost immediately as Euler did not pay *any* of Par Funding's claims under the insurance policy, beginning as early as March 2019. The defendants were aware of these denials, had multiple conversations about the denials with Euler, and looked into purchasing a different policy to reflect their business model. Notwithstanding these facts, the defendants continued to market the insurance as covering Par Funding's investors' investments in MCA deals both orally and in its marketing brochures throughout 2019 and 2020. The uselessness of the Euler insurance is reflected in LaForte's August 7, 2019 email to his younger brother, Jimmy, where he complains: "I sent this company 1.4 million dollars and have Zero insurance. . . . I feel like a sucker." Investors will testify that this insurance was material to their investment decision, Par Funding and Euler employees will testify about discussions of the insurance policy, and business records and emails exchanged among the defendants will prove this aspect of the fraud to the jury.

*Fifth*, the defendants concealed that they were engaged in extensive self-dealing to the detriment of investors. This self-dealing came in the form of (i) millions of dollars of cash kickbacks to LaForte, (ii) excessive "commissions," and other non-business payments to Jimmy LaForte with investor money, (iii) LaForte obtaining ownership interest in Par Funding's merchant-customers via nominees, (iv) Jimmy LaForte's outright theft of funds from Par Funding, and (v) the LaForte brothers' use of an intermediary to steal $750,000 of Par Funding's investors' money via a fake MCA agreement. LaForte and his conspirators did not affirmatively tell investors that they were not receiving kickbacks, that they were not self-dealing, or that they were not investing in businesses that they owned. The defendants instead used presentations to investors to convey the false impression that Par Funding had carefully identified third-party small business investment opportunities that it extensively vetted via an arms-length underwriting process. This was simply false.

One example of the self-dealing was the approximately $8,679,000 in cash that LaForte received from Par Funding merchant-customer T.O. and his small portfolio of businesses. These entities (including B&T Supply) received approximately $91 million in funding payments from Par Funding, and LaForte received approximately 10% in cash kickbacks out of the total MCA funding. Another example of self-dealing is the $742,000 commission that Jimmy LaForte received for a fraudulently-structured MCA deal with T.O. to buy worthless K95 masks during the Covid 19 pandemic. Contemporaneously, Jimmy LaForte received a second illicit payment: in March 2020, $96,000 of a $100,000 MCA deal with JNR Flooring was diverted to a nominee account for Jimmy LaForte. Finally, using investor money, LaForte obtained ownership interests in several MCA customers, such as Vision Solar and Kingdom Logistics. None of the above was

disclosed to investors.

*Finally*, the self-dealing described above overlapped with yet another misrepresentation made to investors concerning Par Funding's investment portfolio. In communications with investors, Par Funding claimed that its MCA merchant-customer base was diversified across many small companies, and consisted of lending arrangements between $5,000 to $500,000, with the average MCA of $50,000. In reality, approximately half of Par Funding's investment dollars were tied up with *only* ten merchant-customers. This material information was not disclosed to investors. By July 2020, ten merchant-customers accounted for approximately $225 million of $420 million in outstanding receivables owed to Par Funding. The largest was B&T Supply, which consisted of five entities, and owed Par Funding approximately $91 million. The smallest merchant-customer in that group was CKD Enterprises, which owed Par Funding $5,442,666.. Investors will testify that the concentration of Par Funding's MCA business in a handful of companies, in staggeringly large amounts, was different from what they were told and would have deterred them from investing. Business records and expert testimony will show the amount of funding and to whom it was directed.

## III.   **Extortionate Collection of Credit**

Under LaForte's direction, Par Funding ran its MCA collections department like a traditional organized crime loansharking operation. Businesses that failed to repay Par Funding under the typically onerous contractual terms would receive surprise visits from Renato Gioe, a muscular ex-convict, or would receive threats of violence from LaForte or his brother Jimmy LaForte. When Gioe visited a non-paying business, he would demand repayment to Par Funding and LaForte using his menacing presence, foul language, and threats of physical violence to the

business owner. On one occasion, he threatened to break the legs of one business-owner and extortion victim (W.B.). Par Funding would routinely send Gioe on trips to non-paying customers, paying for his travel expenses and determining who he should visit on a given trip. Gioe is expected to testify regarding the threats he made at the direction of the defendants.

