```
                    UNITED STATES DISTRICT COURT

              FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,        :
                                 :  Case No. 20-CR-00231-1
                  Plaintiff,     :          23-CR-00198-1
                                 :          24-CR-00065-1
         vs.                     :
                                 :  Philadelphia, Pennsylvania
JOSEPH LAFORTE,                  :
                                 :  September 11, 2024
                  Defendant.     :  10:02 a.m.
                                 :
. . . . . . . . . . . . . . . . .:


              TRANSCRIPT OF CHANGE OF PLEA HEARING
              BEFORE THE HONORABLE MARK A. KEARNEY
                  UNITED STATES DISTRICT JUDGE


APPEARANCES:

 For the Plaintiff:              Matthew Todd Newcomer, Esq.
                                 Eric D. Gill, Esq.
                                 Samuel S. Dalke, Esq.
                                 U.S. Attorney's Office
                                 615 Chestnut Street, Suite 1250
                                 Philadelphia, PA  19106

 For the Defendant:             Joseph Corozzo, Esq.
                                 Ian Healey, Esq.
                                 Rubenstein & Corozzo LLP
                                 260 Madison Avenue, 22nd Floor
                                 New York, NY  10016


 Court Recorder:                Jeff Lucini
                                 Clerk's Office
                                 U.S. District Court


 Transcription Service:         Jessica B. Cahill, CER/CET-708
                                 Maukele Transcribers, LLC
                                 467 Maukele Place
                                 Wailuku, Maui, HI  96793
                                 Telephone: (808)298-8633


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.
```

```
1    SEPTEMBER 11, 2024                        10:02 A.M.

2            THE COURT:  We're here this morning in the matter of

3    the United States vs. Joseph LaForte, Joseph Cole Barleta, and

4    James LaForte, as well as sitting in the matter of purpose --

5    possibly, that's number 23-198, what we call the RICO case.

6            In addition, we're sitting today in the matter of the

7    United States of America vs. Joseph LaForte in the matter of

8    Criminal No. 24-65, and in the United States vs. Joseph LaForte

9    in the criminal matter of 20-231 as consolidated yesterday,

10   transferred to us yesterday by Chief Judge Goldberg and now

11   before us.

12           May I enter your appearance first for the United

13   States?

14           MR. NEWCOMER:  Good morning, Your Honor.  Matthew

15   Newcomer, Sam Dalke, and Eric Gill for the Government.

16           THE COURT:  Welcome.  And on behalf of Mr. Joseph

17   LaForte.

18           MR. COROZZO:  Good morning, Your Honor.  Joseph Corozzo

19   on behalf of Mr. LaForte.  To my far right is Ian Healy, an

20   attorney that the Court is somewhat familiar with.  He was just

21   admitted to the bar of New York last week.

22           THE COURT:  Welcome.  Welcome.  And welcome,

23   Mr. LaForte.

24           THE DEFENDANT:  Thank you.

25           THE COURT:  We're here today, Mr. LaForte, under a
```

```
1    couple orders.  We are preparing now for trial on October 15 in
2    this case, that -- I want to call it the RICO case.  That's the
3    2023 case.  Trial for the second case, the tax case, is not till
4    later in the year.  And there's no trial date set for the felon
5    in possession.  You're aware of that, sir?
6                 THE DEFENDANT:  Yes, Your Honor.
7                 THE COURT:  Okay.  So as of right now, you are
8    scheduled to go to trial before a jury of 12 persons on
9    October 15 in the matter charging you, along with your brother
10   James and Joseph Cole Barleta, in a RICO securities fraud case.
11   You're aware of that, sir?
12                THE DEFENDANT:  Yes, Your Honor.
13                THE COURT:  Okay.  I understand that for the purpose of
14   today, though, it may be a little different.  And, Mr. LaForte,
15   do you understand, have you had a chance to speak to your counsel
16   as to why you're here today?
17                THE DEFENDANT:  I have.
18                THE COURT:  Okay.  Mr. Newcomer, has the United States
19   notified all the victims that are detailed in the RICO and
20   securities fraud case?
21                MR. NEWCOMER:  It has, Your Honor.  That includes the
22   investor victims, the extortion victims, and the obstruction
23   victims.  All three buckets have been notified.  And as to the
24   other cases, the victims in the other cases are basically
25   government agencies, and they've been notified as well.
```

1          THE COURT:  Okay.  How did you notify the individual

2     victims?

3          MR. NEWCOMER:  So the extortion victims and the

4     obstruction victims, those are the ones that involve violence or

5     threats of violence.

6          THE COURT:  Right.

7          MR. NEWCOMER:  They were notified by phone of the plea,

8     either by one of us or other agents.  And the investor victims,

9     prior to the plea being presented to Your Honor, we had a

10    conference call where we invited all of the investor victims, and

11    I gave them a little presentation of what the plea would entail

12    and took comments and questions and any concerns.  They were then

13    notified after that, after we had the conference call on Friday

14    afternoon, they were given electronic notification of the time,

15    date, and place of the hearing this morning.

16         THE COURT:  Okay.

17         MR. NEWCOMER:  We received questions, phone calls since

18    that time confirming that those didn't -- didn't even receive the

19    audience.

20         THE COURT:  Okay.  All right.  Thank you, sir.

21         Mr. LaForte, over the next few moments I'm going to

22    discuss a number of things with you.  There are quite a few

23    people here today interested in this, but all that matters is

24    that you and I understand each other.  Do you understand that?

25         THE DEFENDANT:  Yes.

1          THE COURT:  So we use terms as lawyers and judges that

2    you don't use every day.  Now, you might have become familiar

3    with them recently, but we use them every day.  And if you don't

4    understand what I'm saying, I urge to you stop me.  Do you

5    understand that?

6          THE DEFENDANT:  Yes.

7          THE COURT:  Tap your counsel and stop me and interrupt

8    me and say, "Your Honor, I'm not getting that."  Okay?  I'm going

9    to stop you if I don't understand what the lawyers are saying.

10   You have the same right to stop me.  It's most important you and

11   I understand each other today.  Understand that?

12         THE DEFENDANT:  Yes, sir.

13         THE COURT:  Okay.  So if at any time you want to talk

14   to your counsel, you may do so.  You say stop and say, "Your

15   Honor, I want to talk to my counsel."  Do you understand that?

16         THE DEFENDANT:  Yes.

17         THE COURT:  Okay.  Mr. Deputy, would you kindly swear

18   Mr. LaForte.

19         THE DEPUTY CLERK:  Please stand and raise your right

20   hand.

21         You do swear or affirm that the testimony you should

22   give the Court shall be the truth, the whole truth, and nothing

23   but the truth, so help you God or you do so affirm?

24         THE DEFENDANT:  I do.

25         THE COURT:  Thank you, Mr. LaForte.

```
 1                THE DEFENDANT:  Thank you.

 2                THE COURT:  Mr. LaForte, you are now under oath.  That

 3     means if the United States believes that you've presented a

 4     misleading or purely false response to one of our questions or

 5     said something false today, they could prosecute you for perjury,

 6     which is an offense separate than any you're charged with at

 7     present, a new offense.  Do you understand that, sir?

 8                THE DEFENDANT:  Yes.

 9                THE COURT:  Okay.  Are you going to tell me the truth?

10                THE DEFENDANT:  Yes.

11                THE COURT:  What is your full name?

12                THE DEFENDANT:  Joseph William Edward LaForte.

13                THE COURT:  Have you ever used any other name legally,

14     like another name, any registered name for you?

15                THE DEFENDANT:  No.

16                THE COURT:  Have you ever used another name in a

17     nickname kind of sense or cavalierly?

18                THE DEFENDANT:  Yes.

19                THE COURT:  What is that?

20                THE DEFENDANT:  Joe Mack.

21                THE COURT:  How old are you, sir?

22                THE DEFENDANT:  53.

23                THE COURT:  Did you attend school in the United States?

24                THE DEFENDANT:  I did.

25                THE COURT:  How far did you complete?
```

```
 1                 THE DEFENDANT:  12th grade.  12th -- 12 years.

 2                 THE COURT:  Okay.  Do you read or write any language

 3     other than English?

 4                 THE DEFENDANT:  No.

 5                 THE COURT:  Do you speak any language other than

 6     English?

 7                 THE DEFENDANT:  No.

 8                 THE COURT:  Have you ever been treated -- have you ever

 9     been treated for a drug addiction?

10                 THE DEFENDANT:  No.

11                 THE COURT:  Okay.  Have you ever been treated for an

12     alcohol addiction?

13                 THE DEFENDANT:  No.

14                 THE COURT:  You're presently in the custody of the

15     United States?

16                 THE DEFENDANT:  Yes.

17                 THE COURT:  Have you taken any illegal drugs in the

18     last 72 hours?

19                 THE DEFENDANT:  No.

20                 THE COURT:  Sir, have you ever been treated for a mood

21     disorder such as clinical depression or clinical anxiety?

22                 THE DEFENDANT:  No.

23                 THE COURT:  Have you ever been treated for mental

24     illness such as bipolar or schizophrenia or delusions?

25                 THE DEFENDANT:  No.
```

1          THE COURT:  Other than the anxiety of being in a

2    federal courtroom, are you feeling capable of answering our

3    questions today?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Okay.  Sir, this case arises from a second

6    superseding indictment brought against you by a -- charged by the

7    United States grand jury.  Are you aware of that?

8          THE DEFENDANT:  Yes.

9          THE COURT:  Okay.  It's called amended second

10   superseding indictment.  It also arises from an indictment, to

11   the extent it relates to the tax case, brought against you called

12   a superseding indictment in which you are charged along with

13   Joseph -- with also your brother -- along with your -- with

14   Joseph Cole Barleta, Mr. Irmo (phonetic) and Mr. Bacon

15   (phonetic).  Do you understand that, sir?

16         THE DEFENDANT:  Yes.

17         THE COURT:  Okay.  And a third -- a third indictment

18   charges you with being a felon in possession.  That was just

19   consolidated yesterday.  Are you aware of that indictment?

20         THE DEFENDANT:  Yes.

21         THE COURT:  Have you had a chance over time to read

22   these indictments?

