IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | **CRIMINAL ACTION** |
| | **:** | |
| **v.** | **:** | **NO. 23-198- 1, 4, 5** |
| | **:** | |
| **JOSEPH LAFORTE, JOSEPH COLE** | **:** | |
| **BARLETA, JAMES LAFORTE** | **:** | |

# MEMORANDUM
## with Findings of Fact & Conclusions of Law

**KEARNEY, J.**                                                            **January 21, 2025**

An earlier convicted felon and two other men admitted creating a fraudulent scheme to induce hundreds of persons to lend their related companies approximately $547 million from 2012 to 2020 secured by short term promissory notes and a security interest in the related companies' accounts receivable and cash. The three men sold their investors a "merchant cash advance" business model through which the related companies purchased over $1.3 billion of merchants' accounts receivables at a discount to provide the merchants with short term cash but also required the merchants repay the advance plus substantial interest a few months later. The three men did not tell the investors of their leader's felony conviction, nor did they tell the investors their companies had not returned a profit since 2016. The three men did not tell their investors of enriching themselves and other insiders by more than $150 million in internal distributions while losing money on their merchant advance business and using the investor funds to pay distributions and make more merchant advances. The Securities and Exchange Commission investigated the businesses and filed suit in July 2020 to freeze assets and appoint a receiver to recover for the investors then owed over $404 million in principal. The judge in the securities enforcement action

appointed a receiver to evaluate ongoing operations and work to repay the investors. Our Grand Jury later charged these three men and others with a racketeering enterprise including securities fraud and wire fraud in the operations of their related companies. The three men pleaded guilty before us. We set sentencing hearings over the next several weeks.

Federal sentencing policy requires we adhere to Congressional directives and study the guidance from the United States Sentencing Commission. The Sentencing Commission recommends offense levels based off the amount of a fraud loss in a convicted fraudulent scheme. We now must calculate the fraud loss suffered by the investors under section 2B1.1 of the United States Sentencing Guidelines.

We welcomed extensive briefing and presided over an evidentiary hearing to determine the actual fraud loss weeks before the sentencings. The United States argued, and presented compelling expert and agent testimony, describing the nature of the scheme and identifying an actual loss of $404,737,299 in principal owed to the investors when the Securities and Exchange Commission sued, and a federal judge froze the companies' accounts in July 2020. The convicted felon businessman countered we should calculate the loss number based on the companies' revenue value (as an ongoing concern for sale) or, alternatively, we should take the total funds raised and subtract all repayments to investors, including principal and interest. The companies' financial officer countered we should also limit the actual fraud loss to the dollar amount of claims voluntarily submitted to and approved by the Receiver. We disagree with both deviations from actual fraud loss under the Guidelines based on the outstanding principal at the time a federal judge and Receiver stopped the admitted crimes. But we agree with the businessmen as to a credit for the companies' verifiable accounts receivables and cash in the bank available for distribution to the investors. We find the actual loss to investors resulting from this admitted fraudulent scheme

2

is $288,395,088 after carefully evaluating the credibility of the witnesses and the varied legal positions.

## I.    FINDINGS OF FACT AFTER EVIDENTIARY HEARING

1.    Our Grand Jury charged Joseph LaForte, James LaForte, and Joseph Cole Barleta with a racketeering conspiracy to defraud persons and entities investing in Complete Business Solutions Group, Inc., d/b/a Par Funding and its affiliate companies through the predicate crimes of securities fraud and wire fraud.[1]

2.    Joseph LaForte, James LaForte, and Joseph Cole Barleta, among others, admitted:

a.    They participated in a racketeering conspiracy to defraud investors in Par Funding and its affiliate companies through, among other means, predicate crimes of securities and wire fraud;

b.    Par Funding funded merchant-customer businesses through short-term financing transactions held out as merchant cash advances to purchase accounts receivables to be repaid in short term largely for merchants who could not borrow from a traditional lender. These merchants would instead sell their receivables for a short-term financing to be repaid within a few months;

c.    Par Funding purchased merchant-customers' future receivables at a discount and gave merchant-customers the discounted amount up front to operate their businesses. Merchant-customers agreed to repay Par Funding the purchase price advanced to them plus interest, typically 30% or more;

d.    Par Funding needed to raise money to buy these accounts receivable. It raised capital to fund these merchant cash advances by soliciting investors and selling them promissory notes from approximately 2012 to 2017. Par Funding promised the investors interest payments on their promissory notes ranging from 12% to 44% over the course of twelve months, at which time

Par Funding would repay the investors' principal investment in full. Par Funding also gave the investors a security interest in its assets including its cash on hand and accounts receivable from the merchants. The investors could not transfer or negotiate these promissory notes;

      e.      Par Funding restructured the way it raised capital to fund these merchant cash advances in 2018. It switched from raising capital directly from individual investors to raising capital indirectly through agent funds;

      f.      Joseph LaForte, James LaForte, and Joseph Cole Barleta lied to investors about Joseph LaForte's criminal history and made false claims about Par Funding's profitability; in reality, Par Funding's MCA business did not generate enough cash flow to repay investors their promised returns from 2016 to 2020;

      g.      Joseph LaForte, James LaForte, and Joseph Cole Barleta, among others, continued to raise funds from investors even though they knew Par Funding did not create a profit.

