UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA
------------------------------------------------------------X

UNITED STATES OF AMERICA                    :

    -against-                                         :        CASE No.:    23-CR-198 (MAK)
                                                       24-CR-65   (MAK)
                                                      20-CR-231 (MAK)

JOSEPH LAFORTE,                              :
                     Defendant          :
------------------------------------------------------------X

## DEFENDANT JOSEPH LAFORTE'S SENTENCING MEMORANDUM

Joseph R. Corozzo                        Brian McMonagle
RUBINSTEIN & COROZZO LLP                 MCMONAGLE, PERRI, MCHUGH,
260 Madison Ave., 22nd Fl.               MISCHAK DAVIS
New York, New York 10016                 1845 Walnut Street, 19th Floor
212-545-8777                             Philadelphia, PA 19103
jcorozzo@rubcorlaw.com                   215-981-0999,
*Pro Hac Vice Counsel*                   bmcmonagle@mpmpc.com
*for Defendant Joseph LaForte*           *Counsel for Defendant Joseph LaForte*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................................3

FACTS ....................................................................................................................................4

I. Joseph LaForte's Background. .........................................................................................4

II. Nature and Circumstances of the Offenses. ...................................................................6

A. Count 1 - Racketeering Conspiracy and Count 21 - Securities Fraud. ...........................6

(i) The Exception Portfolio. ......................................................................................15

(ii) Collections Pre-Receivership v. Post-Receivership..............................................22

(iii) The Allegations of Extortion Are Not Credible. .................................................25

B. Making, Subscribing, Filing a False Return..................................................................31

C. Failure to Collect and Pay Over Tax.............................................................................31

D. Perjury..........................................................................................................................32

E. Obstruction of Proceedings and Aiding and Abetting. .................................................33

F. Conspiracy to Defraud the IRS. ...................................................................................33

G. Wire Fraud. ..................................................................................................................34

H. Felon in Possession of Firearms. .................................................................................34

DISCUSSION.........................................................................................................................36

I. Guidelines Calculation. ...................................................................................................36

II. 18 U.S.C. § 3553(a). .....................................................................................................37

A. The Need to Reflect the Seriousness of the Offense and to Provide Just Punishment.....37

B. Devotion to Family. ......................................................................................................43

C. Helping Others..............................................................................................................47

D. Remorse. ......................................................................................................................48

E. The Need to Protect the Public from Further Crimes of the Defendant.........................49

F. The Need to Promote Respect for the Law....................................................................52

CONCLUSION.......................................................................................................................53

## PRELIMINARY STATEMENT

Defendant JOSEPH LAFORTE (hereafter "JOE LAFORTE" to distinguish him from his brother/co-defendant JAMES LAFORTE), submits this memorandum of law in anticipation of his sentencing, which is scheduled for February 12, 2025.

On September 11, 2024, JOE LAFORTE pled guilty, in 23-CR-198, to:

- Count 1, Racketeering Conspiracy, in violation of 18 U.S.C. § 1962(d);

- Count 21, Securities Fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff, 17 CFR § 240.10b-5;

- Count 31, Making, Subscribing, Filing a False Return, in violation of 26 U.S.C. §7206(1);

- Count 44, Failure to Collect and Pay Over Tax, in violation of 26 U.S.C. § 7202;

- Count 45, Perjury, in violation of 18 U.S.C. § 1623;

- Count 52, Obstruction of Justice and Aiding and Abetting, in violation of 18 U.S.C. §§505 and 2.

Contemporaneously, JOE LAFORTE pled guilty, in 24-CR-65, to:

- Count 1, Conspiracy to Defraud the IRS, in violation of 18 U.S.C. § 371, and

- Count 7, Wire Fraud, in violation of 18 U.S.C. § 1343.

Lastly, JOE LAFORTE simultaneously entered a plea of guilty, in 20-CR-231, to Count 1, Felon in Possession of Firearms, in violation of 18 U.S.C. § 922(g)(1).

On September 11, 2024, the Court accepted JOE LAFORTE's aforementioned plea pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), agreeing to accept a sentencing recommendation of between 162 – 186 months of imprisonment, followed by 3 years of

3

supervised release.[1]

As this is below his advisory Guidelines range, the question before the Court is not whether to impose a below Guidelines sentence, but rather where within the agreed upon sentencing range of 162 – 186 months to sentence the defendant.

As we will discuss, a sentence of 162 months of imprisonment, followed by supervised release, would be sufficient but not greater than necessary to satisfy the purposes of sentencing under 18 U.S.C. § 3553(a).

## FACTS

### I. Joseph LaForte's Background.

JOE LAFORTE is 54 years old.[2] The oldest of four siblings,[3] he was born and raised in Staten Island, New York (except for a few years during his childhood when the LaFortes lived in Los Angeles, California).[4]

According to his sisters, as the oldest child, JOE LAFORTE helped look after his younger siblings as they were growing up. His sister Jenn writes "I am the youngest of four… he was a parental figure to me. He always kept me at the forefront of his mind making sure I was doing the right things and staying on the right path… There have been endless times I've been thankful to call him my big brother," Letter from Jenn LaForte (attached).

Their sister Tara writes that "My brother… has always been my closest ally… we stuck up for each other through thick and thin… From a young age, we took on a lot of responsibility,

---

[1] Plea Hearing Tr. p. 58, L. 24 – p. 59, L. 7.
[2] Presentence Report (hereafter "Final PSR") p. 4. (For clarity, the defendant continues to stand by the objections he submitted to Probation on January 27, 2025).
[3] Final PSR ¶ 302.
[4] Final PSR ¶¶ 300, 303.

helping to take care of our younger siblings and stepping up when things got hard," Letter from Tara Gibson (attached).

His parents sent JOE LAFORTE to Catholic schools.[5] He graduated from Monsignor Farrell High School in Staten Island in 1989.[6] He then started college to play on college baseball teams,[7] taking courses at Belmont Abbey College in North Carolina, Rollins College in Florida, and the College of Staten Island in New York.[8] While in college, he played baseball for an affiliate of the Seattle Mariners from 1992 – 1993. PSR Footnote 20.

Along the way, JOE LAFORTE taught himself business, real estate, and stock trading,[9] and acquired licenses as a professional General Securities Representative, Uniform Securities Agent, and General Securities Principal.[10]

In 1995, he became a stock broker on Wall Street.[11] In 1999, he founded Narrows Reality, a service used in renting apartments, and Richmond Abstract, a title insurance company.[12]

In 2003, JOE LAFORTE opened still another business, GMC Mortgage and Lending Services.[13]

In 2002, JOE LAFORTE moved from Staten Island, New York to Fort Lauderdale, Florida, where he met Lisa McElhone. In 2005, JOE LAFORTE married Lisa McElhone.[14] The

---

[5] Final PSR ¶ 316.
[6] Final PSR ¶ 316.
[7] Final PSR ¶ 313.
[8] Final PSR ¶¶ 314 - 315.
[9] Final PSR ¶ 318.
[10] Final PSR ¶ 317.
[11] Final PSR ¶ 326.
[12] Final PSR ¶ 325.
[13] Final PSR ¶ 324.
[14] Final PSR ¶ 304.

defendant deeply regrets that he exploited his wife in furtherance of certain of his criminal conduct, leading to her arrest and plea in 24 CR 65 (the "Tax Matter"). She would have every right to be furious with him. Instead, she remains supportive of JOE LAFORTE, telling Probation that he "is the 'complete opposite of what they've made him out to be.'"[15] Ms. McElhone writes that her husband is "a caring and devoted partner, who is always there for our family and friends. He… has always strived to provide for us… He is the best person I know… I want to emphasize that Joe is genuinely remorseful for the mistakes made. I have witnessed firsthand the commitment to personal growth and the desire to make amends." Letter from Lisa McElhone (attached).

In 2006, JOE LAFORTE pled guilty in Nassau County Court in New York to grand larceny, money laundering, and conspiracy for his role in a scheme involving a law firm that represented mortgage lenders.[16] He was sentenced in 2007 to 42 to 126 months of imprisonment,[17] and was released in February of 2011.[18]

It was in 2011 that JOE LAFORTE founded Complete Business Solutions Group Inc., d/b/a Par Funding (hereafter "PAR") in his wife's name,[19] which brings us to the matters at bar.

## II. Nature and Circumstances of the Offenses.

### A. Count 1 - Racketeering Conspiracy and Count 21 - Securities Fraud.

On May 5, 2023, JOE LAFORTE was indicted in 23-CR-198 (the "RICO Action"). JOE

---

[15] Final PSR ¶ 305.
[16] Final PSR ¶ 290.
[17] Id.
[18] Final PSR ¶ 323.
[19] Final PSR ¶ 39.

LAFORTE was the *de facto* CEO of PAR.[20]

PAR was a merchant cash advance business founded in or about October 2011.[21] Its business model was to advance funds to merchants by purchasing the merchants' future account receivables at a discount.[22] Under the terms of the merchant cash advances, the merchants agreed to repay the funds advanced, plus factoring fees, assessed at a rate of "typically 30% or more," of the advanced amount.[23] (According to Government witness Melissa Davis's testimony, the average factoring fee for the merchant cash advances "was about 33 percent. So if the Merchant sold to Par Funding $100,000 of future cashflow, in that case the Merchant would have to repay $133,000." Loss Hearing Tr. p. 74, L. 2 – 5.)

Generally, the payments from the merchant-clients to PAR were made "in installments through daily or weekly *automatic* debits from the merchant-customer's bank accounts." Final PSR ¶36 (emphasis added).

The enterprise underlying the Racketeering Conspiracy in Count 1 of the RICO Indictment is unnamed, but appears to have been more or less indistinguishable from PAR itself until the date when PAR was placed into Receivership, marking the point when JOE LAFORTE ceased to be the leader of PAR.

The underlying predicates for the Racketeering Conspiracy (Count 1 of the RICO Indictment), are securities fraud and wire fraud. From 2012 to 2017, PAR raised funds by selling promissory notes to lenders.[24] The "promissory notes typically had a 12-month duration and

---

[20] Amended Second Superseding Indictment in 23-CR-198 (hereafter "RICO Indictment"), p. 7, ¶ 16(c).
[21] RICO Indictment p. 3, ¶ 3.
[22] Court's Findings of Fact & Conclusions of Law, ECF # 309, p. 3, ¶ 2(c); Final PSR ¶ 36.
[23] Court's Findings of Fact & Conclusions of Law, ECF # 309, p. 3, ¶ 2(c); Final PSR ¶ 36.
[24] Final PSR ¶¶ 38, 53.

provided that the investor would receive annual interest rates ranging from 12% to 44%. Investors signed a Non-Negotiable Term Promissory Note and an accompanying Security Agreement… The Par Funding Notes generally provided that the interest would be paid over twelve months, and then the investor's principal investment would be returned in full to the investor. The Security Agreements granted the investors a security interest in substantially all of the assets of Par Funding, including its accounts receivable." RICO Indictment, p. 16, ¶¶ 38 – 39; Final PSR ¶ 53.

PAR used sales agents to find potential promissory note purchasers. Final PSR ¶ 54. These sales agents would receive commissions for finding note holders for PAR. Id. However, the Pennsylvania Department of Banking and Securities opened a regulatory matter, *In the Matter of Complete Business Solutions Group, Inc. PAR Funding,* Docket No. 2017-12-4 to address allegations that, in using sales agents to sell the promissory notes, PAR was allegedly using unregistered sales agents in violation of securities regulations. Final PSR ¶ 55. In or about January 2018, PAR received a subpoena from the Pennsylvania Department of Banking and Securities as part of the agency's investigation of PAR. Id.