The LaForte brothers themselves would also threaten their nonpaying customers. In early 2019, LaForte called Extortion Victim No. 8 and said that he would put a bomb in his/her car and that "poof, you will be gone." A few months later, LaForte threatened the same individual by suggesting he would kidnap Extortion Victim No. 8's young children if Par Funding was not paid. In April 2018, Jimmy LaForte led a campaign of threats against Extortion Victim No. 10. He told the victim that he was a "solider" in the mafia and had experience torching cars and kicking people's teeth in. He threatened to kick the victim's teeth in and threatened to harm the victim's under 10-year-old child. The government will call the extortion victims to testify and play audio recordings of some of the LaForte brothers' threats.

## IV.   <u>Joseph LaForte's Tax Crimes</u>

The government has charged LaForte with tax evasion and filing false tax returns for his failure to report cash payments that he received from Par Funding customer T.O. in 2017, 2018, and 2019 as income. In 2017, LaForte received $846,637; in 2018, he received $2,211,617; in 2019, he received $3,381,176. In total, LaForte received cash payments worth $6,439,430 from T.O. The evidence of these violations consists of: 1) IRS special agent testimony; 2) tax records; 3) bank records affiliated with T.O. and his businesses; 4) the testimony of T.O. and his assistant; 5) Par Funding employee testimony; and 6) Par Funding business records.

The government will also prove beyond a reasonable doubt that LaForte failed to collect

and pay over trust fund taxes for the years 2017, 2018 and 2019 when he gave weekly cash bonuses to his many employees. During those years, LaForte paid cash bonuses of at least $2 million. These cash bonuses – used to encourage quick approval of MCA deals that did not satisfy Par Funding's underwriting standards and to engender employee loyalty to LaForte – were not recorded in Par Funding's books and records nor were they reported to the IRS. The government will prove this scheme by presenting payroll records of Par Funding and its affiliates, as well as the testimony of Par Funding employees and IRS agents.

## V.   **Perjury**

Defendants LaForte and Cole Barletta committed perjury in their deposition testimony in two civil lawsuits brought against Par Funding in the Eastern District of Pennsylvania: *Fleetwood Services, et al. v. DBSG d/b/a Par Funding, et al.*, 18-cv-0268 (J. Sanchez), and *HMC Inc. et al. v. CBSG d/b/a Par Funding, et al.*, 19-cv-3285 (J. Sanchez). In those cases, LaForte committed perjury by denying: 1) his role as owner and decision-maker at Par Funding, 2) his knowledge of his wife's title at Par Funding, 3) his knowledge of Par Funding's annual funding; 4) his knowledge that Par Funding kept default rate statistics and information; and     5) his knowledge of Cole Barleta's title at Par Funding.

In these same civil lawsuits, Joseph Cole lied under questioning at his depositions when he stated that Joseph LaForte never served on the credit committee of Par Funding, knowing full well that LaForte had in fact controlled and ran this committee since Par Funding's inception. Defendant Cole Barleta also lied when he separately testified that Joseph LaForte: 1) was not a decision maker of Par Funding, 2) was not involved in the day-to-day operations of Par Funding, and 3) did not have ultimate say in the decisions regarding Par Funding. The government will

offer texts of conversations between the defendants, Par Funding's lawyer, and other Par Funding employees where the defendants discussed these lies. Par Funding employees will discuss the illicit coaching that LaForte and Cole Barleta provided in advance of civil depositions.

## VI.    <u>**Obstruction of Justice, Witness Tampering and Retaliation**</u>

The government will also prove beyond a reasonable doubt that defendants Joseph LaForte and Jimmy LaForte conspired to obstruct and obstructed justice, tampered with witnesses, and retaliated against witnesses by physically assaulting them or threatening to do so. Specifically, the government will show that these acts were impermissible attempts to affect a pending grand jury investigation in the Eastern District of Pennsylvania, a pending criminal case in the same district, and a pending lawsuit by the SEC in the Southern District of Florida. Notably, the brothers LaForte organized and executed a brazen assault of G.A, an attorney for the Receiver in the SEC investigation. The LaForte brothers made threats to several other witnesses to deter them from testifying in a related criminal investigation and a criminal case. These victims will testify at trial, as well as law enforcement witnesses who investigated the threats.

Respectfully submitted,

JACQUELINE C. ROMERO
United States Attorney


*/s/ Eric D. Gill*
MATTHEW T. NEWCOMER
SAMUEL S. DALKE
ERIC D. GILL
Assistant United States Attorneys

10

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the Government's Trial Memorandum has been served via electronic filing upon all defense counsel of record for defendants Joseph LaForte, James LaForte, and Joseph Cole Barleta by the Court's ECF notification system.


*/s/ Eric D. Gill*

MATTHEW T. NEWCOMER
SAMUEL S. DALKE
ERIC D. GILL
Assistant United States Attorneys

Dated: September 6, 2024