23         THE DEFENDANT:  Many times.

24         THE COURT:  Have you had a chance to speak to your

25   attorney about them?

1          THE DEFENDANT:  Yes.

2          THE COURT:  Your attorney, in the felon in possession,

3  we admitted to appear here this week.  At some point you were

4  represented by your local counsel in that matter.  Have you had a

5  chance to speak to your attorney today about the felon in

6  possession case?

7          THE DEFENDANT:  Yes.

8          THE COURT:  Has your attorney explained to you the

9  nature and elements of the offenses that are charged against

10  you --

11          THE DEFENDANT:  Yes.

12          THE COURT:  -- in each of those three matters?

13          THE DEFENDANT:  Yes.

14          THE COURT:  Okay.  Has he explained to you what rights

15  you have at trial in each of those three matters?

16          THE DEFENDANT:  Yes.

17          THE COURT:  Has he explained to you what defenses you

18  would have at trial?

19          THE DEFENDANT:  Yes.

20          THE COURT:  Has your lawyer answered all your questions

21  on what these three indictments mean?

22          THE DEFENDANT:  Perfectly.

23          THE COURT:  Do you have any questions of me about

24  anything in those indictments?

25          THE DEFENDANT:  I do not.

1              THE COURT:  Okay.  Are you satisfied with the

2    representation provided by your lawyer?

3              THE DEFENDANT:  Very much.

4              THE COURT:  Is there anything you asked him to do and

5    he did not do?

6              THE DEFENDANT:  No.

7              THE COURT:  Okay.  First key question I come to today,

8    sir.  Has anyone forced you either by -- or coerced you or paid

9    you money to consider pleading guilty today?

10             THE DEFENDANT:  No.

11             THE COURT:  If you do so, if you plead guilty today,

12   would you be doing so of your own free will?

13             THE DEFENDANT:  Yes.

14             THE COURT:  Sir, I'm aware, because you have an

15   indictment for being a felon in possession of a firearm, that

16   you've been earlier charged and convicted of a felony.  In

17   today -- if you're found guilty today, that will also possibly

18   extend those waivers of certain rights you have, including, as

19   you expect now, the waiver of a right to have a firearm or

20   ammunition, the right to hold certain licenses, the right to do

21   any number of things that vary by state to state, including the

22   right to have a license in some -- like a professional license in

23   some states.

24             Are you aware of that, sir?

25             THE DEFENDANT:  Yes.

1              THE COURT:  Sir, this case involves concepts of

2    restitution and forfeiture.  Have you had a chance to speak to

3    your lawyer about what those terms mean?

4              THE DEFENDANT:  I have.

5              THE COURT:  Do you know generally what they are?

6              THE DEFENDANT:  Yes.

7              THE COURT:  Okay.  It's my understanding, Mr. Newcomer,

8    and I've read it, that you have reached an agreement with

9    Mr. LaForte to resolve all three matters, for him to plead guilty

10   and resolve his liability in all three matters.  Is that correct?

11             MR. NEWCOMER:  That's correct, Your Honor.

12             THE COURT:  All right.  I have a plea agreement before

13   me, Mr. LaForte and Mr. Corozzo.  Do you have that, sir, by any

14   chance?

15             MR. COROZZO:  We do, Your Honor.

16             THE COURT:  All right.  Let's -- Mr. Newcomer will

17   spend some time with it, but let's just make sure we have the

18   same document.  Mr. Corozzo, would you kindly turn to

19   the -- excuse me -- the 20th paginated page of the guilty plea

20   agreement.  And would you kindly show that to your client.

21             MR. COROZZO:  I have, Your Honor.

22             THE COURT:  Thank you.  Mr. LaForte, on the 20th page

23   of this guilty plea agreement sequentially numbered, there's a

24   signature above the name Joseph LaForte.  Is that your signature,

25   sir?

1              THE DEFENDANT:  Yes.

2              THE COURT:  Did you voluntarily sign this document?

3              THE DEFENDANT:  Yes.

4              THE COURT:  Did anyone force you to sign this document?

5              THE DEFENDANT:  No.

6              THE COURT:  Did you read it before you signed it?

7              THE DEFENDANT:  Yes.

8              THE COURT:  Did you have a chance to speak to your

9    lawyer about it before you signed it?

10             THE DEFENDANT:  I did.

11             THE COURT:  Has your lawyer explained to you what's in

12   this plea agreement?

13             THE DEFENDANT:  Yes.

14             THE COURT:  Has he explained to you the concept of what

15   a plea recommendation under Rule of Criminal Procedure 11(c)

16   might mean for you?

17             THE DEFENDANT:  Yes.

18             THE COURT:  Has he explained to you what your rights on

19   appeal depending on what the Court does regarding that plea

20   agreement, what those rights may be?

21             THE DEFENDANT:  Yes.

22             THE COURT:  Have you had enough time to talk about it,

23   talk about this agreement with your attorney?

24             THE DEFENDANT:  Extensive.

25             THE COURT:  All right.  I'm also going to ask,

1  Mr. Corozzo, if you could kindly -- if you would have the

2  acknowledgment of rights, sir, that may be attached to it or

3  separate.

4          MR. COROZZO:  We do, Your Honor.

5          THE COURT:  Three-page document.

6          MR. COROZZO:  Yes.

7          THE COURT:  Mr. LaForte, on the third page of that

8  document, there's a signature above the name Joseph LaForte.  Do

9  you recognize that signature?

10          THE DEFENDANT:  Yes.

11          THE COURT:  Is that yours?

12          THE DEFENDANT:  Yeah.

13          THE COURT:  Did you voluntarily sign that document?

14          THE DEFENDANT:  I did.

15          THE COURT:  Did you have a chance to speak with your

16  attorney about it before you signed it?

17          THE DEFENDANT:  Yes.

18          THE COURT:  Okay.  Do you have any question of me about

19  either of these two documents you signed?

20          THE DEFENDANT:  No, Your Honor.

21          THE COURT:  Are you sure?  Okay.  The answer is yes?

22          THE DEFENDANT:  Yeah.

23          THE COURT:  Mr. Newcomer, I ask you to summarize the

24  essential terms of the agreement.  I will address how 11(c) works

25  both as to -- I'll address the maximum penalty and the penalties

1  as to each of the indictments, but I ask you to address the

2  major -- and I'll address how 11(c) in tandem with appellate

3  rights will work.  But, sir, if you could kindly summarize for us

4  exactly what I should be understanding as the -- as the waiver

5  and what's being stipulated to, etcetera.

6  　　　　　MR. NEWCOMER:  Yes, Your Honor.  So just at the outset,

7  I want to note for the record that the change of plea memorandum

8  that we submitted to the Court on Monday, I believe, was also

9  shared with the Defense, and Mr. Corozzo can confirm, but I

10 believe it was shared and discussed with Mr. LaForte as well.

11 And the essential terms I'm going to put on the record today are

12 consistent with what the essential terms I put in the change of

13 plea memo, which are the Government is -- and Mr. LaForte are

14 agreeing that Mr. LaForte will plead guilty to the following

15 counts in the following cases, and the Government, at sentencing,

16 will move to dismiss all remaining counts.

17 　　　　　So in the 20-231 matter that was recently transferred

18 to this Court, Count 1 being a felon in possession of firearms,

19 Mr. LaForte is pleading guilty to that.

20 　　　　　In Criminal No.  23-198, which we've been calling the

21 RICO case, he's pleading guilty to a RICO conspiracy charge in

22 Count 1, securities fraud charged in Count 21, filing a false tax

23 return is charged in Count 31, failure to collect and pay over a

24 tax as charged in Count 44, perjury in Count 45, and obstruction

25 of justice in Count 52.

1          As for the remaining criminal case, No. 24-65, what

2    we've been calling the tax case, Mr. LaForte is agreeing to plead

3    guilty to two counts:  Count 1, conspiracy to defraud the IRS

4    and, count 2, wire fraud -- I'm sorry, Count 7, wire fraud.

5          Your Honor, for purposes of the RICO conspiracy

6    conviction in Count 1 of the 23-198 matter, the parties have

7    further agreed, and it's contained in Paragraphs 3(c) and 16(g)

8    of the plea agreement, that the predicate crimes for purposes of

9    those -- that specific conviction, the conspiracy, are securities

10   fraud and wire fraud.  And the parties agree that, at sentencing,

11   Government may, if necessary, prove up additional charged or

12   uncharged conduct as relevant conduct and also as predicate for

13   that Count 1.  For purposes of today's plea, the parties agree

14   it's sufficient that they agree that there was at least two

15   buckets of predicate crimes, being securities and wire fraud.

16         The plea is also conditioned on Co-Defendant James

17   LaForte entering a plea agreement, which, as the Court note, he

18   has.  It's also contingent on Your Honor accepting that plea and

19   Mr. James LaForte making it through the change of plea hearing.

20   If any of those things don't happen, then the Government has the

21   right, the sole right, to withdraw from the plea agreement if it

22   deems necessary.  That's described in Paragraphs 4 and 5 of the

23   plea agreement.

24         THE COURT:  So Mr. LaForte doesn't have the right to

25   withdraw?

1          MR. NEWCOMER:  That's correct, Your Honor.  Only the

2     Government.

3          THE COURT:  If James LaForte doesn't, if we don't

4     accept James LaForte --

5          MR. NEWCOMER:  Correct.  And, obviously, the Government

6     can decide to go forward but --

7          THE COURT:  Sure.

8          MR. NEWCOMER:  -- we have the right.

9          THE COURT:  Okay.

10          MR. NEWCOMER:  The next essential term is the one Your

11     Honor flagged, that this is a 11(c)(1)(C) plea and that the

12     recommended term of incarceration for Your Honor from both

13     parties is 13 and a half to 15 and a half years covering the

14     three cases, followed by no more than three years of supervised

15     release.

16          I'll leave it to Your Honor to describe the interplay

17     between 11(c)(1)(C) and the appellate rights.