3.      The LaFortes and Mr. Barleta approved large distributions to themselves with investors' funds. From the beginning of 2015 through July 2020, insider payments exceeded $150 million.[2]

4.      The United States Securities and Exchange Commission sued Par Funding, related entities, and individuals including the LaFortes and Mr. Barleta, in the United States District Court for the Southern District of Florida as part of an enforcement action on July 24, 2020.

5.      The Honorable Rodolfo A. Ruiz II presiding in the enforcement action appointed Ryan Stumphauzer as the Receiver over Par Funding and several of its affiliates.[3]

6.      The Receiver assumed responsibility for the assets of the entities in receivership as part of the securities civil enforcement action before Judge Ruiz, which include identifying and collecting assets to distribute to Par Funding's defrauded investors.[4]

7.      Joseph LaForte, James LaForte, and Joseph Cole Barleta pleaded guilty to participating in a racketeering conspiracy to defraud investors in Par Funding and its affiliate companies with the predicate crimes of securities and wire fraud.[5]

8.      Judge Ruiz froze Par Funding's assets at the end of July 2020.

9.      Par Funding's records as of July 27, 2020 reflected the outstanding principal owed to investors totaled $404,737,299 between Par Funding and its affiliate companies, with Par Funding responsible for approximately $366 million and the balance owed by affiliates.

10.     The Receiver recovered approximately $26.8 million from the bank accounts of Par Funding and its MCA affiliates.

11.     The Receiver collected approximately $81 million in accounts receivable of Par Funding and its affiliates.

12.     Approximately $6.8 million in accounts receivable remains collectible.

13.     We scheduled sentencing hearings for:

    a.  Joseph LaForte on February 12, 2025;

    b.  Joseph Cole Barleta on February 25, 2025; and,

    c.  James LaForte on March 10, 2025.

## II.      CONCLUSIONS OF LAW

14.     Joseph LaForte, James LaForte, and Joseph Cole Barleta participated in a fraudulent scheme resulting in an actual loss of $404,737,299 to investors in Par Funding and Par Funding's affiliates, which constitutes a specific offense characteristic under U.S.S.G. § 2B1.1(b)(1).

15.     Joseph LaForte, James LaForte, and Joseph Cole Barleta pledged collateral to the victim-investors in their fraudulent scheme.

16.     The fair market value of the collateral assets at the time of sentencing is approximately $116.3 million under U.S.S.G. § 2B1.1 cmt. n.3(D)(ii).

17.     The actual loss to investors because of the admitted fraudulent scheme is $288,395,088.

### III.    ANALYSIS

We set the sentencing hearings for Messrs. LaForte and Barleta to begin on February 10, 2025. A key issue for sentencing is the proper offense level based on the actual loss under the advisory Sentencing Guidelines. The questions in sentencing include whether, among other issues, we consider: Par Funding's ongoing market value shortly before detection of the fraudulent scheme; interest paid to the investors as a credit when it is not calculated as part of the loss to the investors; and the amount of voluntary claims recognized by the Receiver in the enforcement action before Judge Ruiz. The parties requested we allow briefing and a hearing to determine the actual loss before issuing the probation officer's presentence investigation report. We benefitted from the comprehensive advocacy and evaluating the credibility of expert and agent witness testimony in understanding the loss consistent with criminal sentencing policy as opposed to issues involved with receivership, disgorgement, or a claims process in a civil enforcement proceeding.

The United States, Joseph LaForte, and Joseph Cole Barleta filed memoranda explaining what they believe is the correct fraud loss number and argued their positions in a fraud loss hearing held January 13, 2025.[6] The United States suggests a fraud loss number of $404,737,299 and urges us not to credit the Defendants for collateral assets. Joseph LaForte suggests a fraud loss number of $9.5 million because he stipulated to it in his plea agreement. Joseph Cole Barleta suggests a fraud loss number of $0 because he did not stipulate to a fraud loss number in his plea agreement.