As a result, in January 2018, PAR hired counsel to represent them in the Pennsylvania regulatory matter. Notice of Appearance in *In the Matter of Complete Business Solutions Group, Inc.*, *PAR Funding.* Although PAR argued that the promissory notes were not securities, on the advice of counsel, PAR ceased using sales agents to sell promissory notes directly to investors.

In response to the investigation by the Pennsylvania authorities, Final PSR ¶ 55, beginning in or about early 2018, instead of continuing to directly sell promissory notes to lenders, PAR used intermediaries to sell promissory notes.[25] Through this arrangement, lenders

---

[25] RICO Indictment p. 17, ¶ 43; PSR ¶ 38.

would purchase promissory notes from Agent Funds, and the Agent Funds would, in turn, purchase promissory notes from PAR. Final PSR ¶ 56.  PAR consulted with legal counsel about this new arrangement, and, in or about September 2018, PAR's counsel sent PAR a draft template for selling promissory notes to Agent Funds. 9/28/18 Email from Counsel to PAR.

JOE LAFORTE participated in a scheme to defraud the promissory note holders and potential investors through misrepresentations regarding JOE LAFORTE's criminal history and role in the company, PAR's business performance and profitability, the diversity of PAR's portfolio, insurance, the underwriting process and self-dealing.[26] (While JOE LAFORTE takes full responsibility for his offenses, on January 27, 2025, the defendant submitted a letter to Probation objecting to, *inter alia,* certain specific allegations that were contained in the initial PSR regarding the scheme to defraud. The defendant continues to stand by his objections.)

Misrepresentations were made at in person meetings and organized events, and telephone calls,[27] and there were material omissions from marketing materials.[28] Steps taken to conceal JOE LAFORTE's role in the company included, *inter alia*, PAR being incorporated under JOE LAFORTE's wife's name.[29] Steps taken to conceal his criminal record included using aliases.[30] (The PSR notes that JOE LAFORTE's LinkedIn profile "did not mention his prior criminal convictions." Final PSR ¶ 72. We objected to this aspect of Paragraph 72 as misleading as, respectfully, it is pushing the envelope, and potentially violating the First Amendment, to consider such a purported omission from a social media profile criminal conduct. Based on counsel's familiarity with the networking platform LinkedIn, counsel finds it extremely unlikely

---

[26] RICO Indictment, p. 21 – 22, ¶ 54; Final PSR ¶ 66.
[27] Final PSR ¶ 59.
[28] Final PSR ¶ 58.
[29] Final PSR ¶ 39.
[30] Final PSR ¶ 70.

that LinkedIn profiles would disclose their users' criminal convictions, with the possible

exceptions of individuals who work to reintegrate ex-convicts into society or to combat mass

incarceration. There are already enough collateral consequences for a criminal conviction

without fabricating an additional requirement that one's convictions must be publicly listed on

one's social media profiles. Such a requirement could only undermine efforts for individuals to

successfully reintegrate into society after serving their time.)

In July of 2020, the SEC filed suit against PAR, JOE LAFORTE, and others in the

Southern District of Florida, <u>Securities and Exchange Commission v. Complete Business</u>

<u>Solutions Group, Inc. d/b/a Par Funding, et al.</u>, 20 CV 81205 (RAR) (SDFL) (hereafter the "SEC

Action"),[31] and PAR was placed into a receivership, with a Florida attorney appointed as the

Receiver.[32] This roughly coincided with the end of the investigation in 23 CR 198.

Following a hearing on the loss amount, the Court ruled that the scheme to defraud

caused an actual loss of **$288,395,088** calculated as follows: $ 404,737,299 in principal owed by

PAR "and its affiliate companies Capital Source 200, Inc. and Fast Advance Funding LLC" on

the promissory notes as of July 2020,[33] less credits for $28.6 million in seized bank account

assets and $ 87.8 million in accounts receivable.[34]

The accounts receivable at the time PAR was placed into receivership totaled $ 415.6

million. <u>Id.</u> p. 15. However, the Court agreed with the Government that out of the total accounts

receivable, the amount credited against loss should be limited to approximately $ 81 million (the

amount the Receiver collected on same since 2020), plus $6.8 million (based on Government

---

[31] Final PSR ¶ 61.
[32] Final PSR ¶ 62.
[33] Court's Findings of Fact & Conclusions of Law, p. 8.
[34] Court's Findings of Fact & Conclusions of Law p. 17.

witness testimony that this amount "remains collectible," Id. p. 5).

The Court further determined that "whether Par Funding was a Ponzi scheme does not change our calculation" on loss,[35] and therefore whether the Government's expert undervalued PAR was irrelevant to the Court's decision on loss. Id. While the Court stopped shy of explicitly stating that PAR constituted a *Ponzi* scheme, the Court appears to be leaning towards the conclusion that it was, given the Court's findings that "investor funds [were used] to pay distributions and make more merchant advances,"[36] "Par Funding's MCA business did not generate enough cash flow to repay investors their promised returns from 2016 to 2020," Id. p. 4, ¶ 2(f), and that "Par Funding did not create a profit." Id. ¶ 2(g). We will address this issue now as, while it may not have been determinative of actual loss or the Guidelines, it remains pertinent to the nature and circumstances of the offense.

PAR did <u>not</u> constitute a *Ponzi* scheme. A *Ponzi* scheme means that investors are paid from the funds of other investors. With all due respect, it is mathematically impossible for the funds received from the noteholders to have been used both for repaying the noteholders and for funding merchant cash advances. The funds received from the noteholders is finite. Altogether, PAR raised a "net total" of **$547 million** from lenders through promissory notes.[37] In contrast, PAR advanced "over **$1.3 billion**" through merchant cash advances.[38] (While the loss amount was calculated from principal owed to PAR and its affiliates, Ms. Davis testified that the $1.3 billion in merchant cash advances referred only to PAR, not its affiliates. Loss Hearing Tr. p. 69,

---

[35] Court's Findings of Fact & Conclusions of Law, p. 12.
[36] <u>Id</u> p. 1.
[37] Court's Findings of Facts & Conclusions of Law, Endnote 32. The PSR puts the amount raised from noteholders at "approximately $ 550 million," Final PSR ¶ 52.
[38] Court's Findings of Fact & Conclusions of Law, p. 1; Loss Hearing Tr. p. 111, L. 16 – 18; Gov's Exhibit 1, p. 34 – Melissa Davis Expert Report.

L. 20 – 21 [findings of Ms. Davis "relate to CBSG only"].)

The merchant cash advances therefore exceed the amount received from the note holders by approximately **$ 753 million**. The difference in these amounts has to have come from somewhere other than the noteholders. The Government's own expert testified at the Loss Hearing that there were no "bank loans to Par Funding, or investments from the Principles, themselves, into Par Funding,"[39] to account for this difference, because "It was just the Investor money coming in… And… *the money from the MCA business, whatever that generated*," Id. p. 74, L. 16 – 20 (emphasis added). See also Id. p. 199, L. 16 – 17 ("A. There was only two sources of money into Par Funding. It was money from Investors and money from the MCAs").

The only way that PAR was able to advance more money to its merchant-clients than it received from the lenders (let alone while simultaneously and consistently making all payments to the noteholders) was by earning a profit from its merchant cash advances. Ms. Davis testified at the Loss Hearing that PAR *collected from* merchant-cash advance *clients* approximately $ 39 million more[40] than the over **$ 1.3 billion** that was advanced, well exceeding the amount that PAR raised through promissory notes (approximately $ 547 million).

PAR was a profitable business and, but for the receivership, PAR would have ultimately paid all noteholders in full. For clarification: it is undisputed that the scheme to defraud the noteholders involved misrepresentations regarding PAR's profitability.[41] These were misrepresentations in that they exaggerated the *extent* of PAR's profitability. For instance, instead of realizing 33% or 35% in profits from factoring fees, Government expert Melissa Davis found that the actual return on PAR's merchant cash advances was 13%. Gov's. Ex. 1 at Loss

---

[39] Loss Hearing Tr. p. 74, L. 12 – 15.
[40] Loss Hearing Tr. p. 109, L. 21 – 23.
[41] Final PSR ¶ 66.

Hearing - Davis Report, p. 43.

JOE LAFORTE continues, as he has throughout his defense, to object to the Government's assertion that PAR was not profitable, and to reiterate that Ms. Davis's contrary conclusion is based on flawed methodology. See Defendant's Pre-Hearing Loss Memo, 23 CR 198, ECF # 292 (hereafter "Defendant's Pre-Hearing Memo"), and Defendant's Memorandum of Law in Support of Defendant's Second Motions In Limine, 23 CR 198, ECF #180-1, both of which Defendant incorporates herein by reference, regarding the unreliability of Ms. Davis's conclusions. See also Declaration of Joel Glick, 23 CR 198 ECF # 292-1; Glick Expert Report, 23 CR 198, ECF # 292-6; Dunkleberger Report, 23 CR 198, ECF # 292-7; Glick Rebuttal Report, 23 CR 198, ECF # 292-10.

We do not dispute the Court's finding of actual loss for the Guidelines, or that JOE LAFORTE is legally responsible for the loss. However, for context, JOE LAFORTE did not intend or expect to cause a loss to the noteholders, and, we maintain that but for the Receivership, the noteholders would not have suffered that loss.

Prior to the Receivership, PAR paid noteholders approximately $ 118 million in interest, and repaid investors over $ 178 million of principal. Davis Expert Report p. 34, Table 2; Loss Hearing Tr. p. 100, L. 9.

Before PAR was placed in Receivership, PAR never missed any payments to noteholders (with the exception of the beginning of the COVID-19 pandemic in 2020). See Letter from T. Anthony Jones ("Throughout the entire investment period, Mr. LaForte never missed a single payment and honored every aspect of our agreement"); Letter from Joseph Kuchs ("I invested a small amount with him… and he was always on time with the payments"). See also Defendant's Pre-Hearing Memo Exhibit A – Glick Declaration, 23 CR 198, ECF # 292-1, ¶ 24 (defense

expert found "no indication that investor principal or interest payments were missed or late prior to March 2020. CBSG consistently paid note holders the interest rate stated in the promissory notes until a renegotiation of those notes due to Covid-19 economic conditions in March or April 2020"); Defendant's Pre-Hearing Memo Ex. B - Declaration of David Alperstein, Esq., 23 CR 198, ECF # 292-2, ¶¶ 26, 28 (indicating PAR made all interest payments and repaid National Fund's principal under the terms of the National Fund's promissory note, and that other than in the beginning of the COVID-19 pandemic, "all investors received their agreed upon payments and/or principal returned at the end of their note"); Ex. C - Declaration of Vincent Camarda, 23 CR 198 ECF # 292-3 ¶ 22, 25 ("Par has never missed a payment due our clients… Par has not missed a single payment to AGM Capital Fund") (emphasis in original); Ex. D - Motion of Alan Candell, *Pro Se* ¶ 4, 23 CR 198 Doc. # 292-4 (prior to the Receivership, PAR "timely delivered all payments ripe, due and owing under the Promissory Note with the exception" of the onset of the COVID-19 pandemic).

As discussed above, the terms of the merchant cash advance deals obligated PAR's customers to pay factoring fees on top of the amount advanced. Unlike the funds raised through promissory notes, which account for less than half of the merchant cash advance funding, the factoring fees would account for PAR's profitability.

Defense expert Joel Glick explained that it is unnecessary to collect 100% of account receivables in order to return a profit. Glick Declaration, 23 CR 198, ECF # 292-1, ¶28. Accordingly, as a businessman and PAR's *de facto* CEO, JOE LAFORTE's concern was not to collect 100% of account receivables, but to earn profits.