18          THE COURT:  Yes, sir.

19     MR. NEWCOMER:  The Defendant has agreed in Paragraph 10(a) of the

20     plea agreement to pay victim restitution in the 23-198 RICO

21     matter in an amount to be determined at sentencing.  He also

22     agrees to pay restitution to the IRS in the amounts set forth in

23     the plea agreement -- or the plea memo at Page 4.  It's

24     $10,487,481 in total restitution to the IRS and $1,655,299 to the

25     PA Department of Revenue.  And that's set forth in Paragraphs

1    10(a) through (d) of the plea agreement.  The Defendant also --

2               THE COURT:  Just to be clear, though, sir, am I right

3    that -- let's break that down.  It's 2.4 -- approximately

4    2.4 million in the -- in the RICO securities case and it's

5    approximately 8 million -- 8 million in the tax case to the IRS,

6    and then approximately 1.6 to the Pennsylvania Department of

7    Revenue in the tax case.

8               MR. NEWCOMER:  You're right, Your Honor.  I -- I

9    combined the two --

10              THE COURT:  I got you.  I want to make sure we're

11   talking -- okay.

12              MR. NEWCOMER:  Your Honor's correct.  Those are

13   the -- those are the specific breakdowns according to the case.

14              THE COURT:  Okay.

15              MR. NEWCOMER:  Right.  And just to make clear that the

16   victim restitution judgment is separate from that in terms of the

17   investor victims.  That would be left for Your Honor to decide at

18   sentencing.

19              THE COURT:  Right.

20              MR. NEWCOMER:  The numbers we read were just for the

21   IRS and the PA Department of Revenue.

22              The Defendant also agrees to forfeit two specific

23   properties that were seized by the Government in the course of

24   its investigation:  A private jet and an investment account.  And

25   he also agrees, obviously, to forfeit the firearms that we seized

1    from his home.

2            Your Honor, in terms of stipulations for guidelines

3    calculation purposes, those are set forth in Paragraph 16 of the

4    plea agreement.  The parties have stipulated and agreed that the

5    fraud loss in this case is at least between 9.5 million and 25

6    million.  And the parties are explicit in the plea agreement that

7    the Government is not bound by that range.  The Government

8    intends to prove a higher range at sentencing, but the parties

9    agree that that's a base, Your Honor.  It's at least 9.5 and 25

10   million.  And due to that stipulated loss amount, the base

11   offense level is increased by at least 20 levels.  That is

12   the -- plus 20 corresponds with 9.5 to 25 million in the fraud

13   loss table at 2B1.1.

14           The parties also agree that Mr. LaForte's guideline

15   range is -- his advisory guideline range is further increased

16   four levels through to his leadership role, two levels due to the

17   fact that his crimes involve 10 or more victims, and, finally, an

18   additional two-level enhancement for obstruction of justice.

19           The parties also agree that Mr. LaForte is entitled to

20   a three-level reduction in his offense level due to his timely

21   acceptance of responsibility in his plea.

22           And then, Your Honor, the rest of the essential terms

23   involve the limitations on Mr. LaForte's ability to withdraw his

24   plea, the significant limitations that are put on his appellate

25   rights, both as to his right to appeal any conviction and any

1    sentence the Court may impose.

2          Your Honor, we believe those are essential terms.

3    Again, it's a 20-page plea agreement.  There are a lot of terms

4    within that, but I think those are the terms that are most, I

5    would say, unique to this case and the most essential.

6          THE COURT:  Thank you, sir.

7          Mr. Corozzo, are you aware of any other agreement or

8    condition other than those that are detailed in this plea

9    agreement to which your client is considering pleading guilty to?

10         MR. COROZZO:  No, sir.  Everything is in writing.

11         THE COURT:  Okay.

12         Mr. LaForte, has anybody promised you or offered you

13    anything in addition to what's in this agreement in exchange for

14    you considering pleading guilty today?

15         THE DEFENDANT:  No.

16         THE COURT:  Do you understand, Mr. LaForte, that your

17    counsel and the United States have made an agreement to make a

18    recommendation to me?  Do you understand that?

19         THE DEFENDANT:  Yes.

20         THE COURT:  Okay.  Do you understand that I can either

21    accept or not accept that recommendation?

22         THE DEFENDANT:  Yes.

23         THE COURT:  And do you understand that if I do not

24    accept it, I can impose a sentence up to the maximum permitted by

25    law?

1          THE DEFENDANT:  Yes.

2          THE COURT:  Okay.  Let me tell you how Rule 11 works

3    for a moment.  I'm going to hear from the United States today

4    about its -- about what it believes it's going to show, and I'm

5    going to decide today whether I believe that this range that

6    they've recommended to me, that I can accept the plea based on

7    that range.  Now, things may change and may affect that, in which

8    case either side would have an argument about that, but they

9    could come to and say, "Your Honor, that's a different number."

10   But for purposes of today, if I accept that range and say, okay,

11   I'm going to sentence in that range based upon what I know today,

12   that's where you're going to be stuck.  I mean, you're going to

13   be in that range of sentencing.  Do you understand that, sir?

14          THE DEFENDANT:  I do.

15          THE COURT:  But if I turn it down and I say, no, that's

16   not enough or that's too low or too high, then I'm -- then you

17   have the right, sir, to say, "Okay, I want to go to trial on

18   October 15th and I want to take my (indiscernible) to the jury

19   and -- or I'll take a chance with a judge at sentencing in

20   February, one way or the other."  So I want to tell you what that

21   is before you make that decision.

22          THE DEFENDANT:  Okay.

23          THE COURT:  If you were found guilty of all the charges

24   in all three matters -- it's kind of misleading right now so I

25   want to be clear.  You're not trying the tax case right now.

1    That's not being tried till December.  Okay.  You're trying, on

2    October 15th, the RICO securities case.  So I want you to keep in

3    your mind, when I say these numbers, you're not going to trial

4    October 15th on the tax case.  Understood?

5            THE DEFENDANT:  Yes.

6            THE COURT:  Okay.  So if you are found guilty of the

7    RICO case, the securities case, and the tax case and the felon in

8    possession case, you'd be looking at a maximum sentence of

9    98 years in prison set by Congress, followed by a three-year

10   period of supervised release, a fine of up to $2,250,000, and a

11   $900 special assessment.  That's what you'd be found

12   based -- that's not accurate actually.  That's based solely on

13   what you're pleading guilty to.  If you were found guilty of all

14   these things, the number would be much higher.  In other words,

15   if you turn this down and those charges go to a jury and you're

16   found guilty, that's what you're looking at.  Do you understand

17   that, sir?

18           THE DEFENDANT:  Yes.

19           THE COURT:  Okay.  So as you might appreciate, what

20   you're considering pleading guilty today is only a portion of

21   your overall claim.  I mean, it's a sizeable portion, but it's

22   only a portion.  Do you understand that?

23           THE DEFENDANT:  Yes.

24           THE COURT:  There are several other claims that the

25   United States is agreeing to dismiss at sentencing, dismiss at

1    sentencing should you -- should you plead guilty and after the

2    sentencing.  Do you understand that?

3              THE DEFENDANT:  Yes.

4              THE COURT:  Okay.  In addition, we can order full

5    restitution with respect to various counts in the

6    restitution -- in the securities fraud case as well in the tax

7    case.  We will order for a full restitution in the securities

8    case and we will have forfeiture of, for example, the airplane

9    and other assets as well as the firearms and ammunition taken in

10   the felon in possession case.  Do you understand that?

11             THE DEFENDANT:  Yes.

12             THE COURT:  Okay.  Do you understand what the term

13   "supervised release" means?

14             THE DEFENDANT:  Yes.

15             THE COURT:  To be very clear with you, supervised

16   release will affect you if -- when you get out, if you were to

17   violate a term of your probation or supervised release at that

18   stage, you would be back before us, in which case we could send

19   you back to jail for additional time.  Do you understand that,

20   sir?

21             THE DEFENDANT:  Yes.

22             THE COURT:  So, sir, no one in this room, as skilled as

23   your attorneys are, can guarantee you what sentence you'll get

24   from me.  If I accept the plea, you have a pretty good idea it's

25   going to be in that range, but you don't know that and you

1    certainly don't know what range it's going to be in.  You don't

2    know that it's going to be in that -- what number it's going to

3    be within that range.  And we're talking about a difference of a

4    couple of years in that range.

5            Mr. Corozzo, have you explained the sentencing

6    guidelines to Mr. LaForte?

7            MR. COROZZO:  Yes, Your Honor.

8            THE COURT:  Okay.  Mr. LaForte, do you understand that?

9    Do you understand that you're allowing the Court to have a

10   considerable discretion as far as what your sentence will be?

11           THE DEFENDANT:  Yes.

12           THE COURT:  Okay.  Do you also -- have you also had a

13   chance to speak to your counsel about the sentencing guidelines

14   and how they affect your case?

15           THE DEFENDANT:  Yes.

16           THE COURT:  These sentencing guidelines, I think the

17   United States (indiscernible) or advisory.  They're not binding

18   on me.  I don't have to follow them.  We're coming up on the 20th

19   anniversary of that idea.  And what I must do, though, is I must

20   consider all of the factors that Congress gives me including what

21   the sentencing guidelines tell me.

22           So what's going to happen at sentencing, sir, in

23   February is we're going to come together -- if you plead guilty

24   and I find you guilty, is we're going to come together and I'm

25   going to hear from the United States and hear from your counsel

1    and any witness you wish to present, any witness the United

2    States wishes to present, and we're going to decide what

3    appropriate range should be, and then we're going to decide,

4    within the scope of what you've agreed to, if I accept it, what

5    an appropriate sentence should be.  But I'm only going to do that

6    if I hear from you.  Do you understand that?

7              THE DEFENDANT:  Yes.

8              THE COURT:  Do you understand you have the ability to

9    bring witnesses to your sentencing hearing?

10             THE DEFENDANT:  Yes.

11             THE COURT:  If you were to be found -- if you plead

12   guilty today, at sentencing you will have a term of supervised

13   release imposed upon you upon your -- upon your release.  Do you

14   understand that?

15             THE DEFENDANT:  Yes.

16             THE COURT:  So all I know about you today, although

17   we've been together for four or five conferences, is essentially

18   what's in these papers and what I've read in motions and

19   memorandum.