We today focus on section 2.B1.1 of the Sentencing Guidelines as amended in November 2024. "For offenses involving fraud or theft, § 2B1.1 of the advisory Guidelines provides for an offense level enhancement based on the value of the 'loss' attributable to the defendant's conduct."[7] "The defendant's base offense level, which is used to calculate a recommended range of imprisonment, increases as the loss resulting from the offense increases."[8] "The maximum increase is a 30-level enhancement for conduct resulting in a loss exceeding $550 million."[9] "To determine loss, a sentencing court 'need only make a reasonable estimate' based on the available evidence—precision is not required.'"[10] "[T]he government bears the burden of proving loss by a preponderance of the evidence."[11] "[A]lthough 'the burden of persuasion remains with the Government, once the Government makes out a prima facie case of the loss amount, the burden of production shifts to the defendant to provide evidence that the Government's evidence is incomplete or inaccurate.'"[12]

"The Guidelines' commentary details how a district court should calculate the amount of loss." In the Application Notes to section 2B1.1 to the Guidelines, the Sentencing Commission instructs us not to include "[i]nterest of any kind" in our loss calculation.[13] The Sentencing Commission also suggests we reduce the loss number by the amount of money returned to the victim before detection of the offense and, "[i]n a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing."[14] Finally, in a case involving a fraudulent investment scheme such as a Ponzi scheme, the Sentencing Commission tells us not to reduce the loss number by money transferred to any individual investor in the scheme in excess of that investor's principal investment.[15]

We address the parties' arguments in turn, starting with their proposed fraud loss numbers and then analyzing their proposed offset credits resulting from the collateral assets.

### A.  The United States met its burden of showing $404,737,299 as a reasonable estimate of the fraud loss attributable to the fraudulent scheme.

The United States' proposed fraud loss of $404,737,299 is the most reasonable and verifiable estimate of loss based on the adduced evidence. Joseph LaForte's valuation argument suggesting he managed Par Funding as a profitable business before the Securities Commission's detection and lawsuit is unconvincing as is his argument we should ignore the Application Notes to the Guidelines and credit the Defendants for their interest payments to the victims. We also disagree with Mr. Cole Barleta we should base the estimate off the number of voluntary claims approved by the Receiver instead of the outstanding principal owed to investors. We set the fraud loss number at $404,737, 299 before considering collateral offsets.

### 1.  The parties' widely differing positions on the investor loss.

***The United States.*** The United States argues we should set the fraud loss at $404,737,299.[16] This number is the total principal amount Par Funding and its affiliate companies Capital Source 200, Inc. and Fast Advance Funding LLC owed to investors in July 2020, shortly before the Securities and Exchange Commission intervened and Judge Ruiz froze the entities' assets. Spreadsheets the United States extracted from Mr. Barleta's laptop kept track of how much principal Par Funding and its affiliates owed investors.[17] Those spreadsheets show Par Funding owed investors $366,101,849 as of July 27, 2020, Capital Source 2000 owed investors $31,409,450 as of July 24, 2020, and Fast Advance Funding owed $7,226,000 as of July 24, 2020.[18] The United States asks we adopt the principal sums from the three affiliates to arrive at the $404,737,299 fraud loss number. This $404 million accounts for the principal Par Funding and its affiliates had repaid investors at the time the Securities and Exchange Commission intervened (and the principal still

owed), but does not account for interest repaid or interest still outstanding because of the Sentencing Guidelines' Application Note directing courts to exclude interest from the loss calculation.[19] At the January 13, 2025 hearing, the United States also proffered two cases where courts of appeals affirmed district courts' exclusion of interest from fraud loss calculations: *United States v. Allen*[20] and *United States v. Peugh*.[21]

The United States' expert Melissa Davis conducted a cash flow analysis of Par Funding which broke things down further: she opined the total funds raised from investors minus the principal repaid equals approximately $366 million (i.e., the largest portion of the United States' proffered fraud loss number).[22] Ms. Davis then subtracted out business expenses, commissions, and related party transactions, which left a net cash inflow of $39.9 million from Par Funding's merchant cash advances from 2011–2020.[23] Ms. Davis swore a cash flow of $39.9 million would not have been enough to cover operating expenses and pay investors their promised interest amounts, so Par Funding must have funded the shortfalls with new investor money. According to Ms. Davis, this business structure has the attributes of a Ponzi scheme. The United States argues if we cannot reasonably calculate the actual loss number, we can use the Defendants' illicit gain (approximately $154 million) as an alternative measure of loss.