Glick's analysis showed that PAR was profitable. Based on his review of the evidence, he

14

determined that from the years 2012 – 2019,[42] PAR earned $ 408.8 million in factoring fees. Glick Declaration, 23 CR 198, ECF 292-1, ¶ 88.

Moreover, *after* subtracting PAR's distributions to investors <u>and</u> other expenses, PAR's *net* income was **$ 64 million**. <u>Id.</u> ¶ 88. Glick also demonstrated that PAR "collected more than it funded during 2020." <u>Id.</u> ¶ 77.[43] Defense expert David Dunkleberger corroborated Glick's conclusions. Dunkleberger Report, 23 CR 198, ECF # 292-7.

### *(i) The Exception Portfolio.*

Nevertheless, in erroneously insisting that PAR constituted a *Ponzi* scheme for the period of 2016 – July 2020, the Government has repeatedly harped on what Ms. Davis termed the "Exception Portfolio," containing the merchants who owed the most money to PAR.

The Exceptions Portfolio actually consisted of **16** merchants, not, as the PSR erroneously stated, ten. However, as the PSR focused on the merchants making up PAR's top ten largest account receivables, we will address these "Top 10" merchants here.

Prior to the Receivership, six of these ten merchants had never missed a single payment to PAR. These six merchants included: one that owned a franchise of 20 pizzerias and 10 gas stations, a custom home building company, a commercial painting company, a company in the insurance industry, a merchant in the PPE and janitorial supply business, and a management, sales, and logistical services company.

The PPE/janitorial supply merchant's debt was personally guaranteed by its president and

---

[42] As a reminder, PAR was founded in 2011 and placed into Receivership in 2020.

[43] <u>See also</u> Loss Hearing Tr. p. 130, L. 25 – 131, L. 5 ("THE COURT: … they didn't make the 32 percent or 36 percent, they did generate over that period of time 98.6 million in fees? THE WITNESS: Yes, in profits, prior to 2019; yes. THE COURT: Prior to 2020? THE WITNESS: Yes.").

CEO ("T.O.")[44]—an entrepreneur, with three decades of experience and multiple entities to his name. One of said entities has a National Hockey League team's arena named after it in consideration of the entity's sponsorship of the team. According to testimony at the Loss Hearing, the PPE/janitorial supply company itself was advanced a total of $ 50,485,491.[45] This merchant had already repaid a total of **$48,567,460**[46] (which would be $1,918,031 less than the amount advanced), yet the merchant's account receivable at the time the Receivership began was $77,984,917.[47] According to a Government witness, the account receivable was greater than the amount the merchant had not repaid due to T.O.'s PPE/janitorial supply company assuming debt owed by T.O.'s other entities to PAR[48] (rather than due to PAR's factoring fees). When including the merchant cash advances made to all of T.O.'s entities, the total cash advanced to T.O.'s entities came to approximately $92.9 million,[49] and the amount T.O.'s entities repaid to PAR prior to the Receivership comes to **$71.5 million.**[50]

At the Loss Hearing, the witness acknowledged that liens had been placed on merchants' assets,[51] and that he "was aware of various UCC filings."[52] (This witness also testified that absent a UCC filing, the merchant cash advance business could only collect against the merchant-debtor's collateral if the merchant had lied in their application.[53] Compare to a filing

---

[44] Surety Agreement, Bates CBSG-ReceiverNative-000150017; Security Agreement dated April 11, 2019, Bates CBSG-Receiver-Nastive000150017; Security Agreement dated February 20, 2019, Bates CBSG-ReceiverNative-000137090; Commercial Promissory Note, Bates CBSG-ReceiverNative-000086298. See also Promissory Note, CBSG-ReceiverNative-000150017.
[45] Loss Hearing Tr. p. 329, L. 11 – 13; p. 330, L. 10 – 13.
[46] Loss Hearing Tr. p. 329, L. 14 – 16.
[47] Loss Hearing Tr. p. 329, L. 17 – 20.
[48] Loss Hearing Tr. p. 331, L. 21 – 25.
[49] Loss Hearing Tr. p. 330, L. 16 - 22
[50] Loss Hearing Tr. p. 330, L. 16 – 23.
[51] Loss Hearing Tr. p. 325, L. 1 – 5.
[52] Loss Hearing Tr. p. 323, L. 15 – 20.
[53] Loss Hearing Tr. p. 324, L. 5 – 22.

by the Receiver in the SEC Action wherein the Receiver specifically represented that he had settled an "unsecured claim" for millions of dollars, without indicating that there was any proof of a lie in the underlying application. Receiver's Motion to Lift Litigation Injunction - SEC Action Doc. # 1541, ¶ 23.)

In addition to T.O. personally securing the debt, collateral securing the merchant's debt to PAR included, "any and all assets/personalty of any sort (including but not limited to equipment, inventory, contract rights, chattel paper, general intangibles, insurance proceeds, and any and all profits and proceeds of any of the foregoing)," Security Agreement, Bates CBSG-ReceiverNative000150167. T.O. sent emails to JOE LAFORTE to assure him that the MCAs were safe business decisions, writing that PAR's "cash advances are fun, but small in comparison with what we can make together here,"[54] and "My balances are still decent and I am about to buy 5mm [$ 5 million] building." 11/16/17 Email from CEO to JOE LAFORTE, Bates CBSG-ReceiverNative-000053490 (to which T.O. attached a screenshot from his online banking app, showing that he had, at that time, $882,945.21 in bank accounts alone).

The merchant who owned the pizzerias and gas stations franchises was advanced $1,692,506.73. That merchant's account receivable, at the beginning of the Receivership, was $5,582,961.72. This was as a result of factoring fees, as the merchant had already repaid $2,733,162.79 ($1,040,656.06 *more* than the amount advanced).

The customs home building company merchant had been advanced $13,365,966.94. The account receivable for that merchant when the Receivership began was $5,502,658.29. This was as a result of factoring fees, as the merchant had repaid $15,322,396.45, which is $1,946,429.51 *more* than the amount advanced.

---

[54] 12/14/15 Email from Merchant's CEO to JOE LAFORTE Bates CBSG-00012294.

$4,499,262.90 had been advanced to the commercial painting company. That merchant's account receivable, as of the beginning of the Receivership, was $8,143,855.92. This was due to factoring fees, as the merchant had already repaid $4,863,984.95 ($364,722.05 **more** than the amount that had been advanced).

The insurance brokerage merchant had been advanced $ 35,358,393.04. The account receivable for that merchant when the Receivership began was $35,188,922.49. This would have been because of factoring fees, as this merchant had already repaid $36,772,340.43, which is $1,413,947.39 **more** than the amount that was advanced. The sole owner of the merchant was interviewed by the FBI during the investigation of the RICO Action. The owner of the insurance brokerage merchant reported that the merchant entity was worth $ 250 million, that he had signed a Confession of Judgment to secure the debt with his own personal property, that the merchant caught up on any missed payments within days, and that he believed he was PAR's "best client." 302 dated January 11, 2022, p. 3 – 4.

$ 31,034,930.75 had been advanced to the logistics company. While the logistics merchant's balance at the beginning of the Receivership was $ 25,361,163.27, this is again due to factoring fees. The merchant had paid back **$27,180,906.10**, ($ 3,854,024.65 less than the amount advanced). The merchant's debt was secured by a coal mine.[55] According to an appraised report, the Replacement Cost of the collateral was valued at $ 85,431,800, while the Fair Market Value of the collateral was estimated at $ 57,749,200.[56] This merchant had been making weekly payments of between $373,741 - $723,392 to PAR in the weeks leading up to the

---

[55] Collateral Assignment of Contracts and Permits, dated February 25, 2019; Collateral Assignment of Contracts and Permits dated March 1, 2019.
[56] Appraisal Report, Bates EPROD-SEC-DEF-000625118.

Receivership,[57] but, under the Receiver, collections from said merchant petered out and ceased entirely by October 2020. Id. ¶¶ 33 – 34. Thereafter, that merchant offered to settle its debt to PAR at the <u>full value</u> of its account receivable.

Turning now from the merchants who were current in their payments pre-Receivership to the rest of the "Top Ten," a seventh merchant in the Exceptions Portfolio owns multiple properties, including but not limited to a large-scale cattle ranch and thousands of acres used to grow hemp, i.e. for medicinal products. This merchant had been advanced $ 25,650,706.24. Their balance at the beginning of the Receivership was $19,650,159.53, which again, was due to factoring fees, as the merchant had repaid $ 23,908,857.50 ($1,741,848.74 less than what had been advanced). The debt of this seventh merchant in the Exceptions Portfolio was secured by collateral worth $ 25,675,000, including $15,675,000 worth of mortgages filed in PAR's name against five real properties owned by the merchant (the combined appraisal value of the five properties being $ 89.7 million), plus $ 10 million worth of lien(s) on the merchant's water rights. Additionally, pre-receivership, in or about December 2019, one of PAR's affiliates (which later became one of the Receivership entities), acquired a golf course in Colorado worth $ 3.6 million (from, on information and belief, an affiliate of this merchant). In or about July of last year, the Receiver received an offer from the merchant's personal guarantor to purchase the golf course from the Receivership. Receiver's Attorneys' Invoice No. 7863 – SEC Action Doc. #2068-8 p. 11 ("07/12/2024 Asset Disposition: Emails and follow up regarding request… and offer to purchase interest in golf course property").

The eighth merchant in the Exceptions Portfolio was a trucking company, which had been advanced $ 5,991,332.52. While the trucking company's balance at the beginning of the

---

[57] SEC Action Doc. # 1215, ¶ 32.

Receivership was $ 18,952,251.88, once again, this is due to factoring fees. The trucking merchant had already paid back **$4,932,682.45** ($1,058,650.07 less than what was advanced). The debt of this eighth merchant in the portfolio was secured by liens against two real properties (a farm in NJ and a business headquarters in Florida), and had been personally guaranteed by one of the merchant company's owners, who had been a wealthy real estate tycoon. (PAR additionally took possession of a Ferrari, worth between $ 45 - $ 50 million, as collateral. Email from Merchant - Bates # CBSG-ReceiverNative-000171562; Appraisal Report, Bates # CBSG-ReceiverNative-000171557.)

Prior to the Receivership, PAR's attorneys filed actions to foreclose on the two pieces of real estate and, after the aforementioned co-owner passed away in December of 2019, submitted a claim against the decedent's estate to further secure the debt to PAR.[58] After the Receiver took over, the Receiver fired PAR's attorneys in these actions while those matters were still pending. Over three years after PAR had filed a claim against the decedent's estate, the Receiver reached a settlement with the decedent's estate in the amount of **$ 4.4 million**. Id. ¶ 23.

A ninth merchant owned various treatment centers. This merchant was advanced $6,682,582.45. Although PAR's records indicated that the merchant's balance at the beginning of the Receivership was over $ 12.2 million, our understanding is the actual account receivable for that merchant as of July 28, 2020 was $ 8,893.246.68. This is, yet again, due to the factoring fees, as the merchant had already repaid $3,639,666.81 ($3,042,915.64 less than the amount advanced). Shortly before the Receivership, a settlement agreement with this merchant in the amount of $ 2 million was executed. The Receiver thereafter fired the attorneys who had negotiated the settlement.

---

[58] Receiver's Motion to Lift Litigation Injunction, SEC Action Doc. # 1541, ¶¶ 10 – 11.