20             So after we're done here today, a probation officer

21   comes to see you.  And he or she is going to prepare a very

22   detailed report for me called a presentence investigation report.

23   So I know very little and I'm going to rely extensively on that

24   report.  So it's very important you understand that you should be

25   as completely accurate in that report as possible.  This person

1    to come to see you does not work for the United States Attorney's

2    Office.  They work for the Court.

3            And so, Mr. LaForte, if I had the ability, the luxury,

4    the time to come sit with you for half a day or a day, I would

5    and interview you.  I don't have that luxury.  So this person

6    comes and sits and talks to you.  Appreciate that everything

7    you're saying to that person, you're essentially speaking through

8    to me, and I will consider it.  It will go in that report.

9            Here's the most unique thing about these reports, sir.

10   You're going to see it before I do.  There's nowhere else in the

11   system that I'm aware of where you get to see something that

12   somebody from the Court writes to me before I do.  And so you get

13   to edit it, you get to look at it, you get to comment upon it,

14   you and your lawyer get to review it, and if you want to make

15   changes to it, you ask the officer to change it.

16           This -- you're going to meet with the person.  Your

17   lawyer is welcome to attend that meeting with the probation

18   officer.  And then she's going to prepare -- she prepares the

19   report, and you want to make edits, you make edits.  If you want

20   to comment upon it, comment on it.  And if the officer doesn't

21   make changes you want, you come to me and say, "Judge, this is

22   just inaccurate.  I want to change it."  And if I agree with you,

23   I'll change it, I'll order it changed.  But if I don't agree with

24   you, if I think the officer has a correct basis based on what

25   you -- what she -- what the officer told me and what you said,

1   it's going to stay as is.  Do you understand that, sir?

2           THE DEFENDANT:  Yes.

3           THE COURT:  Do you understand you can't withdraw your

4   guilty plea if you don't like the presentence investigation

5   report?

6           THE DEFENDANT:  Yes.

7           THE COURT:  Do you understand the presentence

8   investigation report is not going to be your best day?

9           THE DEFENDANT:  Yes.

10          THE COURT:  Do you understand that?

11          THE DEFENDANT:  I do.

12          THE COURT:  Do you understand that, as skilled as your

13  attorney is, he can only make recommendations to me at

14  sentencing?  I don't have to do what he asks me to do.  Do you

15  understand that?

16          THE DEFENDANT:  Yes.

17          THE COURT:  Sir, you signed a document called

18  Acknowledgment of Rights and I just want to tell you what this

19  means.  On October 15, you would come in this room as you're

20  currently scheduled to do and there will be about 60 people in

21  the group out there, and you would turn your chair around and

22  have a chance to see them if you go to a jury trial over the next

23  four, five weeks.  By pleading guilty today, you're giving up

24  several rights I just want to review with you.  I know they're on

25  paper, but the Court views them as so important we try to go

1    through them with you very briefly.

2              One, sitting there right now, you are presumed

3    innocent, or the word we use is not guilty.  And the United

4    States would have to prove your guilt beyond a reasonable doubt

5    on each of these charges you're pleading guilty to

6    (indiscernible).  We'll go through that in a moment.

7              You have the right to assistance of a lawyer at every

8    stage of the proceeding.  And if a point comes -- a time comes

9    you can't afford an attorney, we'll appoint one for you at

10   taxpayer expense who will represent you through trial and

11   posttrial and appeal.

12             You have the right to challenge before trial the manner

13   in which the United States obtained evidence against you.  And

14   you have artfully done so through your counsel, brought several

15   motions -- they're now before me -- as to what evidence should

16   not be allowed at your trial.  If I were to find that your

17   counsel was correct and you were correct, I would exclude that

18   evidence and the jury would never hear about it at your trial.

19             You have the right to plead not guilty, as you've done

20   so far, and have your case heard by 12 people.  You would get to

21   choose those 12 people.  You would literally turn around in your

22   chair with your counsel and you'd face citizens from Philadelphia

23   and the eight surrounding counties who make up our venire, our

24   jury pool, and you get to select who they are.

25             It's important to get to choose who they are because

1  their verdict, in order to be a verdict, must be unanimous.  That

2  means all 12 must agree on each and every count to be found

3  guilty of that count.  What that means, sir, is the United States

4  has to prove beyond a reasonable doubt as to each count to 12

5  people.  The same is true for you.  To be found not guilty, you

6  have to persuade all 12.  But the interesting thing for you, sir,

7  is if you persuade one person that the United States hasn't

8  proved its guilty beyond a reasonable doubt on that charge, then

9  you aren't found guilty of that, because you need 12.  So for

10  you, you need to persuade one.  Now, all that means, you may get

11  what we call hung jury or a non-verdict, and at which stage you

12  may be tried again.

13         But being -- but keep in mind, on October 15th, you are

14  going to trial, sir, on the entire second superseding indictment,

15  not just on the charges that are being -- which you're

16  considering pleading guilty today.

17         At trial, the United States must prove its case beyond

18  a reasonable doubt, and it does so by presenting witnesses.  And

19  those witnesses come to the witness stand over there.  We know

20  who they are.  You know who they are.  I know who they are.  They

21  sent us a pretrial memo.  And they're going put witnesses on the

22  stand and they're going to testify.  And your attorney has a

23  chance to what we call confront them, to ask them questions to

24  attempt to impeach them, to attempt to show the jury that they're

25  lying or they're not -- their recollection is not accurate, their

1  recall is not accurate.

2           At the trial, you have the right to present your own

3  witnesses whose testimony alone as to your character, for

4  example, could persuade one person in that jury to think you

5  couldn't be guilty of that crime and take that one off the board

6  for you.  So you could bring your own witnesses.  And those

7  witnesses may not want to come so you can subpoena them if

8  they're within our jurisdiction and you could subpoena them to be

9  here.  And if they decide not to be here, your counsel will ask

10 me and I'll order -- and I'll order the United States marshal to

11 go pick them up and bring them here and testify on your behalf

12 under oath and tell the truth.

13          At trial, you have the right to testify if you wanted

14 to, sir, as any person in your shoes does, as anybody does, but

15 as a defendant under a grand jury indictment or an information,

16 you do not have to testify in a trial in which you are a party, a

17 defendant.  No one can force you to do that.  The United States

18 cannot mention it.  And the only thing that will happen, sir,

19 because you must -- you're a smart man, you'll figure out pretty

20 quick "The jury's wondering why I'm sitting here quietly."

21          Well, I'll tell the jury repeatedly that they can draw

22 no adverse inference or suggestion of guilt from the fact you did

23 not testify, that you, like them, have the absolute

24 constitutional right to be quiet, because the burden of proof is

25 always on the prosecution to prove your guilt beyond a reasonable

1    doubt.  And should they not do so, you must be found not guilty.

2    And, thus, in most criminal trials, Mr. LaForte, we hear the

3    defendant's voice once and twice a day, good morning, good

4    afternoon, and that is it.  Because they have the absolute right

5    to sit there and be quiet.  And the jury is told not to draw any

6    adverse inference from that.

7              If you were found guilty of one or more of the charges,

8    you could appeal that finding of guilt to our United States Court

9    of Appeals in this building, and that Court of Appeals could set

10   aside the verdict, find there's not sufficient evidence as a

11   matter of law -- and they've done that in the past -- and vacate

12   the conviction and order -- and order the case and that charge be

13   dismissed, or order a new trial, finding some error in the way

14   the trial was proceeding.

15             Do you understand those rights, sir, as I just

16   explained them to you?

17             THE DEFENDANT:  Yes.

18             THE COURT:  Do you have any questions of me about any

19   of them?

20             THE DEFENDANT:  No.

21             THE COURT:  Do you understand that by pleading guilty,

22   you are giving up those rights, at least -- at least as to trial

23   and your posttrial?

24             THE DEFENDANT:  Yes.

25             THE COURT:  Sir, in addition, under your agreement,

1  you've agreed that you are going to substantially limit your

2  ability to appeal what happens after today.  So if I accept the

3  range recommended by the United States and your attorney, you're

4  essentially bound by that and you're giving up all your rights to

5  appeal.

6           There's some rights that you still have, though.  I

7  want to describe those.  Let me tell you how this works.  If I

8  come out here today, this morning, and I say, no, I don't think

9  that works as the United States explains its case, I don't think

10  that works, that's either too high or too low, you still have a

11  choice.  You can say, "All right, I'm still going to trust Judge

12  Kearney, I'm going to plea -- I'm going to tell you, I'm going to

13  take -- I'm going to take my chance with him on these counts I'm

14  charged with rather than going in front of 12 citizens and face

15  at least 98 years in prison --" these are all your counts you're

16  being charged with to be found guilty of, and you have that

17  choice.  And if you choose to do that, you're bound by the same

18  agreement.

19           So either I -- either I accept it, or even if I don't

20  accept it, you accept it and you're bound by it and you go

21  forward today.  Do you understand that, sir?

22           THE DEFENDANT:  Yes.

23           THE COURT:  Okay.  But if I -- if you decide, "You know

24  what?  I don't want to take a chance with Judge Kearney, I want

25  to go to the jury," you can certainly do that.  Do you understand

1    that?

2            THE DEFENDANT:  Yes.

3            THE COURT:  Okay.  So what happens if you accept what

4    we're doing here today, I find you guilty after you plead guilty

5    and I hear from the United States, what's your rights to appeal?

6    And you agreed as follows.  You may only appeal then in five

7    instances.  One -- and this is after the February sentencing.

8            One, if the United States appeals, you can appeal.

9    Two, if I sentence you above Congress's top sentence, if we go

10   above what the statutory maximum is, that -- on each count.  So

11   let's assume I go too high on one count.  You can -- you can

12   appeal that sentence on that count.  You could appeal if I

13   sentence you above the guidelines range.  That's why guidelines

14   ranges become so important.  I may appeal you -- I may sentence

15   you above the guidelines range under a variance or what we call a

16   departure upwards.

17           If I do either of those things, that's why it becomes

18   so important what those numbers are.  Because if I go higher, you

19   say, "Wait a second, I'm going to appeal on that," and you have

20   every right to do so.  The United States has agreed you can do

21   that and it's your right to do so.