**Joseph LaForte.** Joseph LaForte argues we should set the fraud loss at $9.5 million. Joseph LaForte argued in his memorandum the fraud loss number is not the entire amount invested minus the amount repaid to investors (the United States' position); instead, we should consider whether Par Funding's value in 2020, based on the Times Revenue method of valuation, exceeded the amount not repaid to investors.[24] According to Joseph LaForte, Judge Davila's opinion in *United States v. Holmes*[25] supports using a company's value prior to detection of the offense as a starting point for a fraud loss calculation.[26] Joseph LaForte argued Ms. Davis should have valued Par

Funding as a going concern instead of analyzing it as if it went into liquidation when the Securities and Exchange Commission intervened.[27] The "proper" valuation would have shown Par Funding was not a Ponzi scheme because it advanced more cash to merchants than it received from investors.[28] And, when valued as a going concern, Par Funding was worth "significantly more than the amount not yet paid to investors."[29] The valuation argument in Joseph LaForte's memorandum relies heavily on the expert report of David Dunkleberger, who subtracted the Securities and Exchange Commission's disgorgement penalty from Par Funding's estimated value to achieve a "surplus value."[30] According to Mr. Dunkleberger, Par Funding's surplus value means there was no actual loss. But Joseph LaForte still concedes he stipulated to the fraud loss number at $9.5 million in his plea agreement.[31]

Joseph LaForte dropped his argument about Par Funding's value at the hearing. He instead urged us to rely on the numbers in the Receiver's declaration and calculate the fraud loss number as the difference between the total funds raised ($550,325,596) minus the $300,108,117 Par Funding repaid in principal to its investors before the Securities and Exchange Commission intervened. (Joseph LaForte claimed this would equal a fraud loss number of approximately $260 million, but $550,325,596 – $300,108,117 is actually $250 million, not $260 million).[32] Joseph LaForte argued we can subtract both the principal and the interest Par Funding repaid its investors from the fraud loss number because the Application Notes to the Sentencing Guidelines are not binding and/or because Judge Surrick credited interest payments in *United States v. Buckman*.[33] If we choose not to credit the interest payments, Joseph LaForte argued the fraud loss number should be approximately $360 million.[34]

**Joseph Cole Barleta.** Mr. Barleta argues we should set the investor loss at $0. Mr. Barleta incorporated the arguments from Joseph LaForte's memorandum (i.e., Par Funding was a viable

entity and would have been able to repay its investors) with the caveat Mr. Barleta is not bound to a fraud loss floor of $9.5 million.[35]

If we do find fraud loss, though, Mr. Barleta proposed an alternative calculation in his memorandum and at the hearing which Joseph LaForte did not advance. Mr. Barleta argued we should estimate the loss based on the amount of voluntary investor claims made and approved by the Receiver—$227,825,696—rather than the $404,737,299 of outstanding investor notes.[36]

Mr. Barleta agreed with the United States we can use the Defendants' illicit gain as a measure of loss but disagreed the Defendants gained $154 million from the scheme.[37] Mr. Barleta claimed in his memorandum he would challenge that number at the hearing and reserved the right to rebut the United States' evidence with his own documents.[38] But the only number Mr. Barleta advanced at the hearing was the $228 million number based on the Receiver's approved claims.

### 2. We find the total investor loss of principal through confirmed investor notes as of July 27, 2022 is $404,737,299.

The United States met its burden of demonstrating the fraud loss of $404,737,299 at the time the Securities and Exchange Commission detected the scheme and filed suit. The United States offered a compelling prima facie case establishing the loss amount. Messrs. LaForte and Cole Barleta did not meet their burden to provide evidence establishing inaccuracy in the United States' calculations. The United States proved loss by a preponderance of the evidence: we agree $404,737,299 in outstanding principal Par Funding and its affiliates owed investors at the time the Securities and Exchange Commission intervened is a reasonable estimate.[39]

Joseph LaForte's and Mr. Barleta's proposed fraud loss numbers are rooted in flawed analysis. We find Joseph LaForte's argument concerning Par Funding's value unpersuasive for several reasons.[40] Joseph LaForte's concern over Par Funding's value derives mainly from his opinion Par Funding was not a Ponzi scheme: he wants to show the company was profitable and

therefore they did not need to use investor cash to cover its shortfalls. But whether Par Funding was a Ponzi scheme does not change our calculation. True, the Guidelines' Application Notes instruct us not to credit payments exceeding principal investments as part of a fraudulent scheme, but we would reach the same conclusion regardless under Application Note (C)(i)'s general prohibition on interest.[41] So, the value of the company—and whether that value indicates a Ponzi scheme—is of no moment. In other words, even if Ms. Davis undervalued the company, its value is really only relevant to the Ponzi scheme question and does not impact the United States' position Par Funding and its affiliates owed its investors $404,737,299 in principal as of July 2020.