The last of the merchants in the Top Ten was advanced $5,339,802.00. The account receivable for this merchant when the Receiver took over was $6,081,514.70. This is partially due to the factoring fees, as this merchant had repaid $1,685,423.20 ($3,654,378.80 less than the amount advanced). The merchant's debt to the business was secured by mortgages filed against multiple commercial real properties. While we are uncertain as to the total value of the multiple pieces of collateral securing this merchant's debt, one of the properties alone was appraised for close to $ 18 million (more specifically, $ 17,950,000. Bates CBSG-ReceiverNative-001863581.) PAR's attorneys had taken steps to foreclose on the collateral before they were fired by the Receiver.

The Exceptions Portfolio constituted 46% of PAR's accounts receivable, meaning that over half (54%) of its accounts receivable were NOT part of the Exception Portfolio. Glick Declaration ¶ 61, 23 CR 198, ECF # 292-1. That is approximately 3,600 merchants, who had nothing to do with the Exceptions Portfolio. Id.

While we acknowledge that a significant portion of the PAR's account receivables was concentrated in the Exceptions Portfolio, JOE LAFORTE never intended for the noteholders to be harmed by a lack of diversity. Portfolios with similar concentrations can be quite profitable. At the end of 2023, shares in Apple made up nearly 50% of Berkshire Hathaway's portfolio.[59] More recently, as of the end of the Third Quarter of 2024, approximately 70% of Berkshire Hathaway's investment portfolio "was concentrated in five companies (American Express Company… Apple Inc…. Bank of America Corporation… The Coca-Cola Company… and Chevron Corporation…)," Quarterly Report for 3d Qtr 2024, *Berkshire Hathaway, Inc.,* p. 10,

---

[59] Yun Li, *Warren Buffett did something curious with his Apple stock holding*, CNBC (Aug. 15, 2024) Available at: https://www.cnbc.com/2024/08/15/warren-buffett-did-something-curious-with-his-apple-stock-holding.html (visited on February 6, 2025).

Note 5. Investments in equity securities, (November 2, 2024), Available at:

https://berkshirehathaway.com/qtrly/3rdqtr24.pdf (visited on February 6, 2025). As a

businessman, JOE LAFORTE's understanding was that it is commonplace for a business to have

anchor clients. An "anchor client" has been described "as one who gives you predictable and

recurring revenue over time, and who comprises a significant portion of your revenue,"[60] a client

that represents at least 10% or at least $10,000 of annual income,[61] or,  "a client who will give

you a predictable source of cash flows." Ayesha Tariq, *Why You Absolutely Need an Anchor*

*Client And How You Can Develop One,* Medium, (November 4, 2020), Available at:

https://medium.datadriveninvestor.com/why-you-absolutely-need-an-anchor-client-f5e3cfe3a799

(visited on February 6, 2025).

  Thus, as a former stockbroker and the *de facto* CEO of PAR, JOE LAFORTE did not

believe that the company's bottom line or its noteholders would suffer from having less than half

of the company's account receivables spread across 16 anchor clients, and over half spread

across thousands of merchants.


  *(ii) Collections Pre-Receivership v. Post-Receivership.*

  Before the Receiver took over, PAR was collecting over $ 1 million *per day*. See

Defendant's Pre-Hearing Memo p. 5 ("Prior to the Receivership, per **week**, Par Funding collected

an average of: $639,424 on its account receivables in 2015, $1,231,839 in 2016, $ 3,266,997 in

---

[60] Matthew Fenton, *Anchor Clients: Why You May Want Them and How to Make Them Work,* Winning Solo, (July 16, 2023) Available at: https://winningsolo.com/anchor-clients/ (visited on February 6, 2025).
[61] Corinne McKay, *Anchor clients: What are they, and do you need them?* Training for Translators (May 16, 2024), Available at: https://www.trainingfortranslators.com/2024/05/16/anchor-clients-what-are-they-and-do-you-need-them/ (visited on February 6, 2025).

2017, $6,343,946 in 2018, and $7,461,241 in 2019. Exhibit F - Glick Expert Report at p. 32 - 36

[Merchants Weekly Repayments 2015 – 2019]); Id. p. 13 – 14 ("Par Funding collected

$215,617,072.97 on accounts receivable *for the period of February – July 2020 alone,* collecting

an average of $ 1,732,084.84 *per day* from merchants in the six months leading up to the

Receivership… See Charts, annexed as Exhibits H – I, R - W.") See 23 CR 198 ECF Doc. #s

292-8, 292-9, 292-18 – 292-23, Glick Expert Report, ECF No. 292-6 at p. 32 - 36 (Merchants

Weekly Repayments 2015 – 2019).

Because the payment schedules for some of the merchants provided that their payments

would be made on a weekly or bi-weekly basis rather than daily, PAR would not have expected

to collect from 100% of its merchants on any given day. With that said, in the month leading up

to the Receivership, PAR had, on average, 2,536 merchant cash advance deals, and PAR

collected payments, on average, from approximately 1,561 of those merchants per day.

For context, PAR was collecting an average of **$1,536,617.51** per day from its merchant-

debtors during the same month that the number of COVID-19 cases in the U.S. surpassed 3

million, and the number of new cases in a day spiked as high as 75,600. See Ex. W to

Defendant's Pre-Hearing Loss Memo, 23 CR 198, ECF Doc. # 292-23; Excerpt from *CDC*

*Museum COVID-19 Timeline*, CDC.gov (Available at:

https://www.cdc.gov/museum/timeline/covid19.html#Mid-2020) (visited on February 3, 2025),

attached as Exhibit D.

If PAR had continued to collect over $ 1 million per day during the Receivership, the

Receiver could have continued making all payments to noteholders under the terms of the

promissory notes. Instead, after the Receiver took over, collections fell to less than $20.5 million

per *year* ($81 million divided by over 4 years since the Receivership began in July of 2020).

For clarification, the collections did <u>not</u> fall sharply because of the lack of extortion. Collections dropped off exponentially because the Receiver did not know how to run a merchant-cash advance business. Recall that pre-Receivership, collections generally occurred automatically through ACH processors. Final PSR ¶ 36.

The Receiver:

- admitted that he "is not an expert in the merchant cash advance ('MCA') industry, has not owned or operated an MCA business, and is therefore incapable of managing the day-to-day operations (or even monitoring the day-to-day operations) by himself,"[62]

- halted all automatic collections for 44 days,[63]

- further obstructed collections by terminating PAR's accounts with ACH processors, requiring the establishment of new arrangements with other ACH processors,[64]

- laid off the majority of the staff of PAR's collections department,[65] and

- appointed a secretary in charge of collections.[66]

That secretary had been hired by PAR on or about June 22, 2020, the month before the

---

[62] Exhibit O to Defendant's Pre-Hearing Memo - Receiver's Corrected Reply in Support of Motion to Approve Retained Professional.

[63] Ex. P to Defendant's Pre-Hearing Memo - Receiver's Quarterly Status Report, p. 13, fn. 1 (after the Receiver took over, ACH processing did not resume until September 8, 2020);  Ex. D to Defendant's Pre-Hearing Memo - Motion of Candell, *Pro Se*, ¶¶ 11 – 14, 18, 20.

[64] Ex. P to Defendant's Pre-Hearing Memo – Receiver's Quarterly Status Report filed 10/30/2020, p. 5 – 6 (discussing winding down of operations with former ACH processors and restarting ACH collections with unidentified ACH processors).

[65] Ex. O to Defendant's Pre-Hearing Memo – Receiver's Corrected Reply, SEC Case Doc. # 114, p. 3; Cross-Motion to Direct Receiver to Engage 70 Skilled, Knowledgeable and Experienced CBSG Employees Forced From Their Jobs Since the TRO and the Receiver's Appointment, SEC Case Doc. # 106.

[66] Defendant LaForte's Response to Status Conference, SEC Doc. # 602, p. 2 – 3, 15 – 16.

Receivership began.[67] Under the Receivership, she offered merchants who had been voluntarily making payments unsolicited offers to drastically reduce their debts to PAR. Id.; see also Exhibit Q to Defendant's Pre-Hearing Memo - Emails from Chris Jordan Exteriors, Peggy McKenzie, and Andre Perez.

Wherefore, but for the Receiver's failures, PAR could have continued collecting over $ 1 million per day on its account receivables, and continued making all payments to the promissory note holders.

### (iii) The Allegations of Extortion Are Not Credible.

We are not arguing that the Receiver would have collected any significant amount of account receivables by using extortionate methods. The precipitous drop in collections is not and cannot be explained by a cessation of extortion. Using entirely legal methods, if the Receiver had done his job properly, he would have been able to continue collecting over $ 1 million per day.

While the Court alleged that JOE LAFORTE "conceded at the hearing, the collection tactics of Par Funding prior to the Receiver's intervention involved extortion,"[68] JOE LAFORTE

---

[67] Id. p. 2.

[68] Court's Findings & Conclusions of Law, p. 17. Presumably, this is based on a line of cross-examination of a federal agent, during which the following exchange occurred:

"A. … they were also threatening to blow up cars and houses."

"Q. To try to collect on these receivables, not to write them off, and collect, correct?

"THE COURT: Wait, is your question they were threatening to blow up cars, so they'd get a **hundred-dollar** receivable? … Did they threaten to blow up cars and things like that to get a hundred-dollar receivable? That's the question from Counsel."

"THE WITNESS: They threatened to blow up cars."

"Q. And the people that were making these threats were saying, send **anything** to CBSG, **even if it's only $100**. We want you to keep paying correct?

did <u>not</u> plead guilty to extortion, either as a substantive count or as a predicate for the Racketeering Conspiracy. As part of the Plea Agreement, the Government will be moving to dismiss, *inter alia,* <u>all</u> pending charges of Collection of Extensions of Credit by Extortionate Means - RICO Indictment Counts 22 – 27.

JOE LAFORTE objected to all allegations of extortion in the first draft of the PSR. The alleged extortion victims are represented by the same attorney in multiple civil actions against PAR funding. This attorney, ("S.H."[69]), has created a niche for himself in litigation against merchant cash advance businesses and, in particular, against PAR and its affiliates. <u>See</u>, e.g. Declaration of S.H., Esq., SEC Action Doc. 691-5, ¶ 3, acknowledging that S.H. has "represented numerous small businesses and their individual owners in actions against Complete Business Solutions Group," since "at least 2017." See also Aff. in Support of SW for Residence, Offices, Electronic Devices, 23 CR 198, Doc. # 198-17, ¶¶ 95, 98, 100 (enumerating some of the merchants represented by S.H., including two of the alleged extortion victims referenced in the Final PSR at PSR ¶¶ 100 – 103 and PSR ¶¶ 113 – 117); SEC Action Doc. # 727 – Reply in Support of Motion to Dismiss Complaint, p. 11 - 12 (discussing S.H.'s representation of PAR's merchants in actions against PAR, and noting that "The publicity from [the SEC Action] may have resulted in [S.H.] getting additional Par merchant clients. For example, BT Supply, Par's largest merchant client that owed Par in excess of ***$91 million*** has now shown up in Receiver billing as a… client [of S.H.]") (emphasis in original).

According to a sworn search warrant affidavit, at one meeting, S.H. purportedly warned JOE LAFORTE that S.H. was going to escalate matters by involving the U.S. Attorney's Office,

---

"A. Yes." Loss Hearing Tr. p. 430, L. 25 – p. 431, L. 23 (emphasis added).

[69] Not to be confused with the individual referred to in the PSR as S.H.

allegedly stating "that the next attorney would be the 'U.S. Attorney.'"[70]

S.H. made good on this warning, proceeding to hire a private investigator to obtain evidence against the defendants for use in the SEC Action and the RICO Action.[71] S.H. also did his best to get alleged extortion victims to come forward to report JOE LAFORTE to the investigators in the RICO Action.