22           And, lastly, you have the right to always challenge the

23   manner in which your attorney provides you assistance at trial if

24   you can establish that your attorney provided you

25   Constitutionally ineffective assistance at trial to such an

1  extent that you were deprived of a fair trial.

2          But other than that, you cannot appeal.  Do you

3  understand that, sir?

4          THE DEFENDANT:  Yes.

5          THE COURT:  So it becomes really important that we

6  understand something.  If you plead guilty and if I find you

7  guilty, is this your decision and not the decision of anyone

8  else?

9          THE DEFENDANT:  Yes.

10         THE COURT:  All right.  So now I have to understand,

11 sir.  I turn now to the United States.  I have to understand

12 there's enough evidence here to find you guilty.  And we do that

13 in two steps.  One is we ask the United States to tell us the

14 elements of the offense to which you are considered pleading

15 guilty.  Not all the things in the indictment -- indictments, but

16 just the offenses you're pleading guilty.

17         I'm going to ask you, when he's done, if you understand

18 those elements.  These are words created by Congress.  If you

19 don't understand the words, you can join millions of people in

20 asking what those words mean.  All right?  And I'll try to answer

21 them.

22         Mr. Newcomer, would you kindly address the elements of

23 the offenses to which Mr. LaForte is considered pleading guilty.

24         MR. NEWCOMER:  Yes, Your Honor.  These are set forth in

25 detail as well at Pages 5 through 9 of the Government's plea

1  memo.

2          THE COURT:  Let me do that, Mr. (indiscernible).

3          Mr. Corozzo, have you had a chance to review the change

4  of plea memorandum that was filed earlier this week?

5          MR. COROZZO:  Yes, Your Honor.

6          THE COURT:  Have you had a chance to share it with your

7  client?

8          MR. COROZZO:  I have, Your Honor.

9          THE COURT:  Do you have any concerns with the factual

10  recitation in that plea agreement --

11          MR. COROZZO:  No, Your Honor.

12          THE COURT:  -- plea memorandum.  Okay.

13          MR. COROZZO:  No, Your Honor.

14          THE COURT:  Mr. LaForte, have you had a chance to

15  review the change of plea memorandum?

16          THE DEFENDANT:  Yes.

17          THE COURT:  Did you have any concerns with the

18  recitation of facts in that plea memorandum?

19          THE DEFENDANT:  No.

20          THE COURT:  All right.

21          Thank you, Mr. Newcomer.  If you would kindly summarize

22  the elements of the offenses.

23          MR. NEWCOMER:  Yes, Your Honor.  Beginning --

24          THE COURT:  And your plea memorandum is now, with the

25  Defendant's consent to having read it and studied it, no

1    questions, is incorporated into our -- into your -- your

2    comments.

3            MR. NEWCOMER:   Thank you, Your Honor.

4            Count 1 in the felon in possession case, Your Honor,

5    the elements are that the Defendant had previously been convicted

6    of a crime punishable by more than one year in prison; that after

7    this conviction, the Defendant knowingly possessed at least one

8    firearm; that at the time the Defendant possessed the firearm, he

9    knew of his previous conviction and knew it was punishable by

10   more than one year; and that the firearm was possessed in or

11   affecting interstate or foreign commerce.

12           Turning to the 23-198 criminal case, the RICO case, the

13   elements of racketeering and conspiracy in Count 1 are that two

14   or more persons agreed to conduct or to participate directly or

15   directly in the conduct of enterprises affairs through a pattern

16   of racketeering activity; two, that the Defendant was a party to

17   or a member of that agreement; and, three, that the Defendant

18   joined the agreement or conspiracy knowing of its objective to

19   conduct or participate in a conduct of an enterprises affairs

20   through a pattern of racketeering activity and intending to join

21   together with at least one other alleged conspirator to achieve

22   that objective; that is, that the Defendant and at least one

23   other alleged conspiracy -- conspirator shared a unity of purpose

24   and the intent to achieve the object of conducting or

25   participating in the conduct of the enterprises affairs through a

1    pattern of racketeering activity.

2            Your Honor, there's a couple other, I think, important

3    parts to this.  It's a complicated statute.  Enterprise is

4    further defined as a group -- it can include a group of people

5    associated in fact even though the associating -- association is

6    not recognized as a legal entity, and the fact Your Honor may

7    consider evidence presented of racketeering acts committed or

8    agreed to be committed by any co-conspirator in furtherance of

9    the enterprises affairs to determine whether the Defendant agreed

10   that at least one member of the conspiracy would commit two or

11   more racketeering acts.  I think that's the key point, Your

12   Honor, that there's a conspiracy where the Defendant agreed that

13   at least one other member of the -- one other co-conspirator

14   would commit two or more racketeering acts.

15           Turning to the elements of securities fraud, that's

16   Count 2, they are:  First, that in connection with the purchase

17   or sale of securities which the indictment alleges were the

18   promissory notes issued by Par Funding directly or indirectly to

19   its investors, that the Defendant did any one or more of the

20   following:  He employed advice, scheme, or artifice to defraud;

21   two, he made an untrue statement of a material fact or admitted

22   to state a material fact that what was said under the

23   circumstances was misleading; or, three, engaged in an act,

24   practice, or course of business that operated or would operate as

25   a fraud or deceit upon a purchaser or seller.  That's the first

1   of the three elements.

2          The  second being, that the Defendant act willfully,

3   knowingly, and with the intent to defraud.

4          And finally, that the Defendant knowingly used or

5   caused to be used any means or instruments of transportation or

6   communication in interstate commerce or the use of the mails and

7   furtherance of the fraudulent conduct.  That's Count 2 --  I'm

8   sorry, Your Honor, -- that's Count 21 in the RICO indictment.

9          Count 31, in the RICO indictment, is filing a false tax

10  return.  The elements of that offense are:  One, the Defendant

11  made and subscribed and filed an income tax return -- Federal

12  income tax return; two, the tax return contained a written

13  declaration that it was made under penalties of perjury; three,

14  the return was false regarding material matter; and four, the

15  Defendant did not believe the return was true and correct as to

16  that material matter; and five, the Defendant acted willfully.

17         Turning to Count 44, failure to collect and pay tax.

18  The elements are:  One, the Defendant had a duty to collect,

19  account for, and pay over tax; two, the Defendant failed to

20  collect, truthfully account for, or pay over the tax; and three,

21  the Defendant acted willfully.

22         Now, turning to the Count 45 perjury, the elements are:

23  One, the Defendant testified under oath in any proceeding before

24  any court of the United States; two, the testimony was false;

25  three, the Defendant knew that the testimony was false; and four,

1   the false testimony was material.

2           Finally, the last count in the RICO case, to which Mr.

3   LaForte is here to plead guilty to is obstruction of justice;

4   that's Count 52.  It's actually an aiding and abetting charge

5   here.  The elements of the offense begin with the substantive

6   offense, which are:  There was a proceeding pending before a

7   department or agency of the United States; two, the Defendant was

8   aware of the pending proceeding; and three, the Defendant

9   intentionally endeavored to influence, obstruct, or impede the

10  pending proceeding corruptly or by threats or force.

11          And then the elements are further defined by the aiding

12  and abetting statute, 18 U.S.C., Section 2.  The elements to that

13  are that:  A co-Defendant committed the offense charged by

14  committing each of the elements of the offense charged; the

15  Defendant knew that the offense charged was going to be committed

16  or was being committed by the co-Defendant; three, the Defendant

17  knowingly did some act for the purposes of aiding, assisting,

18  soliciting, facilitating, encouraging the commission of the

19  specific offense charged and with the intent that the co-

20  Defendant commit the specific offense; and four, the Defendant

21  performed an act in furtherance of the offense charged.

22          Those are the essential elements of all the counts in

23  the plea agreement as to the 23-198 matter.

24          The final two counts, Your Honor, in the 24-65 tax

25  matter, Count 1, conspiracy to defraud the IRS.  The elements

1  are:  Two or more persons agreed to defraud the United States;

2  two, the Defendant was a party to or a member of that agreement;

3  three, the Defendant joined the agreement or conspiracy knowing

4  of its objectives to defraud the United States and intending to

5  join together with at least one other alleged conspirator to

6  achieve those objectives.  That is, the Defendant and at least

7  one other alleged conspirator shared a unity of purpose and the

8  intent to achieve common goals or objectives, which is -- which

9  were to defraud the United States.

10         And finally, at some point, when the existence of the

11  agreement for conspiracy, at least one of its members performed

12  an overt act in furtherance of the conspiracy objectives.

13         The last count of conviction is Count 7, Your Honor.

14  It's wire fraud.  And the elements are:  One, the Defendant

15  devised or intended to devise a scheme or artifice to defraud or

16  to obtain money or property by means of materially false or

17  fraudulent pretenses, representations, or promises; two, the

18  Defendant acted with the intent to fraud; and three, that in

19  advancing, furthering, or carrying out that scheme, the Defendant

20  transmitted any writing signal or sound by means or a wire,

21  radio, or television communication in interstate commerce, or

22  cause the transmission of any writing, signal, or sound like some

23  kind of wire, radio, or television communications in interstate

24  commerce.

25         To kind of decipher that in layman's terms, Your Honor,

1   there was an email, or a phone call, or some electronic

2   communication used -- to be evidenced in this case that affected

3   interstate commerce or travel to interstate commerce.

4           THE COURT:  Thank you, sir.  Mr. Corozzo, have you

5   explained the nature and elements of those offenses to Mr.

6   LaForte?

7           MR. COROZZO:  I have, Your Honor.

8           THE COURT:  Mr. LaForte, has Mr. Corozzo explained the

9   elements of those charges to you?

10          THE DEFENDANT:  He has.

11          THE COURT:  Do you have any questions of me regarding

12  any of the words that the United States just described to us, as

13  required by Congress and the United States Supreme Court?