Judge Davila's analysis in *Holmes*, which Joseph LaForte relies on, is distinguishable.[42] Judge Davila studied the Guidelines' credit of value provided to the victim before detection of the offense and selected a valuation date prior to the detection of the offense to estimate loss resulting from the fraud. But *Holmes* was a "fraud case[] involving induced stock purchases of an otherwise legitimate company," where the court "must 'disentangle the underlying value of the stock' and identify 'inflation of that value due to the fraud.'"[43] Judge Davila found it important the United States did not establish the company's "ultimate collapse was the result of Defendant's conspiratorial conduct and should therefore be reflected in her loss calculation."[44] The investors in Par Funding, by contrast, did not purchase stock; they purchased promissory notes. The value of a promissory note is derived from the financial strength and creditworthiness of the issuer; it does not—at least in this case—have the same inherent value or potential for profit as stock does. We need not value Par Funding as a going concern to reasonably estimate actual fraud loss.

We are also unpersuaded by Joseph LaForte's related argument Par Funding has a surplus value sufficient to cover the Securities and Exchange Commission's disgorgement penalty if valued as a going concern.[45] Putting aside the fact Joseph LaForte did not move Mr.

Dunkleberger's valuation into evidence, we fail to see how the Securities and Exchange Commission's disgorgement of ill-gotten gains impacts our analysis. Joseph LaForte is essentially arguing there is a surplus value sufficient to cover the fraud loss if there is a surplus value sufficient to cover the disgorgement penalty. This presupposes the disgorgement penalty number is the same as the fraud loss number. But disgorgement penalties and fraud loss calculations address two different things: disgorgement penalties focus on unjust enrichment to the wrongdoer while fraud loss calculations address loss to victims.[46] We are not persuaded by Mr. Barleta's suggestion we adopt the Receiver's $228 million in approved claims for a related reason: the $228 million stems from the money *actually available* to disburse to victims, while our number must focus on the total loss to victims for sentencing purposes.

We also are not persuaded by the argument Joseph LaForte advanced at the hearing suggesting we start with the total funds invested and subtract all of the repayments to investors including principal and interest. Joseph LaForte argued the Sentencing Commission's Application Notes are not binding but we see no reason to diverge from them absent authority from our Court of Appeals. Joseph LaForte cited only one case from this Circuit where the court credited interest in its loss calculation.[47] Judge Surrick's opinion in *Buckman* does not impact our analysis. There, the United States argued defendants' total repayments to homeowners should not be credited toward the loss amount because significant portions of the payments represented interest but the United States' only support for this argument was an amortization calculator found on the Internet.[48] We addressed a breakdown of the outstanding principal and interest still owed to Par Funding's investors; our exclusion of interest does not require guesswork as in *Buckman*.

We conclude $404,737,299 is a reasonable estimate of the fraud loss attributable to the Defendants.

**B. Messrs. LaForte and Cole Barleta met their burden to reduce the fraud loss number to $288,395,088 after accounting for collateral assets.**

We next consider offsets allowing us to reduce the fraud loss number of $404,737,299. The Sentencing Commission offers, "[i]n a case involving collateral pledged or otherwise provided by the defendant," to reduce the fraud loss number by "the amount the victim has recovered at the time of sentencing" or by "the fair market value of the collateral at the time of sentencing."[49]

The promissory notes left outstanding at the time the Securities and Exchange Commission intervened in July 2020 granted the investors a security interest in Par Funding's assets. The Receiver collected two types of collateral from Par Funding: the money in its bank accounts and the accounts receivable due to Par Funding by its merchant cash advance customers. We now consider the parties' evidence and legal arguments on the value of these assets. We disagree we should not credit the collateral assets because they are "illusory" but accept the United States' alternative argument Par Funding's bank accounts are worth approximately $28.6 million and its accounts receivable are worth approximately $87.8 million. We are not persuaded by the higher values Joseph LaForte and Cole Barleta place on Par Funding's collateral assets. We are left with a fraud loss number of approximately $288 million after we credit the collateral assets and subtract their value from the fraud loss number.

### 1. The parties' varied positions on collateral assets.

*The United States.* The United States argues we should not credit Par Funding for these collateralized assets because they are "unsecured and illusory assets which provided no bona fide security or protection to investors in the event of a loss."[50] Yet the United States' own expert witness Bradley Sharp swore the Receiver did in fact recover assets from Par Funding's bank accounts and accounts receivable. The Receiver seized $28,629,613 from the accounts of Par Funding and its affiliates,[51] and collected $80,912,598 of Pa Funding's accounts receivable.[52] Of

14

the approximately $13.6 million in accounts receivable still on the books, Mr. Sharp opined only $6,800,000 remains collectible because of future write offs and reserves. The United States did not present authority—either in its briefing or at the hearing—to support its argument the $28.6 million from the bank accounts and the $87.8 million from the accounts receivable can still be considered "illusory" despite Mr. Sharp's testimony the money has been or will be recovered.