However, despite S.H.'s best efforts, out of PAR's thousands of merchant-clients,[72] S.H. was only able to persuade a handful to come forward with accusations of extortion. The PSR sets forth allegations concerning the alleged extortion of nine merchant-entities and their owners. These alleged victims have one thing in common: they were merchant cash advance clients who retained S.H. to help them get out from under considerable debts that each owed to PAR (and/or PAR's affiliates). For example, one of the alleged victims had owed PAR over **$ 3.5 million**. Final PSR ¶ 100. On May 9, 2019, a second alleged extortion victim received a payoff letter from PAR, advising that her entity's total debt was **$ 11,578,219.64**.[73] Only *after* she had received this letter informing her that her debt was over $ 11.5 million did the alleged victim go to the police to file a Complaint or Incident Report on May 23, 2019, alleging that JOE LAFORTE had threatened her weeks earlier on May 6, 2019. A third alleged extortion victim owed PAR over **$ 4.1 million**. Final PSR ¶ 107. A fourth alleged victim was advanced over **$ 1.2 million**, which does not include the factoring fees that were owed to PAR. Final PSR ¶ 118. After alleging extortion, the merchant's attorney was able to negotiate a settlement with PAR for

---

[70] 7-23-2020 Aff. in Support of S.W. for Residence and Office, ¶ 98 - 23 CR 198, Doc. # 198-17 and Bates USA-SW-000938.
[71] Reply in Support of Motion to Dismiss, p. 12 – SEC Action Doc. # 727.
[72] Ex. A to Defendant's Pre-Hearing Memo – Glick Declaration ¶ 61, indicates that there were approximately 3,600 merchants in the non-Exception Portfolio alone.
[73] Bates SEC-CBSG-P-0152342.

$144,000. Final PSR ¶ 123. A fifth alleged victim owed PAR over **$ 3 million.** Final PSR ¶ 125.

A sixth alleged victim was advanced over **$ 11.5 million** (not counting factoring fees). Final PSR

¶ 128. A seventh merchant-debtor understood his debt to be between $ 2 million and $ 3 million.

Final PSR ¶ 131.

These alleged victims thus had millions of reasons to make false accusations. JOE

LAFORTE supported his objections to the draft PSR with documents undermining the credibility

of a number of these alleged extortion victims. For example, the PSR alleged that JOE

LAFORTE threatened one individual, T.A., beginning in February 2019, and April 2019. PSR ¶¶

120 – 121. We submitted to Probation an email from this same purported extortion victim who

wrote on April 29, 2019 to tell JOE LAFORTE that she is "very thankful for CBSG for all of the

assistance you have provided to me. I'm forever grateful,"[74] which is difficult, if not impossible,

to reconcile with her allegations that JOE LAFORTE had been threatening her and her children

with violence at that point in time.

Similarly, the PSR alleged that JOE LAFORTE threatened K.D., another purported

extortion victim, on May 6, 2019. PSR ¶ 115. However, the very next day after this individual

was purportedly threatened by the defendant, she sent an email to PAR, cheerfully writing

"Yay!"[75] This same witness also sent a gift to express her "gratitude" to PAR on January 12,

2019, which, according to the PSR, is during the same time that K.D. alleges PAR was extorting

her. Ex. 15 to PSR Objections – 1/12/2019 Book of Gratitude from K.D. During the investigation

of the RICO Action, F.B.I. agents in Philadelphia were advised that the F.B.I. office in Baltimore

was opening an investigation into whether K.D. committed loan fraud in connection with

---

[74] Ex. 19 to PSR Objections – 4/29/2019 Email from TA to JOE LAFORTE.
[75] Ex. 14 to PSR Objections – 5/7/2019 Email from K.D. to PAR.

Paycheck Protection Program (PPP) loans she had applied for. Ex. 16 to to PSR Objections – FBI Report dated August 11, 2021.

We also submitted text messages from a third purported extortion victim who, on December 28, 2019, texted to JOE LAFORTE, "love you brother," asking him to go to a football game with him. Ex. 21 to PSR Objections – Text Messages between J.C. and JOE LAFORTE.

In short, the evidence of written communications that were sent by three of the alleged extortion victims referenced in the PSR after they were purportedly threatened suggests the allegations that they were threatened by JOE LAFORTE are simply not credible. Even if we assumed for the sake of argument that out of the thousands of PAR's merchant-customers, less than a dozen merchants were threatened into making payments to PAR, this could not come anywhere close to accounting for the rate of PAR's collections from merchants pre-receivership. Such alleged extortion—which JOE LAFORTE continues to dispute—would have been a *de minimus* portion of PAR's collections*,* and would have had the main benefit of artificially manipulating PAR's default rate to avoid reporting a higher default rate to the noteholders. See Final PSR ¶ 69 ("defendants also forced merchant-customers to make minimum MCA repayments to create the false appearance that they were not in default").

That is not to say that we condone the use of extortion for any reason. However, for clarity, notwithstanding the line of questioning pursued by counsel on cross-examination, JOE LAFORTE does not concede that extortionate methods were used as this is **NOT** part of his (already comprehensive) plea.[76]

---

[76] The defendant's plea required him to accept responsibility for some 9 counts across three different indictments. The Court can note that the parties did not agree to include extortion as one of these multiple counts of conviction, nor as one of the predicates for JOE LAFORTE's plea to the Racketeering Conspiracy.

In sum, but for the Receiver's failure to collect on account receivables (not to mention the Receivership costing tens of millions of dollars in fees and expenses, as detailed in multiple filings in the SEC Action),[77] the note holders could have been paid in full. We acknowledge that this does not change the actual loss amount or the Guidelines, but it is relevant to the nature and circumstances of the offense under 18 USC § 3553(a).

In the SEC Action, JOE LAFORTE has been ordered to pay $142,529,980 in disgorgement.[78] In calculating this disgorgement award, the Southern District of Florida found that "a portion of Par Funding was a lawful business, and therefore legitimate business expenses must be deducted,"[79] These legitimate expenses included, but were not limited to, fees to professionals that PAR had retained pre-Receivership, including "financial firms, marketers, promotional product companies and more… Because the Court views these arms-length consulting fees as legitimate business expenses, the Court deducts **$8,620,102.26** from the SEC's requested disgorgement award," Id. p. 22 – 23 (emphasis in original).

In December 2024, the court in the SEC Action approved an initial interim distribution to the investors from the Receivership in the amount of $110,868,715. SEC Action, Doc. # 2078, 2104. According to the Receiver's latest Quarterly Status Report, prior to the distribution, in December 2024, the Receivership estate had assets totaling $187,501,000, which included $175,474,000 in cash.[80] However, the Receivership collected over $354 million worth of assets,

---

[77] In December 2024, the Receiver filed his 17th Application for Payment of Fees and Reimbursement of Expenses. SEC Action Doc. # 2068. Excluding the Receivership's expenses, the professional fees for the 6th – 17th Applications alone come to over $ 11 million. SEC Action Doc. #s 1176, 1250, 1365, 1445, 1510, 1568, 1667, 1753, 1809, 1969, 2038, 2068.

[78] SEC Action - Second Amended Disgorgement Order, p. 26.

[79] Second Amended Order Granting in Part Amended Omnibus Motion for Final Judgment, SEC Action Doc. # 2065, p. 22.

[80] Receiver's Quarterly Status Report, SEC Action Doc. # 2104, p. 2.

which would be more than enough to satisfy restitution. Compare Ex. J - Receivership Assets as of 12/31/24 (assets totaling over $354.9 million) to Gov's Sentencing Memo p. 14, fn. 7 (current restitution amount of over $ 302 million, which "is expected to decrease as additional assets under the receivership's control are liquidated and returned to investors"). (As of January 31, 2025, the Receiver still had not yet completed the initial  court-approved distribution, indicating that the Receiver was withholding a portion of the funds from the initial distribution pending additional information. Receiver's Quarterly Status Report, SEC Action Doc. # 2104, p. 12. It would almost seem that the Receiver is reluctant to part with funds from the Receivership even a month after being ordered to do so.) Aside from the approved initial distribution of over $ 110 million, another $ 65 million has been reserved in the Receivership estate pending resolution of various issues. Id. p. 12.

### B. Making, Subscribing, Filing a False Return.

Count 31 of the RICO Indictment, Making, Subscribing and Failing a False Return, is premised upon JOE LAFORTE's joint federal income tax return for the Year 2018 (form 1040X).

For Tax Year 2018, JOE LAFORTE's federal tax return falsely reported that he had not earned any income, despite his receipt of substantial income through PAR (including but not limited to cash payments that one of PAR's merchant cash advance customers made directly to JOE LAFORTE, instead of to PAR). RICO Indictment p. 74, ¶ 8(a), p. 77 – 78, ¶ 6.

### C. Failure to Collect and Pay Over Tax

Count 44 of the RICO Indictment is premised upon the fact that Full Spectrum Processing, a corporation that was an affiliate of PAR, made payments to employees under the

table, in cash. RICO Indictment p. 81, ¶ 11. (According to the PSR, "virtually all of Par

Funding's employees were converted to employees of Full Spectrum Processing, Inc…. in early

2017," Final PSR ¶ 41.)

Full Spectrum Processing was required under federal law to withhold taxes for individual

income, Social Security, and Medicare.[81] JOE LAFORTE had a responsibility to ensure the

collection and withholding of these taxes for the IRS on behalf of Full Spectrum Processing.[82]

JOE LAFORTE failed to account for the cash payments made to employees when Full Spectrum

Processing filed its federal quarterly employment tax return for the Fourth Quarter of 2019

(Form 941).

Thus, JOE LAFORTE failed to collect required federal employer withholding taxes on

behalf of Full Spectrum Processing for the Fourth Quarter of 2019. Id. p. 82, ¶ 14.

D. Perjury.

Count 45 of the RICO Indictment is premised upon JOE LAFORTE committing perjury

when he was deposed on December 5, 2019, during discovery in the matter of Fleetwood

Services, LLC, et al. v. Complete Business Solutions Group, Inc. d/b/a Par Funding, et al., 18

CV 268 (E.D. Pa).

More specifically, to further defendants' interests in said civil action, and in furtherance

of the scheme to defraud PAR's noteholders, JOE LAFORTE made false statements at his

deposition concerning his role at PAR, whether he had received any profits from PAR, whether

he had knowledge of others' roles at PAR, of PAR's accounts receivable, of the amount of

merchant cash advances PAR funded, or of PAR's default rates. RICO Indictment, p. 83 – 88.

---

[81] RICO Indictment p. 80, ¶¶ 5 – 7.
[82] Id. p. 81, ¶ 10.

#### E. Obstruction of Proceedings and Aiding and Abetting.

Count 52 of the RICO Indictment is premised upon JOE LAFORTE endeavoring to obstruct the SEC Action. More specifically, after one of the Receiver's attorney's, G.A., moved in the SEC Action to evict JOE LAFORTE and his wife from their primary residence for the failure to pay rent to the Receiver, JOE LAFORTE conspired with a co-defendant to cause serious bodily injury to G.A. On February 28, 2023, JOE LAFORTE communicated with a co-defendant at the conclusion of a virtual proceeding in the SEC Action. The co-defendant allegedly then waited for G.A. to exit his law office, followed G.A. from his law office, and then struck G.A. with an object (possibly a flashlight later recovered from the scene by a third party).