14          THE DEFENDANT:  No.

15          THE COURT:  Okay.  I'm now going to ask the attorney

16  for the United States, Mr. LaForte, to recite the facts in

17  summary fashion, incorporating the change of plea memorandum that

18  you've read, which he believes would show that should he pick a

19  jury and go to trial on October 15th in the -- in the

20  RICO -- what we call the RICO case, or should he go to trial in

21  December on the tax case, or go to trial eventually on the felony

22  possession case -- the 2020 case -- that he would prove those

23  elements -- prove those facts beyond a reasonable doubt.

24          I want you to listen carefully because when he's done,

25  I'm going to ask if you did -- if you did, not others -- if you

1  did what he says you did.  I'm not here, sir, to talk about

2  anybody else.  So I want you to listen carefully that it's your

3  conduct.  For instance, if somebody says that Cole Barleta, or

4  Bacon, or Irmo did something, that's something else.  I mean,

5  that's what you did.  Do you understand that, sir?

6          THE DEFENDANT:  Yes.

7          THE COURT:  All right.  Mr. Newcomer, would you kindly

8  summarize the elements -- I guess or facts -- you can do it any

9  way you wish, chronologically or by indictments, sir.

10          MR. NEWCOMER:  Thank you, Your Honor.  I think I'm

11  going to go by indictment, beginning with the earliest --

12          THE COURT:  All right.

13          MR. NEWCOMER:  -- and going forward to get to the

14  latest.

15          THE COURT:  Okay.

16          MR. NEWCOMER:  At the outset, Your Honor, again, these

17  are set forth in detail page 11 through 21 of the Plea

18  Memorandum.  If this case were to go to trial -- or if these

19  cases were to go to trial, I should say, Your Honor, the

20  Government would be able to prove each element of all the charges

21  in this plea agreement, including through agent and witness

22  testimony, audio and video recordings, text messages, emails,

23  phone records and extractions, cellular location data, digital

24  evidence, printed marketing materials, physical evidence,

25  security camera footage, Par Funding, financial and accounting

1  records, tax records and documents, and sworn statements,

2  including those of the Defendant.

3           I want to say at the outset, Your Honor, that this is

4  by no means, either in the Plea Memorandum or my summary before

5  Your Honor, the entire description of the Government's evidence

6  as, Your Honor, and the Defendant, I believe, are aware the

7  Government intended to present its evidence over the course of

8  five weeks trial.  That's just on the RICO case.  And additional

9  testimony and evidence on the other cases.  So this is a, I'll

10 say, high-level summary meant to put on the record what we

11 believe the facts would support the essential terms of the

12 elements.

13          So starting with the gun case, Your Honor, 20-231, the

14 Government's evidence would show that on July 28th, 2020, federal

15 law enforcement executed a federal search warrant on the

16 Haverford -- or the former Haverford home of Mr. LaForte that he

17 shared with his wife.  And during the execution of that warrant,

18 agent testimony and physical evidence and photographs would prove

19 that the agents seized and recovered a number of firearms from

20 that property, including a firearm that was in what the evidence

21 would show to be Mr. LaForte's home office, and two firearms

22 located in a nightstand on what the evidence would show to be Mr.

23 LaForte's side of the marital bed.

24          Expert testimony, Your Honor, would establish -- from

25 the firearms examiner would establish that the guns were operable

1    at the time that they were seized, and also that they traveled

2    the interstate commerce, based on their arrival here -- or based

3    on the fact they were found here in Pennsylvania because these

4    firearms indeed -- most firearms are not manufactured in

5    Pennsylvania and they must have come from out of state to get

6    here.

7            The evidence would also show that Mr. LaForte had a

8    conviction -- a prior felony conviction, punishable by at least a

9    year in prison, that he actually served more than a year in

10   prison.  And that he was aware both of that conviction and the

11   fact that it was for more than a year when he was found and

12   possessed those firearms.

13           Those are the essential evidence that support the gun

14   case, Your Honor.

15           THE COURT:  What was that underlying conviction?

16           MR. NEWCOMER:  There was a conviction in New York State

17   for, I believe, grand larceny and money laundering.  There was

18   another illegal gambling conviction I believe in District of New

19   Jersey.  That was a federal case.  The first one was a -- was

20   a --

21           THE COURT:  That's what I'm getting at.

22           MR. NEWCOMER:  Yeah.

23           THE COURT:  You were talking about them.

24           MR. NEWCOMER:  Yeah, the first was look.  The  second

25   was a federal conviction of a -- of a statute that was in excess

1    of more than a year punishment.

2              THE COURT:  Grand larceny involved a firearm?

3              MR. NEWCOMER:  No.

4              THE COURT:  All right.  Thank you.

5              MR. NEWCOMER:  Turning to the RICO case, 23-198, the

6    essential facts would show, Your Honor, including witness

7    testimony, including from Par Funding former employees, Par

8    Funding investors, Par Funding merchant customers, as well as

9    business and personal emails, text messages, financial and

10   accounting records, court filings, sworn statements, audio and

11   video recordings would all show that -- would all establish that

12   the Defendant led a years' long criminal enterprise consisting of

13   at various times himself, his family members, including Co-

14   Defendant James LaForte, as well as Co-Defendant Joseph Cole

15   Barleta, in addition to Perry Abbonizio, who was charged

16   elsewhere, and who was pled guilty elsewhere, and other persons

17   known but not identified in the indictment.

18             The evidence would show that the enterprise had a

19   defined structure with the Defendant serving as its undisputed

20   leader and with Co-Defendant Barleta and James -- Co-Defendant

21   James LaForte serving as loyal managers under the Defendant.

22             The evidence would show that the principal purpose of

23   this enterprise was to generate money for Mr. LaForte and the

24   rest of the members of the enterprise.  And that they did so

25   principally through the leadership of investment vehicle,  known

1   as Par Funding.

2           Enterprise controlled Par Funding until the SEC

3   intervened in July of 2020.  The testimony of dozens of

4   witnesses, along with numerous emails and audio and video

5   recordings, would show beyond any doubt that the Defendant,

6   through the enterprise, ran and had absolute control over Par

7   Funding at all relevant times, up to the appointment of the

8   receivership in 2020.

9           Financial records, bank statements and contractual

10  records would establish that the Defendant's enterprise was

11  successful in achieving its goal.  Between 2012 and July 2020,

12  the Defendant caused more than 100 million of Par Funding

13  proceeds to be paid to consulting and entities he controlled.

14  And that he used those proceeds to buy homes, vacation

15  properties, vehicles, artwork, investment properties, a boat, and

16  a private jet, including the private jet that's been -- that will

17  be forfeited, pursuant to this plea.

18          The Defendant also received approximately $9 million in

19  cash over several years from a customer that owed Par Funding and

20  its investors millions of dollars, as the testimony of that

21  customer and others would establish.

22          The evidence would also establish the Co-Defendant Cole

23  Barleta, who was the chief financial officer of Par Funding, also

24  received millions of dollars for his role in helping cook the

25  books of Par Funding by hiding the company's financial losses.

1          The evidence will show the Defendants caused Par

2   Funding to issue  securities.  And these  securities were in the

3   form of promissory notes to many investors, including agent

4   funds, and caused these agent funds to issue promissory notes on

5   their own to additional investors.  These notes promise investors

6   the return of their capital plus an additional amount of money as

7   interest.

8          Par Funding's stated use of these investors funds was

9   to advance them to businesses that were in need of cash, but

10  which could not obtain funding from traditional sources.  And

11  then the idea was to generate money by charging these businesses

12  high rates of return.

13         The Defendant, other members of the enterprise, Par

14  Funding employees, including Co-Conspirator Abbonizio, and others

15  solicited investors primarily through written promotional

16  material, radio advertisement, speaker and dinner events, and

17  investor meetings at Par Funding's offices.

18         And the Government at trial, Your Honor, would present

19  evidence -- recorded evidence, the advertisements themselves,

20  videos of some of these meetings.  These will all be entered into

21  the evidence at trial.

22         The promotional efforts included materially false and

23  misleading statements concerning the state of Par Funding's

24  financial health, as the Government's trial evidence would show.

25  For example, the Defendant and others, at his direction,

1   advertised Par Funding supposed default rate of 1 percent, which

2   Par Funding's investors would testify that they understood to

3   mean that only 1 percent of Par Funding's thousands of MCA

4   customers had defaulted on repaying the money they owed to Par

5   Funding.

6           The evidence would show that in reality, based on

7   employee and witness testimony, along with business and financial

8   records, and internal Par Funding email communications that the

9   actual default rate was many times higher.  Given the Defendant's

10  practice of routinely and systematically failing to recognize the

11  financial losses from MCA customers who had not made their

12  requisite payments for months, even years, and some of whom were

13  in bankruptcy.

14          This evidence includes an interstate wire via email.

15  It's a November 8th, 2018, email from the Defendant to a Par

16  Funding accounting employee in which the Defendant admitted that

17  he did not want to write off a customer that was in default

18  because he, "Needed to stay at a certain number every month", and

19  did not want to go over that number.  And the evidence would show

20  that that email traveled in interstate commerce.

21          That's not the only misrepresentation, Your Honor.  And

22  as detailed in pages 15 and 16 of the Plea Memorandum, there was

23  also misrepresentations regarding the alleged diversity of Par

24  Funding's MCA portfolio regarding the value and validity of

25  insurance policy that the investors believed protect their

1    investments, but which the Defendants eventually learned was

2    worthless.

3            And also, misrepresentations about the supposed rigor

4    of the underwriting process, which would be contrary to the

5    position of employees from the old -- from the Par Funding's

6    former underwriting department.

7            Your Honor, testimony from numerous investors would

8    establish that all of these misrepresentations and more were

9    material to them as investors and that they based their decision

10   to invest based on these and other misrepresentations.

11           Finally, Your Honor, witness testimony and electronic

12   communications would establish that although the Defendant served

13   as a de facto CEO of Par Funding, he took various steps to hide

14   his identity and leadership role from Par Funding's investors

15   because of publicly available media reports of his prior criminal

16   history, which we've discussed today, including a conviction for

17   a multimillion dollar financial fraud that also involved his

18   brother Co-Defendant James LaForte.  To avoid scaring away Par

19   Funding's investors, who would testify at trial that they would

20   not have invested with a convicted fraudster under any

21   circumstances whatsoever.