If we credit the collateralized property, the United States argued the correct fraud loss number is approximately $288 million: $404,737,299 less the cash in the accounts and the amount collected (or collectible) from accounts receivable.

**Joseph LaForte.** Joseph LaForte argued in his memorandum and at the hearing we should credit the Defendants for the $43.5 million seized from Par Funding's bank accounts as a matter of Pennsylvania securities law.[53] But he did not rebut the United States' evidence at the hearing establishing only $28.6 million of the $43.5 million is attributable to Par Funding and its affiliates.

Joseph LaForte further argued we should credit the assets in accounts receivable but we should not cap them at $81 million. According to Joseph LaForte, if Par Funding had continued to operate as a going concern it would have collected a far higher amount of the $415.6 million in accounts receivable reflected in Par Funding's records.[54] Joseph LaForte's cross examination of Mr. Sharp focused on the Receiver's collection efforts, which, according to Joseph LaForte's memorandum, left something to be desired. Joseph LaForte did not state a firm number on how much of the accounts receivable we should credit but seemingly thinks we should credit the entire $415.6 million.

**Joseph Cole Barleta.** Mr. Barleta, like Joseph LaForte, argues we should credit the $43.5 million seized from Par Funding's bank accounts.[55] But he (again like Joseph LaForte) did not

15

rebut the United States' evidence at the hearing showing only $28.6 million is attributable to Par Funding and its affiliate

Mr. Barleta also argued we should credit the assets in accounts receivable but he did not suggest, like Joseph LaForte, we should credit the accounts receivable assets anywhere up to $415.6 million. Mr. Barleta instead argued we should credit $109,830,212 in accounts receivable, which is the number of business receivables reflected in the Receiver's Third Quarter Report.[56] The United States' expert Mr. Sharp explained at the hearing the $109 million in the report reflects the collections attributable to Par Funding and its affiliate plus other collections because the report format used for the Receivership combines all collections. He swore $81 million is the net MCA collections attributable to Par Funding and its affiliate companies.

### 2. We find $116,342,211 in collateral is deductible from the fraud loss amount.

The correct number to offset the fraud loss number falls somewhere between the parties' positions. We do not agree with the United States the assets in Par Funding's bank accounts and accounts receivable are "unsecured" or "illusory"; the United States' own experts testified about the Receiver's successful efforts to seize assets from both sources. The United States offers no authority for the proposition assets which have already been collected can still somehow be "unsecured." We find more persuasive United States' alternative position crediting $28.6 million for the bank accounts and $87.8 million for the accounts receivable. The United States proved by a preponderance of the evidence we can reasonably credit $116.3 million in collateral assets to offset the fraud loss amount.

Messrs. LaForte's and Barleta's arguments are problematic for several reasons. Neither Joseph LaForte nor Joseph Cole Barleta rebutted the United States' evidence only $28.6 million out of the $43.5 million seized from the bank accounts is attributable to Par Funding and its

affiliates. Turning to their positions on the assets in accounts receivable, we find Joseph LaForte's argument particularly uncompelling. He argued, without citing to authority, we should not limit the creditable amount of accounts receivable to the amount the Receiver collected because Par Funding could have collected far more had the Receiver not intervened. This strains credulity. As Joseph LaForte conceded at the hearing, the collection tactics of Par Funding prior to the Receiver's intervention involved extortion, including threats of physical violence. The fact the Receiver did not resort to such measures (or simply used tactics Joseph LaForte did not approve of) is hardly a reason to credit more money than the Receiver actually collected. Anything beyond the $81 million (plus the remaining $6.8 million Mr. Sharp swore is collectible) is speculative, as Joseph LaForte presented no compelling evidence of additional collectible amounts. Without legal authority suggesting we can credit collateral assets beyond those the Receiver collected, we cannot agree with Joseph LaForte's position.

We also disagree with Mr. Barleta's position we should credit $109 million instead of $81 million, although this position is certainly more reasonable than Mr. LaForte's. We found credible Mr. Sharp's testimony only $81 million is attributable to collection on the MCAs from Par Funding and its affiliates. Once the United States made its prima facie case, Mr. Barleta did not meet his burden to rebut Mr. Sharp's testimony with evidence showing $109 million is the correct number.

### C.  Conclusion

The United States met its burden in demonstrating a fact and legal basis for an actual loss of $404,737,299 in investors' principal owed as of July 27, 2020. Messrs. LaForte and Cole Barleta met their burden in demonstrating we should credit approximately $28.6 million in bank account assets and approximately $87.8 million in accounts receivable equaling $116,342,211 in collateral credits. We calculate actual loss under section 2B1.1 as $288,395,088.