Count 52 is also premised on threats of force that said co-defendant allegedly made in a phone call on March 2, 2023 to a witness in the SEC Action, identified in the RICO Indictment as "Extortion Victim No. 6."[83] More specifically, the alleged threat was, "We're coming after you. We're going to split your head open you c---," Id. p. 57, ¶ 73(d).

#### F. Conspiracy to Defraud the IRS.

On February 22, 2024, the RICO Action was effectively severed by the Grand Jury into the RICO Action and the initial indictment in 24-CR-65. (An Amended Second Superseding Indictment in the RICO Action followed days later, to correct the failure to redact certain names from the Second Superseding Indictment in that action.)

Count 1 of the Indictment in 24-CR-65 (the "Tax Indictment") is premised on JOE LAFORTE conspiring with others to defraud the IRS by underreporting the federal taxable income of his wife and an entity under his wife's name, Heritage Business Consulting, Inc., for tax years 2016 – 2018.

---

[83] RICO Indictment p. 56 – 57, ¶ 73(d), p. 108, ¶¶ 1 - 2.

### G. Wire Fraud.

Count 7 of the Tax Indictment, Wire Fraud, is based on JOE LAFORTE's participation in a scheme to defraud the Commonwealth of Pennsylvania out of Pennsylvania income taxes, through misrepresentations in tax forms that JOE LAFORTE and his wife were residents of the State of Florida, when they were, in fact, residents of Pennsylvania. (The State of Florida does not have a State Income Tax.)

Specifically Count 7 is premised on an email that JOE LAFORTE had his wife send to an accountant on August 14, 2019 with signed tax forms for tax year 2018, where said tax forms included the misrepresentations that their home address was an address in Palm Beach, Florida (which, in fact, was the address of a realtor), and that he and his wife were not residents of Pennsylvania. Tax Indictment, p. 32, ¶ 29, p. 35, ¶ 38.

### H. Felon in Possession of Firearms.

On July 23, 2020, law enforcement successfully applied for a warrant to search JOE LAFORTE's primary residence for evidence in the investigation of the RICO Indictment. This warrant was executed on or about July 27, 2020.

During the search of the residence, law enforcement found and seized, among other things, seven firearms. Six of the firearms had been legally purchased by JOE LAFORTE's wife[84] after she was the victim of a robbery. On September 27, 2013, an individual entered Ms. McElhone's nail salon and "pulled a knife on her and other employees in the store," and stole her wedding ring, her earrings, and her watch.[85] Our understanding is that Ms. McElhone was hurt during the robbery; more specifically, that her ear was slashed with the assailant's knife, causing

---

[84] Final PSR ¶ 163.
[85] Ex. X to Declaration in Support – 3/25/22 Aff. in Support of S.W. for Cell Site Info. ¶ 72 – filed as Doc. # 198-24 in 23 CR 198.

blood to cover her face and leading her to fear for her safety. As a result, Ms. McElhone thereafter became a licensed gun owner in order to defend herself in the future.

Nevertheless, during the execution of the search warrant in July 2020, one firearm was seized from JOE LAFORTE's desk and two other firearms were seized from his nightstand. Final PSR ¶ 164.

At the time of the search of the residence in 2020, JOE LAFORTE already had prior felony convictions. In October 2006, JOE LAFORTE pled guilty in Nassau County, New York, to grand larceny and money laundering[86] concerning a conspiracy involving a law firm retained to represent homeowners in real estate transactions. In 2010, JOE LAFORTE pled guilty in the District of New Jersey to conspiracy to operate an illegal gambling business. Final PSR ¶ 39.

As a result of the seizure, on August 5, 2020, JOE LAFORTE was indicted in 20 CR 231 for possession of at least one of the seized firearms in violation of 18 U.S.C. § 922(g)(1). He was arrested on August 6, 2020 on said indictment, and released on bail on October 22, 2020. Final PSR p. 3.

JOE LAFORTE was arrested again on May 23, 2023 following the initial indictment in 23 CR 198. He has been held at the Federal Detention Center ("FDC") without bail ever since. The Bureau of Prisons ("BOP") reports that he has not had any infractions during his detention. Final PSR ¶ 32.

JOE LAFORTE has used his time at the FDC to take a number of courses, including Intro. To Stress Management, Facts about MRSA, Signs of a Stroke and Prevention, How to Play Dominoes, How to Play Foosball, How to Play Checkers, Final PSR ¶320, and Parenting and

---

[86] Final PSR ¶ 39.

NRDAP, in addition to correspondence programs offered by Life's Key. Exhibits 23 – 27 to Objections to PSR (Certificates).[87]

## **DISCUSSION**

### I. Guidelines Calculation.

Pursuant to U.S.S.G. § 2B1.1(a)(1), because Securities Fraud has a statutory maximum term of imprisonment of 20 years, the base offense level for Counts 1 and 21 of the RICO Indictment (Racketeering Conspiracy and Securities Fraud), is 7.

Because the actual loss was more than $ 250 million, but not more than $ 550 million, 28 levels are added. Final PSR ¶ 198.

The offense level is raised by 2 levels for 10 or more victims, Id., and by another 4 levels for JOE LAFORTE's aggravated role as leader of PAR/the racketeering conspiracy.

2 more levels are added due to the defendant's obstruction of justice, bringing the offense level for the Racketeering Conspiracy and Securities Fraud Group up to 43 (7 + 28 + 2 + 4 +2). Final PSR ¶ 202.

While we have already objected to Probation's inclusion in the PSR of groups for unpled and unproven conduct, it is undisputed that the Racketeering Conspiracy/Securities Fraud group has the highest offense level, that the total number of units is 1 and that there is therefore no further increase to the offense level of that group, making 43 the combined offense level. Final PSR ¶ 284.

---

[87] On January 27, 2025, when we submitted defendant's objections to the initial PSR, we advised Probation that in addition to the courses identified in the PSR, the defendant had also taken NRDAP and Parenting at the FDC and correspondence programs while incarcerated, supporting our objection with proof of completion. For reasons unknown, Probation does not appear to have addressed this objection in the Addendum of the Final PSR.

The offense level is then reduced 3 points for the defendant's timely acceptance of responsibility, bringing the total adjusted offense level down to 40. Final PSR ¶¶ 286 - 288.

JOE LAFORTE had 5 criminal history points from his prior convictions, putting him in criminal history category III. Final PSR ¶ 293.

At criminal history category III, Offense Level 40, JOE LAFORTE's advisory Guidelines range is 30 years to life in prison.

However, as stated above, the Court already accepted JOE LAFORTE's plea pursuant to Fed. R. Crim. Pro. 11 (c)(1)(C), and has therefore agreed to accept a sentencing recommendation of between 162 – 186 months of imprisonment, followed by 3 years of supervised release.

II. 18 U.S.C. § 3553(a).

We respectfully submit that, despite the draconian advisory Guidelines range, a sentence of 162 months is appropriate in the case at bar.

A. The Need to Reflect the Seriousness of the Offense and to Provide Just Punishment.

Because one of the § 3553(a) factors is for the punishment to appropriately reflect the seriousness of the offense, the Court may grant a downward variance where, as here, the Guidelines overstate the seriousness of the offense. Application Note 21(C) to U.S.S.G. § 2B1.1 provides that where "the offense level determined under this guideline substantially overstates the seriousness of the offense….a downward departure may be warranted." For clarity, we believe the appropriate vehicle under the terms of the R. 11(c)(1)(C) plea is for the Court to grant a downward variance, rather than a departure. United States v. Nagle, 2016 U.S. Dist. LEXIS 35840, *2 - *3; 2016 WL 1088809 (M.D. Pa. March 21, 2016) (prior to defendant's appeal, the district court had granted both a downward variance and a downward departure for the guideline

range overstating the seriousness of the offense). However, case law concerning this departure is instructive. One district court outlined four scenarios where the guideline for § 2B1.1 overstates the seriousness of the offense, two of which are relevant herein.

The first is the "multiple causation" scenario, where "the amount of loss may be the product of several sources, in addition to the defendant's conduct," United States v. Forchette, 220 F. Supp. 2d 914, 924 (E.D. Wis. 2002) (citing United States v. Kopp, 951 F.2d 521, 531 [3d Cir. 1991]) (other citations omitted). Such is the case here where, as discussed *supra*, PAR was a profitable business, timely making all payments to the noteholders up until the Receivership (or, at least, up until the COVID-19 pandemic). Prior to the Receivership, PAR was collecting over $1 million per *day*, collecting on average from 1,561 of its clients *per day* during the COVID-19 pandemic. (Again, because the payment schedules for some merchants required them to make payments on a weekly or bi-weekly basis, PAR never expected to collect from 100% of its merchants on a daily basis.) During the Receivership, collections fell to less than $ 20.5 million per *year.*

Collections did not dwindle because the Receiver would not engage in extortion of a small fraction of PAR's thousands of customers; they dwindled because, by his own admission, the Receiver did not know how to run a merchant cash advance business.[88] Under the Receiver,

- collections ceased for 44 days,

- PAR's accounts with ACH processors were terminated and had to be replaced,

---

[88] Exhibit O to Defendant's Pre-Hearing Memo - Receiver's Corrected Reply in Support of Motion to Approve Retained Professional.

- 70 experienced PAR employees, including experienced collections staff, accountants, bookkeepers, and underwriters were laid off ,[89]

- an unqualified secretary was appointed to oversee collections—a secretary who then extended unsolicited offers to paying merchants to drastically reduce their debts to PAR, and

- those fired under the Receiver  also included attorneys who had been in the process of bringing foreclosure actions on PAR's behalf against merchants' collateral and of putting in a claim against the estate of a wealthy decedent who had personally guaranteed the debt of a merchant. We estimate that prior to being fired by the Receiver, these attorneys had been collecting approximately $100,000 per week on PAR's behalf, and that the attorneys had been in the process of collecting perhaps $135 million or more at the time the Receivership began (which was not included in the account receivables figure of $ 415.6 million at the start of the Receivership). Cf. Defendant's Joint Response to Receiver's Status Report of September 8, 2020, SEC Action Doc. # 249, p. 2 – 3 (estimating that the law firm had been "collecting on $148M in unpaid merchant receivables", and distinguishing said unpaid receivables from the "current accounts receivable").

(Not to mention the eight figure fees and expenses billed by the Receiver that would not have been incurred but for the Receivership.)

---

[89] Cross-Motion to Have Court Direct Receiver to Engage Approximately 70 Skilled, Knowledgeable and Experienced CBSG Employees Forced From Their Jobs, SEC Action Doc. #106, p. 2.

The Receiver's conceded inexperience in running an MCA business and his inept practices [90] unquestionably contributed to the loss. In addition to the fact that no collection attempts were made for 44 days and ACH processing was shut down, pursuant to the investigation, the FBI and/or the SEC attorneys reached out to merchants, informing them there was an investigation into PAR for fraud, which gave the suggestion to merchants that there was no need to continue their payments to PAR. Thus, the "multiple causation" scenario is one reason that the Guidelines overstate the seriousness of the offense.

The court in <u>Forchette</u> referred to the second pertinent scenario as "Unusual Conduct or Role," which would encompass an atypical fraud defendant in that "his intent… may have been significantly different than of the usual fraud defendant, e.g. he may have entered the scheme with honest intentions or with the intent to make good on his obligations," 220 F. Supp. 2d at 925 (citing <u>United States v. Monaco</u>, 23 F.3d 793, 799 [3d Cir. 1994]; <u>United States v. Stuart</u>, 22 F. 3d 76, 82 [3d Cir. 1994]) (other citations omitted).