22           Mr. LaForte made his wife the nominal head of Par

23   Funding and all legal business paperwork and used fake names such

24   as Joe Mack to hide his identity and convictions.  The Defendant

25   also hired a reputation manager in New York who took steps to

1   bury unfavorable news articles concerning Mr. LaForte in

2   furtherance of the scheme.  And many of those emails were sent

3   and texts were sent in furtherance of -- or sent interstate

4   commerce from Pennsylvania to outside of Pennsylvania.

5           Turning to the tax counts, Your Honor, in the -- well,

6   I should say, Your Honor, that the -- in sum, for the Count 1,

7   RICO conspiracy, and the Count 21,  securities fraud, the

8   evidence would show beyond a reasonable doubt that the Defendant

9   conspired to run a criminal racketeering enterprise with a

10  defined structure and purpose and with a related -- and that the

11  related pattern of predicate crimes included multiple

12  counts -- multiple acts of wire fraud as well as  securities

13  fraud.

14          Turn to the tax crimes in the RICO indictment, Counts

15  31 and 44, witness testimony, along with bank records, text

16  messages, emails would prove the Defendant received more than 9

17  million in cash kickbacks from an MCA customer who had borrowed

18  almost $100 million from Par Funding.  The evidence would show

19  the Defendant kept the money for his own personal benefit and did

20  not report it on his 2018 federal tax return, which the Defendant

21  signed and filed under penalty of perjury.  That's the essential

22  facts and evidence the Government would show for Count 31.

23          Turning to Count 44, the Government's evidence would

24  show via witness testimony and internal Par Funding emails that

25  during the time the Defendant controlled Par Funding he paid

1    regular weekly cash wages in the form of bonuses to many

2    employees.  And this included, during the conduct -- during the

3    quarter from October 1st, 2019, through December 31st, 2019.

4           The evidence would further show that the Defendant did

5    not report this income on quarterly employment tax returns and

6    they failed to pay over the trust fund taxes that were due and

7    owing to the IRS.  That's Count 44, Your Honor.

8           Count 45, is a count of perjury.  The Government's

9    trial evidence would prove that the Defendant, as we've stated

10   previously, controlled and operated Par Funding and its web of

11   interrelated entities at all relevant times until the appointment

12   of the receiver in approximately July of 2020.  In furtherance of

13   the efforts to hide his leadership role of Par Funding, the

14   Defendant lied materially under oath at depositions in a federal

15   lawsuit that was pending against the Par Funding company here in

16   the Eastern District.  I believe it was for Judge Sanchez.

17          The details are set forth in paragraph 7 -- on page 17

18   of the Plea Memorandum.  The material lies under oath at that

19   proceeding, the evidence would show included that Mr. LaForte did

20   not know the identity of Par Funding CFO, which was Mr. Cole

21   Barleta; that Mr. LaForte never received any form of profits from

22   Par Funding; and they never hired or fired any Par Funding

23   employees.

24          Turning to the last count of conviction in the RICO

25   case, Your Honor, obstruction of justice.  This is Count 52.

1    Witness testimony, court records, and financial records would

2    show that during the course of the SECs enforcement action

3    against the Defendant Par Funding and related parties.  There was

4    an appointment of a receivership.  The court appointed

5    Receivership and that the receiver's lawyers -- the

6    receivership's lawyers including G. A. and his law firm, who was

7    a Philadelphia attorney.

8            The evidence will show that during the course of those

9    proceedings -- the SEC proceedings and the receivership, the

10    receiver and his counsel, including G. A. were successful in

11    seizing and recovering tens of millions of dollars of personal

12    assets from Mr. Laporte and his wife that had been purchased with

13    the proceeds.  And that included attempting in February of 2023

14    attempting to evict Mr. LaForte and his wife from their former

15    home in Haverford.

16            Witness testimony, phone records, crime scene

17    photographs, security camera video, and physical evidence later

18    recovered from Co-Defendant James LaForte's car would establish

19    that on February 28th, 2023, Co-Defendant James LaForte

20    physically attacked G. A., the lawyer for the receivership, as he

21    left his office in downtown Philadelphia, Pennsylvania with the

22    intent to cause serious bodily injury in an effort to obstruct

23    the SEC enforcement action and its receivership.

24            Your Honor, phone records, agent surveillance,

25    security camera video, and evidence seized from Co-Defendant

1    James LaForte's car would show that from February 15th to

2    February 28th of 2023, the Defendant Joseph LaForte agreed and

3    counseled his brother James LaForte to use threats and force

4    against G. A. to attempt to obstruct the SEC proceedings.

5    And that Joseph -- Defendant Joseph LaForte knowingly aided and

6    abetted his brother February 28th -- 23 -- February 28th, 2023,

7    attack on G. A.

8              Those are the evidence -- that's the evidence that

9    would show the essential elements of both the underlying

10   obstruction conduct and the aiding and abetting piece, Your

11   Honor.

12             THE COURT:  What's the underlying conduct of February

13   28th.  There are emails, but what do they show?  There's going to

14   be a plan for February 28th?

15             MR. NEWCOMER:  The February 28th -- the evidence for

16   that date, Your Honor, is principally the attack itself so that

17   the --

18             THE COURT:  The attack is the brother, right?

19             MR. NEWCOMER:  The attack is the brother, correct, Your

20   Honor.  And the aiding and abetting conducted by Mr. LaForte is

21   agreeing to counseling his brother in connection with that attack

22   in the time period from February 15th to February 28th.  So it --

23             THE COURT:  Is there knowledge that that was going to

24   happen that day?

25             MR. NEWCOMER:  That's a question for Mr. LaForte, Your

1    Honor.

2              THE COURT:  No, but would you have -- no, I --

3              MR. NEWCOMER:  Yes.

4              THE COURT:  -- would you -- would you submit evidence

5    that would say there was knowledge it was going to happen on

6    February 28th?

7              MR. NEWCOMER:  Yes, Your Honor.

8              THE COURT:  At or around February 28th?

9              MR. NEWCOMER:  We've had to submit evidence at

10   sentencing that --

11             THE COURT:  Or at trial.

12             MR. NEWCOMER:  Or at trial -- at trial, Your Honor.

13   Correct.

14             THE COURT:  That would suggest -- that it would show

15   the jury beyond a reasonable doubt that there was -- that this

16   Defendant knew that something was going to happen imminent?

17             MR. NEWCOMER:  Right.  At least --

18             THE COURT:  May not be --

19             MR. NEWCOMER:  -- circumstantial evidence, Your Honor,

20   including phone records and surveillance.

21             THE COURT:  Oh, that's okay.  Okay.  It was kind of

22   conclusory knowing and I'm trying to understand exactly.  You

23   would have evidence to say, hey, by the way, this is going to

24   happen on or around February 28th.

25             MR. NEWCOMER:  We would present that evidence, Your

1  Honor, correct.

2          THE COURT:  Okay.  All right.  No further question.

3          MR. NEWCOMER:  Turning to the tax case, Your Honor,

4  Number 24-65.  There are two schemes charged here that Mr.

5  LaForte is pleading guilty to.  There's actually three schemes

6  outlined in this indictment, but Mr. LaForte is only pleading

7  guilty to two and the Government is dropping the third

8  sentencing.

9          Witness and agent testimony -- this is the consulting

10  fee scheme charged in Count 1, Your Honor -- witness and agent

11  testimony, business contracts, financial and accounting records,

12  bank records, and electronic communications would establish the

13  Defendant caused Par Funding to pay him and his wife tens of

14  millions of dollars of taxable consulting income including in tax

15  years 2016, 2017, and 2018, via an entity that the Defendants

16  controlled called Heritage Business Consulting, Inc., which we'll

17  call Heritage.

18          Evidence would further establish that two accountants

19  Rodney Irmo and Ken Bacon prepared, reviewed, and assisted with

20  the filing of the personal federal tax returns for the Defendant

21  as well as the business returns of Par Funding and Heritage

22  during these time periods.

23          Testimonial evidence, tax returns, tax court papers,

24  emails, text messages, and Par Funding financial and accounting

25  records would establish that from 2017 to 2019, the Defendant and

1    Co-Defendants Rodney Irmo, and Ken Bacon, and Cole Barleta

2    conspired to hide in that report more than half of the tens of

3    millions of dollars of taxable income that was flowing through to

4    Heritage and should have flown -- should have flowed through to

5    the personal tax returns of the Defendant or his wife.

6              The specific amounts that the evidence would show, Your

7    Honor, is that the Defendants conspired to under report

8    Heritage's gross receipts for tax year 2016 by approximately 3.5

9    million; for tax year 2017, they conspired to report

10   approximately 11 million of consulting income when, in fact, Par

11   Funding's own books and records would show approximately 25

12   million of taxable income; and filing for tax year 2018, the

13   Defendants conspired to create and report an imaginary and non-

14   existent shareholder loan of approximately $15 million that

15   appeared on Heritage's tax return and essentially wiped out the

16   previous amounts that were owing.

17             Turning to the final count of conviction, it's

18   the -- we're calling the Florida residency scheme.  It's charged

19   in Count 7, testimonial evidence, including an expert witness

20   testimony -- strike that, Your Honor.

21             The trial evidence would show that Mr. LaForte and his

22   wife are residents of Pennsylvania for tax years 2013 through

23   2019, in that they were physically present in Pennsylvania for at

24   least 300 days each of those years and that they maintain a

25   permanent place of bode in PA during each of those years.

1          The evidence would include cellular location data from

2    their phones, witness and agent testimony, electronic

3    communications, including text messages and emails and banking

4    and mortgage records, along with other personal and business

5    records that would all establish that they actually lived in

6    Pennsylvania during this time period and not Florida.

7          And essentially, the rest of the evidence would show,

8    Your Honor, is detailed on pages 20 and 21, that despite living

9    in Pennsylvania for those tax years, they caused to have their

10   Pennsylvania state tax returns inadequately and falsely claimed

11   to be non-residents of Pennsylvania on the basis of being alleged

12   Florida residents for those tax years.  And they did so knowingly

13   and they did so under penalty of perjury by signing the state tax

14   returns.