---

[1] We use "Par Funding" and "CBSG" interchangeably to refer to Complete Business Solutions Group, Inc., d/b/a Par Funding. Messrs. LaForte and Barleta also used Par Funding's affiliated companies Capital Source 200, Inc. and Fast Advance Funding LLC in the scheme.

[2] Gov't Ex. 21 (Lareau Summ. of Insider Payments).

[3] *See General Information*, PAR FUNDING RECEIVERSHIP WEBSITE, https://parfundingreceivership.com/ (last visited Jan. 14, 2025).

[4] *See also Frequently Asked Questions*, PAR FUNDING RECEIVERSHIP WEBSITE, https://parfundingreceivership.com/faqs/ (last visited Jan. 14, 2025). Judge Ruiz recently approved the Receiver's request to distribute $227,825,696 to defrauded investors across eight different classes of claims ranked by priority.

[5] ECFs 230, 241, 273.

[6] James LaForte's counsel attended but did not present witnesses or ask questions during the hearing as stipulated to a fraud loss amount between $1,500,000 and $3,500,000. ECF 241 ¶ 15(b).

[7] *United States v. Xue*, 42 F.4th 355, 361 (3d Cir. 2022).

[8] *Id.* (citing U.S.S.G. § 2B1.1(b)(1)).

[9] *Id.* (citing U.S.S.G. § 2B1.1(b)(1)).

[10] *United States v. Norman*, 465 F. App'x 110, 122 (3d Cir. 2012) (quoting *United States v. Ali*, 508 F.3d 136, 145 (3d Cir.2007)).

[11] *Id.* (citing *United States v. Fumo*, 655 F.3d 288, 310 (3d Cir. 2011)).

[12] *Fumo*, 655 F.3d at 310 (quoting *United States v. Jimenez*, 513 F.3d 62, 86 (3d Cir. 2008)).

[13] U.S.S.G. § 2B1.1 cmt. n.3(C)(i).

[14] *Id.* § 2B1.1 cmt. n.3(D)(i)–(ii).

[15] *Id.* § 2B1.1 cmt. n.3(E)(iv).

[16] The United States in its fraud loss memorandum argued Par Funding and its affiliates owed investors a principal amount of $416,145,483. ECF 289 at 3–4. At the hearing, the United States revised that number to $404,737,299, explaining it had stipulated to the numbers reflected in Par Funding's July 2020 spreadsheets as opposed to the numbers reflected in the March 2020 spreadsheets the United States relied on in its memorandum.

[17] ECF 289 at 3; see also Gov't Ex. 3 (CBSG Balance Sheet July 27, 2020); Gov't Ex. 17 (Capital Source Balance Sheet July 24, 2020); Gov't Ex. 18 (Fast Advance Funding Balance Sheet July 24, 2020).

[18] Gov't Ex. 3 (CBSG Balance Sheet July 27, 2020); Gov't Ex. 17 (Capital Source Balance Sheet July 24, 2020); Gov't Ex. 18 (Fast Advance Funding Balance Sheet July 24, 2020).

[19] ECF 289 at 4 & n.6. Par Funding raised $547.2 million in total from investors and repaid $178.7 in principal, leaving approximately $366 million in principal still left to be repaid. As noted above, Par Funding's outstanding $366 million plus the outstanding principal amounts due to investors in Par Funding's affiliate companies is how the United States reaches its number of $404,737,299.

[20] 88 F.3d 765, 771 (9th Cir. 1996) ("[P]ayments made towards interest cannot be considered as repayments made on the loan.").

[21] 675 F.3d 736, 741 (7th Cir. 2012) ("[Interest] payments were not money 'returned' to State Bank: they did not reduce the loans' outstanding principal balance . . .."), *rev'd on other grounds*, 569 U.S. 530 (2013)).

[22] We note a potential discrepancy between the $366 million in principal Ms. Davis swore at the hearing and in certain sections of her report Par Funding owed its investors in July 2020 and the $368.5 million in principal reflected in another section of her report. *Compare* Gov't Ex. 1 (Davis Expert Rep.) at 31 ¶ 67, *with id.* at 33 ¶ 75. But this difference of $2.5 million is immaterial.

[23] *Id.* at 32 ¶ 73.

[24] ECF 292 at 2–8.

[25] No. 18-258-1, 2023 WL 149108 (N.D. Cal. Jan. 10, 2023).

[26] ECF 292 at 3, 7.

[27] *Id.* at 6.

[28] *Id.* at 3–4.

[29] *Id.* at 6.

[30] *Id.* at 6–7. Joseph LaForte did not move to admit Mr. Dunkleberger's expert report into evidence at the hearing.