Such is the case here, where, while the actual loss from the racketeering conspiracy/securities fraud was great, it was never JOE LAFORTE's intent to cause a loss to the noteholders. JOE LAFORTE's intent was to earn a profit, not only for himself, but also for the noteholders. Since the inception of PAR to the day the Receiver was put in place, JOE

---

[90] We cannot emphasize enough that it was the aforementioned failures, **not** the refusal to engage in extortion, that caused collections to dwindle under the Receivership. Even if we assumed *arguendo* that the allegations of extortion were true (which we do not), we are talking about a handful of merchants, making up only a small fraction of PAR's thousands of clients. And we vehemently dispute the allegations of extortion. In addition to the obvious motive of the alleged victims to make false accusations to get out from under crippling debt (millions of dollars' worth), we presented Probation with documentary evidence of written communications from a number of the alleged victims after they were allegedly being threatened by the defendant, where, far from appearing apprehensive, they wrote of being "forever grateful", of "love" for JOE LAFORTE, or simply cheerfully exclaiming "Yay!" <u>See</u> *supra* Subsection II(A)(iii) of Facts Section (citations omitted).

LAFORTE's singular focus was the financial success of *both* PAR and himself. He tirelessly devoted himself to the company, working 7 days a week, for 15 or more hours a day.[91]

Involved in every aspect of operating the company,[92] JOE LAFORTE ran PAR as a profitable business, with the goal of selling the corporation. The more profitable that PAR was, the more money that JOE LAFORTE hoped to sell PAR for.[93]  The defendants misrepresented the *extent* of PAR's profitability. As discussed, prior to the Receivership, PAR collected over $ 1 million *per day* on accounts receivable, totaling more than $ 1.3 billion over the course of PAR's existence ($ 39 million more than PAR had advanced). With the exception of the onset of the COVID-19 pandemic, PAR never missed a single payment to the noteholders.

Thus, another reason the Guidelines overstate the seriousness of the offense is that JOE LAFORTE is an "unusual" fraud defendant who never intended to cause a loss to the noteholders, notwithstanding his role in the securities fraud.

There is also another, broader reason that the Guidelines overstate the seriousness of the offense, and it is that the loss Guidelines, which were overstated at their inception, have only

---

[91] Discovery includes a 302 Report, dated March 2022, of an interview of a potential purchaser of the company. The would-be purchaser had wanted the deal to include JOE LAFORTE remaining on at the company in some capacity after the sale because JOE "LAFORTE was the 'heartbeat' of the company", noting that JOE LAFORTE worked 15 hour days, 7 days a week. 302 Report p. 2.

    PAR's former employees corroborated that "it was a rare occurrence when LAFORTE was not at work, considering that most employees knew him to be someone who worked long hours at the office." Ex. X to Declaration in Support – 3/25/22 Aff. in Support of S.W. for Cell Site Info., 23 CR 198, Doc. # 198-24, at ¶ 80. Likewise, when JOE LAFORTE was on parole, his parole officer interviewed JOE LAFORTE's wife, who reported that "she works long hours like her husband." Id. ¶ 51.

[92] Cf. Final PSR ¶ 40 (indicating JOE LAFORTE "was consulted on or had the final say over all major decisions."); 302 Report of Interview with Potential Purchaser (referring to JOE LAFORTE as the "heartbeat" of PAR).

[93] 302 Report of Interview of the potential buyer, according to whom a main issue in the negotiations was the sales prices.

become more and more draconian over the years. "The three sets of amendments to the loss table of the fraud guideline alone have effectively multiplied several times the recommended sentence applicable in 1987 for large-loss frauds, which itself was set higher than historic sentences. Each of the three increases in the recommended Guideline ranges for fraud crimes was directed by Congress, without the benefit of empirical study of actual fraud sentences by the Sentencing Commission." United States v. Corsey, 723 F.3d 366, 380 (2d Cir. 2013) (Underhill, D.J., concurring).

The result is a loss guideline that is "fundamentally flawed, especially as loss amounts climb. The higher the loss amount, the more distorted is the guideline's advice to sentencing judges. As a well-known sentencing commentator has put it, '… the guidelines now are divorced both from the objectives of Section 3553(a) and, frankly, from common sense…'" Id., (quoting Frank O. Bowman, III, *Sentencing High-Loss Corporate Insider Frauds After* Booker, 20 Fed. Sent'g Rep. 167, 168 [2008]).

The case at bar illustrates the absurd, draconian nature of the Guidelines, as the upper end of the Guidelines range for *securities fraud*—a white collar offense—would have still been life imprisonment even if JOE LAFORTE had not pled guilty to any additional counts.

The Guidelines do not take into account that, aside from April and May of 2020 (which was during the beginning of the COVID-19 pandemic), PAR did not miss a single payment to noteholders prior to the placing of PAR into Receivership.

The Guidelines also do not take into account that, notwithstanding the misrepresentations to the noteholders, JOE LAFORTE's intent was not to cause them a loss, but to earn profits, not only to benefit himself and his family, but to the benefit of PAR's investors, as well.

Because the Guidelines cannot take into account the nuances of each case, the Court must make an individualized assessment under § 3553(a), especially in a case such as this one where "the Guidelines range zooms off the sentencing table… '[W]here, as here, the calculations under the guidelines have so run amok *that they are patently absurd on their face*, a Court is forced to place greater reliance on the more general considerations set forth in section 3553(a),'" Corsey, 723 F. 3d at 380 (Underhill, D.J., concurring) (emphasis added) (quoting United States v. Adelson, 441 F. Supp. 2d 506, 515 [S.D.N.Y. 2006], *aff'd mem.,* 301 F. App'x 93 [2d Cir. 2008]).

In short, while the Guidelines range (of 30 years to life) overstates the seriousness of the offense, a sentence of 13 ½ years (162 months) would adequately reflect the seriousness of the offenses and to provide just punishment. While we do not make excuses for JOE LAFORTE's conduct or make light of the severity of the conduct, he is not the villain that the Government would portray him as.

We turn now to additional factors that would support a sentence of 162 months.

B. Devotion to Family.

The attached character letters attest to JOE LAFORTE's devotion to his family. For instance, his sister writes of how he took care of their father "when our father was seriously ill. Joe stepped up without hesitation to be his primary caregiver. He dedicated his time and energy to ensuring our father had everything he needed, from scheduled doctor's appointments to providing around-the-clock care. He was patient, compassionate, and tireless, and his efforts significantly improved our father's quality of life during a very difficult time," Letter from Tara Gibson (attached).

His sister also writes of how JOE LAFORTE has helped their family in other ways, including when he helped her when she moved. "His support has been instrumental in helping me through personally. Several years ago, I made the decision to move to Philadelphia. I was leaving behind a familiar… environment for a completely new city, with no established support system. This move was incredibly overwhelming. I felt lost and isolated… It was during this time of vulnerability that Joe recognized my struggles and made a conscious effort to ensure I didn't feel alone… He would spend countless hours with me, exploring the city, introducing me to new places and people, and simply being there to talk. He patiently listened to my anxieties and frustrations, offering a steadying presence and unwavering encouragement… His absence would create a significant void in our family, and his unique ability to provide support and stability would be sorely missed." Letter from Tara Gibson (attached).

Their sister Jenn adds, "Joey is kind, thoughtful and selfless. There have been endless times I've been thankful to call him my big brother and have been grateful for his friendship and love. I'm asking for you to remember that he is a husband uncle and brother- and his family needs him." Letter from Jenn LaForte (attached).

His mother writes that her son's crimes "do not define him. He is a devoted husband, a loving son, and even a caretaker to his beloved dogs… As his mother, I remain steadfast in my support and commitment to him." Letter from Tina LaForte (attached).

His sister-in-law recounts how the defendant helped her with her schoolwork, with gaining experience, and her school sports team. "I remember when I first met Joe, I was in high school. Our basketball team didn't have the funds for new uniforms, and he was the first person to donate to my high school so our team could have what we needed. Joe was always patient and kind and helped me with papers in school, gave me a job after school and during my summers

off so I could learn something constructive and build my resume." Letter from Jamie McElhone (attached).

She goes on to write that, "Joe's absence has affected mine and my family's greatly, especially my sister, Lisa. He was always there for anything that any of us ever needed and it has been difficult without him. He has been an instrumental role model and big brother in my life and I miss him very much." Id.

JOE LAFORTE's wife writes of how the defendant has, time and again, gone above and beyond for his family. "I have come to know Joe as a caring and devoted partner, who is always there for our family and friends. He has a deep sense of responsibility and has always strived to provide for us… I have witnessed Joe doing so many good deeds for myself, our family, friends, and others that I cannot possibly list all of them. Joe was the first person to recognize when someone in our family needed help with substance abuse and took it upon himself to send them to rehab. He called the facility, made reservations and booked that person a plane ticket so they would get the treatment they needed… He helped put family members through school and offered to move those in need closer to us, so they had opportunities to work. He hand-delivered Christmas trees to our family and friends during Christmas time when they were not in the spirit." Letter from Lisa McElhone (attached).

His wife also reports that, "It is very hard dealing with his absence during this challenging time, and I kindly ask for your understanding and leniency as you make your decision," Id. She advised Probation that she "'needs this to be over.' … He has been instrumental in her professional education and has always been a huge help to her family." Final PSR ¶¶ 304 - 305. See also Letters from James and Margaret McElhone, Defendant's Father-in-Law and Mother-in-Law ("He has been a dedicated and loving partner to our daughter

demonstrating love, and commitment to family. Joe consistently goes out of his way to help others and has been there countless times for our family during difficult moments and times of need").

Downward variances under § 3553(a) are <u>not</u> to be conflated with downward departures. <u>United States v. Gunter</u>, 462 F.3d 237, fn. 10 (3d Cir. 2006) (citing <u>United States v. Vampire Nation</u>, 451 F.3d 189, 195, n. 2 [3d Cir. 2006]). Accordingly, § 3553(a) factors may weigh in favor of a downward *variance* regardless of whether they would have merited a downward departure. <u>See</u> <u>United States v. Howe</u>, 543 F.3d 128, 138 (3d Cir. 2008) (Government's argument regarding downward departures, "might have merit under the Guidelines, but it is without merit with respect to a non-Guidelines variance. <u>See</u> <u>United States v. Smith</u>, 445 F.3d 1, 5 [1st Cir. 2006]"); <u>United States v. Jones</u>, 460 F.3d 191, 194 (2d Cir. 2006) ("the Guidelines limitations on the use of factors to permit departures are no more binding on sentencing judges than the calculated guidelines ranges themselves").

Here, the defendant's close relationships with his family constitutes a mitigating factor under § 3553(a). <u>United States v. Weary</u>, 2021 U.S. Dist. LEXIS 70724, *15; 2021 WL 1387757 (E.D. Pa. April 2021) ("supportive family" had been one of the factors that resulted in below guidelines sentence); <u>United States v. Telfair</u>, 2021 U.S. Dist. LEXIS 140688, *10 - 11; 2021 WL 3185812 (D.N.J. July 28, 2021) ("family connections" one of the factors that resulted in a significantly below Guidelines sentence"). <u>See also</u> <u>United States v. Levinson</u>, 350 Fed. Appx. 756, 758 (3d Cir. 2009) (impact on family one of the mitigating factors that resulted in a below-Guidelines sentence); <u>United States v. Rivers</u>, 2021 U.S. Dist. LEXIS 9358, *8; 2021 WL 168516 (D.N.J. January 19, 2021) ("family situation" one of the factors that resulted in a below guidelines sentence).

The defendant's role in his family and the support of his family should thus be taken into consideration under § 3553(a) when determining where within the agreed upon sentencing range to sentence the defendant. We submit that the factor weighs in favor of a sentence of 162 months (13 ½ years).