15         And consistent with the restitution piece of the plea

16   agreement, a expert witness from the IRS would testify that -- or

17   from the Pennsylvania Department of Revenue would testify that

18   the total tax loss to Pennsylvania from that scheme was

19   approximately $1,655,299.

20         So again, Your Honor, those are the facts that the

21   Government would prove for each of the elements of the offense.

22   We believe these facts and the evidence we proffered here would

23   be sufficient.  In fact, more than sufficient to cover the

24   elements of the offenses that Mr. LaForte is to plead guilty to.

25         THE COURT:  If I remember correctly, Ms. McElhone has

1  pled guilty solely to that charge; is that correct?  That's the

2  Florida --

3          MR. NEWCOMER:  Correct, Your Honor.

4          THE COURT:  -- residency idea?

5          MR. NEWCOMER:  Correct.  It was a Florida residency

6  scheme.  Ms. McElhone pled guilty to one count of conspiracy.

7          THE COURT:  Okay.  Thank you, sir.

8          Mr. LaForte, did you hear what the attorney for the

9  United States just said he would be able to show at trial?

10          THE DEFENDANT:  Yes.

11          THE COURT:  As it relates to you, did you do what the

12  United States says you did?

13          THE DEFENDANT:  Yes.

14          THE COURT:  Turning to each counsel seriatim, first the

15  United States and then Mr. Corozzo.  Are you satisfied today that

16  you presented a fact basis for this possible plea of these

17  charges?

18          MR. NEWCOMER:  Yes, Your Honor.

19          THE COURT:  Mr. Corozzo?

20          MR. COROZZO:  Yes, Your Honor.

21          THE COURT:  Are you satisfied today that Mr. LaForte is

22  competent today to enter a plea to those charges?

23          MR. NEWCOMER:  Yes, Your Honor.

24          MR. COROZZO:  I am, Your Honor.

25          THE COURT:  Are you satisfied that Mr. LaForte's

1  willingness if he does so to plead guilty would be voluntary?

2          MR. COROZZO:  I am, Your Honor.

3          THE DEFENDANT:  Yes, sir.

4          THE COURT:  Are you satisfied that a plea should be

5  made that's not based on a plea agreement or promise, other than

6  that set forth in this detailed plea agreement?

7          MR. NEWCOMER:  I agree, Your Honor.

8          MR. COROZZO:  Yes, Your Honor.

9          THE COURT:  Are you satisfied that the plea being made

10  is made with a full understanding by Mr. LaForte of the nature of

11  the charge, the maximum possible penalty set by the United States

12  Congress, as well as Defendant's legal rights to contest the

13  charge?

14          MR. NEWCOMER:  Yes, Your Honor.

15          MR. COROZZO:  Yes, Your Honor.

16          THE COURT:  All right.  Thank you, Counsel.

17          Mr. LaForte, I've heard the evidence that the United

18  States says it would prove.  And I've carefully read the Plea

19  Memorandum presented by the United States, which you have also

20  read.  The United States is -- and your counsel are recommending

21  to me that I consider a sentence in a certain range under Federal

22  Rule of Criminal Procedure 11.  I'm going to find today that I'm

23  going to accept that range.

24          I'm going to accept the criminal range that's suggested

25  to me today.  So what that means, sir, should you -- I'm going to

1   give you this advice ahead of time.  So that means if you -- if

2   you accept the plea and plead guilty, that I'm agreeing to

3   consider a recommendation in that range sentence, which again, is

4   just so we're clear, is between 162 and 186 months, which is

5   approximately 13 1/2 to 15 1/2 years, followed by 3 years

6   supervised release, a fine in our discretion, and a  restitution,

7   and an $800 special assessment.

8          Any questions as the Court's acceptance of the

9   recommendation for the United States?

10         MR. NEWCOMER:  No, Your Honor.

11         THE COURT:  Any questions in terms of the Court's

12  acceptance of the recommendation?

13         MR. COROZZO:  No, Your Honor.

14         THE COURT:  Mr. LaForte, I've heard from the United

15  States and I've watched you carefully listen to my questions, and

16  listen to the recitation, and I find today that you are fully

17  alert, competent, and capable of entering an informed plea.  I

18  find that you told me that the plea is knowing and voluntary on

19  your part, and it is not the result of a force, or a threat, or a

20  payment, or some other outside force, other than a plea

21  agreement.

22         I find that the plea is made based upon an independent

23  basis and fact described in detail by the United States

24  containing each of the essential elements of the offenses to

25  which you are conceding -- considering pleading guilty and not

1    addressing the remaining charges which will not be pled to today.

2         I find you understand the charges, as you told me.  You

3    understand your legal rights, as you told me.  You understand

4    what the maximum possible penalty should be should you go to

5    trial on these charges on October 15th.

6         And I find that you understand that by pleading guilty,

7    should you plead guilty, you'd be giving up your right to go to

8    trial on October 15, and in December, and on the felony

9    possession case.

10        And so I made those findings now before I turn to you

11   and ask if you wish to change your plea and now plead guilty to

12   the charges brought against you in three indictments rising in

13   Case 20-231, 23-198, and 24-65.

14        THE DEFENDANT:  Yes.

15        THE COURT:  Mr. Deputy, would you kindly take the plea?

16        THE BAILIFF:  Please stand.  Joseph LaForte,

17   (indiscernible)to pled not guilty to Criminal Indictment Numbers

18   20-231, 23-198-1, and 24-65-1.

19        Charging you with in Case Number 20-231, Count 1,

20   felony possession of a firearm in violation of Title 18 United

21   States Code § 922(g)(1);

22        In Case Number 23-198-1, Count 1, racketeering

23   conspiracy in violation of Title 18 United States Code § 1962(d);

24   Count 21, securities fraud in violation of Title 15 United States

25   Code § 78(j)(b), 78(f)(f), and 17 CFR, 240.1(o)(b)-5; Count 31,

1  filing a false income tax return in violation of Title 26 United

2  States Code § 7206(1); Count 44, failure to collect and pay over

3  taxes in violation of Title 18 United States Code § 7202; Count

4  45, perjury in violation of Title 18 United States Code § 1623;

5  Count 52, obstruction of justice in violation of Title 18 United

6  States Code § 1505;

7              And in Case 24-65, Count 1, conspiracy to defraud the

8  Internal Revenue Service in violation of Title 18 United States

9  Code § 371; Count 7, wire fraud in violation of Title 18 United

10 States Code § 1343, and how say you, guilty or not guilty?

11             THE DEFENDANT:  Guilty.

12             THE COURT:  Thank you, Mr. LaForte.  Mr. LaForte, do

13 you have any questions about anything that happened here today?

14             THE DEFENDANT:  No.

15             THE COURT:  Do you understand what happened here today?

16             THE DEFENDANT:  Yes.

17             THE COURT:  Do you understand the facts the United

18 States argued that it would be able to present at trial?

19             THE DEFENDANT:  Yes.

20             THE COURT:  Is everything you've told me the truth?

21             THE DEFENDANT:  Yes.

22             THE COURT:  Mr. LaForte, I've watched you carefully

23 answer these questions.  I'm going to accept your plea of guilty

24 to those itemized counts in item -- in the charge that the felony

25 possession case at 20-231, in the RICO securities fraud,

1  obstruction justice, and tax matter 23-198, and in the separate

2  tax matter 24-65.  And I find and adjudge you guilty of those

3  charged offenses.

4          Sentencing, sir, in your matter is set for February 19,

5  2025, at 12:15 p.m., in this courtroom.

6          MR. COROZZO:  Your Honor, is there any way to have an

7  earlier date?  I know the Co-Defendant Ms. McElhone's sentencing

8  is scheduled for December.  I do have a matter scheduled for

9  trial at the beginning of February the first week.  I would ask

10  for any consideration to do it a little sooner, please.

11          THE COURT:  I would love to help you there.  You're

12  going to have to deal with the probation office in a timing.

13  It's 120 days.  We might be able to help you in early January or

14  if we can move the (indiscernible), might even get interviews

15  done earlier.  That is, of course, a lot of them what happens as

16  you go through the other trials.

17          MR. COROZZO:  Can we set it for an early January date

18  and I'll deal with probation, obviously, if they need more time,

19  they'll let us all know that they can't be ready.

20          THE COURT:  Well, I'd love to.  So the earliest I can

21  set it for by our internal guidelines is 120 days from today.  So

22  you're talking right -- you're talking October, November,

23  December -- talking, you know, second week of January.

24          MR. COROZZO:  Fine.  I would like that.

25          THE COURT:  Let me see what we can do.  Let me see what

1    we can do.  We'll see what we can do.

2              I'm also going to order a presentence report and we'll

3    work with probation to see if there can be something done.  Much

4    of that, Mr. Corozzo, as you know, will depend on how the fall

5    develops in the remaining -- as the charges against remaining

6    persons.

7              MR. COROZZO:  There's a lot of factors and we

8    acknowledge that.  That's why an earlier date will just at

9    least --

10             THE COURT:  I get it.

11             MR. COROZZO:  -- set a guideline.

12             THE COURT:  I agree.  That's (indiscernible).

13             United States, any changes to the terms of custody or

14   conditions?

15             MR. NEWCOMER:  No, Your Honor.

16             THE COURT:  All right.  Mr. LaForte, you will stay in

17   custody.  We'll see you -- your counsel has asked a fair request.

18   We'll see if we can get you in in January rather than mid-

19   February and depending on how we can proceed.

20             Any further questions, United States?

21             MR. NEWCOMER:  No, Your Honor.

22             THE COURT:  Any further questions for Mr. LaForte?

23             MR. COROZZO:  No, Your Honor.  Thank you.

24             THE COURT:  Thank you very much, Mr. Corozzo.

25             THE COURT:  All right.  Court is adjourned in this

1    matter.  We're back together in a couple of minutes in the second

2    matter.

3              THE BAILIFF:  All rise.

4         (Proceedings concluded at 11:15 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

I, Jessica B. Cahill, court approved transcriber, do hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

Dated: September 24, 2024

Jessica B. Cahill, CER/CET-708