[31] *Id.* at 8.

[32] We attribute the slight difference between Joseph LaForte's total number of invested funds ($550 million) and the United States' total number of invested funds ($547 million) to the "returned payments" represented in Melissa Davis's cash reconstruction. *See* Gov't Ex. 1 (Davis

Expert Rep.) at 34. In other words, it seems $550 million is the gross total while $547 million is the net total.

[33] No. 14-540, 2019 WL 142385 (E.D. Pa. Jan. 8, 2019), *aff'd*, 811 F. App'x 73 (3d Cir. 2020); ECF 292 at 8–9.

[34] This number reflects another mathematical error, although not one impacting our final analysis. Assuming, as set forth in Joseph LaForte's memorandum, the interest payments totaled approximately $120 million, adding this number back to the fraud loss number would put us at $370 million, not $360 million.

[35] ECF 293 at 3.

[36] *Id.* at 5.

[37] *Id.* at 10–11.

[38] *Id.*

[39] Because the United States proved actual loss by a preponderance of the evidence, we need not consider the parties' alternative arguments concerning the Defendants' illicit gains.

[40] We further reject these arguments to the extent Mr. Barleta incorporates and relies on them.

[41] The Sentencing Commission's Office of General Counsel cites courts of appeals distinguishing between the general prohibition on interest set forth in Application Note (C)(i) and the earnings reinvested by victims of a Ponzi scheme. OFFICE OF THE GENERAL COUNSEL, U.S. SENT'G COMM'N, PRIMER ON LOSS CALCULATION UNDER §2B1.1 (2024). These courts of appeals permit the earnings victims reinvested in the Ponzi scheme to be included in the fraud loss number as "realized gains" and only exclude the most recent interest gains from the loss calculation. *Id.* at 21 & n.4. But in this case the United States is not including interest either as a credit or a debit, so the Application Note specific to Ponzi schemes does not affect our analysis. The United States is not seeking to address interest on either side of the equation.

[42] ECF 292 at 7 (citing *Holmes*, 2023 WL 149108, at *6).

[43] *Holmes*, 2023 WL 149108, at *4 (quoting *United States v. Zolp*, 479 F.3d 715, 719 (9th Cir. 2007)).

[44] *Id.*

[45] ECF 292 at 6–7.

[46] *Compare SEC v. Bonan Huang*, 684 F. App'x 167, 176 (3d Cir. 2017) (the disgorgement penalty is meant "to deprive a wrongdoer of his unjust enrichment and to deter others from violating securities laws." (quoting *SEC v. Teo*, 746 F.3d 90, 104–05 (3d Cir. 2014))), *with United States v.*

*Bennett*, 9 F. Supp. 2d 513, 519 (E.D. Pa. 1998) ("Under the Guidelines, loss in a fraud scheme arises from the impact on the victim, which is not necessarily related to defendant's gain." (citing *United States v. Wolfe*, 71 F.3d 611, 617 (6th Cir.1995))), *aff'd*, 161 F.3d 171 (3d Cir. 1998).

[47] ECF 292 at 9 (citing *Buckman*, 2019 WL 142385).

[48] *Buckman*, 2019 WL 142385, at *5.

[49] U.S.S.G. § 2B1.1 cmt. n.3(D)(ii).

[50] ECF 289 at 8.

[51] Gov't Ex. 6 (Sharp Cash on Hand Summ.). This number is different than the $43.5 million set forth in the United States' memorandum. ECF 289 at 8. The cash on hand at the start of the Receivership was $28.7 million with an additional $14.7 million from all expanded Receivership entities. Gov't Ex. 6 (Sharp Cash on Hand Summ.). These are the numbers the United States apparently used to get to $43.5 million. ECF 289 at 8. But Mr. Sharp swore the cash on hand at the start of the Receivership attributable to Par Funding and its affiliates was only $24 million, and the additional cash due to the expanded Receivership attributable to Par Funding and its affiliates was only $4.5 million, which, together, equal the $28.6 million number the United States put forth as the amount of collateralized assets in Par Funding's bank accounts at the hearing. In other words, not all of the $43.5 million can be attributed to Par Funding and its affiliates.

[52] As the United States argues, $81 million is a fraction of the $415.6 million in accounts receivable reflected in Par Funding's records. ECF 289 at 9.

[53] ECF 292 at 9–11.

[54] *Id.* at 11–14. Joseph LaForte claims "this cap is unreasonable as the Receiver has not collected anywhere near as much of the account receivables a Par Funding could have and would have absent the Receiver's intervention." *Id.* at 12.

[55] ECF 293 at 8–9.

[56] *Id.* at 9.