### C. Helping Others.

In addition to helping his family, JOE LAFORTE has given back to society. For example, he volunteered his time to help deliver food for Meals on Wheels in 2022. See attached Emails re: Meals on Wheels.

His wife writes of how JOE LAFORTE, "puts everyone's needs before his own… I have witnessed Joe doing so many good deeds for myself, our family, friends, and others that I cannot possibly list all of them… He… sent a close colleague to therapy… when they were dealing with a very hard time. Joe took it upon himself to find a psychologist, booked the appointment and made sure that person had someone to talk to when they didn't feel comfortable speaking to anyone else. He helped employees get emergency medical appointments, find them apartments to live in, and pay for funerals for their family who he never met or knew… I firmly believe that Joe can continue to be a positive influence not only for our family but also for the community." Letter from Lisa McElhone.

His mother writes that JOE LAFORTE "has provided jobs and training to those struggling, helping them rebuild their lives. His advocacy for children with Duchenne muscular dystrophy is yet another testament to his selflessness and desire to make a difference," Letter from Tina LaForte.

His friend Paul Pristavec writes that "Joe is a charitable person and always helped me physically or monetarily with my various charitable endeavors. Every summer Joe would

accompany me on a charity cruise around Manhattan for the Cristian Rivera Foundation. A few children with brain cancer would be on the cruise and Joe would interact with them and lift their spirits. He has also paid for airfare for sick children and their families to attend Memorial Sloan Kettering for treatment… He has employed thousands of people over the years… He has given people opportunities in business that they would not normally get and helped them to excel." Letter from Paul Pristavec (attached).

T. Anthony Jones writes that "Mr. LaForte went out of his way to help my daughter secure a summer internship while she was a Junior at Penn State University. His support in this regard meant a great deal to our family," Character Letter from T. Anthony Jones (attached).

These examples of selfless behavior weigh in favor of a sentence of 13 ½ years.

We turn now to another factor that weighs in favor of a sentence of 13 ½ years, the defendant's remorse.

D. Remorse.

The attached letters attest to the remorse that JOE LAFORTE feels for his offenses. His wife states, "While I fully acknowledge the severity of the matter at hand, I want to emphasize that Joe is genuinely remorseful for the mistakes made. I have witnessed firsthand the commitment to personal growth and the desire to make amends." Letter from Lisa McElhone (attached).

His in-laws likewise write, "While we understand the gravity of the situation at hand, we truly believe that Joe is remorseful and has recognized the impact of his actions. We have seen him take responsibility for mistakes, seeking ways to grow and improve." Letter from James and Margaret McElhone (attached).

His sister concurs, "We understand that Joseph must be held accountable for his actions, but I sincerely hope that when you consider his sentence, you will also take into account the positive contributions he makes to our family's wellbeing and the deep remorse he has expressed… We believe that he has the potential to learn from this experience," Letter from Tara Gibson (attached). And his mother writes, "I truly believe this experience can serve as a turning point in his life, and I have faith in his resilience and capacity for redemption," Letter from Tina LaForte (attached).

The Third Circuit has recognized that "a defendant's degree of remorse at sentencing may be considered as a basis for downward variance under § 3553(a)," Howe, 543 F.3d 128, 138 (citing United States v. Todd, 515 F.3d 1128, 1134 n. 3 [10th Cir. 2008]). The Third Circuit also noted that remorse does not have to be "extraordinary" in order to be a mitigating factor under §3553(a). Howe, 543 F.3d at 138 (citing Gall v. United States, 552 U.S. 38, 128 S. Ct. 586, 595 [2007]).

Wherefore, JOE LAFORTE's remorse is another factor weighing in favor of a sentence of 13 ½ years, which brings us to a related factor.

### E. The Need to Protect the Public from Further Crimes of the Defendant.

Although we acknowledge that JOE LAFORTE's criminal history increases his risk of recidivism, that risk is lowered by other factors, including:

- his remorse,

- his age,

- his level of education,

- his history of employment, and

- an offer to employ JOE LAFORTE after his release.

JOE LAFORTE is currently 54 years old. Even taking into account the time that he has served at the FDC since his arrests in the matters at bar, he will be in his 60s when he is released.

There is a well-documented inverse relationship between age and risk of recidivism. United States v. Patterson, 2019 U.S. Dist. LEXIS 222167, *11; 2019 WL 7290436 (M.D. Pa. Dec. 30, 2019) (citing UNITED STATES SENTENCING COMMISSION, THE EFFECTS OF AGING ON RECIDIVISM AMONG FEDERAL OFFENDERS 22-23 [2017]); United States v. Pitt, 2020 U.S. Dist. LEXIS 144280, *11; 2020 WL 4677251 (M.D. Pa. Aug. 12, 2020) (citing same). "As to protecting the public, United States Sentencing Commission studies have found that recidivism declines with increasing age of release of federal offenders… Furthermore, 'older offenders have the lowest recidivism rate of any age [group] in U.S. prisons.'" United States v. Stephens, 2020 U.S. Dist. LEXIS 242671, *19 - 20, 2020 WL 7699839 (D.V.I. Dec. 28, 2020) (quoting *The High Costs of Low Risk: The Crisis of America's Aging Prison Population*, The Osborne Association [2018] at 11) (also citing United States Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders*, at 25, Fig. 19 [December 2017], available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf).

Indeed, the U.S. Sentencing Commission has found that:

- older offenders are "more likely to receive departures and variances based on age," and other factors;[94]

---

[94] Kristin M. Tennyson, Lindsey Jeralds, Julie Zibulsky, *Older Offenders in the Federal System*, at p. 38 - 39 (July 2022), Available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220726_Older-Offenders.pdf  (visited on January 31, 2025).

- "[t]he recidivism rate of older offenders… was less than half that of offenders under the age of 50," Id. p. 5, and

- "Recidivism events for older offenders were less serious, compared to offenders under the age of 50." Id.

JOE LAFORTE's age is thus a mitigating factor that reduces the need for specific deterrence in the case at bar.

His level of education, which includes some college, is another factor that curbs his risk of recidivism. United States v. Staats, 505 F. Supp. 3d 958, 967 (E.D. Pa. 2020) (citing Report-At-A-Glance: Recidivism & Federal Sentencing Policy, United States Sentencing Commission [Mar. 2016], https://www.ussc.gov/sites/default/files/pdf/research-and-publications/backgrounders/RG-recidivism-overview.pdf).[95]

Further mitigating his risk of recidivism, T. Anthony Jones has offered to employ JOE LAFORTE after "his release from prison… as a consultant with Trio Solutions Inc. He has worked in this capacity for me in the past and added tremendous value to the company… I am confident that he will continue to be an excellent contributor in the future." Employment Letter from T. Anthony Jones (attached). "'[P]articipation in pro-social behaviors like employment, education and civic engagement — the very things that people with criminal records are often barred from participating in — actually reduce[s] recidivism.' Indeed, study after study has shown – and the government has repeatedly acknowledged – that secure employment is one of the best ways to combat repeat criminal conduct." Doe v. United States, 168 F. Supp. 3d 427

---

[95] See also United States v. Vidrine, 2024 U.S. Dist. LEXIS 151716, *14 (E.D. Cal. August 22, 2024) ("greater education levels and age of Mr. Vidrine reduce his recidivism rates") (citing U.S. Sent'g Comm'n, *Recidivism of Federal Offenders Released in 2010* 24-25 [Sept. 2021], https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210930_Recidivism.pdf).

(E.D.N.Y. 2016) (citations omitted). See also United States v. McKnight, 33 F. Supp. 3d 577, 586 – 587 (D. Md. 2014) (regarding "negative correlation between employment and recidivism rates").

Likewise, although we do recognize that JOE LAFORTE committed a number of the offenses at bar through PAR, PAR was nonetheless a legitimate merchant-cash advance business. Nor was it the only time that JOE LAFORTE has been gainfully employed. For instance, he started out his career as a stock broker on Wall Street. Employment history is a mitigating factor under § 3553(a). See United States v. Tomko, 562 F.3d 558, 571 (3d Cir. 2009) (affirming below-Guidelines sentence of probation, community service, restitution, and fine where factors supporting variance included, inter alia, employment record).

Wherefore, the risk posed by JOE LAFORTE's criminal history is counterbalanced by numerous factors, including but not limited to his age, his employment history, his offer of employment upon his release, his level of education, and his remorse for his crimes. The need for specific deterrence is therefore not as high as it is for others in his Criminal History Category.

F. The Need to Promote Respect for the Law.

We respectfully submit that a sentence of 13 ½ years would be sufficient but not greater than necessary to promote respect for the law. While we acknowledge that this is well below his advisory Guidelines range of 30 years to life imprisonment, Guidelines sentences do not actually promote respect for the law.[96]

There is evidence that the public, were they aware of the Guidelines (which they are not), would find them far too severe. When "a district court asked jurors what each thought was an

---

[96] And, in any event, a Guidelines sentence is not an option in the matters at bar given his Fed. R. Crim. Pro. 11(c)(1)(C) plea.

appropriate sentence: 'In several cases, the recommended median Guidelines range was *more than 10 times greater* than the median jurors' recommendation," Hopwood, Shon R., *Improving Federal Sentencing* (March 15, 2018). University of Missouri-Kansas City Law Review, Vol. 87, No. 79, 2018 at Footnote 48. Available at SSRN: https://ssrn.com/abstract=3353521 (visited on January 8, 2025) (emphasis added) (quoting James S. Gwin, *Juror Sentiment on Just Punishment: Do the Federal Sentencing Guidelines Reflect Community Values?*, 4 Harv. L. & Pol'y Rev. 173, 187-88 [2010]).

## <u>CONCLUSION</u>

The Court needs to consider more than the sum of the defendant's offenses and criminal history. JOE LAFORTE is legally responsible for the loss to the noteholders, but he did not intend the loss to the noteholders, which was caused by the Receivership.

His risk of recidivism from his Criminal History is mitigated by numerous factors, including his age, his employment history, his offer of gainful employment upon his release, his remorse for his crimes, and his education.

He has the support of a loving family, including but not limited to his wife, his mother and in-laws, and sisters. He has gone out of his way to help others, both in his family and in his community, whether by volunteering for Meals on Wheels, helping people with school, or with work, caring for an ailing father, or helping others get the medical care that they need.

By our calculations, even a sentence of 162 months would put JOE LAFORTE at least at age 63 before he is released from prison. The Sentencing Commission's research indicates that he is unlikely to return to a life of crime at that age. Or, as his wife told Probation, "the defendant is 'older now and would never want this situation again.'" Final PSR ¶ 305.

We respectfully submit that JOE LAFORTE has learned his lesson from this experience and will turn over a new leaf upon his release.

Wherefore, we respectfully request that the Court sentence the defendant to 162 months (13 ½ years) imprisonment, plus supervised release.

Thank you for your consideration.

Dated: New York, New York                              Respectfully submitted,
        February 7, 2025


/s/ *Joseph R. Corozzo*                               /s/ *Brian McMonagle*
Joseph R. Corozzo                                     Brian McMonagle
RUBINSTEIN & COROZZO LLP                              MCMONAGLE, PERRI, MCHUGH,
260 Madison Ave., 22nd Fl.                            MISCHAK DAVIS
New York, New York 10016                              1845 Walnut Street, 19th Floor
212-545-8777                                          Philadelphia, PA 19103
jcorozzo@rubcorlaw.com                                215-981-0999,
*Pro Hac Vice Counsel*                                bmcmonagle@mpmpc.com
*for Defendant Joseph LaForte*                        *Counsel for Defendant Joseph LaForte*