UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,  :   CRIMINAL CASE
                         :
        Plaintiff(s)    :   Case No.2:20-cr-231-1-MAK
                         :         2:23-cr-198-1-MAK
                         :         2:24-cr-65-1-MAK
                         :
   v.                :   Philadelphia, Pennsylvania
                         :   March 26, 2025
JOSEPH LAFORTE          :   Time 9:00 a.m. to 7:20 p.m.
                         :
        Defendant(s)    :
. . . . . . . . . . . . . . .

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE MARK A. KEARNEY
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff(s):      Matthew Todd Newcomer, Esq.
                       Samuel S. Dalke, Esq.
                       Eric D. Gill, Esq.
                       Joseph Minni, Esq.
                       U.S. Attorney's Office
                       615 Chestnut St., Ste. 1250
                       Philadelphia, PA 19106

For Defendant(s):         Joseph R. Corozzo, Esq.
                       Rubinstein & Corozzo, LLP
                       260 Madison Ave.
                       22nd Floor
                       New York, NY 10016

Court Recorder:           Nelson Malave/Christian Henry
                       Clerk's Office
                       U.S. District Court

Transcription Service:    Precise Transcripts
                       45 N. Broad Street
                       Ridgewood, NJ 07450

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

```
                              INDEX


                              D    C    RD   RC    FRD  FRC

WITNESSES FOR PLAINTIFF:


Tina Allegretta
(By Mr. Dalke)               45         89
(By Mr. Corozzo)                  56              91


WITNESSES FOR DEFENDANT:


John Murray
(By Mr. Newcomer)            92         218
(By Mr. Corozzo)                  167            226


Gaitan Alfano               233
(By The Court)



EXHIBITS:                                         Marked

Plaintiff's

M1        Email from Par Funding                  103
M2        Email from Joe Mack to Joe Cole         104
M3        Email from Par funding                  106
M4        Email from Par funding                  107
M5        Email from Par funding                  109
M6        Email from Par funding                  109
M7        Email from Par funding                  110
M8        Email from Par funding                  112
M9        Email from Par funding                  116
M10       Photograph of Renato Gioe               118
M11       Printout from threat intake center      131
M12       Group chat from Laforte's cell phone    145
M13       Chat from Laforte's cell phone          148
M15       FD 302 interview with Mr. Perrillo      219
```

1    (Proceedings started at 9:22 a.m.)

2    JUDGE MARK A. KEARNEY:  Good morning, please be

3    seated.

4    COUNSEL:  Morning, Your Honor.

5    THE COURT:  Thank you.  We're here this morning in

6    the rescheduled sentencing hearing under a tentative

7    acceptance of a C Plea in the matter of United States versus

8    Joseph Laforte.  May I have the entry appearance first for

9    the United States?

10   COUNSEL MATTHEW TODD NEWCOMER:  Yes, Your Honor,

11   Matthew Newcomer for the government.  I'm here with a AUSA,

12   Sam Dalke, AUSA Eric Gill, behind us, AUSA, Joe Minni.  Also

13   here for the government, special agent -- FBI special agent

14   John Murray.  We have special -- FBI special agent, Rob

15   Lithgow (ph), IRS CI agent Allison Larow (ph) and FDICOIG

16   agent James Gresik (ph).

17   THE COURT:  Thank you.  You're all welcome.  Thank

18   you very much.  And on behalf of Mr. Laforte.

19   COUNSEL JOSEPH R. COROZZO:  Good morning, Your

20   Honor.  On behalf of Joseph, Joseph Laforte, Joseph Corozzo,

21   and to my far left is my associate Ian Keeley. Good morning,

22   Your Honor.

23   THE COURT:  Welcome sir.  And welcome Mr. Keeley.

24   And welcome Mr. Laforte.  And, and thank you officers for

25   being here as well.

1        MR. COROZZO:  Thank you, Judge.

2        THE COURT:  Alright.  Mr. Corozzo, do you expect Mr.

3   Laforte will want to allocute today, wants to speak to us

4   today?

5        MR. COROZZO:  No, Your Honor.  Your Honor, Your

6   Honor, there is one thing I do want to address though.  I, I

7   believe the court just put on the record that this is for the

8   tentative acceptance of --

9        THE COURT:  Oh, yeah.  There's a lot of facts I

10  didn't know about.

11       MR. COROZZO:  Your Honor, but you've --

12       THE COURT:  You want to go to trial?

13       MR. COROZZO:  Your Honor, you've accepted it.  It's

14  on the record that the court accepted the 11C plea.

15       THE COURT:  Yeah.  Did you look at the case law?

16  Did you look at the --

17       MR. COROZZO:  C Plea.  I have the case law.

18       THE COURT:  Hold the case law.  Third Circuit case

19  law about the ability to withdraw a C Plea upon further

20  evidence of facts.

21       MR. COROZZO:  And not only do I have Third Circuit

22  case law, Your Honor, but I have --

23       THE COURT:  Hand it up.

24       MR. COROZZO:  I have Supreme Court case law.

25       THE COURT:  Okay.  I have it too.

1          MR. COROZZO:  Hughes (ph) versus United States.  The

2    United States Supreme Court decided June 4th, 2018, once the

3    district court accepts the agreement, the agreed upon

4    sentence is the only sentence the court may impose.

5          THE COURT:  Right.

6          MR. COROZZO:  That's on page 19 of that document.

7    Also, Third Circuit, Your Honor, United States v Hicks,

8    decided July 17th, 2008.

9          THE COURT:  Let me ask it this way, sir.

10          MR. COROZZO:  Yes, Your Honor.

11          THE COURT:  A footnote, let me get your right

12    footnote, because I don't think we have, I don't think we

13    have a benefit of the bargain.  At footnote, at page 36 of

14    your memorandum at footnote 90, quote, "we vehemently dispute

15    the allegations of extortion."  You pled to them.

16          MR. COROZZO:  No, we did not, Your Honor.  The plea

17    does not include --

18          THE COURT:  What is count one?

19          MR. COROZZO:  The plea -- as -- if you read the plea

20    and the statement of facts submitted by the government and

21    put on the record at the time of the plea, the RICO

22    conspiracy is a conspiracy that involved -- that was pled to,

23    involved two predicate acts, securities, fraud and, and wire

24    fraud.  That is on the record.  It's in the transcript.

25          THE COURT:  So, you believe that a racketeering

1  conspiracy that includes extortion does not include the idea

2  that we have a, that we have a, that we have extortion in the

3  conspiracy, even though he may not have been involved it, but

4  involves extortion in the conspiracy.

5       MR. COROZZO:  Your Honor, I, I believe that he can

6  plead and the government can offer a plea to objects of the

7  conspiracy.

8       THE COURT:  Right.

9       MR. COROZZO:  And limit those objects of the

10  conspiracy.  In this case, the objects of the conspiracy were

11  limited on the record and in writing in the plea agreement

12  and the statement of facts that were attached to the plea

13  agreement and, and which were stated to the court and

14  accepted by the defendant prior to the court accepting the

15  11(c)(1)(C) plea.

16       COUNSEL MATTHEW NEWCOMER:  Your Honor, for the

17  government, we, we, we agree with Mr. Corozzo.  We, we carved

18  out two predicate, two groups of predicates, wire fraud and

19  securities fraud as part of the plea agreement.  And in the

20  plea, and I think we put this on the record.

21       THE COURT:  So what happens to the -- why am I

22  hearing anything?  What happens to the extortion?  Does the

23  public not get to any kind of remedy for the extortion?

24       MR. NEWCOMER:  No, we, we, we do, Your Honor.  So

25  our, our plea agreement contemplated us at sentencing what

1  we're doing here today, putting on evidence of extortion.

2          THE COURT:  Yeah.  But, but the sentences you

3  arrange, the range you give of sentences, all those cases,

4  none of them involved the kind of conduct that occurred here.

5  I looked at every single one of them.  This is Elizabeth

6  Holmes on down.  You give me a single case that involves the

7  type of conduct that was engaged in this case.

8          MR. NEWCOMER:  The, the facts are all unique, Your

9  Honor.  I, I agree with that.

10          THE COURT:  And so you're going lower than those

11  other cases.

12          MR. NEWCOMER:  We're -- the, the sentence we're

13  recommending here, Your Honor, and we're recommending for the

14  government 15 and a half years, we think falls in line with

15  those cases.

16          THE COURT:  Really?  Did you look at them?  I'm sure

17  you did.  Right?  You gave me a memorandum.  Not a single one

18  of them involved the type of damage and harm and physical

19  harm to people that this case involves.

20          MR. NEWCOMER:  Well, I, I, I don't disagree with

21  that, Your Honor.

22          THE COURT:  So why is the United States so low?  I'm

23  not going to decide it now.  But you're saying extortion is

24  not part of it.

25          MR. NEWCOMER:  No, no.  Extortion is part.  When we,

1     we, we crafted that sentence, Your Honor, we fully intended

2     to do what we're doing here today, which is to hold Mr.

3     LaForte responsible for the extortion conduct that was baked

4     into our range from the beginning.  They were going to fight

5     us on it, and they can fight us on it if they want to.  We

6     stand by 15 and a half years as covering the extortion, the

7     obstruction, the securities and wire fraud and the tax

8     accounts.  It's all --

9            THE COURT:  Is your view the same that if I, I

10    believe there's been a -- not been a benefit of the bargain,

11    that there's a misunderstanding of the terms of the extortion

12    that, that I am bound by it under 11C?  Because those cases

13    are talking about full -- they're talking about a full

14    explication of the conduct before the C plea.  Do you believe

15    we're bound by it now even though there was not a full

16    expectation of the conduct?

17           MR. NEWCOMER:  Well, I believe we're bound by it

18    now, Your Honor.  But I also believe that, you know, and I'm

19    hopeful that we're going to present the evidence today, make

20    our arguments, and that, you know, we're going to try to

21    convince, Your Honor, that 15 and a half years for the

22    government is the appropriate sentence from Mr. LaForte here

23    and holds them accountable for all the conduct.

24           THE COURT:  So your answer is, your answer is yes.

25    That you believe it's bound.  Even though, even though we

1 have a statement by counsel that says, quote, pretty amazing

2 statement, frankly.  It says that "we vehemently dispute the

3 allegations of extortion."

4    MR. NEWCOMER:  It, it's a, it's a --

5    THE COURT:  We have an agreement.  And you agree

6 with that?

7    MR. NEWCOMER:  I don't agree.  No, I agree that

8 they're vehemently opposing that, Your Honor.  What I don't

9 agree with is that, it was somehow not presented to the court

10 at the, at the plea hearing.  We were very careful to present

11 only the, the two groups of predicate crimes, the securities

12 and wire fraud as supporting that count one conviction.  And

13 in our plea agreement, I think we went over these terms.  You

14 know, we all agreed at sentencing, the government would still

15 try to prove up the, the, the -- and we put specific

16 language, we will still prove up the extortion of conduct

17 because we believed that we can prove it.  He should be held

18 accountable for it.  And that it factors into why we're

19 arguing 15 and a half years and not 13 and a half years.  So

20 it's very much a part of the package we're presenting to you,

21 to you today, Your Honor.  I, I, you know, we, we haven't

22 briefed it.  We haven't looked at it.  If you asked my

23 opinion, I, I think you're bound by it.  But I would rather

24 address it.

25    THE COURT:  I, I, I'm not comfortable taking it

1　because I'm not comfortable that I, that, that, that it was

2　explained to us that this gentleman was denied extortion.

3　He's denying it.  He's saying, I, I agree to count one.  I

4　plead guilty to racketeering.  I'm a racketeer.  I agree to

5　that, but, but guess what?  I wasn't involved in the

6　extortion.

7　　　　　MR. NEWCOMER:  That's what he's saying, Your Honor.

8　And we don't think it's true.

9　　　　　THE COURT:  No, but you're saying I'm bound by a

10　plea agreement where it does not consider extortion.

11　　　　　MR. NEWCOMER:  Well, no.  The plea agreement, again,

12　Your Honor and argue the plea agreement does consider

13　extortion.  The plea agreement carved out and said the

14　government intends to prove this up.  ATS sentencing to

15　present it to Your Honor, as a reason why we think the high

16　end of that sentence is appropriate for 15 and a half years.

17　So, so it is, it is in the plea.  It wasn't something that

18　was carved out.  They're just not pleading guilty to it.  And

19　we're going to argue it as relevant conduct, Your Honor, just

20　like we do in a lot of cases where something outside of the

21　counts of conviction or relevant conduct.  So maybe that's a

22　better way to put it, Your Honor.  We're arguing extortion is

23　relevant conduct.  They were aware of it going into it.  We,

24　we specifically included those paragraphs in the plea

25　agreement saying, yeah, we agree the government can try to

1   prove extortion.  We're denying it, but the government can

2   try to prove it.  And that will factor into your sentence

3   today,

4        MR. COROZZO:  Your Honor, that would be the position

5   of the defense also.  This is specifically provided for in

6   the plea agreement that the government was going to prove the

7   extortion.  And when the court accepted the 11(c)(1)(C) plea

8   and stated that, that there is some range that the court has

9   discretion and it's significant of two years, that this all

10  goes to this alleged relevant conduct.  Now, again, Your

11  Honor, we are disputing what's in the pre-sentence report.

12  The witness is here today.  I think there's a lot of reasons

13  that they're incredible and we're, we're, we're willing to

14  move forward.  We --

15       THE COURT:  I don't know if I am.  Well, I, I don't

16  -- I, I didn't understand any of this.  I mean, I -- maybe I

17  just missed it, but I thought when you plead the count one,

18  you plea as example of these hard acts.  I want to, I want

19  to, I want to get the plea agreement again.  You're telling

20  me it specifically says, on each of count one, quote

21  "Defendant understands and agrees by counsel with respect to

22  the count's charge on each counts count one and count 21."

23  Is there a caveat there, Mr. Newcomer?

24       MR. NEWCOMER:  No, Your Honor.  We're pulling up the

25  plea agreement.

1      THE COURT:  I have it ahead of me.  Okay.  Paragraph

2   six.  I mean, maybe it's there somewhere else.

3      MR. NEWCOMER:  One moment, Your Honor.

4      THE COURT:  Okay.  It allows you to comment on the

5   evidence, including not limited to the conduct -- what you

6   did not charge on is extortion and conspiracy to obstruct

7   justice.  I get that.  But you can comment on it.  Yeah, I

8   have the plea right here.

9      MR. NEWCOMER:  Okay.  So this is in -- I'm looking

10   at, Your Honor, on, on the plea agreement page, it starts on

11   page two.

12      THE COURT:  Yep.

13      MR. NEWCOMER:  It's a section of the plea where we

14   typically say what the parties going to be able to argue with

15   sentencing.  Government agrees move to dismiss these counts.

16   Okay.  That's subparagraph A.  C, comment on the evidence in

17   the case.  Bring to the court's attention, all facts known as

18   sensing, including, but not limited to the convict charge in

19   counts 22, extortion.  If the conspiracy, yada, yada yada.

20   The government also may bring the court's attention, evidence

21   related to count one racketeering conspiracy of the amended

22   second superseding indictment in case 23.  That does not

23   otherwise form the basis of the defendant's plead to count

24   one, including, but not limited to overt Acts 68 through 74.

25   So what we're saying there, Your Honor, is, is we're going

1    to, you know, this conduct is not included in the plea.  They

2    wouldn't plead guilty to it.  They wouldn't have fight us

3    about it as a sentencing.  We said, that's fine.  You know,

4    we still stand by our range, the C plea range.  But we're

5    going to fight you with sentencing and we're going to present

6    this evidence to Your Honor.

7             THE COURT:  Hold on.  Let me look at the

8    (indiscernible) 68 to 74.  Okay.  Amending, but that does not

9    otherwise go to basis of the defense guilty plea.  How do you

10   read, how do you read C?  I mean, how, how do you read six

11   then?  What are you saying is six?  The defendant

12   understands, agrees, and has explained to him by counsel.

13   They encode the following statutory maximum of sentences with

14   respect to the counts on count one and 21, 20 years

15   imprisonment for each count.  What, what is the, what is the

16   -- where's the carve out, sir?  I'm missing it.

17            MR. NEWCOMER:  Well, that in, in six, there is --

18   the sixth is just a statutory maximum for the, for the

19   counts.

20            THE COURT:  No, it says he agrees.  He -- okay.

21            MR. NEWCOMER:  Yeah.  Your Honor, we're not -- and,

22   and you know, we're not trying to put you in a, in a corner,

23   Your Honor.  This, this was a, a plea we took, and it was a

24   complicated plea.  We took it back and I think September, it

25   was, it was a while ago.  I guess what we'd ask is like, if,

1    if we can put forward the evidence here, we have witnesses

2    that will testify in the extortion.  We can get through that.

3    We can get through the objections to the PSR.  We can make

4    our allegations and then, Your Honor, can, you know, make a

5    decision or take a break or whatever Your Honor needs to do,

6    to evaluate whether or not you still think that range is

7    appropriate or not.  That's what we propose to move this

8    forward.

9         MR. COROZZO:  Your Honor, and, and I would object to

10   that process because we've, we've --

11        THE COURT:  Tell me where it is, Mr. Corozzo.  Tell

12   me.  Tell me where it is in the plea agreement.

13        MR. COROZZO:  Since the plea in September, all of my

14   actions were based upon the court's acceptance of the

15   11(c)(1)(C) plea, which is on page 58 of the plea transcript

16   where the court says, "I'm going to find today that I'm going

17   to accept that range."

18        THE COURT:  Yeah, exactly.

19        MR. COROZZO:  We've done everything.

20        THE COURT:  Here's the plea.  Here's the plea.  Tell

21   me where it is.

22        MR. NEWCOMER:  Well, did -- I think where it is,

23   Your Honor, is that --

24        MR. COROZZO:  The plea 11(c)(1)(C) range is in that

25   plea.

1        THE COURT:  Oh, yeah.  But it's based -- nothing in

2     there says that this idea that we can't talk about extortion,

3     excuse me.  That, that, that we're carving out the extortion

4     part of count one.  Can you tell me where it is?  I'm just

5     missing it.

6        MR. NEWCOMER:  Well, they're only agreeing to -- it

7     says right here, paragraph one, Your Honor.

8        THE COURT:  Paragraph one.

9        MR. NEWCOMER:  Yeah.  Defendant agrees to plead

10    guilty to counts one.

11       THE COURT:  Right.

12       MR. NEWCOMER:  Charging him with racketeering

13    conspiracy.  Crime one.

14       THE COURT:  Predicate crimes being securities fraud

15    and wire fraud.

16       MR. NEWCOMER:  Right.  With the predicate crimes

17    being securities fraud and wire fraud.  So those are the two

18    predicates that form the basis of that count.  And then in

19    the, the plea memo, Your Honor, on page three, and I, I

20    believe we covered this during the colloquy too.  The parties

21    have agreed that the predicate crimes underline the RICO

22    conspiracy in this case are for purposes of the defendant's

23    guilty plea securities and wire fraud.  The defendant

24    understands and agrees that sentencing the government, well

25    as necessary, seek to prove the existence of additional

1   predicate crimes as charged in the indictment, including the

2   extortion and collection of credit and obstruction of

3   justice.

4            THE COURT:  And, and you're -- okay.  Alright.

5            MR. NEWCOMER:  So that's where, that's our attempt.

6   It was our attempt, Your Honor, to carve that out from the

7   plea agreement.  You know, we couldn't reach terms on those,

8   those, those items.  They wanted to fight them, fine.  We

9   agreed to, to reserve that battle until today and to fight

10  about extortion today as opposed to in the plea and the plea

11  --

12           MR. COROZZO:  And the pro -- and the province of

13  that evidence would be whether the court were to give a

14  sentence of 13 and a half, or 15 and a half, or somewhere in

15  the middle.

16           MR. NEWCOMER:  Yeah.  I suppose that Mr. Corozzo is

17  going to argue that, you know, that the evidence of extortion

18  is incredible and therefore Your Honor should sentence him on

19  the low end of that scale, which he's entitled to do, to

20  argue.

21           THE COURT:  I'm going to hear the evidence.  I

22  haven't -- I'm not persuaded.  I'm going to hear the

23  evidence.  Mr. Corozzo, if you don't want to go forward, I'm

24  happy to postpone.

25           MR. COROZZO:  Your Honor, I would --

1          THE COURT:  Unless you, unless you brief it.  Sir,
2     I'm speaking now.
3          MR. COROZZO:  I'm sorry, Your Honor.
4          THE COURT:  What happened here -- I'll hear all the
5     evidence.  I have an open mind.  But for a lawyer to write to
6     me in a, in a footnote in a federal court that we vehemently
7     deny conduct that is pled to at least in part is of concern.
8     That's all I'm going to say.  I, I, I had the impression that
9     we were not, we were not, I thought we were here on a plea
10     agreement that said, yes, the Judge will accept 13 to 15 --
11     13 and a half to 15 and a half years plus whatever I do on
12     supervisory release.  But we will, but, but it would be
13     involving conduct in count one.  The predicate acts as a
14     securities fraud and, and, and, and as conduct.  And then to
15     say, well, we didn't commit extortion, we vehemently deny it,
16     I think is a, a, an injustice to those people.  I'll hear the
17     evidence.  But --
18          MR. COROZZO:  Your, Your Honor, may I just inquire
19     again, what footnote are we referring to?
20          THE COURT:  Sure.  Your footnote, sir.
21          MR. COROZZO:  Yes, I understand that.
22          THE COURT:  Page 36.  Footnote 40.  I'm sorry.
23     Footnote 90.  Get my pen.  Get my glasses.  Footnote 90.
24          MR. COROZZO:  Of my presentence, of my --
25          THE COURT:  No.  Of your sentencing memorandum.

1    Yes, sir.  Footnote 90 on page 40, in addition to the obvious

2    motive of the alleged victims make false accusations to get

3    out from under their crippling debt.

4              MR. COROZZO:  Your Honor, we are specifically --

5              THE COURT:  I got you.  Got you.  You can present

6    it.  I'm just saying that was not my understanding of --

7              MR. COROZZO:  We're not referring to every instance

8    in --

9              THE COURT:  Oh, you're not?

10             MR. COROZZO:  -- in front of this case.  No, we're

11   referring to the persons listing the PSR, which is why we're

12   having this hearing today.  We're not, we're not suggesting

13   across the board, we are talking about specific people that

14   have put forth in the PSR, which we have a substantial amount

15   of evidence to contradict what they're stating.  And we think

16   that's relevant to the court's calculation.  However,

17   however, having said all that, Your Honor, again, I've

18   proceeded for the last six months on the basis that the court

19   accepted the 11(c)(1)(C).  I do not want to go any further --

20             THE court:  Okay.

21             MR. COROZZO:  -- without the court accepting it.  So

22   I would then like the opportunity to issue --

23             THE COURT:  You'd like to talk to your counsel about

24   -- talk to your client about going to trial.  Would you like

25   to talk to your client about going to trial?

1          MR. COROZZO:  Your Honor, may I brief the issue that

2     the court is bound --

3          THE COURT:  Yeah, I'm aware.  I'm bound if I have an

4     understanding of the terms.  I agree with you.  The problem

5     is if -- I, I don't have an under-- I didn't have an under --

6     well, and maybe you -- and, and maybe you can show it to me,

7     but I, I am thinking that why do we have a count a sentence,

8     a plea that says, this gentleman among other things, did a

9     bunch of conduct, allegedly.  And he -- and, and I thought he

10    pled to it involving racketeering among other things.  That I

11    knew that it was dropping the extortion claim as a, as a

12    count of conviction.  I did not think it was being dropped as

13    part of a racketeering conviction.  And I -- and I'm, and,

14    and I, I, the United States is telling me that I read

15    paragraph one to be exclusive.  That's only security fraud

16    and wire fraud.  That's the question of law.  Because if the

17    court doesn't have an appreciation, if, if it is not

18    explained fully to the court under 11C, this is why we don't

19    generally accept it ahead of time.  But I accept it because

20    I've had an understanding that we are, we were dealing with

21    the same issue through the racketeering conspiracy.  I'm

22    happy to, I'm happy to have it briefed.  Mr. Newcomer?

23         MR. NEWCOMER:  Yes.  We're, we're, we're happy to

24    brief you, Your Honor, but I, I believe we, you know, I --

25         THE COURT:  Do you think that's a -- do you think

1   that you, you -- do you think that gives notice that there's

2   nothing else involved in count one other than securities

3   fraud and wire fraud?

4           MR. NEWCOMER:  Your Honor, and, you know, now

5   withstanding Your Honor's questioning --

6           THE COURT:  No, I'm just asking, is that the way, is

7   that the way it's way written?

8           MR. NEWCOMER:  I think paragraph one combined with

9   paragraph 3C and I believe -- let me just check, Your Honor.

10  I think it also comes up in -- it's a lengthy plea agreement.

11          THE COURT:  Okay.

12          MR. NEWCOMER:  So, so certainly those two --

13          THE COURT:  The overt acts.

14          MR. NEWCOMER:  So certainly paragraph one, paragraph

15  3C.  And then also, Your Honor, I think we have to take, you

16  know, into consideration the, the full transcript of the plea

17  colloquy, which I don't have in front of me.  I'm not sure we

18  ordered it.  I'm not sure.  It's before the parties.  And

19  then also the government's change of plea memo where we also

20  attempted to spell that out, that we were carving out, you

21  know, as the predicates for count one going forward on, for

22  purposes of the plea were securities and wire fraud.  Now he

23  also pled guilty to obstruction, which is another predicate

24  RICO, RICO predicate, not to confuse things further.  But the

25  extortion, you know, we tried to be clear that we're

```
1    reserving the right to battle that as relevant conduct at
2    sentencing.
3            THE COURT:  Let me see.  You was talking about a
4    (indiscernible) 68 through 74 in superseding indictment count
5    one.  Okay.
6            MR. NEWCOMER:  Yeah.  Those, those were, I think,
7    dealt with the attack on Mr. Alfano (ph), I believe.  But I
8    can pull it up there.
9            THE COURT:  The government may also bring to the
10   court's attention evidence relating to count one of the
11   amended to it does not otherwise form the basis of defense,
12   guilty plea, including, but not limited to.  So what you're
13   saying is we reserve the right to talk about it.
14           MR. NEWCOMER:  Yeah.
15           THE COURT:  We're able to talk about it.
16           MR. NEWCOMER:  Improve it.
17           THE COURT:  But it's not a, it's not a count of
18   conviction.
19           MR. NEWCOMER:  Correct.
20           THE COURT:  Go -- sort of conduct to inform the
21   court under 3553.
22           MR. NEWCOMER:  We're -- I'm confident we're going to
23   prove it today, Your Honor.  You're going to have no doubt
24   that just committed extortion.
25           THE COURT:  Talking about that.  Mr. Corozzo
```

1   disagrees with that.

2   MR. NEWCOMER:  And my, and my, and my colloquy or

3   my, my, my allocution, Your Honor, I'm going to say 15 and a

4   half years is appropriate because of the securities fraud,

5   because of the wire fraud, because of the extortion, because

6   of the extraction, because of the tax crimes.  It's all part

7   of our case.  We're not abandoning it, we're moving forward

8   with it today.  It's just Mr. Laforte reserved his right to

9   fight about it for whatever reason.  Whether it was a good

10  idea or not, strategically, that's up to Mr. Corozzo, Mr.

11  Laforte.

12  THE COURT:  Okay.

13  MR. NEWCOMER:  But, but we intended to present it to

14  you and we're trying to be transparent about how we were

15  going to do that.

16  MR. COROZZO:  And Your Honor, just, just to make the

17  record clear, my, my footnote objects to the statements in

18  the PSR.  Now, again, we agree with the government, the

19  defense and the government agree that this is relevant

20  conduct.  This is factors to considered under 3553.  And just

21  as the court instructed my client, if there's anything within

22  the PSR that you, you, you don't agree, you object, you have

23  the opportunity to contest it.  We are merely contesting

24  what's in the PSR.

25  THE COURT:  Is that sir?

1           MR. COROZZO:  Yes, Your Honor.

2           THE COURT:  What?

3           MR. COROZZO:  We are in the footnote.

4           THE COURT:  What portion of your footnote talks

5    about the PSR?

6           MR. COROZZO:  We are talking about a handful of

7    merchants making up a small fraction of thousands of clients.

8    We presented probation with documentary evidence of written

9    communications from a number of the alleged victims.  This is

10   exactly what we're doing.  We presented our arguments to

11   probation about why these certain people are incredible.

12   Probation chose to continue to include it.  And we are

13   requesting the opportunity to contest what's in the probation

14   report at a hearing and to contest any relevant conduct that

15   the government wants to argue.  Your Honor, this was laid out

16   very, very specifically in the plea.  It was very carefully

17   done by both parties.  And I'm almost at a loss as to why

18   we're here.  Because if, if my writing offended the court, I

19   have to take responsibility for that.

20          THE COURT:  I'm not, I'm not --

21          MR. COROZZO:  But I am talking about, and --

22          THE COURT:  Sir, sir, let me interrupt you, but

23   that's not what you did here.  Alright, let's, let's be

24   candid with each other.  Okay.  That's not what happened

25   here.  That's not what was said there.  I mean, you, you talk

1   about probation, but that's not what was said there.  Okay?

2   So, I, I, I, I don't get offended.  I get, I get concerned

3   that lawyers think they can write whatever they want when

4   they, when they have an allegation, vehemently dispute the

5   allegation of extortion.  And if the context is -- here's the

6   bottom line.  If the context is, I'm disputing it in

7   connection with count one, I understood that.

8         MR. COROZZO:  And I'm disputing it with the PSR,

9   that's exactly what I'm doing.  The relevant conduct and the

10  inclusions in the PSR.

11        THE COURT:  Alright.  Here's the, here's the bottom

12  line of it though, frankly.  It just struck me that

13  regardless of what I think about how the plea agreement was

14  presented, the reality is even if I understood that extortion

15  would be part of that, that extortion was not being

16  challenged.  At least as in part, the reality is I did

17  understand that and I still accepted 13 and a half to 15 and

18  a half.  So the bottom line is, while I think there has been

19  some confusion and, and, and I'm not suggesting that I may

20  not have caught it, but some confusion.  The reality is my

21  confusion would only have been to the benefit of the

22  defendant because I thought it was already included in, and I

23  was still thinking 13 and a half to 15 and a half would be

24  okay.  What I was getting at is, is I'm -- is now that I

25  think now that I say I, I understand that what you're saying

1     is it should be a number that you argue for the lower end, he

2     argues the higher end.  I'm going to, I'm going to, I'm going

3     to revisit and go forward.  I'm going to, I'm going to stick

4     with it, and let the evidence play out as it will.  There's

5     other, there's other ability, things I can do on supervisor

6     lease, things like that.  But let me hear the evidence.

7              MR. NEWCOMER:  And Your Honor, just one more, just

8     for the record.  16A of the plea agreement, paragraph 16A, we

9     all -- I'm sorry, paragraph 16, subparagraph G.  So paragraph

10    16 is a stipulation to the parties entered, and so you'll see

11    a number of stipulations, right?  So paragraph G, as set

12    forth in paragraphs 3C, that's when we talked about above the

13    parties agreeing to stipulate that the government in its

14    discretion may present evidence of sentencing related to the

15    dismissed counts, including, but not limited to conduct

16    charging count 22 extortion and 50 conspiracy justice.  And

17    the rest of the paragraph is basically saying, you know, we

18    want to make sure that Mr. Corozzo wasn't going to come into

19    court today and say, "Hey, no, you can't argue that because

20    it's not part of the plea."  We carved it out and said, no,

21    no, no, he agrees.  We can argue it.  He can fight it.  And

22    Your Honor makes a decision whether to include it or not.

23             THE COURT:  The, the point being, the, the point

24    being.  Yeah, I -- that's a simple, similar to what you said

25    earlier, paragraph.  The point being though, when, when

1   United States -- when a plea agreement says he agrees to

2   plead guilty to count one with the predicate crimes being

3   securities fraud and wire fraud, you're -- it's -- you're

4   saying courts should interpret that as being only securities

5   fraud and wire fraud.

6         MR. NEWCOMER: Well, I'm saying, and we wouldn't, we

7   wouldn't, we wouldn't have just put that in there. And, and

8   you know, Your Honor, we -- is that combined with the other

9   paragraphs combined with the colloquy where we, we tried to

10   explain it, how we were doing it, I wouldn't want to just

11   have that language and then not flag it with, Your Honor.

12   You know, we, we, we put the language in there in a couple

13   places and, and we believe, we flagged it in the plea

14   colloquy, you know, so that we, you know, we believe all

15   parties were on the same page in terms of what was being

16   proposed.

17         THE COURT: Alright. I'm going to, I'm going to

18   proceed, and see where, see where it takes us.

19         MR. NEWCOMER: So the evidence, Your Honor, that the

20   government --

21         THE COURT: Oh, I'm going to -- I, I you're not

22   going to present evidence now. Let me, let me, let me --

23   just a couple things first. Okay. Thank you. United States

24   under the Crime Victims Act, I've seen victim impact

25   statements. We just talked about a couple of them, I guess.

1   Have you guys -- has the United States fulfilled a duty, Mr.

2   Minni, etc., have you guys fulfilled a duty to tell all the

3   people involved in this of today's hearing?

4           MR. NEWCOMER:  We have, Your Honor.  It's Mr. Dalke

5   -- I put on the record for James LaForte's sentencing hearing

6   was a combination of direct contact by us, direct conduct by

7   our agents, and then the electronic victim notification

8   system that notifies all the investor and securities victims

9   of, of, of this hearing and what's involved.

10          THE COURT:  Okay, I'm not going to swear Mr.

11  Laforte.  He does not wish to present testimony today.  The -

12  - today we hear under three indictments that have been agreed

13  to be consolidated for purposes of sentencing, three cases.

14  The first is indictment delivered down on 8th -- August 5th,

15  2020, which was a felon-- Mr. Laforte was a twice felon

16  before this for being in possession of a firearm at that

17  time, at the time of search warrant in 2020.  The second one

18  we're looking at is a super-- 59 count superseding

19  indictment, which is just the one we've been talking about in

20  number 23-198, which was including among others, 59 counts,

21  including counts involving racketeering, wire fraud,

22  conspiracy to use extortion at means, tax evasion, false

23  returns, perjury, and a variety of retaliation counts along

24  with aiding and abetting.  There was a request in that

25  indictment for a forfeiture of $416,395,484.  Thereafter, a

few weeks later, there was a third -- there was another case
open called 24, number 65.  That was 11 count superseding
indictment relative to tax conduct, which we'll talk about
involving Ms. McElhone (ph) and Mr. Laforte and accountants
and others.  Mr. Laforte had been arrested on August 6th,
2020.  He was released on October 22nd, 2020, and that, that
release was revoked on May 23rd, 2023.  So he was the street
until May 23 of, of 2020, approximately May 23rd, 2023.  We
had extensive discovery in this case.  They were, or they are
-- they were three separate cases, and they are three
separate cases, frankly.  We're just being consolidated
purposes sentencing.  So, for purposes of understanding,
these are different occasions.  They're just being sentenced
together today.  These are not in any way to be -- to
indicate something as a common one-day event.  These occurred
over a period of time, the three different indictments.  The
-- Mr. Laforte agreed, as we just talked about, to a plea
agreement on September 11th, 2024, in which United States
agreed, agreed to consolidate dismiss counts.  And Mr.
Laforte agreed to plead guilty to the following charges that
he was engaged in a racketeering conspiracy with a sentence
up to 20 years.  He was engaged in securities fraud for up to
sentence up to 20 years.  He was engaged in filing a false
income tax return with a sentence up to three years that he
failed to collect and pay over tax for a sentence up to five

years, that he himself or others committed perjury, was up to

five years.  And that he, among others, obstructed

proceedings and he had embedded so with the sentence up to

five years.  He also pled guilty, said he committed the

conduct to -- to defraud the United -- Internal Revenue

Service in tax case 24-65, as well as committed wire fraud

account seven with a sentence of no more than 20 years in

count.  In case number 90, 20-23 -- 231, Mr. Laforte agreed

that he was a felon in possession and agreed to a sentence up

to 15 -- agreed that, and the sentence could be up to 15

years.  Also, in the plea agreement, the parties recommended

the combined disposition of three cases of sentence of 162 to

186 months filed by three years of supervised lease with a

term set by us, a fine determined its sentencing and a $900

special assessment.  They agreed to pay restitution.  Mr.

Laforte paid, agreed to pay restitution at sentencing for

counts one in 21, which is the racketeering and securities

fraud in 23198.  He agreed to pay -- well, we'll set that

today.  He agreed to pay restitution of $2,400,000 --

$2,400,096 to Internal Revenue Service under counts 31 and

44.  And number 23-198.  He agreed to pay $8 million, $8

million -- $87 -- $385 to the General Revenue Service arising

from count one in matter number 24-65 and $1,655,299, the

Department of Revenue for count one and number 24-65.  Mr.

Laforte, from all intents, from all indications, has been a

1  model while in custody, been a model, incarcerated person

2  while in custody.  In fact, I had seen several certifications

3  of his work towards, towards rehabilitation while in custody.

4  Mr. Laforte had an opportunity to meet with our probation

5  officer back on September 25th, 2024, at the Federal

6  Detention Center with his counsel present.  So the way this

7  works, Mr. Laforte, is that we have to work our way through

8  several steps.  And the way this works, sir, is we have what

9  the United States Congress tells us.  I think I just told you

10  that.  We have what the United States Sentencing Commission

11  recommends, and we'll talk about that.  We have, in this

12  case, a joint request to either depart or vary downward from

13  a sentence range that by the United States Sentencing

14  Commission.  And then we have an agreement that would --

15  would recommend, would, would, would allow us to depart down

16  or vary down to 162 and 186 months.  So we have to go through

17  all three of those.  The way we do that is we run through the

18  present investigation report that you and your counsel I now

19  understand if had an opportunity to go through, but we'll go

20  through it just to make sure.  So United States, have you

21  seen, the report that's dated now of March 20.  New

22  information coming in as of March 20th, 2025?

23        MR. NEWCOMER:  Yes, we have, Your Honor.

24        THE COURT:  Does the United States have any

25  corrections to it?

```
 1          MR. NEWCOMER:  No corrections, Your Honor.

 2          THE COURT:  Okay.  Mr. Corozzo have you seen the

 3   report that's dated as of March 20th, 2025?

 4          MR. COROZZO:  Yes, Your Honor.  Do you have any

 5   corrections to it?

 6          MR. COROZZO:  Your Honor, in addition to my previous

 7   objections --

 8          THE COURT:  Just, just corrections.  Yeah.

 9          MR. COROZZO:  I'm sorry.

10          THE COURT:  Just corrections.  We'll do objections.

11          MR. COROZZO:  No, no corrections, Your Honor.  Well,

12   I don't know if it's a correction or objection, but on page

13   four where it lists the legal address, it lists none.  My

14   client's does have a legal address.

15          THE COURT:  Okay.

16          MR. COROZZO:  13185 Faberge Place, Palm Beach,

17   Florida.

18          THE COURT:  Okay.  Any objection from the United

19   States?

20          MR. COROZZO:  No, Your Honor.

21          THE COURT:  Alright.  Officer will change that on

22   page four.

23          MR. NEWCOMER:  Thank you, Your Honor.

24          THE COURT:  Alright.  Is that -- Mr. Corozzo, is

25   that as of -- that's as of today, right?
```

1          MR. COROZZO:  That's it.  I'm sorry?

2          THE COURT:  That's as of today.  That's correct.

3          MR. COROZZO:  Yes.

4          THE COURT:  Okay.  So has that, has that changed

5    since -- no, in the last week.  That's, that's it.  Okay.

6    Alright.  Got it.  Okay.  Mr. Corozzo, have you had an

7    opportunity to go over this report with Mr. Laforte?

8          MR. COROZZO:  I have, Your Honor.

9          THE COURT:  Okay.  Have you answered all his

10   questions concerning the report?

11         MR. COROZZO:  Yes, Your Honor.

12         THE COURT:  Alright.  Mr. Corozzo, do you need any

13   more time to review this?  I mean, Mr. Laforte, do you need

14   any more time to review this report?

15         DEFENDANT JOSEPH LAFORTE:  No, Your Honor.

16         THE COURT:  Mr. Laforte, are you satisfied with the

17   representation provided by your attorneys?

18         THE DEFENDANT:  Yes, Your Honor.

19         THE COURT:  So again, we're going to go back to the

20   general sentencing standard.  United States Congress gives us

21   the outer ranges.  The people we elect set these terms, and

22   they have, they have given us various times.  Then we'll turn

23   to the sentencing guidelines, which are not mandatory on us,

24   but our guidelines, and then we'll decide what an appropriate

25   range should be for those guidelines.  And then we'll hear

1   evidence about what should be the appropriate sentence
2   thereafter.  So United States Congress tells us that in the
3   case 23198, which is the -- for want of a better word, the
4   RICO case, the racketeering case with the 59 counts.  In
5   count, the, the pled counts one and 21, which is racketeering
6   and wire and securities fraud.  Just make sure that's
7   correct.  Okay.  United States Congress tells us not more
8   than 20 years per count.  So that could be a total of 40
9   years, 40 years.  Count 31, not more than three years.
10  Counts 44, 45 and 52, which are the, the 44, 45 and 52.  44
11  and 45 are the, are the -- 44 is the tax.  Failure to pay
12  over tax.  45 is the perjury, and 52 is the obstruction of
13  proceedings up to five years with supervised release of up to
14  three years on the securing -- on the racketeering, the
15  securities and wire fraud, the tax -- failure to collect tax,
16  the perjury and the obstruction of proceedings, and up to one
17  year of supervised lease on the filing of a false tax return.
18  The fine is up to $250,000 per count.  We could consider --
19  Congress says an appropriate case, consider probation of one
20  to five years and supervise release in this case of $900.
21  Oh, excuse me, $600 out of that, out of that case.  The
22  second case is, Congress tells us for count one, which is the
23  conspiracy to defraud the IRS.  We can sentence you up to
24  five years in custody.  And count seven, which is the wire
25  fraud, we could sentence you up to 20 years with supervised

1   release on each count up to three years.  It be concurrent

2   three years.  On number 20-231, which is the felony

3   possession.  The United States Congress tells us we consent

4   and show up to 15 years with supervised lease of up to three

5   years.  Okay.  So now we ask the attorneys, we turn to them

6   and, and talk about our officer's calculation of the offense

7   level under the guidelines, Mr. Laforte.  So what we do next

8   is we try to decide what is the appropriate guidelines range,

9   putting aside any agreement just based on the math.  So let

10  me first ask the attorneys before we get into any

11  discussions.  Let me first ask you, because I'll go to

12  objections in a moment, but let me first make them see if the

13  math is correct.  United States, do you agree with the

14  officer's calculation of an offense level of 40, history

15  category of three?

16          MR. NEWCOMER:  We do, Your Honor.

17          THE COURT:  Mr. Corozzo, do you agree with the

18  officer's calculation of 40 and issue category three?

19          MR. COROZZO:  I do, Your Honor.

20          THE COURT:  Alright.  So what that means is the

21  United States Sentencing Commission is to -- is recommending

22  based on cases around the country that cases of similar type

23  with this kind of criminal background, courts are sentencing

24  in a range of 360 months to life.  In, in case number 23-198

25  with supervised release of 190.  Excuse me, supervised

1　release in, in 198, one to three years on counts 121, 41 --

2　44, 45, and 52, and one year on, on the count 31, which is

3　the tax, one of the tax accounts.  In case 24 to 65

4　supervised release of one to three years for counts one to

5　seven.  Counts one to seven, excuse me, supervised release

6　for count 20 dash -- a case that's felony in possession count

7　20-231.  Sentencing commission is not recommending probation

8　in these kind of cases.  Sentence commission recommends a

9　total fine of 50,000 to $500,000 restitution set by the

10　court.  And in total, because there's nine counts, a special

11　assessment of $900.  So that's what that equals.  So I do

12　have from Mr. Corozzo, I do have some objections that I

13　reviewed and I'm happy to talk to you about them, sir.  Which

14　ones would you like?  I have a series of them corrections to

15　the report.  I think they go to language as opposed to

16　calculation, but I'm certainly willing to hear you, sir.

17　　　MR. COROZZO:  The, the only issue with calculation

18　again, is the specific extortion acts included in the PSR, we

19　object to.  We understand that the government is presenting

20　some evidence to support some of them not to support or, or

21　maybe to support all of them.  I'm not certain, I know there

22　is three witnesses, so we would like to --

23　　　THE COURT:  So they -- that doesn't affect the

24　count, does it?  Because it, it, it -- right.  It doesn't

25　affect the number 40, does it?

1        MR. COROZZO:  No, no.  That's why we -- the number

2   40 is, is specifically driven by, by the wire insecurities,

3   Your Honor.

4        THE COURT:  You dispute the language, the narrative.

5        MR. COROZZO:  Only language.  It's the, the numbers

6   get absorbed into, into the guidelines.

7        THE COURT:  Okay.  So that's at, that's at several

8   paragraphs.

9        MR. COROZZO:  Yes, Your Honor.

10       THE COURT:  And okay.  Anything further on that one,

11  sir?  I mean, I, I, I had the preview of it a couple minutes

12  ago, so that's good.  You did, Your Honor.

13       MR. COROZZO:  And just there were, there were three

14  additional victim impact statements that were given.  And we

15  have some evidence that I would have if I was given more time

16  because I just received these over the weekend.  I would've

17  submitted to the probation because our first steps in

18  objecting to even the extortion and our, and our first step

19  would've been with these victim impact statements would've

20  been to present certain evidence to the probation department,

21  which we think conflict or contradict what's in the victim

22  impact statement.  The court has every right to hear anything

23  from any victim.

24       THE COURT:  Right.

25       MR. COROZZO:  And we're just suggesting as, as to

1   paragraphs 178, 179, 184, we just have relevant information

2   that should be included.

3         THE COURT:  And I certainly will hear that, sir.  So

4   the objection is noted and I will -- and I -- and -- but it's

5   overruled.  Other than I will certainly hear it and consider

6   all that evidence in connection with whether there's any, how

7   it affects our, our, our consideration under 35 53 of the

8   relevant sentencing facts.

9         MR. COROZZO:  And Your Honor, just to be specific.

10         THE COURT:  Will not strike those allegations.

11         MR. COROZZO:  No, I'm not -- I wasn't asking to

12   strike it.  I would be asking to add this other information.

13         THE COURT:  Well, you can do that today.

14         MR. COROZZO:  Yes.

15         THE COURT:  Yeah, Certainly.

16         MR. COROZZO:  I just wanted to make my position

17   clear.  I understand that the court has absolute discretion,

18   including victim impact statements.  So even if we argue

19   they're erroneous, they should still be included.  We're not

20   moving to strike.

21         THE COURT:  I, I understand, sir.  Thank you.

22   Alright.  You have, you have other objections, sir?  I see.

23   Do you have -- you wish to raise any other objections?  The

24   officers responded to them, but do you have any wish you wish

25   to press today?

1          MR. COROZZO:  Your Honor, the, the, the primary --

2     the very vast majority of the, of the objections go to

3     specific allegations of extortion.  We understand that the

4     government intends to establish some of them or if not all of

5     them today.  So I guess we would reserve until after the

6     hearing.

7          THE COURT:  Well, you, you -- hold on.

8          MR. COROZZO:  Well, I think the court needs --

9          THE COURT:  You could reserve into your argument to,

10    to, to --

11         MR. COROZZO:  Reserve my argument and my

12    presentation.  Why it should be stricken until the end.

13         THE COURT:  Yeah, that's right.  Or, or stricken or,

14    or right.  Or certainly not considered it.  The point is the

15    officer -- when the officer prepares the report, the

16    officer's based upon the facts that she has at the time, your

17    suggestion is that, Judge, I ask you not to credit those for

18    evidence I'm going to give you, rather than striking those

19    statements,

20         MR. COROZZO:  And in the earlier ones, we did

21    present some, some evidence that the probation department and

22    the probation department chose not to consider it.  And to

23    consider what was submitted by other parties.

24         THE COURT:  Okay.  Well, that's fair.  Okay, so

25    I'll, so I'll hear, I'll hear all that.  Okay.  I'm happy to

1    hear all that, but I'm not going to strike the references.

2    Subject of course to my consideration under all the factors.

3    For example, you have a challenge, sir, to -- it's really

4    argument about whether people understood per funding's

5    insurance.  That -- I believe that would really be in the

6    nature of argument, would it not.  Sir, in other words,

7    you're saying you disagree with what the probation officer

8    found.  That's your objection number six, is that correct?

9    Paragraph 86.

10          MR. COROZZO:  Paragraph 86.

11          THE COURT:  Well, the problem is, this is dated

12   before your objections would've been to an earlier version.

13   So if it's the same page.  Let me see if it's the same, 86.

14          MR. COROZZO:  No, I'm, I'm seeing paragraph 86, Your

15   Honor.  What -- that's, that's a specific nuanced argument

16   because we agree that the investors were misled or not given

17   full information as to the insurance policy, but they were

18   given information that there was an insurance policy and it

19   would've provided stipulated to, at the time of the plea part

20   of the omissions.  And, and misrepresentations by omissions

21   was a complete explanation of the insurance policy.

22          THE COURT:  Okay.  Okay.  I'll take into

23   consideration, but I, I'm, I'm -- you asked it, you asked for

24   it to be.  It's objection.  Okay.  The only one you asked, I

25   think, to strike is the obstruction of justice on OF.  The

1   rest you -- the rest you object to.  One, you asked a strike.

2           MR. NEWCOMER:  That's, that's my understanding as

3   well.  And, and to simplify that, Your Honor, we're not

4   moving forward with that evidence on, on -- in paragraphs 134

5   to 139 and 288 to 293, I believe, of the PSR with the attack.

6           THE COURT:  So that won't be presented today nor so

7   it would not be considered today.

8           MR. NEWCOMER:  After consultation with the victim,

9   we're not moving forward with those -- that evidence.  So

10  that those can be stricken, Your Honor.

11          THE COURT:  Alright.  So we'll grant the -- we'll

12  sustain the objection number two, only because it's -- not

13  because it's not -- not because the officer dealt wasn't

14  correct, but maybe because it's not going to be presented

15  today.  The officer is relying upon grand jury testimony, but

16  it's not going to be presented today.

17          MR. NEWCOMER:  That's right.  Your Honor, just to be

18  clear, we don't agree that the evidence is unreliable and

19  unfairly prejudicial, but we're not moving forward so it can

20  be stricken.

21          THE COURT:  So it's moot.

22          MR. NEWCOMER:  It's moot.

23          THE COURT:  Okay.  I won't consider it as part of,

24  part of the evidence object to make sure.  Okay.  Alright.

25  We've talked about the plea, the third component being the

1  plea agreement, which is the custody between 162 and 186

2  months, three years of supervised release, the fines that by

3  us, which we'll talk about restitution, which Mr. Minni and I

4  will talk a lot about.  Special assessment of $900 and then a

5  fine.  We -- the, the sentencing, the, the, the probation

6  officer gives us the idea that, that fines shall consider the

7  expected cost of the government of a term imprisonment of

8  $49,770 per year of incarceration.  So we'll be, we'll be

9  considering that factor as we consider a fine.  There's no 5K

10  motions.  There's no -- there's a 3553 essentially a variance

11  motion, I guess, or departure motion.  So let me hear that

12  from the United States because your, your friend tells me,

13  and, and I, and I, and I was wrestling with this.  Is what's

14  happening here to go from 360 months start to 168 start.  Is

15  that a variance or a departure?

16        MR. NEWCOMER:  It's a variance, Your Honor.  And,

17  and if I, if I may, I, I, I -- on the issue of our witnesses,

18  we have two lined up that are, one has childcare issues and

19  the other one is on the West coast.  And so is looking to

20  start his, his work day.  Is it possible we can put the

21  witnesses on and then we can return to the, to the issue of

22  the --

23        THE COURT:  Yeah.  We'll do that first before --

24        MR. NEWCOMER:  The answer to your question.  Yes.

25  It's a, it's a variance, Your Honor.  There's no, there's no

1   basis for a, under the guidelines for departure.

2          THE COURT:  Okay.  Fine.  Because I was wondering

3   whether -- okay.

4          MR. COROZZO:  And the defense agrees with that.

5          THE COURT:  Alright.  That, well you argued it.  And

6   I tend to agree with you in your brief.  That's why I wanted

7   to make sure you argued.  It's not apart -- you argued it.

8   No, actually think you what?  Doesn't matter.  It's material.

9   Both sides agree with the variance.  Okay.  Alright, we'll

10  come back to restitution later.  So Mr. Minni, don't leave

11  us.  Alright, so the United States, you, you -- I have --

12  I've read your papers.  I know you're recommending the, the

13  top of the guidelines range.  So I'll wait to hear any

14  witnesses that you have, sir, or any argument you wish to

15  make.

16         MR. NEWCOMER:  Your Honor, the first witness we call

17  is Michael Mansouri (ph) by video.

18         THE COURT:  Alright.  Mr. Mansouri?

19         MR. NEWCOMER:  I believe he's in the waiting room of

20  the --

21         COUNSEL SAMUEL S. DALKE:  Should we get this on

22  here?

23         THE COURT:  United States, could you arrange this?

24  Do we have --

25         MR. DALKE:  Mr. Mansouri?  Can you hear me?

1          WINTNESS MICHAEL MANSOURI:  Yes, I can.

2          MR. DALKE:  Can, can you see us?

3          THE WITNESS:  No, I'm, I'm, I'm in the car.

4          THE COURT:  You're in the car.

5          MR. DALKE:  Okay.  So, so, we're, we're going to

6     have you drop, drop off the FBI agent, we'll talk to you,

7     we'll call another witness and we're going to see if we can

8     have you appear by video.  It's important.  So why, why don't

9     you drop off the link?  We'll have the FBI contact you and

10    Your Honor, we'll, we'll go with another witness right now.

11         THE COURT:  Sure.

12         MR. DALKE:  Okay.

13         THE COURT:  Thank you Mr. Mansouri.  We'll be back

14    to you.  Yeah.  United States, do, do you wish to do us

15    further evidence?

16         MR. DALKE:  Yes we do, Your Honor.  We, we call Tina

17    Allegretta.

18         THE COURT:  Okay,

19         MR. COROZZO:  Your Honor, if the witness is only

20    appearing on that screen, may I sit over there?

21         THE COURT:  Is Ms. Allegretta not here?

22         MR. DALKE:  She's by video, Your Honor.  Yes.

23         THE COURT:  You, you may, sir.  Thank you.  You may

24    slide a chair over.

25         MR. COROZZO:  Thank you.

1          THE COURT:  Is the witness not appearing on this

2   screen?

3          MR. COROZZO:  She is, Your Honor.

4          THE COURT:  Alright.

5          MR. DALKE:  Good morning, Ms. Allegretta.  How are

6   you?

7          WITNESS 1 TINA ALLEGRETTA:  Good morning.  Fine.

8   Thank you, sir.

9          MR DALKE:  Your Honor, could we swear in the

10  witness?

11         THE COURT:  Yes.  Ms. Allegretta, this is Judge Mark

12  Kearney.  I'm going to have you sworn in.  If you -- please

13  raise your right hand, ma'am.

14         ESR/CLERK NELSON MALAVE:  You do swear or affirm,

15  you do swear or affirm that the testimony you should give

16  before this court shall be the truth, the whole truth, and

17  nothing but the truth, so help you God or you do so affirm.

18         WITNESS 1:  I do

19         ESR/CLERK:  State your full name for the record,

20  spelling your last name.

21         WITNESS 1:  Tina Marie Allegretta.  A-L-L-E-G-R-E-T-

22  T-A.

23         MR. DALKE:  Alright, thank you Ms. Allegretta.  You,

24  you can put your hand down.  I, I appreciate.

25         THE COURT:  Thank you Ms. Allegretta.  You may

1  proceed, Counsel.

2                    DIRECT EXAMINATION

3  BY MR. DALKE:

4  Q   Could you tell the court a little bit about yourself, Ms.

5  Allegretta?

6  A   Yeah.  So I'm a stay-at-home mom.  I'm a mother of two

7  twin 11 year olds.  At this time, I was, became very ill in

8  2020 and my husband and I decided that it was best to spend

9  the time at home instead of business.

10  Q   Prior to 2020.  What was your occupation?

11  A   I was the controller in my husband's electrical

12  contracting business.  The Allegretta Electrical Corp.  And

13  my role there was for all the functions of a controller, the

14  accounts receivable, payable.  I controlled the money

15  basically.

16  Q   Okay.  And how long did you work as a controller or

17  bookkeeper for Allegretta Electrical Corporation?

18  A   16 years.

19  Q   And where's that entity based?

20  A   It's based in Hampton Base.

21  Q   Okay.  Is that on Long Island in New York?

22  A   Yes.  It is.  East End Long Island.

23  Q   And this, this may be silly because it's in the name, but

24  what, what line of business is Allegretta Electrical Corp in?

25  A   The business provides electrical wiring for general

1    contractors and new construction.

2    Q   Are you familiar with another entity, complete Business

3    Solutions Group doing business as PAR funding?

4    A   Yes.

5    Q   Could you explain to the court briefly the circumstances

6    under which you were initially introduced to Par funding?

7    A   I was introduced to Par funding and at a time in the

8    business where we were, we were desperate financially and we

9    were searching for means to relieve the financial stress and

10   we located them via the internet and thought this would be a

11   solution to our financial issues.

12   Q   Do you recall approximately what timeframe we were

13   talking about when, when you initially kind of started to

14   interact with Par funding?

15   A   2018 was the first time we interacted with them in early

16   on, maybe springtime.

17   Q   Okay.  And what, what was the sales pitch from PAR

18   funding?

19   A   It was, it was very enticing, exploring.  It promised to

20   fill gaps in and to leave us of the financial pressures that

21   we were under at that time.  It was a deal that I needed to

22   act on quickly.  It's not -- wasn't a deal that was going to

23   remain in play for a long period of time.  It was aggressive.

24   And as I said, it was enticing to a desperate business in

25   search of immediate financial help.

1    Q    Had Allegretta Electrical obtained these merchant cash

2    advances, this, this type of money or funding previously?

3    A    No.

4    Q    Okay. Was there any inspection or underwriting done by

5    PAR funding before getting funded?

6    A    No.

7    Q    And, and when I'm talking about like onsite inspection,

8    people coming out, you know, examining, you know, the books

9    and records from the controller's office, anything like that?

10    A    No.

11    Q    Did Par funding advance Allegretta Electrical money in

12    2018?

13    A    Yes.

14    Q    Okay. And it's not a memory test, but you recall

15    Ballpark, you know, how much, how much you started out with?

16    A    It was over 200,000 -- 260,000 believe the initial, and

17    the terms were short, you know, maybe a hundred, but very

18    aggressive daily payment, you know. And with that --

19    Q    Was Allegretta able to keep up with these, these daily

20    payments back to par funding at, at least for, for a period?

21    A    Yes. Yes. We, we were able to maintain. It did help.

22    Initially, we were able to maintain the daily payments for a

23    period of time, but without additional receivables coming in

24    within the business, we had reached a point where we could

25    not maintain the payments.

1  Q   And when Allegretto electrical court became strained to

2  make those payments, did it approach PAR funding?

3  A   Yes, I did.

4  Q   Okay.  And who did you reach out to?

5  A   James -- Jimmy LaForte.

6  Q   And had he been your initial contact in getting the, the

7  deal Jimmy LaForte?

8  A   Yes.

9  Q   And what did you ask Jimmy for when, you initially were

10  struggling to make the payments?

11  A   Oh, I, I wasn't sure exactly what that meant, what the

12  picture that was, was it.  Could we, you know, readjust the

13  terms of the note?  Could -- is there any -- was there

14  anything we could do?  What would be the solution to the

15  immediate issue?  And the solution came up with was to

16  advance more money, but that was going to be the best way to

17  settle the previous --

18  Q   By advancing more money.  Do you mean another MCA,

19  another merchant cash advance agreement?

20  A   Yes, I do.

21  Q   And was that in a larger amount?

22  A   It was a large amount, similar to the first one which we

23  had paid back, you know, some of, but we still had a hefty

24  balance.

25  Q   And did Allegretta Corp -- did this happen a couple

1    times, meaning Allegretta Corp kind of did additional MCA or

2    reloads with additional, you know, to pay off the balance?

3    A    Yes.

4    Q    Okay.  Did the balance increase over time?

5    A    Yes.

6    Q    Did the daily payments increase?

7    A    Yes.

8    Q    Okay.  Did your struggles to meet these payments, did

9    they continue?

10   A    Yes.

11   Q    Okay.  Did you ever try to figure out how much was paid

12   and how much was owed?  After, after this went on for a

13   couple times, a couple cycles?

14   A    Yes, I did.

15   Q    Okay.  And did you reach out to PAR as part of that kind

16   of your own accounting process to figure out, you know, what

17   had been paid, would've been owed?

18   A    Yes, I, I had reached out many times to try to get

19   clarification, what the post to come, what did come.

20   Administration fees, additional funds, free loads, additional

21   funds come being deducted automatically that weren't a part

22   of the written agreements.

23   Q    And what did your accounting -- what did your, you know,

24   your work as a controller review in all this?  What, what did

25   it determine?

1    A    It determined that we did not receive what we were

2    loaned, unfortunately.  And the total that we ended up paying

3    was almost three times more than what we actually borrowed.

4    Q    So after figuring out that, what did you do next?

5    A    I reached out to various -- first to Jimmy, and said, you

6    know, that's not my responsibility.  I need to contact -- he

7    gave me various names, which I don't recall.  They were in

8    their account [indiscernible] and, you know, guided me to

9    reach out to them.  He recommended just that.

10   Q    Did you, did you ever ask to go to the top of PAR

11   funding?

12   A    I did.  I did.  It was, it wasn't an option for, for

13   quite some time.  And I'll go up.

14   Q    Who, who did you talk to when you asked to go to the top

15   of Par funding?

16   A    I, I don't recall the person's name.  I'm, I'm sorry.

17   Q    Did you ever speak with a person, Joe Mack or Joe

18   LaForte?

19   A    Yes, yes.  I, I spoke to Joe Mack.

20   Q    Okay.  Do you, do you recall when approximately you first

21   spoke with, with Joe Mack?

22   A    I believe my first encounter with him, it was 19, late

23   2018.

24   Q    Okay.  And what was your request?

25   A    Help.  It was -- we, we, we were in some reconstruct form

1  of renegotiation in the term.  It was impossible to maintain

2  what we had in front of us.  We -- I explained to him that we

3  had every intention of paying the debt, not the purpose of

4  why I was contracting him, not trying to make the debts go

5  away.  We just have to try to make the money.

6  Q    And what was Joe Mack's response?

7  A    Not my problem.  Figure it out.  I gave you the money

8  when you needed it, and now I need it back.

9  Q    Did you have additional calls with Joe Mack in,

10  throughout 2019?

11  A    Yes, I did.

12  Q    Okay.  Do you recall approximately how many calls we're

13  talking about with Joe Mack?

14  A    A handful, you know, three to five, I would say.

15  Q    Were they all at once in 2019, early 2019?  Like when you

16  initially reached out or did they span the, the year?

17  A    No, they spanned over, you know, almost a year, probably

18  six to eight months, I would say.

19  Q    Okay.  And between the calls, and during the calls, were

20  you still trying to work out a payment?

21  A    Yes, yes.  That was the goal, you know, always, always

22  the goal to pay what we owed.

23  Q    Do you recall those, those phone calls with, with Joe

24  LaForte or Joe Mack?

25  A    Yes.

1   Q   What stands out to you from those calls?

2   A   The biggest thing that stands out for me is, he, he

3   threatened me.  And those, those threats stand out from the

4   calls.  The relevance of the calls to the situation was

5   irrelevant.  I just, I recall how I felt when I was told some

6   of the things that I was told by him.

7   Q   What was the first threat that you can recall Joe Mack

8   making to you when you, you were asking for reprieve from

9   your, your payments to Par funding?

10  A   He talked about how, how he handled people that owed him

11  money and it works well, then while I'm in my car, then when

12  I turned the key, there's, there's no more Tina and that I

13  should figure out whatever I needed to do to pay the money or

14  that.

15  Q   Did that affect your, your daily life?

16  A   Yes, it did.

17  Q   How did that change your daily routine after Joe Mack

18  threatened you like that?

19  A   There isn't a way that it didn't affect my daily life.  I

20  was afraid I was anxious, I was angry.  It altered where I

21  was so hypervigilant, looking behind my back was around me,

22  aware of my surroundings.  I parked my car, I wait for my

23  house.  I wouldn't allow my children or anyone else to get in

24  my car.  I, I would hold my breath this when I would turn the

25  key and hope that today wasn't that day.  I grew very cold

1   and sad and numb, determined, you know, determined, wanted to

2   pay back the money.

3   Q    Were there -- after that call about the bomb in the car,

4   and, you know, you'll be gone.  Were, were there other

5   threats from Joe Mack in, in some of the subsequent phone

6   calls?

7   A    Yes.

8   Q    Are there others that you can recall here today?

9   A    Yes.

10  Q    Could you tell the court about what else you can recall?

11  A    Maybe you, maybe you'll come with the money.  If you, you

12  go to pick up your, your kids, your twins.  He knew I had

13  twins.  He knew her.  I had children that were small at the

14  time.  They were five years old in kindergarten.  I went to

15  pick them up and they wouldn't be there.  I slammed the phone

16  down and was shaking, troubling, now would figure my -- for

17  my kids.

18  Q    So in addition to the bomb and the, the threats to kid --

19  the kids, was there another threat that, that you can recall

20  that Joe Mack made?

21  A    He said, "Do you want, do you want to take him to the

22  streets?"  We'll take you to the streets.  He asked me if I

23  ever heard of cement shoes.  He said, "we'll tie the cement

24  shoes.  You're -- you'll go to the bottom of the

25  [indiscernible] figure it out.  I want to be paid."

1   Q   After receiving, you know, maybe not the first threat of

2   the second threat, but you know, this goes on and on.  Did

3   you ultimately report this to the authorities?

4   A   Yes.  I called the FBI.  It was like a definer, you know,

5   if you're in a situation, it was like an 800 number.

6   Q   Why did you call the FBI?

7   A   I didn't, I didn't know what to do.  I, I didn't -- I had

8   no idea who to call or local authorities.  We -- an attorney,

9   you know how we made stop court by this time my husband and I

10  had researched and his brother and backgrounds and what we

11  were involved in and who we were involved with.

12  Q   At the time.  You -- sorry.  At, at the time you reached

13  out to the FBI, you called that, you know, the threat hotline

14  or that 800 number.  Did you know the FBI was investigating

15  Joe Mack or Joe LaForte or Par funding?

16  A   No.

17  Q   You weren't aware of that.  Had you spoken with the FBI

18  before that November, 2019 call?

19  A   No.  No.

20  Q   Had you spoken with an attorney about the threats before

21  that November, 2019 call to the FBI?

22  A   No.

23  Q   Did Par funding continue to collect money from Allegretta

24  Electrical Corp following Joe Mack's threats?

25  A   Yes.

1  Q   In rough ballpark amounts.  How much did all Allegretta

2  Electrical Corp borrow from Par funding?  And, and how much

3  did Allegretta ultimately pay back?

4  A   We ended up borrowing it almost 400,000, like 367,

5  roughly that for [indiscernible]

6  Q   And that's the amount that came in to you guys right

7  after fee, after fees and all the expenses, things like that.

8  How, how much was paid back, do you know?  Ballpark?

9  A   Yeah, almost, almost $700,000.

10  Q   Ultimately, how did things resolve with Par funding

11  after, after these calls with Joe Mack?

12  A   We, we hired an attorney because at this point now, our

13  lawsuit was filed against the business and our bank accounts

14  were completely frozen.  So we filed confessions of judgment

15  against them, and now we have no access to the business bank

16  accounts at all.  So we reached out to an attorney and then

17  he proceeded to reach out to an attorney that either worked

18  for them or with them in Philadelphia.

19  Q   Did the threats -- the, the blowing up the car, the

20  kidnapping, the children, the cement shoes being sunk to the

21  bottom of the Hudson, did that impact Allegretta Electrical

22  Corp and your decision to, to pay up and settle?

23  A   Yes.  It -- we never, we never tried to avoid what we

24  owed.  Never.  Our intention was always to pay money back.

25  We just needed new terms.  We just, we just needed another

1  way to make that happen.  And fortunately our attorney was

2  able to put that in place.

3  Q  Did the series of threats throughout 2019, did that have

4  an impact and effect on you and your family?

5  A  Yes, and yes, of course it did.  And, and in every way.

6  Q  Could you tell the court about it?

7  A  There was so much stress and, and, and pressure.  It

8  became like a -- and this frozen feeling and like a numbness.

9  My husband got so sick, the stress was getting this horrible

10  upper GI bleed that was from ulcer that had developed.  It

11  was for almost two weeks.  He got a stroke while he was in

12  the hospital.  It was, it was something I would never, ever

13  want any more to let through.  Never.

14  Q  Thank you, Ms. Allegretta, for your questions.  I believe

15  either defense counsel or possibly the court may have

16  questions for you as well.  Okay.

17          MR. COROZZO:  Your Honor.

18          THE COURT:  Mr. Corozzo, please.

19                  CROSS EXAMINATION

20  BY MR. COROZZO:

21  Q  Thank you.  Good morning, Ms. Allegretta.  My name is

22  Joseph Corozzo.  I'm going to ask you a series of questions

23  and I might show you some documents.  If there's something

24  you don't understand, please let me know.  I'll try to

25  rephrase it, and if you need time, I'm sure the court will

1   take it into consideration and give you whatever time you

2   need.  Okay?

3   A   Yes.  Yes, sir.  Okay.

4   Q   You, you earlier stated that you were the controller for

5   Allegretta up until 2020.  That's correct?

6   A   Yeah, when COVID came basically that was when I stopped.

7   Q   And the company started up approximately 16 years before

8   that.  You said you were in that position for 16 years?

9   A   No, it was actually started several years before being

10  into the business.  It was started 24 years prior to that.

11  Q   Okay.  So for the first eight years, did you have any

12  involvement with the company at all?

13  A   No, I did not.

14  Q   Did the company have a controller or a bookkeeper?

15  A   Yes, it did.

16  Q   Prior, prior to your involvement.  And what, what

17  occasions for you to replace the current bookkeeper

18  controller in approximately 2004?

19  A   I met -- I had met my husband, and it was -- I was

20  already in that line of work and we made the decision for me

21  to join him in his business.

22  Q   Okay.  And when you say you were in that line of work

23  already, what, what was your previous work experiences as

24  bookkeeper or controller?

25  A   I worked for a couple of companies.  There is another on

1  Long Island doing similar functions.

2  Q   And for how many years did you, did you do that work?

3  A   Since 1995 or so.  So 10 years, roughly,

4  Q   Almost 10 years prior to beginning to work with

5  Allegretta, correct?

6  A   Pardon me?

7  Q   Almost 10 years prior to work, starting work with

8  Allegretta, correct?

9  A   Roughly, yes.

10 Q   And did you have any specific training or education that

11 enabled you to be qualified to be a controller?

12 A   No.

13 Q   Okay.  Now, when you first started working with

14 Allegretta, can you estimate how many employees Allegretta

15 had at that time?  In 2004?

16 A   Maybe 10.

17 Q   And, and over the time period of your, your work as a

18 controller there, it grew, grew quite significantly, right?

19 Allegretta?

20 A   Yes.

21 Q   Okay.  It grew, doubled the amount of employees at least,

22 correct?

23 A   Yes.

24 Q   And how did the revenue change from 2004 to 2020?

25 A   Significantly.

1    Q   And, and there came a point in time in 2017, 2018 that

2    the monthly income for Allegretta would be as high as

3    $700,000 a month, correct?

4    A   Yes.

5    Q   Okay.  So a few million dollars a year of income,

6    correct?

7    A   Yes.

8    Q   Okay.  And were -- when the company has grown to that

9    size in 2017, 2018, did you have any help with the

10   bookkeeping or controlling of the company?  Did Allegretta

11   hire any new employees to help you?

12   A   We had other administrative help in the office, yes.

13   Q   And so in 2017, approximately 2017, 18 and 19, you had

14   people assisting you in your controlling duties?

15   A   To some degree, that really wasn't their role in the

16   business.  It was more of doing estimates and contracts,

17   payroll mostly.  So, with their --

18   Q   I'm sorry, I'll let you finish.  I apologize for

19   interrupting.

20   A   No problem.  This payroll was grown, that was main

21   function, so that's definitely a part of booking.  Sure.

22   Q   Okay.  And outside of assistance with the payroll,

23   everything else fell into your lap, correct?

24   A   Yes.

25   Q   The monthly books for Allegretta.  Did you hire outside

1  people or you did it yourself?

2  A   We did it ourselves.

3  Q   And were you working in conjunction with an outside

4  accountant or was that all done in house?

5  A   No, we worked in conjunction with the CPA firm.

6  Q   And you would provide the CPA with your monthly income

7  and monthly expenses and, and, balance sheets, correct?

8  A   Yes.

9  Q   Now, I believe your testimony earlier today was that you

10  found Par funding pursuant to an internet search sometime in

11  2018, correct?

12  A   I believe so.  I think I'm [indiscernible]

13  Q   And you also, and you also testified that prior to being

14  extended funds from Par, you did not engage in any previous

15  merchant cash advance transaction.  Is that fair?

16  A   Yes.

17  Q   Okay.  Are you familiar with a company by the name of

18  Yellowstone Capital?

19  A   I am.

20  Q   And they were a lender to Allegretta?

21  A   Yes.  They purchased accounts receivables and used of a

22  factoring different type of lending.

23  Q   So in your opinion, that was not an MCA.

24  A   That was not the name of that kind of funding.  No.

25  Q   Okay.  As far as you know, is there any difference in the

1    structure of the funding that you received from Par than you

2    received from Yellowstone?

3    A    It's similar.

4    Q    Was there any difference that you're aware of?

5    A    No.

6    Q    So you received the same type of funding from

7    Yellowstone, and that predated your interactions with Par,

8    did it not?

9    A    Yes.

10   Q    Okay.  And so when you testified earlier today that you

11   had no previous MCA, you're saying that's -- your testimony

12   is based upon the fact that while the funding was identical,

13   Yellowstone Capital never used the term MCA or Merchant Cash

14   Advance, that's your testimony?

15   A    Yes.

16   Q    Are you familiar with a company and, and when did you

17   start receiving advances from Yellowstone Capital?

18   A    I don't recall.

19   Q    Alright.  It's at least in 2017.  Would that be fair?

20   A    I don't recall if that date is fair.

21   Q    Let me show you a document to see if it refreshes your

22   recollection that in 2017, you had received funding from

23   Yellowstone Capital.  Just page two of that.  Well do both

24   pages.  We'll go through both.  Your Honor.  I'll present for

25   identification Exhibit A from the defense.

1          THE COURT:  Okay.

2          MR. COROZZO: Is it up?

3          MR. DALKE:  It's not up, Mr. Corozzo.  One second.

4    We're just getting the --

5          MR. COROZZO:  Oh, you guys have it.

6          MR. DALKE:  Yes.  Is that it there?

7    BY MR. COROZZO:

8    Q   Yes.  Ms. Allegretta, if you, if you can see this

9    document, can you identify this as a bank account that

10   Allegretta Electrical maintained in People's United Bank and

11   a monthly statement from September 29th, 2017?

12   A   Yes, sir.

13   Q   Okay.  And you were familiar with that bank account in

14   2017, correct?

15   A   Yes, sir.

16   Q   Okay.  Let's go to page two of that report, and see if we

17   can go a little higher.  Okay.  It's 9117.  There's an CH

18   withdrawal to Yellowstone Capital for $1,122.  Does that

19   refresh your recollection that you received advances from

20   Yellowstone at least as of September of 2017?

21   A   Yes, sir.

22   Q   Okay.  Also, I'd like to show you on that document, are

23   you familiar with Pearl Capital?

24   A   Yes, I am.

25   Q   And, and what is Pearl Capital?

1  A   A similar, I'd say it's lending, it's similar to the

2  Yellowstone accounts receivables borrowing against your

3  receivables in factory.

4  Q   Was there anything different in the funding arrangement

5  you had from Pearl Capital compared to the funding

6  arrangement you had with Par funding?

7  A   Terms -- in more manageable terms.

8  Q   Was there -- was it an MC -- was it a merchant cash

9  advance?

10  A   It was not called a merchant cash advance, no.

11  Q   Was it an advance on your receivables?

12  A   Yes.

13  Q   Do you recall over, over the years how much you were

14  advanced from Yellowstone Capital?

15  A   I do not.

16  Q   Do you recall how much you ultimately paid to Yellowstone

17  Capital?

18  A   I do not.

19  Q   Do you recall how much you were -- you -- and when I say

20  you, I mean Allegretta Electrical, the company that you were

21  the controller of received from Pearl Capital?

22  A   I do not.

23  Q   Do you recall how much you paid back over time to Pearl

24  Capital?

25  A   Do not.

1    Q   Well, also on that page, you'll see a company by the name

2    of New Logic.  Do you see that?

3    A   I see it, yes.

4    Q   Are you familiar with that company?

5    A   I am.

6    Q   And what is that company?

7    A   I believe that was our payment for our printers we had.

8    Q   Okay.  But it's, it's -- your recollection is now

9    refreshed that as of September of 2017, you had at least cash

10   advances from outstanding from two different companies,

11   Yellowstone and Pearl, correct?

12   A   Yes, sir.

13   Q   Prior to doing business with Par funding.  Did you do

14   business in a similar way with any other companies outside of

15   Yellowstone, Yellowstone and Pearl?

16   A   Possibly.

17   Q   Well, you were the controller.  How, how many companies

18   did you deal with in trying to get advances on your

19   receivables?

20   A   Sure.  This was many years ago, and I haven't played a

21   part in that business in, in many years.

22   Q   And how -- I'm sorry.  I'll let you finish.  I apologize.

23   A   I was finished.  It's okay.

24   Q   Okay.  And how is it that you came to find the

25   Yellowstone Capital?

```
1    A   I don't recall, sir.

2    Q   And how is it that you came to find Pearl Capital?

3    A   I don't recall, sir.

4    Q   But you specifically recall how you found Par, correct?

5    A   I do, sir.

6    Q   Now, you recall a company by the name of UFS?

7    A   No.

8    Q   Do you recall a company by the name of One Global?

9    A   No.

10   Q   Do you recall a company by the name of Green?

11   A   No.

12   Q   Do you recall a company by the name of Influx?

13   A   I do.

14   Q   And what is Influx?

15   A   Influx.  It provides lending against collateral.  It's a,

16   not a daily payment.  It's a monthly, I believe,

17   Q   And that's the -- and did you do business with Influx?

18   A   I believe so, yes.

19   Q   And again, the deal with Influx would be different than

20   your deal with the other companies we spoke of.  This is not

21   in advance on receivables, but is a loan collateralized,

22   correct?

23   A   Yes, sir.

24   Q   And what did you use to collateral?  What did you, or,

25   and when I say you again, it's you and Allegretta Electric.
```

1  What did you use to collateralize the loans from Influx?

2  A   I believe equipment of back hose, skid steer.

3  Q   And when --

4  A   I'm sorry.

5  Q   I -- my fault.  I keep interrupting you as you pause.

6  Please continue if you can.

7  A   I'm done, sir.

8  Q   Okay.  Do you recall at any time that pursuant to

9  Allegretta Electrical Corporation's relationship with Par,

10 that Par provided a funding to consolidate other debt that

11 was already existing for Allegretta Electrical?

12 A   Yes.

13 Q   Okay.  Explain what your recollection is on the

14 consolidated, the advance that was consolidating your other

15 outstanding loans or advances.

16 A   Yes, the -- I believe the initial 267 was a combination

17 of these two that we're looking at right now on the screen on

18 balances that were owed plus additional funds for operating.

19 Q   And when did Allegretta Electrical receive this advance

20 that consolidated its other outstanding debt, if you recall?

21 A   2018, early, I believe.

22 Q   Okay.  I'll like to show you a document to see if it

23 refreshes your recollection that the consolidated funding

24 occurred on November 26th, 2018.  And that's document one.

25 Do you recognize this document?

1  A   I don't.  Sorry, sir.

2  Q   Okay.  Does this refresh your recollection if you read

3  it, that Allegretta Electrical received the consolidated

4  funding on November 26th, 2018?  And I'll draw your attention

5  to the top.

6  A   I'm sorry, I don't see anything else except for the

7  original document that was on the screen.

8  Q   Yes.  Well, I'm, I'm asking you to read this document to

9  see.  And I'm sorry, Your Honor, I'll mark this document as

10  defendant's B for identification indicated on top

11  consolidation calculator.  So I'd like you to read the top of

12  this document and to see if it refreshes your recollection

13  that the consolidation funding occurred on November 26th,

14  2018.

15  A   I do see that.

16  Q   And do you remember that's when it happened?

17  A   Yes, sir.

18  Q   Okay.  Now the --

19  A   Can I interrupt for, for one moment?

20  Q   Sure.

21  A   My device is going -- it's low battery.  Could I step

22  away or could I come back?  I don't, I don't have a charger,

23  unfortunately.  The cable is not working.

24          MR. COROZZO:  Your Honor --

25          THE COURT:  Ma'am, this is the Judge.  What do you

1  mean step away?  Do you want to go get a charger or

2  something?  You can't, you can't leave your testimony,

3  ma'am.  I'm sorry.

4       WITNESS 1:  I know.  I'm so sorry.  So right now

5  I'm in my garage and I would just need to go into my house

6  to get a different cable.

7       THE COURT:  To get, to get a, to get a -- to

8  charge your phone?  To charge your machine?

9       THE WITNESS:  Yes.

10       THE COURT: Alright.  We'll, we'll, we'll -- go

11  ahead ma'am.  Take, take one minute and come right back.

12  We'll wait for you.

13       WITNESS 1:  I'll be right back.

14       THE COURT:  Counsel, you can step out if you want

15  to take a minute break.

16       MR. COROZZO:  Thank you, Your Honor.

17       THE COURT:  Counsel, we're breaking at 12:15 to

18  two o'clock for court.  I have to address something down in

19  Philadelphia at 12:30 for about an hour.

20       MR. COROZZO:  We were told that, Your Honor, and I

21  do have quite a bit more with Ms. Allegretta, so I'll

22  probably be with her till that time.

23       THE COURT:  And you're scheduled for tomorrow --

24  is available as well?  Or Friday?  It's not tomorrow.  I

25  can't do tomorrow, but Friday.  Friday afternoon, Friday

1  afternoon actually.

2          MR. COROZZO:  Afternoon is better for me because I

3  do have something --

4          THE COURT:  Counsel?

5          MR. NEWCOMER:  We'll make it work, Your Honor.

6          THE COURT:  Okay.  Yeah.  Let's see.  I mean,

7  we'll, we'll go as late as we can tonight.  We've, we've

8  gone late before.  We can go late.

9          MR. NEWCOMER:  We have, Your Honor.

10          MR. COROZZO:  Your Honor.  Ms. Allegretta seems to

11  be back.

12          THE COURT:  Yep.  Ms. Allegretta, can you hear me?

13  This is the Judge.

14          WITNESS 1:  Yeah.

15          THE COURT:  Alright.  You charged up?

16          WITNESS 1:  Yes.

17          THE COURT:  Back in business.  Go ahead, counsel.

18  You may -- counsel is going to continue asking you

19  questions.  Okay, ma'am?

20          WITNESS 1:  Yes, sir.

21          THE COURT:  Please counsel.

22  BY MR. COROZZO:

23  Q   Now, do you recall that part of the consolidation was

24  debt that Allegretta had, had outstanding to a company

25  referred to as UFS?  Do you recall that?

1    A    I don't have a recollection of that business name.

2    Q    Does this document refresh your recollection?  If you

3    look at number two on that page.

4    A    I see the name.  Yes, sir.

5    Q    Okay.  Did you have cash advance debt with any other

6    company as of 2018 outside of Yellowstone?

7    A    I don't recall, sir.

8    Q    Okay.  Do you -- and you don't recall ever dealing with a

9    company with the initials UFS?

10   A    I do not, sir.

11   Q    Okay.

12   A    I see it here in front of me.

13   Q    So what is your recollection as to what debt was

14   consolidated into that advance of November 26th, 2018?

15   A    Previous debt that were held with other businesses.

16   Q    And what type of businesses?

17   A    A factoring of businesses that you lend or you borrow

18   against your accounts receivables.

19   Q    And does it -- does this document refresh your

20   recollection that when you took the consolidation advance on

21   November 26th, 2018, that you were consolidating seven

22   existing, seven existing debts that were owed to seven

23   different companies or six different companies?

24   A    I see that here, yes.

25   Q    And do you recall one global,

1  A   I, I, I see them here on this sheet.  I see Yellowstone

2  first, global twice.  UFF all the companies you've mentioned

3  thus far.

4  Q   And does, does that refresh your recollection that as of

5  November, 2018, Allegretta electric owed debts to these

6  companies for funds advanced?

7  A   Yes.

8  Q   So, there was -- as of the consolidation agreement, there

9  was almost $30,000 owed to UFS.  6,300 owed to Yellowstone,

10  almost 200,000 owed to one Global.  46,000 owed to green and

11  80,000 owed to influx.  Is that fair to say?

12  A   I see those, all those things here on this sheet.  Yes,

13  sir.

14  Q   And you recall taking the consolidation loan, correct?

15  A   Yes, I recall taking that consolidation loan.

16  Q   Now, when you testified earlier today on direct

17  examination, I believe you said that your first advance from

18  Par was never paid off.  It was -- there were additional

19  loans taking.  Is that your testimony?

20  A   Yes.

21  Q   Okay.  And are you saying it was paid off through these

22  consolidation loans or prior to this consolidation advance?

23  A   I'm sorry, sir, I don't understand your question.

24  Q   Okay.  Well, isn't it a fact that originally in

25  approximately August of 2018, Allegretta Electric took two

1  advances from Par funding each in the amount of $75,000 and

2  that both of these agreements were paid off entirely.  Isn't

3  that a fact?

4  A  Yes, sir.

5  Q  Okay.  So when were those two advances totaling $150,000

6  taken in August of 2018?  When were they paid off entirely?

7  A  I don't know the answer to that, sir.

8  Q  Okay.  And then, and they were not paid off with another

9  loan, is that not true?

10  A  I don't recall, sir.

11  Q  Well, isn't it true that after those agreements were paid

12  off entirely Allegretta Electric then took out a third loan

13  for approximately $276,000 in November of 2018?

14  A  Yes, I am.  I do recall us taking multiple loans with our

15  funding, the reloads.

16  Q  Well it was not a reload because the first two were paid

17  off entirely and the third one was taken in November of 2018.

18  Is that not accurate?

19  A  Perhaps I'm using the wrong words, sir.

20  Q  Okay.  Perhaps.  In August of 2018, they're both paid off

21  at advances and then in November of 2018, a third advance was

22  taken after the first two were paid off, and that third

23  advance was in the amount of $276,000.  That's accurate.  Is

24  it not?

25  A  Yes.  Yes, sir.

1    Q   Now, when, when you are working for Allegretta

2    Electrical, the company is technically owned and controlled

3    by your husband, correct?

4    A   Yes.

5    Q   And around the time that you were taking these advances

6    on the company, your husband was not involved in the day-to-

7    day operations of the company because he was traveling a lot

8    racing cars, was he not?

9    A   Yes, he was racing, but certainly involved in his own

10   business, yes.

11   Q   Well, he was traveling a lot during that time period.

12   18,19, correct?  17, 18, 19.

13   A   Yes, sir.

14   Q   And where would -- how often would he travel racing his

15   cars?

16           MR. DALKE:  Objection, relevance, Your Honor.

17           THE COURT:  Yeah.

18           MR. DALKE:  Getting Farfield.

19           THE COURT:  What, what -- next question.  Sustained.

20   BY MR. COROZZO:

21   Q   So the, who was running the day-to-day operation of, of

22   Allegretta Electrical during the time period your husband is

23   traveling racing cars?

24   A   My husband and I both --

25   Q   Would he be able to manage the company from afar while

1   he's engaged in the car racing activity?

2   A   Well, you'd do it with help, so yes.

3   Q   Well, you were the help, right?

4   A   Yes, sir.

5           MR. COROZZO:  I might just have a moment, Your

6    Honor.

7           THE COURT:  Certainly.

8   BY MR. COROZZO:

9   Q   And around the time that you were engaged in receiving

10  funds from Par funding, specifically in September of 2018,

11  Allegretta Electrical, is receiving approximately $700,000 a

12  month in receivables into its bank account, correct?  We --

13  we've established that before, did we not?

14  A   Yes.  Yes sir.

15  Q   So when you owe this $400,000 to Par funding, it's around

16  this same time period that the monthly receivables of

17  Allegretta Electrical are upwards of $700,000 a month,

18  correct?

19  A   Yes, sir.

20  Q   Now, after you receive the, the, the consolidation

21  advance, which we've established is November of 2018, for how

22  long of a period do you continue to make monthly payments off

23  that debt?

24  A   I don't recall there.  A lot, several months I believe.

25  Q   And you testified that you -- off the total $400,000

1  advance, you paid about 700,000.  Is that your testimony?

2  A   Yes sir.

3  Q   And when was the final payment made?

4  A   The final payment was made through our attorney.  I don't

5  recall that final amount date.

6  Q   Do you recall what the final amount number was?

7  A   Yes, it was $142,000.

8        MR. COROZZO:  Okay.  And that settlement -- if I

9  might have a moment, Your Honor, just one second.

10        THE COURT:  Please.

11        MR. COROZZO:  That settlement was made on December

12  15th, 2019, if you recall.

13        THE COURT:  Is that a question?  She said she didn't

14  recall?  Is that --

15        MR. COROZZO:  So I'd like to show you --

16        THE COURT:  Well, ma'am, do you have any reason to

17  dispute that before we slow this down any further?  Do you

18  have any reason to dispute that, ma'am?  December 15th.  What

19  day, sir?  December 15th.

20        MR. COROZZO:  December 15th, 2019.

21        THE COURT:  2015, 2019.  That last 142,000 payment,

22  ma'am, do you dispute that?

23        WITNESS 1:  No, sir.

24        THE COURT:  Okay.  United States any problem with

25  that date?

1          WITNESS 1:  No sir.

2          MR. DALKE:  I think it sounds generally correct,

3    Your Honor.  I, I don't know the specifics, but it sounds

4    about right.

5          THE COURT:  Alright, so December 15th, 2020, 2019.

6    Okay.

7    BY MR. COROZZO:

8    Q   And prior to the settlement in December of 2019,

9    Allegretta Electrical had completely stopped making any

10   payments to Par funding, right?

11   A   I believe at that time our bank accounts were locked.

12   There was a confession of judgment placed against the

13   business.

14   Q   Well, prior to the confession of judgment being placed,

15   Allegretta had stopped making payments, correct?

16   A   Yes, sir.

17   Q   And that's why the confession of judgment was, was

18   placed, correct?

19   A   Yes, sir.

20   Q   And you negotiated with Par funding to lift the

21   confession of judgment by promising to continue making

22   payments, correct?

23   A   My intention was always to make payments, sir.  I, I

24   don't understand the question,

25   Q   My question is, when --

1  A   We couldn't make the payments, that's why we weren't

2  paying.

3  Q   When Allegretta stopped making payments and the

4  confession of judgment was filed, you then negotiated with

5  Par funding to release the confession of judgment by settling

6  on a payment schedule, correct?

7  A   Yes.

8  Q   And you made that payment schedule for a little while,

9  correct?

10  A   I -- yes.

11  Q   And then you stopped making that payment, correct?

12  A   Yes.

13  Q   And after you stopped making that payment, emails were

14  sent to your business clients and your customers, correct?

15  A   Yes.

16  Q   And the lien or the confession of judgment that froze the

17  accounts occurred in November of 2019, do you recall that?

18  A   Yes, sir.

19  Q   Okay.  And you negotiated the release of the lien on

20  November 22nd, 2019, if you recall.

21  A   Sounds correct.  Yes, sir.

22  Q   And you promised to send Par funding on that day $3,000,

23  correct?

24  A   Yes, that sounds correct, sir.  Yes.

25  Q   Now, now, now within three weeks of making that

1  settlement to lift the confession of judgment, Allegretti

2  again stopped making payments, correct?

3  A  I'm, I'm sure that's correct.  It was a cycle, yes.  I

4  think exactly that.  Yes, sir.

5  Q  And within that time period, after the confession of

6  judgment was lifted and a second agreement was entered after

7  you call the FBI on December 10th, 2019, do you recall that?

8  Do you not?

9  A  I do recall.

10  Q  Right.  And you tell the FBI on December 10th, 2019, that

11  you were threatened by Joseph LaForte on November 7th, 2019,

12  that he was going to put a bomb in your car.  You recall

13  that?

14  A  Yes.

15  Q  So you told the FBI on December 10th, 2019, that one

16  month earlier, 30 days earlier, Joseph LaForte promised to

17  put a bomb in your car.  You remember saying that to, to the

18  FBI, correct?

19  A  Yes.  And I recall the threat physically.

20  Q  Okay.  So it's your testimony here today that you recall

21  that the threat of putting a bomb in your car occurred on

22  November 7th, 2019,

23  A  The exact date?  Yes.  If you're saying 2007 and or

24  November 7th, and yes, that's the date.

25  Q  And the bomb threat was the first threat, was it not

1  according to your testimony,

2  A   Sir, I don't, I don't recall the order in, in which the

3  threats came.  I don't recall the date.  I don't -- I'm

4  sorry.  I don't.

5  Q   Okay.  I'm going to show you a document to refresh your

6  recollection.  This would be, I guess, defendant C.

7          MR. DALKE:  Your Honor.  Objection.  This is the

8  second document that's been used to refresh recollection.  If

9  she hasn't seen these documents, shouldn't know them similar

10 as the last one.

11         MR. COROZZO:  Well, I can refresh recollection of

12 documents she hasn't seen, but the question, she could show

13 her something, but I don't think it's disputed as November

14 7th.  She said it's November 7th.  So, if you say so.  It is.

15         MR. DALKE:  I have, I'm, I'm a little bit more --

16 BY MR. COROZZO

17 Q   Well, we don't need to show a document about November

18 7th.  That's, that's established.  What else do you have?

19 Okay.  And do you recall that when you talked to the FBI on

20 December 10th, 2019 and told them you were threatened

21 approximately 33 days earlier, you told them about the bomb

22 threat, but you did not say there were any other threats

23 except the bomb threat on November 7th, 2019.  Do you recall

24 that?

25 A   I don't recall that conversation at this particular

1   moment.

2   Q   Okay.  I'd like you to look at this document and read the

3   first two pages to see if it refreshes your recollection that

4   when you call the FBI on December 10th, 2019, you discuss a

5   threat from Joseph LaForte that I'm going to put a bomb in

6   your car, which occurred on November 7th, 2019, and did not

7   state anything about threats to your children or cement

8   shoes.  And we'll scroll up when you're done the reading.

9           MR. DALKE:  Counsel, you know, I already had -- I'm

10  the fact finder and I already know what date that was after

11  this.  You already heard that evidence?  So she's not saying

12  it was it's not after it.

13          MR. COROZZO:  Because I have a 302 that says it's

14   before.  And I, and I'll get to that next one.

15          MR. DALKE:  Alright.  No.  Okay.  I thought it was

16  in --

17          MR. COROZZO:  No, it wasn't.  She says it was early

18   2018 starting in early and for six months.

19          MR. DALKE:  2018 you say?

20          MR. COROZZO:  Yes, yes.  Or, or if it's 19, it's

21   definitely before November.

22          MR. DALKE:  This is December 10th, 2019.

23          MR. COROZZO:  Yes, it is.  It's the end of the year

24   and I have a 302 that I'll get to next time.

25          MR. DALKE:  Okay.  Alright.

1     MR. COROZZO:  We will scroll up so you could read the

2     second page and continue reading.

3         THE COURT:  The question is, ma'am, does it say

4     anything there about anything other than a bomb threat?

5     Right, Mr. Corozzo?

6         MR. COROZZO:  That is correct.

7         THE COURT:  Okay.

8     BY MR. COROZZO:

9     Q  Does that refresh your recollection that when you reported

10    a threat to the FBI on December 10th, 2019, the only threat

11    you report is that Joseph LaForte threatened to put a bomb in

12    your car and which occurred on November 17th,

13    [indiscernible].

14    A  I see the document.  I've read it.  Yes, sir.

15    Q  Okay.  Now, and again, this is all during the time of

16    trying to negotiate the outstanding funds owed to Par, right?

17    A  Yes, sir.

18    Q  And even after November 7th and early November, you were

19    continually communicating with Par in an effort to

20    renegotiate the terms of your debt, correct?

21    A  Yes.

22    Q  Okay.  And did you go to any lawyer in, in this time

23    period, November, December, 2019 to discuss these threats?

24    A  I, I don't recall.  We did not speak to an attorney about

25    the threats.  We spoke to the attorney with regard to making

1    a settlement.

2    Q    Right.  The first time you discussed any of these

3    occurrences with an attorney is later on in 2020 when you're

4    trying to negotiate a settlement, correct?

5    A    Yeah, I believe so.  I don't recall those exact dates

6    either.

7    Q    Okay.  Your Honor, you were correct that it is 2019, but

8    there are different dates.  Now, however, while you didn't

9    report in, in December of 2019, the other two threats to the

10   FBI on January 29th, 2020, you were interviewed by agent John

11   Murray of the FBI.  Do you recall meeting Agent Murray?

12   A    Yes, sir.

13   Q    And on that day, January 29th, 2020, you told Agent

14   Murray that the first threat was over the phone in February

15   of 2019, wherein in February of 2019, Joe LaForte threatened

16   to put a bomb in your car.  Do you recall that's what you

17   told Agent Murray on January 29th, 2020?

18   A    What I recall is, is that feeling I had.  Yes.  The dates

19   of, of when those occurrences were or the order in which they

20   have them?  I don't have, I don't have those dates, sir.  I'm

21   sorry.

22   Q    Okay.  I'll show you a document to see if it refreshes

23   your recollection.  Ma'am, I'm going to show you a document,

24   refresh your recollection.

25   A    I, I, I see the document.  I'm not disputing the

1  document.

2  Q   Okay.  So you see in that document, the first paragraph,

3  it refreshes your recollection that on January 29th, 2020,

4  you told Agent Murray that the first threat occurred in

5  February of 2019 over the phone and that was the threat of

6  the bomb, correct?

7  A   Yes, sir.

8  Q   Drawing your, drawing your attention to the next

9  paragraph, please read it and tell me if you agree that you

10  told Agent Murray on that date that there was a second threat

11  in April of 2019, a threat from Joseph LaForte to kidnap your

12  children.  You told that to Agent Murray, correct?

13  A   I see that here, yes.

14  Q   And then lastly, you told Agent Murray as to the third

15  threat that that occurred on -- in August of 2019 where

16  Joseph LaForte talked to you about cement shoes, correct?

17  A   Yes.  I see that here in the document.

18  Q   So you told Agent Murray that all three threats occurred

19  well before you called the FBI on December 10th, 2019,

20  correct?

21  A   Yes, sir.

22  Q   Okay.  If the last threat occurred in August, why did you

23  call the FBI in December?

24  A   The answer I could give you on that is, you know, threats

25  create fear and, and fear creates anxiety and, and worry and

1    I, I, I can't answer.  Okay.  I waited this amount of days to

2    contact the FBI.  I contacted them when I couldn't handle the

3    fears.

4    Q   So when you couldn't, what ma'am?  You, you could -- you

5    contacted them when you couldn't what?

6    A   When I couldn't deal with those fears anymore, were

7    becoming more and more real.

8    Q   And that anxiety and fear, according to your testimony,

9    began in February of 2019 and continued through December when

10   you called the FBI.  Correct?

11   A   Yes.  Okay.

12   Q   Do you recall any emails with Par funding where you told

13   them that you were forever grateful to them and you would --

14   and the company would not have made it without them?

15   A   Yes, I recall.

16   Q   Now, did these, did these emails occur while you're

17   having this fear and anxiety or before?

18   A   All.  During.

19   Q   Okay.  So on April 29th, 2019, while you're having this

20   fear and anxiety, you emailed Joseph LaForte and you tell him

21   Good morning, hope all is well with you.  I first want to say

22   that I am very thankful for CBSG for all the assistance you

23   have provided to me.  I'm forever grateful.  You sent that

24   email to Joe LaForte on April 29th, 2019, correct?

25   A   Yes, sir.

1   Q   And then on June 27th, 2019, while you're suffering this
2   anxiety and fear, you send Joseph LaForte an email.  Good
3   morning.  I first want to say thank you very much for
4   everything you have done for me through the years.  I would
5   not have made it through without your help.  Do you recall
6   that one?
7   A   Yes.  I recall.
8   Q   Were those emails sent during a time period where you did
9   not have fear and anxiety, or was it all fear and anxiety
10  from February through December?
11  A   I was desperate.  I was desperate to, to pay money.  All
12  that we ever wanted to do was pay our debts.
13  Q   But you stopped paying it at certain times and that's
14  when a confession of judgment was filed.  Correct?
15  A   Sir, there was no money to pay.  I would've paid if I had
16  the money, but I didn't, and I was forthcoming and telling
17  Par that I didn't have the money.
18  Q   You controlled Allegretta's books and records.  What was
19  all Allegretta's income in 2017?
20  A   I don't recall that, sir.
21  Q   Was it less than 2018?
22  A   I don't recall that, sir.
23  Q   Was it less than 2019?
24  A   I don't recall that, sir.
25  Q   But clearly Allegretta's receiving $700,000 a month in

1    certain months in 2017, correct?

2    A   I don't deny that, sir.

3    Q   No further questions, Your Honor.

4            THE COURT:  Thank you.  Counsel, do you wish to

5    redirect?

6            MR. DALKE:  Briefly, Your Honor.

7            THE COURT:  Please.  One second.  Anything else?

8    Anything?  She never does, did she?

9            MR. COROZZO:  Your Honor, may I interrupt for one

10   question?  I, I forgot one issue.

11           THE COURT:  You may.

12           MR. COROZZO:  Thank you.

13           THE COURT:  One question.

14           MR. COROZZO:  It's, it's one issue.

15           THE COURT:  You can come back.  No, no.  You can come

16   back on recross if it's scoped to.  No.  One -- how, how long

17   it's going to be.  You sat down, you said I'll rest.

18           MR. COROZZO:  I'll make it one question.

19           THE COURT:  Go ahead.  You can have a follow up, but

20   not, we're not doing another thing.

21   BY MR. COROZZO:

22   Q   Oh, that's it.  If I can have a follow up.  I believe you

23   testified on direct examination that there was no onsite

24   inspections for Allegretta electrical.  Is it not true that

25   Metro Inspections, a third-party inspection company conduct

1    an inspection on site for Allegretta Electrical on October

2    16th, 2017?

3    A    I don't recall that, sir.

4    Q    If I can just show you one document.  Number 9, does this

5    refresh your recollection that there was an onsite inspection

6    done at Allegretta Electrical on October 16th, 2017?  Does

7    that refresh your recollection that onsite inspection was

8    done and those photographs were taken?

9    A    I see pictures of my office, yes, outside and inside.

10            MR. COROZZO:  Your Honor, for -- just for the

11    record, I'll, I'll note that the inspection certificate,

12    inspection report should be marked as defendant's D.

13            THE COURT:  Exhibit D.  No more.  Thank you.

14            WITNESS1:  What is this sign based on?

15            THE COURT:  Ma'am.  We, we, we'll go to the next

16    question, ma'am.  It's okay.  I'm going to come back to it in

17    a moment.  Go ahead, counsel.  You can redirect.  Before you

18    get there sir, am I correct because I -- this is changing on

19    me.  The gentleman pled guilty to wires in securities fraud,

20    correct?

21            MR. COROZZO:  That's correct, Your Honor.

22            THE COURT:  With no exception.  Just no -- I get it.

23            MR. COROZZO:  No exception.

24            THE COURT:  Alright.  One of that, isn't one of

25    those things that he agreed is that he lied about the

1  underwriting process as being rigorous?

2         MR. COROZZO:  That is correct, Your Honor.  I, I

3  recall --

4         THE COURT:  Is it not, not part of the under -- it's

5  not part of the underwriting process?

6         MR. COROZZO:  I would hope that the court would

7  consider relevant that the witness testifies definitively

8  that there's no inspection report and there is an inspection

9  report.

10        THE COURT:  Okay.  But he already --

11        MR. COROZZO:  I'm not suggesting that there's

12  inspection reports for every situation.

13        THE COURT:  Okay.  Got it.  And you already admitted

14  that he lied about that.  Okay.

15        MR. COROZZO:  Without a doubt, Your Honor.

16        THE COURT:  Alright.  Thank you.

17        MR. COROZZO:  This -- in my opinion, this goes

18  totally to the credibility.

19        THE COURT:  I got it.  Yeah.

20        MR. COROZZO:  This witness why we're contesting it

21  and why we don't want it in.

22        THE COURT:  Understood.  Thank you.  You may

23  redirect.

24                   REDIRECT EXAMINATION

25  BY MR. DALKE:

1   Q   Ms. Allegretta, is it fair to say you had lenders before

2   Par funding?  That Allegretta Electrical Corp had lenders?

3   A   Yes.

4   Q   Did Pearl Capital ever threaten you?

5   A   No, sir.

6   Q   Did Yellowstone ever threaten you?

7   A   No, sir.

8   Q   Did Influx ever threaten you?

9   A   No, sir.

10   Q   Did any lender at any time ever threaten you for not

11   making payments on, on the debt or the money loaned other

12   than Par funding?

13   A   No.

14   Q   Were you threatened by Par funding and its founder Joe

15   LaForte, Joe Mack?

16   A   Yes.

17   Q   Did that happen on multiple occasions?

18   A   Yes.

19   Q   Did that include threatening to put a bomb in your car

20   and you'll be gone?

21   A   Yes.

22   Q   Did that threat include threats to kidnap your children?

23   A   Yes.

24   Q   That you'd show up to pick them up, these 6-year-old

25   twins and they wouldn't be there?

1  A   Yes.

2  Q   That include threats to put cement shoes on you and toss

3  you in the bottom of the Hudson?

4  A   Yeah.

5  Q   How many times did -- do you recall how many times

6  LaForte threatened you?

7  A   Three times.

8  Q   Do you recall whether on those different occasions, on

9  those different calls that he threatened to blow up your car

10 just once or did that happen on multiple calls multiple

11 times?

12 A   I recall those words coming from his mouth, yes.

13 Q   Did you and Allegretta Electrical Corp continue to make

14 payments after those threats?

15 A   Yes.

16 Q   When you stopped paying, were you threatened again?

17 A   Yes.

18 Q   Did those threats continue after the march or April, 2019

19 emails that were discussed?

20 A   Yes.

21 Q   Is there any doubt in your mind that you were threatened?

22 A   No, sir.

23 Q   Thank you.

24          MR. COROZZO:  Just briefly, Your Honor.

25          THE COURT:  Sure.  Counsel.  Please.

1          RECROSS EXAMINATION

2     BY MR. COROZZO:

3     Q Ms. Allegretta, why on December 10th, 2019, did you not tell

4     the FBI about the threat to your children or the threat of

5     cement's shoes?

6     A I, I -- when I called the tip line, I don't recall why we

7     didn't discuss all of the circumstances and threats that

8     occurred over the course of time.

9     Q But you chose to refer to the threat that you told Agent

10    Murray that happened 10 months earlier, not the more recent

11    threats.  Correct?

12    A The order of the threats are not relevant.  I'm sorry.

13    Q They're not.  Why do you say that they're not relevant?

14    A I don't -- I explained I didn't need.  So when they

15    occurred, or the dates of pending the dates of much of this.

16    Q In drawing your attention to the other companies that you

17    received advance funding from, did you ever have to hire an

18    attorney to make a settlement with those companies?

19    A No, sir.

20    Q Because you paid all those companies, correct?

21    A Yes, sir.

22          MR. COROZZO:  No further questions.

23          THE COURT:  Thank you.  Ma'am, we excuse you from

24     the courtroom.  Thank you for your testimony.  You may now

25     close down your phone line.

1           WITNESS 1:  Thank you.

2           THE COURT:  Thank you very much.  United States, do

3    you wish to do further evidence?

4           MR. NEWCOMER:  Yes, Your Honor.  We're going to

5    pivot here and call special agent John Murray as opposed to a

6    second video witness.  We may try to call him later.  He tied

7    up at work.

8           THE COURT:  Alright.  Agent Murray.

9           ESR/CLERK:  Do you swear or affirm that the

10   testimony before court the truth, the whole truth, nothing

11   truth, so help you God or affirm?

12          WITNESS 2 JOHN MURRAY:  I do.

13          ESR/CLERK:  State your name and spell your last

14   name.

15          WITNESS 2:  John Murray, M-U-R-R-A-Y.

16          THE COURT:  Good Morning, sir.

17          WITNESS 2:  Good morning.

18                       DIRECT EXAMINATION

19   BY MR. NEWCOMER:

20   Q   Good morning agent Murray.  Briefly, can we tell the

21   court about your education and training?

22   A   Sure.  I'm a special agent with the FBI currently

23   assigned to the Organized Crime Squad here in Philadelphia.

24   I've been here since May, 2016.  I started the Academy in

25   May, 2011.  And prior to that I was an Assistant district

1   attorney in the Philadelphia District Attorney's office.

2   Q   Okay.  And when you were assigned, and hired by the FBI,

3   what group did you, you put?

4   A   So I was -- my initial assignment was mostly focusing on

5   gangs and violent crime.

6   Q   Okay.  And did you transition from that unit to a

7   different unit?

8   A   Yeah, so when I came to Philadelphia, I was assigned to

9   the Organized Crime squad and I've been there ever since.

10  Okay.

11  Q   And how long have you been with the organized crime

12  squad?

13  A   Since May, 2016.

14  Q   Okay.  And during the course of that almost 10 years, an

15  organized crime squad, what kind of cases have you

16  investigated?

17  A   So our, our squad focuses on organized crimes groups, so

18  I've worked a number of violations.  Those violations have

19  included drug trafficking, violent crime and loan sharking,

20  as well as white collar offense.

21  Q   And loan sharking.  Does that include the extortion of

22  collection of debt?

23  A   Correct.

24  Q   The type of charge that was brought here against Mr.

25  Laforte?

1   A   Correct.

2   Q   Did you become involved with the investigation of Par

3   funding?

4   A   I did.

5   Q   And when was that?

6   A   This case was opened in May, early June, 2019 is when we

7   invest -- started fully investigating portfolio.

8   Q   That's what was opened by the FBI?

9   A   Correct.

10  Q   Were other agencies involved in the investigation?

11  A   They were.

12  Q   And what other agencies were involved?

13  A   So the primary -- the primary agencies involved in

14  investigation have been the IRS, and the FDIC Office of

15  Inspector General.  We also had some support from the

16  Pennsylvania State Police and some other agencies, but they

17  were the primary agencies involved.

18  Q   And of the, of the many things you investigate in the

19  course of this case, and we won't belabor the point on this

20  record, given the court's familiarity with the case.  I want

21  to focus on the investigation of the extortion and collection

22  of credit, specifically those charges against Mr. Laforte.

23  A   Yes.

24  Q   Does that make sense?

25  A   Yes.

1  Q   Were you involved in that portion of the investigation?

2  A   I was.

3  Q   And tell the court what types of investigative things did

4  you do to investigate the extortion, alleged against Par

5  funding?

6  A   Sure.  This investigation included interviewing of many

7  witnesses.  It also included in the execution of search

8  warrants for records, as well as searching of electronic

9  devices such as cell phones and laptops.  Service of grand

10  jury subpoenas and obtaining records through those means in

11  reviewing those records.

12  Q   Okay.  You said interviewed witnesses.  What types of

13  witnesses did you interview?  Did you interview alleged

14  victims?

15  A   So we interviewed alleged victims, generally merchant

16  cash, advanced customers of Par funding, or it's related

17  entities.

18  Q   And did you, did you interview individuals that worked at

19  Par funding?

20  A   Yes.

21  Q   And I'm talking about worked at Par funding prior to the

22  receivership.

23  Q   Correct?

24  A   Right.

25  Q   This is back when Joe LaForte was running?

1    A    Correct.

2    Q    At Par funding?

3    A    We, we interviewed probably -- I want to say probably a

4    couple dozen employees that worked for Par funding prior to

5    the execution of the search warrants in 2020 in the SEC

6    receivership.

7    Q    And were any of those employees relevant to the extortion

8    charges against Mr. Laforte?

9    A    They were.

10   Q    And who, who, who were those witnesses or employees?

11   A    So we interviewed a number of employees from the

12   collections department, and most significant witness that we

13   interviewed was Renato Gino Gioe, who also worked --

14   Q    And you, you interviewed other members of the collections

15   team too, is that fair to say?

16   A    Yes, that's correct.

17   Q    You talked about seizing and searching cell phones.  Were

18   cell phones of Mr. Laforte recovered in the course of this

19   case?

20   A    They were.

21   Q    Were there extractions of, of text communications taken

22   from those phones?

23   A    There were.

24   Q    Did you obtain cell phones from other sources other than

25   Mr. Laforte during the course of this investigation?

1    A    We did.

2    Q    And who else did you get cell phones from?

3    A    We received cell phones from Joseph Fort's brother, James

4    LaForte, Renato Geo, as well as probably a handful of other

5    employees that are pertinent to the extortion part.  And then

6    we also reviewed text messages that the occasional merchant

7    may provide.

8    Q    Okay.  So this -- so in addition to getting the cell

9    phones, you also obtained text communications?

10   A    Correct.

11   Q    And those were directly from victims or employees?

12   A    Correct.

13   Q    Okay.  You talked about financial records.  What type of

14   financial records did you get from Par funding relevant to

15   the extortion investigation?

16   A    So on our own, we reviewed a volumous amount of bank

17   records that we received ourselves.  But then once the SEC

18   receivership came into play in July, 2020, they also

19   collected voluminous amounts of records and that included

20   most relevant -- most partly probably the client records of

21   the actual merchants themselves as well as their accounting

22   software that they used to, to run their business.

23   Q    Right.  And why were those accounting records relevant to

24   the extortion investigation?

25   A    So those allowed us to see from Par funding's perspective

1  the payment history of these merchants.

2  Q   Okay.  Including before and after the alleged threats

3  were made?

4  A   Correct.

5  Q   Got it.  You mentioned Renato Gioe.  Is Mr. Geo a

6  government corroborator?

7  A   He is.

8  Q   Did Mr.  Geo plead guilty in front of this court?

9  A   He did.

10  Q   And did he plead guilty to conspiring with Mr.  Joseph

11  LaForte to extort payments from Par's MCA customers?

12  A   He did.

13  Q   And is he awaiting sentencing on that?

14  A   He is.

15  Q   You've talked with Mr. Gioe?

16  A   Yes.

17  Q   How many times?

18  A   I believe we -- we've interviewed him three times in

19  person.  There's been a couple others shorter ad hoc

20  interviews via telephone.

21  Q   Okay.  And what did Mr.  Geo tell you about his

22  relationship to Par funding?

23  A   So he said that he was hired by Joe -- defendant Joe

24  LaForte back around 2013, and that his primary role was to

25  serve as the in-person collector for merchants that had

1    stopped making payments.

2    Q   Did Mr. Gioe have any nicknames?

3    A   Gino.

4    Q   Okay.  Gino?

5    A   Correct.

6    Q   Did Mr. Laforte have any nicknames according to Mr. Geo?

7    A   Yes.  Mr. Laforte, but would go by well, Joe McEhone or

8    Joe Mackey.

9    Q   Did Mr. Gino identify anyone else at Par funding that

10   went by the name Joe Mack except for Joe LaForte?

11   A   No.  His brother Jimmy would occasionally go by Joe

12   Mackey or Jim Mackey or something like that, but --

13   Q   But Joe Mackey, Joe Mack, there's only one guy who

14   answered to that.

15   A   Oh, absolutely.  Yeah.  There's only one Joe Mack.  And

16   that's Joe LaForte.

17   Q   Did you uncover evidence during the course of the

18   investigation showing corroborating Mr.  Geo's statements

19   that he worked directly for Mr. Laforte?

20   A   We did.

21   Q   And did that -- did those document span a number of

22   years?

23   A   They did.

24   Q   I'm going to show you, we're going to mark as government

25   Exhibit M for Murray one, government M1.  Your Honor, may I

1 approach please?

2 　　　　MR. DALKE:  I think it might move faster without the

3 electronics.

4 BY MR. NEWCOMER:

5 Q   Do you recognize this email Mr.  -- Agent Murray?

6 A   I do.

7 Q   And where does it come from?

8 A   So the sender of this email is from Joseph Cole Barleta,

9 who was then the Chief Financial Officer of Par funding.

10 Q   And bad question, just more generally, agent Murray.

11 Where, where, where does this email come from?  How have you

12 seen it before?  Where did you get it?

13 A   Oh, I apologize.  Yeah, so this production would've been

14 from the G Suite or the Google Cloud-based email account of

15 Par funding that was provided by the SEC court appointed

16 receiver.

17 Q   So at some point, and the court knows this, the receiver

18 took over operating Par funding fair to say?

19 A   Correct.

20 Q   Did you make a request to the receiver to get all the old

21 historic emails of Par funding?

22 A   We did.

23 Q   And was that produced to you?

24 A   It was.

25 Q   And does this come from that historic group?

1  A   It does.

2  Q   Of, of par funding emails?

3  A   Correct.

4  Q   Refresh this again, that -- from email it says Joe Cole

5  and email, that's joeCole@parfunding.com.  You're familiar

6  with that email address from the course of your

7  investigation?

8  A   Correct.

9  Q   And that's who?

10 A   That's Joe -- Joseph Lewis Cole Barleta, the Chief

11 financial Officer for Par funding and its related entities.

12 Q   And who did he report to?

13 A   He reported it to defendant Joe LaForte.

14 Q   And who is the two -- who's the recipient of this email?

15 A   The recipient in this case is joemack888@alo. com, which

16 I'm familiar with is a personal email address used by Joe

17 LaForte in addition to his company email address.

18 Q   And Joe Mack, that's one of the variations of the alias

19 for Mr. Laforte?

20 A   That's correct.

21 Q   And this particular subject for this email is what?

22 A   So the subject of this is the CBSG, which -- that's the

23 parent came Complete Business Solutions Group doing business

24 as Par funding.  So those names are often used

25 interchangeably, but it's the CBSG org chart is the subject

line.

Q   And is Mr. Cole Barleta the CFO writing to his boss, Joe
LaForte, and asking, please see the working version of the
employee organizational chart.  I wasn't sure on some of
these titles and how you wanted to show relations between
department, but we can change as needed.

A   That's correct.

Q   By the way, what -- what's the date of this?

A   It's December 7th, 2016.

Q   And as of December, 2016, how long has Par funding been
in business?

A   It's been in business since about 2012.

Q   Okay.  And how long has Mr. Cole been working for CBSG at
this point in time?

A   I believe at that point he's been working for, for a few
years.

Q   Okay.  And if we turn to the next page, you see the org
chart there?

A   Yes, sir.

Q   Mr. Gioe is not on that org chart, is he?

A   No, he's not.

Q   By the way, Ms.  McElhoe is also not on this org chart,
is she?

A   No.

Q   And what was her purported role in December 2016 to the

1    outside world based on your investigation?

2    A    The purported role at the outside world was that she was

3    the president of CBSJ.

4    Q    And who's president on this work chart?

5    A    In this case it's Joe Mack on this work chart.

6    Q    Is that consistent with the other evidence you obtained

7    during your investigation?

8    A    Right.  That's consistent with the actual reality of what

9    existed.

10   Q    Let's go to Exhibit -- look at admitted M1.  Exhibit

11   admitted M1.

12              THE COURT:  Any objection?

13              MR. COROZZO:  No, Your Honor.

14              THE COURT:  So admitted.

15              (Plaintiff Exhibit M1 admitted in evidence)

16              MR. NEWCOMER:  I'm going to mark government Exhibit

17   M2.  A copy for counsel.  And Your Honor, my approach.

18              THE COURT:  Thank you.  Yes, prior to our, prior to

19   our law clerk here and we hand it up.

20   BY MR. NEWCOMER:

21   Q    Agent Murray, was there a response [indiscernible]?

22   A    There was.

23   Q    Is that what we're looking at here?

24   A    It is.

25   Q    And you recognize this email from Par funding's business

1   email records?

2   A   Correct.

3   Q   Alright, Your Honor, move to admit government Exhibit M2?

4           MR. COROZZO:  No objection, Your Honor.

5           THE COURT:  So admitted as government M2.

6               (Plaintiff Exhibit M2 admitted in evidence).

7   BY MR. NEWCOMER:

8   Q   And I'm going to go to the email in the middle of this

9   chain from Joe Mack to Joe Cole.  Same day, right?  December.

10  Oh, I'm sorry.  What's, what's the date of the middle email?

11  A   It's December 8th, 2016, the next day.

12  Q   So it's the, the next day.  Right.  And what is Joe

13  Mack's response to the original email from Joe Cole?

14  A   So in response to the email from Joe Cole, he wrote, this

15  is great.  Add Gino as an outside collector, add Lisa, my

16  wife, to a position to get these guys used to seeing her

17  name, give her a title.

18  Q   And who is Gino?

19  A   Gino would be Renato Gino.

20  Q   And Lisa, that's who?

21  A   That's Lisa McElhoe, LaForte's wife.

22  Q   And is giving her a position on the org chart in

23  December, 2016 consistent with the arrest of investigation in

24  terms of Lisa's -- Ms.  McElhoe actual role in the company?

25  A   It is not.

1    Q   It is not consistent or it is consistent?

2    A   Giving her a position on the title?  Well, having her

3    have a position on the title is not consistent with the

4    actual role.

5    Q   Okay.  Alright.  And then if we take a look at the org

6    chart on the next page, fair to say that now if you go under

7    Joe Mack, you'll see an entry for Gino Geo Outside collector?

8    A   Correct.

9    Q   And does that person report up through Joe Mack?

10   A   Yes.

11   Q   And Lisa now appears as what?

12   A   President.

13   Q   And Joe is now, Joe Mack is now?

14   A   CO.

15           MR. NEWCOMER:  Okay.  Alright.  Let's move to

16   government Exhibit M3.  May I approach again?

17           THE COURT:  You may.

18   BY MR. NEWCOMER:

19   Q   Do you recognize this document Agent Murray?

20   A   I do.

21   Q   And where does this one come from?

22   A   This is from Joseph Laforte's Par funding email account.

23   Q   Alright.  Move to admit -- move to admit this as

24   government Exhibit M3?

25           MR. COROZZO:  No objection Your Honor.

1    THE COURT:  Without objection admitted government

2  M3.

3    (Plaintiff Exhibit M3 admitted in evidence).

4  BY MR. NEWCOMER:

5  Q   And the, the, this email?

6  A   Sir, this email based on our investigation is a

7  discussion with a merchant who was also in discussions with

8  Joseph LaForte about another joint venture involving their

9  company.

10  Q   So Jen Cornacchia [ph] of Baker's Center, is that an MCA

11  customer?

12  A   Correct.

13  Q   Of Par funding?  This was sent in September of 2015.

14  A   Sir, I think Baker's Center was actually a, a, a real

15  estate location.  Ms. Cornacchia was involved in a physical

16  Rehab company and that was the merchant.  So I think that's

17  what the topic is about.

18  Q   Thanks for that correction agent Murray.  And this Joe

19  Mack writes to this individual saying, you guys owe me a lot

20  of money.  I gave you a week off and now it's late.  Please

21  have the money ready.  I will have Gino come and pick it up.

22  A   Correct.

23  Q   And Gino again is reference to who?

24  A   Geo.

25  Q   Let's go to government Exhibit M4.  Mr. Murray do you

1   recognize this email?

2   A   I do.

3   Q   Does it also come from Par funding's historic email

4   records?

5   A   It does.

6   Q   Your Honor move to the admit -- move to admit government

7   Exhibit M4?

8            MR. COROZZO:  No objection, Your Honor.

9            THE COURT:  As admitted as Government Murray --

10    government Exhibit M4.

11              (Plaintiff Exhibit M4 admitted in evidence).

12   BY MR. NEWCOMER:

13   Q   Okay.  Now, agent Murray, this -- the front line on this

14   one has Joe Mack, but then the email address is

15   joe@parfunding.com.  Are you familiar with that email

16   address?

17   A   Yes.

18   Q   And who does that email address belong to?

19   A   Joseph LaForte.

20   Q   And are you familiar with Steven Siegel and Randy Siegel

21   as part of your investigation?

22   A   Yes.

23   Q   And who were these two individuals?

24   A   They were a merchant cash advance borrower involved in a

25   company known as Ticket Guys based in St.  Louis.

1   Q   Okay.  And what's the date of this email?

2   A   October 29th, 2015.

3   Q   And does the email start, Randy, can you give me a call?

4   Is that accurate?

5   A   That's correct.

6   Q   Randy's reference to Randy Siege, the one of the MCA

7   customers?

8   A   Correct.

9   Q   And this Joe Mack writes, this is disrespectful to

10   continue to ignore me.  I'm sending Gino back down with Tommy

11   to meet you.

12   A   Correct.

13   Q   Alright.  from your investigation, do you know who Tommy

14   is?

15   A   Not a hundred percent sure.  We identified another person

16   that was involved briefly in collections and I'm not sure if

17   Tommy is actual -- is his actual true name.

18   Q   But Gino, the other guy he's sending back down is who?

19   A   Is Renato Gino.

20   Q   Alright.  I'm going to mark this as government Exhibit

21   M5.  Mr.  Murray, this is another email from Par funding's

22   historic email database?

23   A   Yes.

24          MR. NEWCOMER:  I'd like to mark this as or admit

25   this as Government Exhibit M5.

1          MR. COROZZO:  No, objection, Your Honor.

2          THE COURT:  No objection.  Admitted is Government

3    M5.

4              (Plaintiff Exhibit M5 admitted in evidence).

5    BY MR. NEWCOMER:

6    Q   And who is this email from and who is it to, agent

7    Murray?

8    A   This email is from Joseph Laforte using his company email

9    address to Fred Davies, a merchant borrower from a business

10   located in New Jersey.

11   Q   And we're still in the 2015 time frame, right?

12   A   Correct.

13   Q   And does Joe Mack write, don't let me send Gino to your

14   house again.  I'm tired of bullshit Fred?

15   A   Correct.

16   Q   I'm going to mark this as government Exhibit M6.  Agent

17   Murray's M6, another government -- I'm sorry, another email

18   from the custodial database.

19   A   Correct.

20          MR. NEWCOMER:  Your Honor, I move to admit

21   government Exhibit M6.

22          MR. COROZZO:  No objection.

23          THE COURT:  Admitted without objection.

24              (Plaintiff Exhibit M6 admitted in evidence).

25   BY MR. NEWCOMER:

1    Q    And agent Murray, describe who this email is to and from

2    and the date.

3    A    So the email is from Joseph LaForte to a merchant who had

4    a business located in Jessup, Maryland.  The date of the

5    email is February 17th, 2016.

6    Q    So now we're out of 2015, to 2016.  And Joe LaForte is

7    writing to this customer.  This is unacceptable.  I'm going

8    to hammer you with legal and whatever else I can think of,

9    dot, dot.  Gino on his way back down there if you don't do

10   the right thing.

11   A    Yes, that's correct.

12   Q    Gino is who?

13   A    Gino is Renato Gioe.

14   Q    Look at government Exhibit M7.  Agent Murray, is this

15   another email from the historic database?

16   A    It is.

17        MR. NEWCOMER:  Your Honor, I move to admit

18   government Exhibit M7.

19        MR.  COROZZO:  No Objection, Your Honor.

20        THE COURT:  Admitted as government M7.

21        (Plaintiff Exhibit M7 admitted in evidence)

22   BY MR. NEWCOMER:

23   Q    What's the title of this email?  What's the subject line,

24   agent Murray?

25   A    Gino.

1    Q    And that's who?

2    A    That's Renato Gioe.

3    Q    And who is sending the email and who is receiving it?

4    A    This is an email from Joseph Laforte to a person who is

5    then in the collections department of Par funding.  His name

6    is Ken and his last name is [indiscernible]

7    Q    Okay.  So Par is not his real last name?

8    A    No, no.

9    Q    Ken from Par as opposed to Ken [indiscernible]?

10   A    Correct.

11   Q    Alright.  But this is a Par funding collection employee

12   that Joe Mack sent an email to?

13   A    Correct.

14   Q    And the date of this is what?

15   A    October 6th, 2016.

16   Q    So we're well into 2016 now, correct?

17   A    Correct.

18   Q    And does Joe Mack write to this employee, keep Gino

19   within 80 miles today?  I have him going to see Duke first

20   thing.

21   A    Correct.

22   Q    Gino is again, Gino -- Renato Gioe?

23   A    Correct.

24   Q    And does reference to Duke have any relevance to your

25   investigation, agent Murray?

1  A   Yes.  During this investigation we identified the Duke

2  Barbershop as a barbershop based in Philadelphia.

3  Q   Okay.  And did you identify the owner of that business?

4  A   Correct.  His name is William Brown.

5  Q   And did you interview Mr. Brown in the course of your

6  investigation?

7  A   We did.

8  Q   And did Mr. Brown report being threatened by Mr.  -- by

9  Mr. Gioe?

10  A   He did.

11  Q   Okay.  And we'll talk more about that a little bit later.

12  We will talk more about that a little bit later.  Exhibit M8.

13  Agent Murray, are we looking at another email from the

14  historical database?

15  A   We are.

16       MR. NEWCOMER:  Your Honor, I move to admit

17  government Exhibit M8.

18       MR.  COROZZO:  No objection.

19       THE COURT:  Admitted without Objection is Government

20  M8.

21       (Plaintiff Exhibit M8 admitted in evidence).

22  BY MR. NEWCOMER:

23  Q   And what's the subject line of this email, agent Murray?

24  A   Request for approval files for next week.  Parentheses

25  Gino slash Birch.

1    Q   So I think we know who Gino is by this point in time.

2    Who is Birch?

3    A   So, Birch was another -- I'm not a hundred percent sure

4    on who Birch is referred to.  As I mentioned before, we

5    identified another collector that briefly worked with Gioe in

6    the collections.  I was never able to identify him using the

7    Alias Birch.  I don't know where that came from.  He has a

8    little heavy set, so maybe that's how that came.

9    Q   So a year ago there was Gino and Tommy now was Gino and

10   Birch?

11   A   Correct.

12   Q   Alright.  The, the, the, the consistency is of Mr. Gioe,

13   correct?

14   A   Correct.

15   Q   And when was this email sent?

16   A   It was sent on August 24th, 2017.

17   Q   So now we're well into 2017, correct?

18   A   Yes.

19   Q   And who is Anthony Fazio the sender of this email?

20   A   Anthony Fazio was in the collections Department of Par

21   finding.  He eventually became in charge of the collections

22   department, but at this time he -- I think he was co charge

23   of -- in charge of collections.

24   Q   And do you know why Mr. Fazio from your investigation

25   has an email address that ends in fast advance funding?

1 A    I don't know why he used the fast advance funding.  I --

2 I've seen him use a Par funding email account in this case.

3 He was briefly in sales at one point in time and I think

4 that's why he had the fast advance funding account, but he

5 eventually transitioned into collections.

6 Q    Okay.  And, and this court has heard evidence about the

7 various different, Laforte controlled entities that related

8 to PAR funding?

9 A    Right.  Fast advance funding was another sort of alter

10 ego of Par funding.

11 Q    Got it.  And Joe Mack obviously is Joe LaForte --

12 A    Correct.

13 Q    The recipient?

14 A    Correct.

15 Q    Tell the court -- explain to the court what's going on in

16 this email.

17 A    So this was an email from Anthony Fazio to Joe LaForte

18 and it begins, Joe, I'm going to map out these stops out

19 after the girls leave tonight and go over the weekend.  So it

20 does not interfere with the day-to-day tasks.  I'll print

21 this out as well so we can review later when you have time.

22 Thanks Anthony.  And then he goes on to list multiple states

23 with merchants within those states for an itinerary for Gioe.

24 So this

25 Q    Right, this looks to be an itinerary of weekly projected

1  activity for Mr. Gioe?

2  A   Correct.

3  Q   And who was he asking for permission to set this up to?

4  A   Joseph LaForte.

5  Q   And who's reference to the girls after the girls leave

6  tonight?

7  A   I, I, I assume that means the other employees in

8  collections and at Par.

9  Q   Were there female employees in the collections unit?

10 A   There were.

11 Q   And did you speak with them in the course of your, your

12 investigation?

13 A   We did.

14 Q   Did they also describe updating Joe LaForte -- asking Joe

15 LaForte's permission to schedule Mr. Gioe's travel?

16 A   Correct.

17 Q   And we've got what, five states and dozens of MCA

18 customers on this, on this list, correct?

19 A   Correct.

20 Q   This is just next week, one week.

21 A   Correct.

22 Q   I'm going to mark this as government Exhibit M9.  Agent

23 Murray, is this another email from the historical Par funding

24 database?

25 A   It is.

1        MR. NEWCOMER:  Your Honor, I move to admit

2    government Exhibit M9?

3        MR.  COROZZO:  No objection, Your Honor.

4        THE COURT:  Admitted without objection.  Government

5    Exhibit M9.

6        (Plaintiff Exhibit M9 admitted in evidence).

7    BY MR NEWCOMER:

8    Q   And what's the subject line of this email agent Murray?

9    A   It was response for potential trips for the guys next

10   week.

11   Q   And does this look similar to the email we saw from 2017?

12   A   It does.

13   Q   Exhibit M8?

14   A   Correct.

15   Q   And what's going on in Exhibit M9?

16   A   It's just another proposed itinerary with the -- with

17   multiple states as arranged by Par funding employee Lucia

18   Mariani.

19   Q   So we've been through 2015, 2016, 2017.  Now we're in

20   2018.  Fair to say Joe LaForte is still being consulted on

21   where Mr. Gioe is traveling on a weekly basis?

22   A   He is.

23   Q   Are these the only nine, 10 emails that you've seen

24   involving Mr. Gioe Travel schedule being coordinated by Mr.

25   Laforte?

1  A   No.

2  Q   Can you ballpark how many emails like this you've seen?

3  A   I would approximate dozens of them, but I don't want to

4  put a number on as I sit here right now.

5  Q   Did -- based on your investigation, how long did Mr. Gioe

6  work for Mr. Laforte at Par funding?

7  A   Based on the investigation, he worked there from around

8  2013 to about June, 2018.

9  Q   Did you learn how Mr. Gioe met Mr. Laforte?

10 A   They met in state prison in New York.

11 Q   How did you learn that?

12 A   Through interviewing Gioe.

13 Q   Okay.  And what was Mr. Gioe and Mr. Laforte's

14 relationship in prison?

15 A   They were cellmates.

16 Q   And did they have a friendly relationship?

17 A   They did.

18 Q   Did Mr. Gioe play a role for Mr. Laforte?

19 A   Gioe said that he as a muscular guy, he kind of served as

20 sort of an assistant bodyguard type fellow for Mr.  Laforte

21 in jail.

22 Q   I'm going to pass up what I'm marking as Exhibit M10.

23 And you've met Mr. Gioe multiple times?

24 A   Yes.

25 Q   Do you recognize the photographic passed up?

1  A   Yes.  That's Renato Gioe.

2         MR. NEWCOMER:  I'd like to move to admit government

3  Exhibit M10.

4         MR.  COROZZO:  No objection, Your Honor.

5         THE COURT:  Admitted without objection.

6            (Plaintiff Exhibit M10 admitted in evidence).

7  BY MR. NEWCOMER:

8  Q   Agent Murray, do you know when, do you know when this was

9  taken?  This is after being released from prison when he was

10 serving with Mr. Laforte?

11 A   Yes.

12 Q   How much did Mr. Gioe say he was paid a week?

13 A   He was --

14 Q   In Par funding collection department.

15 A   He was paid approximately $1,500 a week.  He also

16 received some commissions for some of his.

17 Q   Now did -- excuse me, excuse me.

18 A   He also received some commissions for some of his

19 collections efforts too.

20 Q   Any, any evidence that he was paid millions of dollars?

21 A   No.

22 Q   Was he one of the people who the court has heard about

23 who had consulting agreements with Par funding where he was

24 making commission on the amount of money Par funding was

25 pushing out the door to MCA customers?

1   A   Oh no.

2   Q   No large payments of, of consulting fees?

3   A   No.

4   Q   Pay Relatively modestly?

5   A   Yes.

6   Q   Did Mr. Gioe admit to threatening customers?

7   A   He did.

8   Q   Did he say whether Mr. Laforte, Joseph Laforte knew about

9   those threats?

10  A   He said he did.

11  Q   And how did he say Mr. Laforte knew about the threats

12  that he was making?

13  A   Well, in general, he would say that he knew because they

14  would strategize about how he was going to handle himself.

15  And there was also -- it was a, a, a regular course of

16  conduct for when Gioe would visit a merchant, that he would

17  put Joe LaForte on either speaker phone or even a video chat

18  or FaceTime call during the actual collection efforts.  So he

19  would be able to hear what Gioe was saying in real time.

20  Q   And by the way, agent Murray, some of the, some of the

21  extortion victims, the MCA customers that that you spoke

22  with, did they corroborate whether Mr. Laforte would

23  sometimes be put on the phone when Mr. Gioe was visiting them

24  in person?

25  A   That's correct.

1   Q   That was, that was a practice that was corroborating

2   that.

3   A   Correct.

4   Q   Would Mr. Laforte sometimes make threats himself?

5   A   Yes.

6   Q   According to Mr. Gioe.  What kind of, what kind of

7   threats would Mr. Laforte make in the presence of Mr. Gioe?

8   A   Well with, with Gioe, Ms. LaForte would often make

9   threats.  Sometimes they were just general like, I'm going to

10  crush you, I'll follow you, you know, we can find you

11  wherever you were, that sort of thing.  And then sometimes

12  they were more specific.

13  Q   Did Mr. Gioe describe sort of good cop, bad cop routine?

14  A   Yes.

15  Q   And Mr. Laforte would do?

16  A   Yes.  It was pretty common that they would do a good cop,

17  bad cop thing.  Sometimes Gino would be the good cop.

18  Sometimes he would be the bad cop depending on the

19  circumstances.

20  Q   And what did Gioe say?  Well, first of all, did Gioe

21  corroborate?  He was being flown all around the country by

22  Par funding to meet with MCA customers in person.

23  A   All around the country.

24  Q   And did he say, what was the financial status of those

25  customers that he was visiting?  Was he just checking in to

1  see how they were doing?

2  A    No, they were all merchants that had stopped payments.

3  Q    Okay.  And did he, did he say whether or not those trips

4  were, were coordinated and with the knowledge of Mr. Laforte?

5  A    Yes.  He said that Mr. Laforte knew all the merchants

6  that he was going to and he would often text him when he was

7  about to approach a certain merchant or call him or otherwise

8  let him know that he was about to see a merchant.

9  Q    And you -- have you seen text corroborate the, the sort

10  of daily communication between Mr. Laforte and Mr. Gioe?

11  A    Yes.

12  Q    Did Mr. Gioe say why he and Mr. Laforte wanted him to

13  meet in person with these -- with, with these non-paying

14  customers?

15  A    Because he knew it would be intimidating for someone to

16  announce that their business or resonance to collect on a

17  debt.

18  Q    And how about his own appearance?  Was Mr. Gioe an

19  intimidating presence?

20  A    Yes.  He was a very muscular build.  He's not a tall guy,

21  but he's a very muscular build and intimidating presence and

22  carries himself in a way that would be intimidating to most

23  people.

24  Q    And how did he dress when he visited customers?

25  A    He dressed professionally.  He wore slacks and a button-

1  down shirt generally.  But you'd be able to see his physique

2  when he arrived.

3  Q   And would he, would he schedule his -- I mean, as a

4  general matter, would he schedule his appointments or would

5  he use the element of surprise, Mr. Gioe.

6  A   In general, no.  There's sometimes he would call ahead.

7  Usually that'd be like if he couldn't find a merchant, but

8  usually he would -- the MO was to arrive unannounced at a

9  business or home.

10 Q   And, and, and why -- did Mr. Gioe say why he would arrive

11 unannounced versus scheduling an -- a meeting?

12 A   Because it's intimidating.

13 Q   I mean, you mentioned homes.  Did Mr. Gioe also visit

14 homes at MCA customers?

15 A   He did.

16 Q   As opposed to the business addresses of these customers.

17 A   Correct.

18 Q   And why did Mr. Gioe say he would visit the homes of non-

19 paying MCA customers?

20 A   Well, he said -- I believe he said actually that was

21 actually Mr. Laforte's idea because it was so intimidating to

22 arrive to show up at someone's residence and then you might

23 catch them with their family there or their spouse there,

24 which would be particularly intimidating to the merchant.

25 Q   Did Mr. Laforte ever tell Mr. Gioe not to threaten

1    customers?

2    A    No.

3    Q    Ever reprimand him --

4    A    No.

5    Q    For threatening customers?

6    A    No.

7    Q    Is there anything that Mr. Laforte instructed Mr. Gioe

8    not to do with these MCA customers?

9    A    He did tell them not to put his hands on the merchants.

10   Q    But don't physically touch them.

11   A    Don't physically assault the merchant.

12   Q    But threats are okay?

13   A    Yes.

14   Q    Did Mr. Gioe threaten every customer?

15   A    No.

16   Q    Every dunk with customer he met with?

17   A    No.

18   Q    Did he, did he, did he say he, he, he threatened 90% of

19   the customers?

20   A    I don't think he put a percentage on it.  He threatened a

21   number -- a lot of customers.  It depended on the

22   circumstances and the response that he got.  It was --

23   Q    But to be fair to Mr. Gioe, Mr. Laforte, Mr. Gioe didn't

24   say every customer I encountered, I, I, I threatened with

25   violence.

1   A   Correct.

2   Q   It would depend on what his read of the situation?

3   A   Yes.

4   Q   And would he depend, would he change his approach

5   depending on his read of the situation?

6   A   Yes.

7   Q   Now, in those meetings with Mr. Gioe, did he tell you --

8   Mr. Gioe, tell you about threats he made, victims he extorted

9   on behalf of Par funding you hadn't learned about previously?

10  He didn't know before going into that meeting?

11  A   He did.

12  Q   Okay.  And can you give us an example of that?

13  A   One example was a company called Buck Hardware.  They're

14  located, they were located out in Quarry, Pennsylvania.

15  That's near Lancaster.

16  Q   Okay.  So when you met with Mr. Gioe, and can you --

17  ballpark, what, what year, month was this when he was telling

18  you about this Buck Hardware?

19  A   We received that information in June 22.

20  Q   June 22.  Okay.  How long have you been investigating the

21  extortion part of this case in June of 2022?

22  A   Since about June, 2019.

23  Q   Okay, so about three years?

24  A   Yes.

25  Q   And Mr. Gioe mentions, what does he say about Buck

1  Hardware?

2  A   So he said he was sent -- that they were -- they had

3  stopped making payments and he was sent there to make an

4  unannounced collections from, from that merchant.

5  Q   And during the interview in June of 2022, did Mr. Gioe

6  remember the name of the person he threatened?

7  A   He didn't remember the name.  He remembered the name of

8  the business was Buck Hardware.

9  Q   No, it's not previously on your radar in terms of your

10  overall investigation.

11  A   It was not.

12  Q   And did he tell us what he described that, that encounter

13  with the guy from Buck Hardware?  How did Mr. Gioe describe

14  it to you?

15  A   So he described it as he arrived at the business and

16  there were customers there and he asked to speak to the owner

17  and he was directed to go to a, a back room.  And he may have

18  said it was a lunch room or some sort of back room, and he

19  went to the back room and then had a one-on-one confrontation

20  with the owner.

21  Q   Okay.  And did he, did he threaten him or suggest

22  violence to, to, to this owner according to Mr. Gioe?

23  A   He didn't, he didn't come out and threaten him per se.

24  It was -- but he did threaten, say things in general like, we

25  know where you live and, and that sort of thing.

1    Q   Okay.  And what did Mr. Gioe say, say to Mr.  -- oh, that

2    the owner's reaction was to -- those statements?

3    A   He was very scared.  At one point in time, I think the

4    owner made something -- said something about he was going to

5    call the police and Gioe said something like, you, you, you

6    can't call, you know, calling the police won't help you.  And

7    he actually left the man in tears over the confrontation.

8    Q   So Mr. Gioe said, I, I left this guy crying.

9    A   Correct.

10    Q   This guy -- I can't remember the guy's name.  He lived

11    out in the county somewhere.  It was, you know, a couple

12    years ago.  And the, and the entity was named Buck Hardware.

13    A   Correct.

14    Q   Did he say whether Mr. Laforte would've known about that

15    encounter?

16    A   Yeah, he said he was on the phone during the

17    confrontation.

18    Q   Mr. Gioe put Mr. Laforte on the phone during this

19    confrontation.

20    A   Correct.  I can't remember if it was a FaceTime call or a

21    conference call.

22    Q   Okay.  So June, 2022, Mr. Gioe tells you this information

23    during the interview.  He's cooperating or he's attempting to

24    cooperate at that point in time?

25    A   Yes.

1   Q   New information, correct?

2   A   Yes.

3   Q   What do you do to corroborate whether that actually

4   happened?

5   A   So we pulled the file for Buck Hardware, it was the same

6   name as the merchant he had named.

7   Q   And you say you pulled the file.  Whose file did you

8   pull?

9   A   Sorry, the file -- the record received from the receiver.

10   We had the client file, file.  So we pulled the client file

11   for Buck Hardware and then we contacted the owner.

12   Q   So, you got the -- and you had the whole database of all

13   of MCA, all the MCA customers of Par funding that existed

14   from 2013 to when the receiver took over, you find Buck

15   Hardware out.  Right?  And then you identified the owner?

16   A   Correct.

17   Q   Do you go talk to him?

18   A   Another agent is a trooper, went and spoke to him.

19   Q   Okay.  And were you -- did you -- you spoke with that

20   agent or read the report that that agent gave about the

21   encounter?

22   A   Yes.

23   Q   Alright, tell us about what the investigation learned

24   from talking to and who was this individual?

25   A   His name is Shane Howell.

1    Q    Howell.  And what did Mr. Howell have to say?

2    A    Mr. Howell's story was very similar to Mr. Gioe's.

3    Recitation of the events said Gioe showed up unannounced, and

4    that he was made -- was, was extremely very scared after the

5    confrontation and, and at one -- and, and the whole

6    interaction left him in tears.

7    Q    Corroborated that the, the, the visit from Gioe, Mr. Gioe

8    left him in tears.  And who, who did Mr. Howell say he was

9    communicating with at Par funding?  Who was his point of

10   contact there?

11   A    So his point of contact was Joe Mack.  And, and I think

12   he also had interaction with Jimmy Mack before, if I were --

13   sorry, Joe LaForte.  I don't think he knew him as Joe LaForte

14   and I think he also might have had an interaction with James

15   Mack, James LaForte, but I can't remember.

16   Q    Did Mr. Gioe, according to Mr. Howell, did he identify

17   himself as Mr. Gioe being from Par funding?

18   A    Yes.

19   Q    Now did Mr.  -- in addition to saying he cried from this

20   interaction, did he say whether he felt threatened with Mr.

21   Howell?

22   A    He didn't.

23   Q    And what was he -- what was his concern?  What, what,

24   what -- how did this encounter leave him?

25   A    So he was particularly concerned about the safety of --

1    for his safety and the safety of his family.

2    Q    Did Mr. Howell report this incident to the police?

3    A    He did not.

4    Q    And did he say why he didn't?  He was too afraid.  Now

5    did, did -- was Mr. Howell asked whether or not he remembered

6    Mr. Laforte being on the phone for that time?

7    A    He said he didn't remember whether Mr. Laforte was on the

8    phone.

9    Q    Okay.  By the way, this, this particular victim he

10   learned about in June of 2022, any connection to attorney

11   named Shane Haskin?

12   A    No.

13   Q    Did Mr. Howell say whether he continued making payments

14   to Par funding after receiving those threats?

15   A    He did.

16   Q    Did he -- were you able to confirm with Par funding's

17   records whether or not payments continued --

18   A    Yes.

19   Q    After the visit from Mr. Gioe.  And did they continue?

20   A    Yes.

21   Q    And is that conduct charging over Act eight of count one

22   of the RICO indictment?

23   A    It is.

24        MR. NEWCOMER:  And Your Honor, I also believe that

25   conducts described in paragraphs 104 to 106 of the PSR.

1          THE COURT:  Thank you.

2   BY MR. NEWCOMER:

3   Q   Agent Murray, you heard the testimony today of Ms.

4   Allegretta, correct?

5   A   I did.

6   Q   Have you met Ms.  Allegretto before?

7   A   I did.

8   Q   And how did you come to identify her as a, as her

9   testimony, extortion victim of Joseph LaForte?

10  A   So we received notification through our system that she

11  had called the 800 number for the FBI to report her

12  complaint, and we followed up on that.

13          MR. NEWCOMER:  I'm going to mark this as government

14  Exhibit M11.  Sorry.  Joseph, I marked up two copies.  So.

15          THE COURT:  Is that what I already marked for

16  identification?

17          MR. NEWCOMER:  Did you mark this?

18          THE COURT:  Yeah.

19          MR. NEWCOMER:  Did you mark it as D1 or

20  identification?

21          THE COURT:  Just for identification.

22          MR. NEWCOMER:  I'm going to mark as the same too.

23  I'm going to mark it as to government Exhibit M11, just so

24  we're clear on it.

25          THE COURT:  What is it?  This is -- I have Exhibit

1   C.  It is marked for, marked for identification?

2        MR. NEWCOMER:  This is C, Your Honor?

3        THE COURT:  That is C under, under your

4   identification.

5        MR. NEWCOMER:  Yes.  Thank you.

6        THE COURT:  And you're marking it as M11?

7   BY MR. NEWCOMER:

8   Q   M 11.  Agent Murray, you recognize this report?

9   A   Yes.

10  Q   And where did it come from?

11  A   So this is the printout from the threat intake center of

12  the FBI.

13  Q   And you're familiar with this document?

14  A   Yes.

15  Q   And you obtained it during the course of your

16  investigation?

17  A   Yes.

18       MR. NEWCOMER:  And -- alright.  I move to admit,

19  Your Honor, give government Exhibit M11.

20       MR.  COROZZO:  No objection, Your Honor.

21       THE COURT:  Admitted without objection.

22       (Plaintiff Exhibit M11 admitted in evidence)

23  BY MR. NEWCOMER:

24  Q   Alright.  So, just up front you heard Mr. Corozzo's

25  cross-examination of Ms. Allegretta.  He repeatedly

1   referenced the date of December 10th, 2019.

2   A   Yes.

3   Q   You see that date at the top of the report?

4   A   Yes.

5   Q   Is that the date of the incident or just the date the

6   report was written?

7   A   That's just the -- that's the date of the report.

8   Q   So Mr. Corozzo is just wrong about the date that the

9   threat was reported?

10          MR. COROZZO:  Absolutely not that mischaracterizes.

11          THE COURT:  I appreciate your vigor, but we, we

12   don't argue that way.  Your objection is what?

13          MR. COROZZO:  Mischaracterizes the --

14          MR. NEWCOMER:  I'll rephrase it.

15          MR. COROZZO:  I said the report was -- the call was

16   on 12/10.

17          THE COURT:  Yeah.  Okay.

18          MR.  COROZZO:  She reported the incident being on --

19          THE COURT:  Sir, I, I remember.  Sustained.  Just

20   rephrase the question, sir.

21                          MR. NEWCOMER:  Agent Murray --

22          THE COURT:  Don't worry about, don't worry about,

23   don't worry about what Mr. Corozzo said.  I, I recall.  Just

24   get the facts.

25   BY MR. NEWCOMER:

1  Q   Thank you, Your Honor.  Agent Murray, what was the date
2  according to this report that Ms. Allegretta made the report
3  to the FBI?
4  A   November 14th, 2019.
5         MR.  COROZZO:  I stand corrected, Your Honor.
6         THE COURT:  Okay.  Counsel, and do we have another
7  minute?  I would like to jump in.
8         MR. NEWCOMER:  I'll finish this document and then
9  we'll be good.  Your Honor, does that work?
10        THE COURT:  Whatever works for you.  But I, I want
11 to give you a heads up.
12 BY MR. NEWCOMER:
13 Q   Thank you.  Page two of this document.  There's a
14 detailed summary.  We don't need to get into it, but does it
15 say on November 7th, 2019, Joseph, that's Joseph before,
16 correct?
17 A   Yes.
18 Q   That threatened her life via telephone, that including
19 the following comments.  Do you want to take this to the
20 streets?  We'll take this to the streets.  I'm going to put a
21 bomb in your car and when you turn it on, it's going to blow
22 and you're going to go with it.
23 A   That's correct.
24 Q   Is that consistent with the testimony Ms. Allegretta gave
25 today in terms of the content of the threat, one of the

1  threats she received from Mr. -- from Mr. Laforte?

2  A   It is.

3          MR. NEWCOMER:  Is it a good time to break, Your

4  Honor?

5          THE COURT:  If it is for this document.  Yes sir.

6  You are done with this document?

7          MR. NEWCOMER:  Yes.

8          THE COURT:  11.  Alright.  Very good.  Counsel.  I

9  had a prior engagement that I didn't -- I can't schedule long

10  before this schedule -- let me -- at the original date.  So I

11  have to break and be somewhere at 12:30, walk down there by

12  12:30 and I have to be back, hopefully back by quarter of, so

13  if you can get back around here around quarter of, we'll get

14  started as soon as we can get back.  Quarter of two.

15          MR. NEWCOMER:  Of course.  And Your Honor, I don't -

16  -

17          THE COURT:  You can leave everything here.

18          MR. NEWCOMER:  Thank you.

19          THE COURT:  The court won't be, the court won't be

20  locked.  Thank you.  Sir, you are under oath.  Do you

21  understand?  Please do not speak to anyone about your

22  testimony [indiscernible].

23          WITNESS 2:  It will be lonely lunch, Your Honor.

24          THE COURT:  You'll be lonely lunch.  Exactly right.

25  Former DA knows that.  Alright, thank you very much.  We'll

1  take, we'll take, we'll take a lunch break and be back as

2  soon as we can of closer to quarter two to two o'clock.

3  Thank you.

4           Recess from 12:10 p.m. until 2:03 p.m.)

5           ESR/CLERK:  All rise.

6           THE COURT:  Thank you, counsel.  Thank you for your

7  patience.  Please be seated.  Agent -- United States is the

8  agent remaining on the stand?

9           MR. NEWCOMER:  Yes, Your Honor,

10          THE COURT:  Please.  Thank you.

11          MR. NEWCOMER:  Are you ready to continue?

12          THE COURT:  When the agent is ready.  Agent, you're

13  prepared to continue this testimony?

14          THE WITNESS:  Yes, Your Honor.

15          THE COURT:  Please, let's continue.  Thank you very

16  much again, counsel.  Thank you for your graciousness as we

17  had to move on to something else.  Thank you.

18  BY MR. NEWCOMER:

19  Q   Good afternoon, agent Murray.  Welcome back.

20  A   Good afternoon.

21  Q   And you understand you're still under oath, correct?

22  A   Yes.

23  Q   Where we left off, we were talking about Allegretta, I

24  believe.

25  A   Yes.

1   Q   Ms. Allegretta testified that she continued making
2   payments after the threats that she testified about.  Were
3   you able to confirm based on Par funding's records whether
4   those payments continued after those threats?
5   A   Yes.
6   Q   And did they?
7   A   Yes.
8   Q   Just to be clear, you came across Ms. Allegretta because
9   of that FBI complaint that she filed.
10  A   Correct.
11  Q   Ms. Allegretta was not brought to you or you weren't --
12  didn't learn of her from an attorney named Shannon Huske, did
13  you?
14  A   No.
15          MR. NEWCOMER:  And the -- Your Honor, just for the
16  record, the, the Allegretta related conduct is charged in, or
17  I'm sorry, contained in paragraphs one 18 to 123 of the PSR.
18          THE COURT:  Thank you.
19  BY MR. NEWCOMER:
20  Q   Agent Murray.  I want to move on to an MCA customer of
21  PAR findings named Duke Barber and William Brown, the owner.
22  A   Yes.
23  Q   You testified previously, before the break about Mr.
24  Brown, is that right?
25  A   Correct.

1    Q    Just start from the beginning.  How did you learn about

2    MCA customer, Duke Barber and the owner William Brown?

3    A    We learned of Duke Barber because he had filed a

4    complaint with the Consumer Financial Protection Bureau, and

5    we reviewed claim -- so we reviewed complaints against Par

6    funding with CFPB and Better Business Bureau and similar

7    agencies, and he had made a complaint with CFPB.

8    Q    So at the time, Mr. Brown made the -- well, let me ask it

9    this way.  Had you -- was the investigation, your

10   investigation of Par funding ongoing when you learned of this

11   complaint or the complaint made historically, if you

12   remember?

13   A    The complaint was made prior to our full investigation on

14   Par funding.  Right.  Sorry.  We learned of it during our

15   investigative Par funding in 2019, but he had made the

16   complaint prior to that.

17   Q    Okay.  So, so you -- as in the course of the

18   investigation, you learned of this prior, prior complaint

19   that had made?

20   A    Correct.  We went to the -- we asked the Better Business

21   Bureau and CFPB related organizations, do you have any

22   complaints against this company?  And we reviewed those

23   complaints and he had alleged that he had been threatened in

24   his complaint to CFPB.

25   Q    And did you interview Mr. Brown?

1    A   We did.

2    Q   And what did Mr. Brown tell you about his business with

3    Par funding?

4    A   So he said that he, he had a barbershop with multiple

5    locations in Philadelphia.  Primarily one was in Chestnut

6    Hill and that he had borrowed money during the course of his

7    -- arrangement with Par funding or I think technically I

8    think he borrowed from fast advance funding that he had

9    issues making payments.  And then -- let me back up.  His

10   initial conversations.  He had a relationship with dealing

11   with Joe Mack, and then eventually when he stopped making

12   payments, he received an unannounced visit from Renato Gioe.

13   Q   And do you know approximately when he received this visit

14   from Mr. Gioe?

15   A   Oh, I believe it was 2015 or 16.

16   Q   And did Mr. Brown describe any threats he received from

17   Mr. Gioe?

18   A   So the -- Mr. Brown said that -- well, the, the way it

19   was set up was, Gino arrived.  It was, you know, a

20   confrontational type conversation with Mr. Gioe.  And that he

21   became aggressive and at one point in time threaten to break

22   his legs.

23   Q   And did Mr. Brown feel threatened by Mr. Gioe?

24   A:      He did.

25   Q   And did Mr. Brown receive any visits to his home by

1  anyone associated with Par funding?

2  A   Yes.  So during -- they had the issue with Gioe, and then

3  at one point in time they -- someone from Par funding, not

4  Mr. Gioe described as a known black male arrived at his

5  residence and said he was there from Parkland.

6  Q   Did that raised concerns with anyone in Mr. Brown's

7  family.

8  A   It did, it particularly affected Mr. Brown's wife.

9  Q   During your interviews with Mr. Gioe, did you ask him

10  about the threats reported by Mr. Brown?

11  A   Yes.

12  Q   And, what did Mr. Gioe say about those threats?

13  A   He, he said that he, he did take an aggressive tone.  He

14  made the conclusion that Mr. Brown was a street guy.  Which I

15  don't think is accurate, but that's -- he made a conclusion

16  that he was a street guy.  He said he didn't not remember

17  saying that he broke, that he would threaten to break his

18  legs.

19  Q   Okay.  So he remembered or he did not?

20  A   He -- Mr. Gioe denied saying that he broke his legs.  I

21  don't know if he, I don't know if he said, I don't remember

22  or denied it, but he did not confirm that threat.

23  Q   I see, and this particular one, Mr. Gioe having confirmed

24  other threats, this one, he said, I don't remember saying I

25  was going to break his legs.

1    A   Correct.

2    Q   But he said he would approach it like they were some of

3    the streets or, or in the prison yard, that kind of

4    confrontation.

5    A   Correct.

6    Q   Consistent with Mr. Gioe's describing how he would tailor

7    his approach to the particular customer he was facing.

8    A   Correct.

9    Q   This one he admitted he took a very aggressive approach.

10   A   He did.

11   Q   Now were you able to confirm whether Duke Barber

12   continued to make payments to Par funding after this

13   confrontation with Mr. Gioe?

14   A   Yes.

15   Q   And did duke Barber in fact continue to make MCA

16   repayments?

17   A   They did.

18           MR. NEWCOMER:  Alright.  And that's -- Your Honor,

19   that's conduct described in paragraph 97 through 99 of the

20   PSR.

21           THE COURT:  Yes.  Thank you.

22   BY MR. NEWCOMER:

23   Q   Next I want to ask you about MCA business customer of Par

24   Fundings InvestQuest.  Are you familiar with InvestQuest?

25   A   Yes.

1    Q   And who were the owners or, or principals of InvestQuest?

2    A   The principal owner was named by the name Jose Peria.

3    Q   Okay.  And how did you come to identify Jose Peria as a

4    potential extortion victim?

5    A   So I believe we identified Jose Peria in reviewing the

6    text messages.  Yeah, we -- I think we had seen him as a

7    fairly high-level borrower, but I think what made us drill on

8    Mr. Peria was reviewing the text messages between Mr. Laforte

9    and Mr. Peria about Gino visiting him.

10   Q   I take it, you -- during the course of your

11   investigation, you seized that phone from, from Mr. Laforte,

12   you read through his text messages?

13   A   Yes.

14   Q   And the course of doing that, you flagged this as a

15   potential victim of extortion?

16   A   Correct.

17   Q   Alright.  This particular, this particular investor --

18   I'm sorry.  MCA customer wasn't flagged to you by an attorney

19   named Shane Husky?

20   A   No.

21   Q   Did you interview Mr. Peria?

22   A   We did.

23   Q   And what did Mr. Peria tell you about his business in

24   InvestQuest?

25   A   So he said he had this -- it's a real estate investment

1  company based in Florida.  They had a number of properties

2  and they borrowed -- I would say, two to $3 million from Par

3  funding.  Eventually they started to have issues making

4  payments and they stopped making payments.  And they -- he

5  also said that he primarily -- I believe he said he primarily

6  -- I know -- I believe he said he primarily dealt with Joe

7  LaForte.  I know he said he dealt with LaForte, but I think

8  that was his primary person -- primary point of contact at

9  Par funding, if I recall.

10  Q  And did he remember a visit from Gioe in and around June

11  of 2018?

12  A  Yes.

13  Q  And what did he remember about that visit?

14  A  So Gino arrived at his business.  He said that he showed

15  up unannounced and was acting erratically and, and, and

16  essentially hung out at his, at his place of business and

17  refused to leave.

18  Q  Okay.  And for a prolonged period of time, like how long

19  are we talking?

20  A  I think it was all day, like eight hours or something

21  like that was what Mr. Peria said.

22  Q  And did he eventually give Mr. Gioe any of his personal

23  belongings?

24  A  Yes.  Eventually he gave -- Mr. Peria gave Mr. Gioe the

25  Rolex off his wrist.

1  Q   And why did Mr. Peria say he gave Mr. Gioe the Rolex off

2  his wrist?

3  A   To try to get him to be satisfied and leave his -- leave

4  him alone for a short time?

5  Q   Did Mr. Peria tell you about any threats he received

6  directly from Joseph LaForte?  Not necessarily connected with

7  this incident in May of 20 or June of 2018, but just in

8  general?

9  A   Yeah, so he, he, he didn't -- the, the threats he

10  received from Mr. Laforte were generally in each, generally

11  along the nature that Mr. Laforte said he was going to come

12  down there and fight him and kick his ass.  Something to that

13  effect.  He said he beat him.

14          THE COURT:  This is Mr. Laforte?

15          THE WITNESS:  Mr. Laforte said this.  Not Mr. Gioe.

16  Mr. Gioe, he said, and he started off aggressive and was

17  definitely very intimidating, but then he sort of took on

18  this kind of almost mediator good cop role with Mr. Laforte

19  being the more aggressor.  That being said, he still gave him

20  the Rolex off his wrist, but it was Mr. Laforte that had the

21  more pointed threats.

22  BY MR. NEWCOMER:

23  Q   And you mentioned text messages that related to this,

24  this episode, correct?

25  A   Yes.

1        MR. NEWCOMER:  I'm going to show you what I'm going

2    to mark as government Exhibit.  I'm going to mark this as

3    government Exhibit -- I think we're at 12G -- I'm sorry, M12,

4    Your Honor.

5            THE COURT:  Yes, we are.  Government M12

6            MR. NEWCOMER:  May I approach Your Honor?

7            THE COURT:  Please.

8    BY MR. NEWCOMER:

9    Q   Thank you.  Agent Murray, do you recognize the document I

10   showed you?

11   A   I do.

12   Q   Can you explain to the court what it is and where it came

13   from?

14   A   So this is a extraction from Joseph LaForte's cell phone.

15   This is a group chat involving Ms. LaForte, which is the, the

16   unnamed number at the top.  Jose InvestQuest, which that

17   would be the, the number for Jose Peria from InvestQuest and

18   then Gino is Renato Gioe.

19   Q   Okay.  So the, the -- you're talking at the participant

20   section at the top there where it says has a number at the

21   top.  The top number is whose number?

22   A   Mr. Laforte's.

23   Q   Okay.  And then the second number, Jose InvestQuest,

24   that's the number as it was entered into Mr. Laforte's phone?

25   A   Correct.

1    Q   And same with Gino.  The number below that, is that

2    number familiar to you, is Renato Gioe's number?

3    A   Yes.

4    Q   And also did the owner of the phone, Mr. Laforte give

5    that phone number the name Gino?

6    A   Correct. That's what the -- those are the contact names

7    in the phone as reflected by the user in this case, Ms.

8    LaForte.

9    Q   Your Honor, I move to admit government Exhibit M12.

10            MR. COROZZO:  No objection, Your Honor.

11            THE COURT:  Without objection, we admit Government

12   M12.

13            (Plaintiff Exhibit M12 admitted in evidence).

14   BY MR. COROZZO:

15   Q   Alright, let's look at the, the series of, of text

16   messages, agent Murray.  Does it start at the top of page

17   one?  Is that the, the oldest text message going to the most

18   recent?

19   A   Yes.

20   Q   Alright, so the first text is dated June 2nd of 2018, is

21   that right?

22   A   Yes.

23   Q   Roughly around the time that Mr.  Korea told you about

24   getting the visit from Mr. Gioe?

25   A   Yes.

1  Q  And is the owner, and that's Mr. Laforte.  Is the owner

2  of the phone, correct?

3  A  Yes.

4  Q  Say to Mr. Peria, Jose Gino will be there on Monday

5  morning with the hopes of receiving our funds on Monday by

6  business close.  If this cannot be accomplished, would you

7  mind if Gino could be a guest at your home until this can be

8  procured, your hospitality will be much appreciated.  Did I

9  read that accurately?

10  A  Yes.

11  Q  And then the response from Mr. Peria was, I'll do all I

12  can to get this resolved by Monday.  Dot, dot, dot.  I have a

13  house in the beach that for the time being is furnished and

14  vacant?  In default or not, Gino was welcome to stay there

15  for a time being, for the time being any time he comes to

16  Miami.  See you guys.  Don Incur cost, the house is being

17  demoed for a new construction in 40 to 60 days.  45 to 65

18  days.  I'm sorry, 45 to 60 days.  And then he says, "I'll

19  pick up the keys at your office."  Is that his response?

20  A  Yes.

21  Q  So Mr. Peria is clearly envisioning Mr. Gioe staying at a

22  guest house or a separate property?

23  A  Yes.

24  Q  And what was Mr. Laforte's response to that?

25  A  He responded, "I thought it would be nice if you, if you

1    stayed together."

2    Q   Which you interpreted how based on your investigation?

3    A   Meaning Mr. Peria, Mr.  -- that Gioe would stay with Mr.

4    Peria.

5    Q   Okay.  Did Mr. Gioe and Mr. Peria have any sort of pre-

6    existing friendship or relationship?

7    A   No.

8    Q   So this is Mr. Laforte saying he's going to have his

9    higher muscle go down there and stay at your house until this

10   debt is paid.

11   A   Correct?

12   Q   Did Mr. Gioe in fact travel to visit Mr. Peria?

13   A   He did.

14   Q   And what, what state did you say he lived in?

15   A   Florida.

16   Q   Florida.  And are the text messages contemporaneous with

17   that visit by Mr. Gioe to Mr. Peria in Florida?

18   A   Yes.

19          MR. NEWCOMER:  I'm going to mark Exhibit M13,

20   government Exhibit M13.

21          THE COURT:  Thank you.

22   BY MR. NEWCOMER:

23   Q   Agent Murray, is this another cell phone extraction from

24   Mr. Laforte's phone?

25   A   Yes.

1    MR. NEWCOMER:  I'm going to move this to -- mark

2    this as Exhibit -- government Exhibit -- I'm sorry, I move to

3    admit government's Exhibit M13.

4    THE COURT:  Any concerns, sir?

5    MR. COROZZO:  No objection, Your Honor.

6    THE COURT:  Without objection.  We, we admit

7    government M13.

8    (Plaintiff Exhibit M13 admitted in evidence).

9    BY MR NEWCOMER:

10   Q   So the previous chain we saw, agent Murray that involved

11   this three people, right?

12   A   This is Mr. Laforte and Mr. Peria.

13   Q   Let's start on the second page.  It says page 70 at the

14   bottom.  It's the second page of the -- this report.  Agent

15   Murray, in prepping for this hearing, did we call out history

16   of, of not necessarily relevant text messages between these

17   two individuals leading up to the second page, which is page

18   70?

19   A   Yes.

20   Q   So there was a history of text messages between these two

21   individuals?

22   A   Yes.

23   Q   We're going to focus on the text messages beginning on

24   June 2nd, 2018.

25   A   Okay.

1  Q   That's the same date as the one we just -- the text we
2  just looked at?

3  A   Yes.

4  Q   Where, where Mr. Laforte is telling Mr. Peria that Gioe
5  is going to come live with him until this debt is paid?

6  A   Correct.

7  Q   Alright.  And does Mr. Laforte on June 2nd, 2018 telling
8  Mr. Gioe -- Mr. Peria, you believe I got to send Gioe at you
9  on Monday to get my payments?  By the way you are paying for
10 these trips.  He isn't cheap.  We are also foreclosing on all
11 these units.  If we don't get satisfied on Monday, no more
12 games.  Is that an accurate reading?

13 A   Yes.

14 Q   And then what was Mr. Peria's response to that text on
15 the next page?

16 A   Joe, dot, dot, dot.  You don't have to send Gino.  It's
17 not like he's had to chase me.  I've been calling him almost
18 daily, updating him on what's going on and even met him in
19 California last week.  I'm pulling every string I can to get
20 liquid and get you paid.

21 Q   And Joe, the first response to that is, tell me if I'm
22 correct.  I'm sending him because he will stay with my assets
23 until I see results that by the way I own.

24 A   Yes.

25 Q   Alright.  And that's the end of the June 2nd, 2018 chain

1  or, or conversation?

2  A   Of June 2nd.

3  Q   June 2nd.

4  A   Yes.

5  Q   And does the conversation pick up again on June 4th,

6  2018?

7  A   Yes.

8  Q   And at this point in time, is Mr. Gioe at the business of

9  Mr. Peria?

10  A   I believe so, yes.

11  Q   Yeah.  And does Mr. Peria write to Mr. Laforte?  Bro, you

12  are crazy and so is Gino.  I try to talk to him.  He just

13  keeps saying he wants the money.  I laid everything out,

14  showed him all my accounts, brought him into my meetings, had

15  him listen on my phone calls, showed him what I had been

16  closing in texts from people, banks that are sending me

17  money.  I can assure you the mortgage payments of 5,700 by

18  tomorrow and another payment before the end of the week of

19  another five to 10K.  I get the severity of what's going on.

20  I'm just empty on cash flow.  But the receivables are there,

21  the money is coming in.  I'm getting the banks to give me big

22  money on my equity.  They already said yes.  It just takes

23  time.  We'll get back on track.  I'll go pawn my Rolex for

24  you for now if you want or give it to you.  It's all I have.

25  Can you please get Gino the out of my office?  I can't have

1  this shit.  I get it.  But this doesn't help and I don't want

2  any kind of scene.  Is that a correct reading of that text?

3  A  Yes.

4  Q  And what is Joe LaForte's response to that lengthy test?

5  A  Do whatever you need to do, you owe.

6  Q  And then does Mr. Peria text back?  It looks like less

7  than an hour later, Joe, dot, dot.  Gino really liked the

8  Rolex, so I gave it to him as a present.  I gave it as a

9  present.  You'll have a payment tomorrow and one at the end

10  of the week.  You have my word.  Let me work with Gino.  I'm

11  doing everything I can.  It will be an open book.  I will be

12  liquid soon.  I owe you.  I get it.  I'm not going anywhere.

13  Is that right?

14  A  Yes.

15  Q  And then a minute later, does he say please call off the

16  Hounds.  And by that I mean that animal you sent down here.

17  A  Correct.

18  Q  And then if you go down a couple texts he's telling Mr.

19  Laforte that Gioe is still here.  He's still here.

20  A  Yes.

21  Q  And does that conversation continue on the next page?

22  A  Yes.

23  Q  And with Mr. Laforte telling Mr. Peria, we need an

24  account to draw payments from, has to be a business account.

25  Gino needs to get it from you.  I will work, I will work you

1  through it.  The only thing I can't do is have non-payment.

2  It is considered default.  Then he says Capric.  I think he

3  means Capish.

4  A    Yes.

5  Q    And then another text Capish.  And then another text.

6  Hello, I don't like being ignored.  I need the payment ASAP?

7  A    Correct.

8  Q    And did Mr. Peria tell you whether or not he continued

9  paying Mr. Laforte in Par funding after this visit from Mr.

10  Gioe?

11  A    Yes.

12  Q    Did Mr. Peria say whether you felt threatened by this

13  encounter from Mr. Gioe?

14  A    He did.

15  Q    And also the, the threats he received directly from Mr.

16  Laforte?

17  A    Correct.

18        MR. NEWCOMER:  Your Honor.  The conduct described in

19  paragraphs 107 to 112 of the PSR.

20        THE COURT:  Yes, sir.  Thank you.

21  BY MR. NEWCOMER:

22  Q    Alright, Mr.  -- agent Murray, we've talked about Buck

23  Hardware, Shane Howell, right?

24  A    Yes.

25  Q    We've heard testimony from Tina Allegretta?

1   A   Yes.

2   Q   At Allegretta Electric.  You talked about Duke Barber

3   from William Brown, I'm sorry, William Brown of Duke Barber

4   and Jose Peria of InvestQuest.

5   A   Correct.

6   Q   Next, I want to ask you about individual named Michael

7   Mansouri of Raid images.  Are you familiar with Mr. Mansouri?

8   A   I am.

9   Q   And was Mr. Mansouri scheduled to testify here today?

10  A   He was.

11  Q   And was he unable to, to work commitments to, to make

12  that happen?

13  A   That's my understanding.  I have not.

14  Q   Have you spoke with Mr. Mansouri in the course of your

15  investigation?

16  A   I have.

17  Q   And what did Mr. Mansouri have to say about his

18  relationship with, with Par funding?

19  A   That he -- as one of -- I'm not sure if he's the co-

20  owner, but he's a principal at the company radiant Images

21  along with his wife Gianna Wolfe together, radiant Images

22  borrowed money from Par funding.  It was -- I forgot the,

23  the, the amount.  It was significant.  I, I think it was over

24  a million dollars, might be more than that.  And eventually

25  they struggled to make payments and that's when they started

1    to have issues with Par funding.

2    Q    And this particular extortion victim, how did you

3    identify him as a victim?

4    A    So I think I initially read about him in the article in

5    Bloomberg, which quoted his lawsuit, but then he was

6    represented by attorney Shane Haskin, who provided -- almost

7    certain provided his contact information

8    Q    And I know the court is familiar with the Bloomberg

9    article having heard extensive testimony about it.  But just

10   very briefly for the record, this was what this article that

11   was in.

12   A    This was the article that came out in late 2018.  And

13   the, the headline of the article was something in effect of

14   fall behind these loans and you might get a visit from Gino.

15   And then it highlighted among other things of Par funding,

16   Gino's collection efforts.

17   Q    And identified victims of, of the collection efforts.

18   A    Correct.

19   Q    That you were able to trace.

20   A    Correct.

21   A    But, but this of the four victims we talked about before

22   Mr.  Mansour.  This is the first you mentioned an attorney

23   named Shane Howell being -- I'm sorry.  Shane Haskin being

24   involved?

25   A    Correct.

1  Q   Okay.  Now what did Mr.  Mansour say about any visits

2  from Gioe in connection with his MCA?

3  A   So, in general, and I believe it was in 2017.  He got a

4  visit from -- excuse me.  From 20.  It was either 2017 or

5  2018, I forget.  I think it was early, maybe it was early

6  2018, I guess.  And all of a sudden he had -- Gioe arrived

7  unannounced at his company.  I think he was already at the

8  business.  And then someone called Mr. Mansouri in and said,

9  Hey, this guy's here from Par funding or something like that.

10  Q   And did he make any explicit or implicit threats, Mr.

11  Gioe to Mr. Mansouri?

12  A   So he, he, he was generally aggressive and it was, you

13  know, demanding we need our money, that sort of thing.  The,

14  the thing that particularly stood out to Mr. Mansouri was he

15  started telling this story about how he went to collect from

16  a merchant who was in Idaho and there was a car accident and

17  the family was on the side of the road.  And, and it was told

18  in such a way, the effect of like, I can find anybody

19  anywhere.  And he, and he made a comment like, these are the

20  things that can affect families that affect people's lives.

21  You know, not making these payments or something like that.

22  That was like the, the kind of -- that was the kind of summon

23  substance of the story.

24  Q   And sir, I believe it gave the impression that if, if he

25  didn't pay, bad things would happen to him and possibly his

1   family.

2   A   Correct.  That was a -- that was the point of the story.

3   Q   Now, when we interviewed or when you interviewed Mr.

4   Gioe, did he remember telling this car story to Mr. Mansouri

5   specifically?

6   A   No, he said he didn't, he didn't remember telling this

7   story to Mr. Mansouri.  He did remember the story and he did

8   admit that he used this story in the course of his business.

9   He just said that he didn't remember saying it to Mr.

10  Mansouri.

11  Q   This was when in his, in his tool bag of, of implicit

12  threats, he would make included this car story about bad

13  things happening to bad people or bad delinquent payers.  But

14  he didn't, he couldn't pin it directly.  Oh, I remember

15  giving that to Mr. Mansouri.

16  A   Yes.  In fact, he actually remembered the merchant in

17  Idaho who he encountered that he used for inspiration for

18  this story.  And so, he was consistent in that.  But, but

19  yeah, for Mr. Mansouri, he said, I don't, I don't remember

20  telling that story, but again, it was -- but he did admit to

21  using the story as part of his package.

22  Q   The text messages related to the visit by Mr. Gioe to Mr.

23  Mansouri?

24  A   Yes.

25  Q   I'm going to mark this as government Exhibit M14.  Yes,

1  M14. Take a look at this agent Murray and tell me if you

2  recognize it.

3  A    Yes.

4  Q    And what is it?

5  A    So this is another extraction of a group chat involving

6  Joseph LaForte, Renato Gioe, and then the name Lucy. And

7  that's the phone number for Lucia Mariani, who was one of the

8  employees in collections for a time.

9  Q    Okay. One of the collection employees at, at Par

10 funding?

11 A    And Par funding. Correct.

12 Q    And if we look at the second page, so by the way, in this

13 particular text chain, the, the victim, Mr. Mansouri story

14 isn't part of this?

15 A    No.

16 Q    Okay. This is an internal Par funding communication

17 between the collections person, Gioe and Mr. Laforte?

18 A    Correct.

19 Q    Alright. And it's dated -- well, we'll get to the date.

20 Second page there. It says, there's a text in the middle.

21 Is that from Ms. Mariani, the collections person?

22 A    Correct.

23 Q    And she says, Gino per Joe, please run over to Radiant

24 Images. They revoked authority on our 13 K weekly payment.

25 And then she gives some, some detail. Is that right?

1  A  Yes, I think probably authorization.  But anyway, not

2  authority, but anyway.

3  Q  Your mention is right.  You mentions Gianna at raided

4  images?

5  A  Correct.

6  Q  And who is Gianna?

7  A  That's the woman I mentioned Gianna Wolf.  She's Mr.

8  Mansouri wife or, or partner.  I, I think they're married.

9  Q  Okay.  And then Gino says, done.  Is that right?

10  A  Correct.

11  Q  And then Mr. Laforte chimes in and says she is my friend.

12  Is that right?

13  A  Yes.

14  Q  And then he says hit radiant hard with AR letter first

15  thing that will buckle their knees.  Is that right?

16  A  Yes.

17  Q  And then what is Gino's response to that?

18  A  He'll call me ASAP behind that.

19  Q  And then what's Mr. Laforte's response to that text?

20  A  I will pound them with Fury if we keep this up -- if they

21  keep this up.

22  Q  Is then there -- is there a discussion related to a

23  different MCA customer?

24  A  Correct.

25  Q  Let's go to page 47 on the bottom of the second to last

1   page of the text chain.  It's fair to say there's a

2   discussion between these three people about various MCA

3   customers in the collections?

4   A   Correct.

5   Q   And then on the middle, middle blue bubble on page 47 of

6   the, of the Exhibit, does Gino -- what does Gino say at

7   approximately on February 16th, approximately 6:24 am?

8   A   He, he says, by the way, radiant Mike is scared.  Could

9   not believe I arrived.

10  Q   And who is the reference to, to Radiant Mike?

11  A   That'd be Michael Mansouri from Radiant Images.

12  Q   And were you able to confirm based on -- well first of

13  all, did Mr. Mansouri say that he continued making payments

14  to Par funding after Gioe arrived and told him the story

15  about the car accident and bad things that could happen to

16  people that didn't pay Par funding?

17  A   They, they did for a time.  I can't remember for how

18  long.

19  Q   Okay.  And were you able to confirm that in Par funding's

20  MCA records?

21  A   Yes.

22       MR. NEWCOMER:  Your Honor.  That context chart or

23  described in paragraphs 100 through 103 of the PSR.

24       THE COURT:  Yes, sir.  Thank you.

25  BY MR. NEWCOMER:

1  Q   You identify a victim of, of extortion, Kara DiPietro and

2  Josh Persing?

3  A   Yes.

4  Q   And how did you come across Mr. DiPietro, and, and Mr.

5  Persing?

6  A   They were brought to us by attorney Shane Haskin.

7  Q   Okay.  And did you interview Mr. DiPietro and Mr.

8  Persing?

9  A   We did.

10  Q   And did they have an MCA business or a business that

11  received MCA funding from our funding?

12  A   Correct.

13  Q   Can you describe the background briefly?

14  A   So, Mr. DiPietro was owner of a company that makes in

15  commercial furniture products down in, in Maryland.  And they

16  borrowed a series of loans from Par funding.  It eventually

17  got up, I think, into the, like $8 million range from Par

18  funding.  And at, at some point in time in early 2019, I

19  think is when they started to really have trouble making

20  payments to Par funding.  They also believed that Par funding

21  was overly withdrawing, withdrawing more than the agreed upon

22  term.  And so they were unable to keep up with those

23  payments.  Whatever it was.  They, they had difficulty making

24  payments.

25  Q   And I apologize.  Agent Murray, if you said this, what

1    was Ms. DiPietro's role with HMC?

2    A    She was the president or owner.

3    Q    And how about Mr. Persing?

4    A    He was the CFO.

5    Q    Okay.  And fair to say, there was a, a financial dispute

6    between Mr. DiPietro and Mr. Persing on one end and Par

7    funding on the other end?

8    A    Yes.

9    Q    And how did they attempt to, to settle that dispute?

10   A    So first they had a -- they had a number of meetings in

11   Philadelphia.  And then it culminated in a meeting in around

12   May, 2019 in which Ms. DiPietro and Persing came up to

13   Philadelphia to sit down with Joseph LaForte, Joe Barletta,

14   perhaps another party from Par funding to go over the

15   financials and, and for to explain their position.

16   Q    Were they able to resolve the financial dispute at that

17   meeting?

18   A    They were not.

19   Q    And on the way out what did Mr. DiPietro, Mr. Persing say

20   happened?

21   A    They said on the way out, Mr. Laforte threatened Mr.

22   DiPietro.  Mr. Pietro said, I believe her recollection, it

23   was something to the effect they were going to burn her house

24   down.  Persing's recollection when he was going to blow up

25   their house, but it had to do with damage or her house with

1  her in it, or something to that effect.

2  Q   Okay.  And they both, they both independently recounted

3  that threat?

4  A   Correct.

5  Q   And it was aimed in furtherance of getting more payments

6  from this business HMC?

7  A   Yes.  Specifically Joe LaForte wanted her to sign a new

8  agreement with higher terms or something like that.  And that

9  was what the dispute was.  Well, I mean, that was what Ms.

10 DiPetro refused to do at that time.

11 Q   Did Ms.  DiPetro report that threat to law enforcement?

12 A   She reported it to the local police.

13 Q   Okay.  And it eventually -- did that get to you too?

14 A   It did.

15 Q   Eventually, did HMC sue Par funding?

16 A   They did.

17 Q   And that spin off a federal lawsuit that was here in

18 front of Judge Sanchez for some period of time?

19 A   Correct.

20 Q   One of the many lawsuits in federal court here involving

21 Par funding?

22 A   Correct.

23 Q   And this particular lawsuit, this particular civil

24 lawsuit, is that the lawsuit in which Mr. Laforte and others

25 perjure themselves is charged in the indictment and admitted

1   by the defendant in his plea?

2   A   It's one of the two.

3            MR. NEWCOMER:  Okay.  Your Honor, this conduct's

4   charged in paragraphs 113 to 117 of the PSR.

5            THE COURT:  I have it, sir.  Thank you.

6   BY MR. NEWCOMER:

7   Q   Let me ask you about Joe Canty of JS --JRC painting.

8   A   Yes.

9   Q   Are you familiar with that?

10  A   Yes.

11  Q   Person in business.  Tell us about Joe Canty and JRC

12  painting.

13  A   Mr. Canty owns a commercial real estate, a commercial

14  painting company based in Vermont.  And they borrowed money

15  from Par funding.  I know it was in the multimillions of

16  dollars.  I want to say ultimately it was in three, $4

17  million or something like that.

18  Q   This is a painting company.

19  A   It's a com -- Right.  It's a painting contractor.

20  Q   Did he say anything why his painting company needed

21  millions of dollars?

22  A   I don't know.  I think he was -- I mean, generally it was

23  the most of these business was to make payroll slash maybe

24  expand their business.  I don't remember specifically why he

25  borrowed the money.

1    Q   Okay.  And did he in fact, receive funding from, from,

2    from Par funding?

3    A   He did.

4    Q   And who was his contact at Par funding?

5    A   Joe LaForte.

6    Q   And did he get in a payment dispute with Mr. Laforte?

7    A   He did.

8    Q   Did Mr. Laforte threatened him?

9    A   He did.

10   Q   What did he threaten to do?

11   A   He threatened to -- so when he was initially interviewed,

12   he said he, he threatened his life, and then more

13   specifically, I think he said he threatened to break his legs

14   or something like that.

15   Q   And that conduct is described in paragraphs 113 to 117 of

16   the PSR.  Agent Murray.  Are those the only --

17               THE COURT:  No, no Hold on.

18               MR. NEWCOMER:  Is that about right, Your Honor?

19               THE COURT:  No.  That's the, that's the, that's the

20   company in Columbia, Maryland.

21               MR. NEWCOMER:  Oh, you're right.  I -- sorry.  That

22   was the previous one.  Okay.  So, Joe Canty, JRC painting.

23   Alright.  Paragraph 131 of the PSO Extortion of JRC --

24               THE COURT:  Yes.  I got it.  Alright.  Thank you.

25   BY MR. NEWCOMER:

1    Q    Thank you, Your Honor.  Those, I think were up to seven,
2    seven victims here.  Those the only victims of extortion you
3    identified during the course of your investigation?
4    A    No.
5    Q    You said you've been doing -- did you organize crime
6    related investigations for almost a decade?
7    A    Yes.
8    Q    Including other cases involving the extortion and
9    collection of debt?
10    A    Yes.
11    Q    Take you've interviewed other victims of extortion
12    unconnected to this case.
13    A    Sure.
14    Q    And you also identified many victims you talked to in
15    this case?
16    A    Yes.
17    Q    Victims of search threats.  And you heard Mr. Corozzo
18    cross-examination, cross-examining Ms. Allegretta regarding
19    some emails she wrote where she's saying nice things to Mr.
20    Laforte?
21    A    Yes.
22    Q    Is that a unique phenomena to Ms. Allegretta?  Have you
23    ever seen that before where a extortion victim says nice
24    things to the extorter?
25    A    No, we see that pretty frequently.

1  Q   Okay.  And, and in your professional opinion, and based

2  on your experience, why is that?  Why would somebody be nice

3  to somebody who's trying to shake money out of them?

4  A   Well, initially you see people are nice when there are no

5  problems, and the borrower is borrowing money and the lenders

6  getting paid back and everyone is happy.  So, they're just a

7  mutually agreed upon relationship.  Then later on you'll see

8  it where they're trying to, you know, take a -- keep your

9  friends close enemies closer, kind of approach and keep

10  things copacetic between the person that perhaps they're

11  behind in paying their money back to.  So, it also seems some

12  people almost have a weird kind of, you know, Stockholm

13  syndrome type relationship with their lenders.  I mean, it

14  kind of runs the gamut, but it's not unusual to see sort of

15  friendly text in -- I mean, this is a bad analogy, sort of

16  like a spousal abuse relationship where you see things back

17  and forth, you know.  So it's not unusual to see something

18  like that, especially in the early parts of the relationship.

19  Q   Fair enough.  We also -- you also talked about Mr.  Geo's

20  presence, physical -- physically intimidating.  We saw a

21  picture of him.  What's your understanding of Mr.  Geo's

22  present health?

23  A   Oh, his present health is not very good at all.  My

24  understanding is he had multiple back surgeries or something

25  to deal with longstanding, pre-existing injury.  So my

1  understanding he's in poor health these days,

2  Q   No longer the imposing presence he, he once was.

3  A   I don't -- I haven't seen him in years, but that's my

4  understanding that he's not, not in an opposing presence that

5  he once was.

6          MR. NEWCOMER:  Nothing further.

7          THE COURT:  Thank you.  Counsel, do you wish to

8  cross-examine?

9          MR. COROZZO:  Thank you, Your Honor.

10          THE COURT:  Please.

11                  CROSS EXAMINATION

12  BY MR. COROZZO:

13  Q   Good afternoon, agent Murray.

14  A   Good afternoon, Your Honor.

15  Q   You just asked about your career as an FBI agent.  Have

16  you ever come across an alleged extortion victim who lied

17  about an extortion to get out of a debt?

18  A   No, I don't think I -- no, I didn't.

19  Q   Okay.  Have you ever come across a potential witness who

20  lied to the FBI?

21  A   Oh, sure.

22  Q   And when you met with Ms. Allegretta for the first time,

23  you were aware of her complaint to the FBI via telephone on

24  11/14 /2019, correct?

25  A   Yes.  That's why we went there.

1    Q    Okay.  And prior to today, did you know Ms. Allegretta

2    had all those debts from cash advances prior to dealing with

3    Par?

4    A    I'm sure prior to today.  I don't know if prior to the

5    interview, but I'm sure prior to today I did.

6    Q    Did you ever ask her about those prior advances?

7    A    Whenever I asked her about being the three oh two?  I

8    don't recall if I asked her about it during that interview or

9    not.  But I'm -- but I may have not known.  I don't know.  I

10   don't remember.

11   Q    Well, I'm saying prior.

12   A    Actually, excuse me.  I can, I can tell your answer that

13   question.  Since I interviewed before the receivership, I

14   wouldn't, I wouldn't have had her full complete file, so I

15   would not have known what kind of other debt she had.

16   Q    But she told you that she never had any merchant cash

17   advances prior to dealing with Par?

18   A    I believe that's what she said, yeah, yeah.

19   Q    And as you sit here now, you think that's true, full

20   testimony?

21   A    She borrowed money from other alternative lenders.  It --

22   to me, and, and they're, they're very similar to merchant

23   cash advances, and some of these companies have different

24   products.  So to me, it seemed like very similar.  So to me,

25   it doesn't seem -- I would've thought that those would be

1  considered merchant cash advances.  Some looks like she took
2  out, there were other factoring type loans.
3  Q   You said the terms are identical?
4  A   Yeah, to me, they -- if she borrowed from, and I was not
5  privy to all her testimony.  To me it seemed like she had
6  other alternative lending.  So to me it's a distinction
7  without difference as far as what you're saying.  There,
8  there are other alternative products that she had prior to
9  Par funding for sure.
10  Q   What I'm asking you is that when she told you on January
11  29th, 2020, that in August of 2018 when she took a cash
12  advance from Par funding, that that was the first time that
13  Allegretta Electric had ever obtained a merchant cash
14  advance.  Was she telling you the truth?
15  A   So I think -- I don't know, I don't know if she was or
16  not because the loans that she had, they may have not been
17  technically merchant cash advances.  I don't know without
18  seeing them.  Like one through Yellowstone, they definitely
19  do, as far as I understand it, do merchant cash advance.
20  That's just from my knowledge of the industry.  But it's also
21  possible they do some other lending such as, you know, non-
22  merchant cash advance loan, maybe a -- maybe just a, a higher
23  interest loan.  So maybe that's what she had.  I don't know.
24  Q   Well, okay.  Based upon her testimony today that the
25  loans were identical or the advances were identical to what

1   she received from Par, based upon your knowledge of the
2   company being an MCA company.  Did she tell you the truth or
3   both of you --
4   A   If, if that's what she said, then that doesn't seem to be
5   true.  Right?  If that's what she said.  I don't know if
6   that's what -- I don't -- honestly, I wasn't hearing through
7   her entire testimony all candor.  So if that's what she said,
8   I defer to your recollection.
9   Q   Well, do you recall her telling you on January 19th, 2020
10  that when she took an NCA from CBSG in August of 2018, this -
11  - that was the first time that Allegretta Electric had ever
12  obtained a merchant cash advance?  Do you recall her telling
13  you that on that day?
14  A   I don't recall, but if that's what I wrote, I'm sure
15  that's accurate.
16  Q   We can show it to you.
17  A   Yeah, that's -- I don't disagree with you.  I just don't
18  recall.
19  Q   Alright.  That's --
20          THE COURT:  Why do I need to see it?  He just told
21  me he doesn't recall.  I'm the, I'm the --
22          MR. COROZZO:  I'm asking if it refreshes his
23  recollection.
24          THE COURT:  He said, he said he agrees with you, but
25  says it.  He's agreeing with you.  There's no jury here, sir.

1   Move it along.

2          MR. COROZZO:  If you're agreeing that she said that

3   to you --

4          THE COURT:  She's saying your report shows there is

5   no reason to disagree with it.  Next question.

6          MR. COROZZO:  Was she telling you the truth or was

7   she lying?

8          THE COURT:  Asked and answered, sir.

9          MR. COROZZO:  Okay.

10         THE COURT:  No jury here.

11         MR. COROZZO:  I understood, Your Honor.

12         THE COURT:  No, I don't think so.

13         MR. COROZZO: I'm trying to, to hope that the court

14   can understand what I'm doing.

15         THE COURT:  I know exactly what you're trying.  I've

16   got it.

17         MR. COROZZO:  It's got credibility issues.  These

18   witnesses, Your Honor.

19         THE COURT:  Hammer's head.  You got it.  I know it.

20   Now you're just, now you're just rule 611 all over the time.

21         MR. COROZZO:  I'm just kidding.  Sometimes I do go

22   too far, Your Honor.

23         THE COURT:  Yeah.

24         MR. COROZZO:  I apologize.

25         THE COURT:  Rule 611.

1          MR. COROZZO:  Okay.

2          THE COURT:  I'm revoking it.  You understand what

3    that means?  Your third circuit?

4          MR. COROZZO:  I am -- I'm moving on, Your Honor.

5    Different subject.

6          THE COURT:  Okay.  Thank you.

7    BY MR. COROZZO:

8    Q   Can you estimate how tall Renata Gioe is or Gioe is?

9    A   Oh God.  He's not very tall.

10   Q   Compared to my size?

11   A   He's taller than you.

12   Q   Okay.  Well, if I tell you I'm 5'3, how much taller you

13   think he might be than that?

14   A   5'8.

15   Q   And, and you say that he had a pre-existing back injury,

16   correct?

17   A   He had a pre -- well, to his surgeries.  Now, I don't

18   think he had a -- I don't know his medical history at the

19   time he was collecting.  I meant like in 2025 over the past

20   few years, he's had multiple surgeries.  I -- maybe I

21   misphrased it.  He's had multiple surgeries.  I'm not sure

22   what the -- what's going on there.

23   Q   Okay.  And Mr. Gioe has had some substance issues over

24   the years?

25   A   Oh, yes.

1  Q  Okay. And what do you know about Mr. Gioe's substance

2  issues?

3  A  I, I think his main issue is cocaine. I know he has been

4  in rehab. My understanding he's been into, into rehab for

5  cocaine at least once or twice.

6  Q  And that's since the time after working with Par funding.

7  Correct?

8  A  I think he went to rehab while he was working for Par

9  funding, and I think he went to rehab after for Par funding.

10  Q  Drawing your attention to Buck Hardware, the owner of

11  Buck Hardware was Mr. Howell, correct?

12  A  Yes.

13  Q  And you said that he was interviewed by another law

14  enforcement agent, correct?

15  A  Yes.

16  Q  And was there a report for this interview?

17  A  Yes.

18  Q  Is it a 302?

19  A  Yes, it was a 302. I think I have a copy.

20  Q  If you have a copy. May I look at it for a second?

21  A  Eric, look at -- I stacked there.

22          THE COURT: You produced in discovery?

23          WITNESS 2: Oh, yeah. No, we produced all the, all

24  the 302's for all the victims.

25          MR. COROZZO: Your Honor, we've gone through --

1          THE COURT:  No, you have a lot.  Take a moment.

2    Start with the 302.

3          WITNESS 2:  90% sure is the 302.  It is possible

4    that the trooper wrote it and then it would've been included

5    part of our file, but I know I reviewed it in preparation for

6    today.

7    BY MR. COROZZO:

8    Q  And in that, in that interview, Mr. Howell stated that Mr.

9    Gioe never gave the impression that he was going to

10   physically harm Howell that day, correct?

11   A  Yes.

12   Q  Okay.  And you know, that also one thing that Mr. Gioe --

13   is it Geo or Gioe?

14   A  I thought it was Geo.

15   Q  Okay.  I'll use the Geo.  You've, you would --

16   A  I, I, I might have mispronouncing it.

17   Q  And, and as you've been told by Mr. Gioe, one of the

18   specific instructions that he received while working for Par

19   funding and from Mr. Laforte was never to put his hands on

20   anyone, correct?

21   A  Yes.

22   Q  And Mr.  Geo -- now, Mr. Gioe, did he tell you about this

23   interaction with Mr. Howell?

24   A  Yes.

25   Q  And that's in his 302?

1  A   Yes.

2  Q   And did -- and he says he never specifically threatened

3  him, correct?

4  A   No -- correct.

5  Q   Correct.  So you have both Mr. Howell and Mr. Gioe saying

6  there was no specific threat to that day, however, Mr. Howell

7  tells you sometime after that day that he was frightened,

8  correct?

9  A   Well, I guess I'm getting caught up on the word threats

10  because at one point in time, Mr. Howell was going to call

11  the police, and Gino said something like, you're not going to

12  be able to call the police in time, or something like that.

13  Q   Is that the -- at the same interview where Mr. Howell

14  said Gioe did not physically threaten him in the office that

15  day?

16  A   Right.  So maybe didn't say, I'm going to break your legs

17  or something like that, but I guess there's other

18  intimidating language used about not being able to call the

19  police or something.

20  Q   And Mr. Gioe had, had told you that he did not threaten

21  everyone that he went to visit, correct?

22  A   Correct.  Correct.

23  Q   And he did not give you a percentage of how many people

24  he threatened compared to the people he did not threaten?

25  Correct?

1  A   I don't recall a percentage.

2  Q   Did he Identify the people that he did threaten?

3  A   He identified some people that we threatened other

4  people.  We asked him about incidents that we were familiar

5  with.

6  Q   And there, there was times when you had information that

7  a merchant customer said they were threatened by Mr. Gioe,

8  but Mr. Gioe denied it, correct?

9  A   Yes.

10 Q   And who did Mr. Gioe specifically admit to threatening?

11 A   Well, so he -- I mean the folks that we, I guess,

12 testified about today, I mean, the --

13 Q   And again, just to stop you there.  He did not admit to

14 threatening everyone that you testified to about today in

15 case, in fact, there was one instance where he denied it and

16 another instance where he did not.  Remember, right?

17 A   Well, sometimes they were things like for Mr.  Howel, I

18 think he said something like, we, you know, we have -- we can

19 -- we know where you live and that sort of thing.  So I mean,

20 the, the threats were often sort of these indirect threats,

21 if you will.  That's where -- So perhaps I'm getting hung up

22 on the word threat and I'm being overly cautious, but --

23 Q   But did he -- did he specifically identify the parties

24 who he threatened?

25 A   We went through a number of merchants that --

1   Q   Just today.

2   A   That he threatened, including today, and then there were

3   some other -- and then there's some other incidents that we

4   didn't bring up today where the merchants said they were

5   threatened and Gioe either corroborated some part or some of

6   their story,

7   Q   But not all of the story.

8   A   Correct.  Sometimes he had, you know, his version of what

9   happened.

10  Q   And in reference to Mr. Howell and the Buck Hardware

11  situation, Mr. Howell says that he does not recall Mr. Gioe

12  making a phone call while he was in Mr. Howell's office,

13  correct?

14  A   Correct.

15  Q   And Mr. Gioe, according to your recollection, says that

16  he did, correct?

17  A   Correct.

18  Q   Did you try to corroborate that with phone records?

19  A   We did.

20  Q   Okay.  Do you have the phone records for that call?

21  A   I don't have the phone.  We saw that there were phone

22  records to the -- from Par funding.  There were phone records

23  between Par funding and Mr. Howell, and then -- and another

24  agent did this work.  So the high level where there was,

25  there was phone records between Par funding, Mr. Howell to

1  the business line, and I believe his cell phone.  But we, but

2  we did not trace the call to Gino on that date because I

3  don't think we knew the exact date that it occurred.

4  Q   So you, you could not produce a phone record, which shows

5  a phone call from Gioe's phone to Par funding or any phone

6  connected to Joe LaForte.  Correct?

7  A   We -- there's definitely calls between Gino and Joe

8  LaForte.  We never -- and maybe if we were going to trial, we

9  would've taken this number level.  I never took it the extra

10  level of establishing that your client called Gino while Gino

11  was at, at Buck Hardware.  But in order to do that, probably

12  would've had to get cell psych to show Gino was at that

13  location.  I'm not sure it was even available by the time we

14  learned of this information.  Right?  So it would've been

15  like four years.  So as I think about it, I don't know if we

16  would've been able to do that.  So the answer to your

17  question is no.  And I'm not sure that we -- I'm not sure we,

18  we tried to take it to that level.  I'm not sure we would've

19  been able to anyway.

20  Q   Okay.  And during your attention to Tina Allegretta, you

21  also had the occasion to interview her husband Vincent

22  Allegretta, correct?

23  A   Yes.

24  Q   And when you in interviewed Vincent Allegretta, who's the

25  owner of Allegretta Electric, you interviewed him, if you

1  recall, on January 29th, 2020?

2  A   Yes.

3  Q   And at that time, Mr. Allegretta said he was unaware of

4  any funding from Par prior to the year 2019, correct?

5  A   I don't recall, but if I wrote that, I'm sure that that's

6  what he told us.

7  Q   I'll just show it to you very quickly.

8  A   Yeah.  I have no doubt that if -- Yeah, I'm not

9  disagreeing with you.  Sure.

10         MR. COROZZO:  Can we just show it to you very

11  quickly?  If I may, Your Honor?

12         THE COURT:  You may.

13  BY MR. COROZZO:

14  Q   Thank you.  Do you see the highlighted portion?

15  A   Mm-hm.

16  Q   And when you interviewed Mr. Allegretta in 2020, he said

17  that when his wife and controller was, was taking out, was

18  incurring this debt in 2018, he was unaware of it until 2019,

19  correct?

20  A   Correct.

21  Q   Thank you.  And drawing your attention now to Mr. Brown

22  from Duke's Barber.  It says he testified on direct

23  examination about an issue, an incident where Mr. Brown told

24  you someone came to his home, and I believe they said they

25  were employees of Fast Advance, correct?

1   A   I think he said Fast Advance.

2   Q   And he also said that that person did not threaten him in

3   any way, right?  And he was very respectful.

4   A   Correct.

5   Q   And Mr. Brown's situation was one where Mr. Brown told

6   you that Gioe had threatened to break his legs, correct?

7   A   Yes.

8   Q   And Gioe denied ever doing that, correct?

9   A   Correct.

10   Q   And in fact Mr. Brown had taken advances from Par

11   funding, correct?

12   A   Correct.

13   Q   And he never paid the full amount, correct?

14   A   Oh, I don't -- yeah, probably not.  And in fact, are, are

15   you aware of the fact that he took the advances to use in his

16   business, but that he was misusing the funds?

17   A   No.

18   Q   Okay.  Let me just -- do you recall that there was an

19   email where after Mr. Brown took an advance that he actually

20   invested it into a money market account?

21   A   No.

22   Q   Contrary to the rules of the agreement?

23   A   No.

24   Q   Okay.  Let me just -- that's [indiscernible] And you had

25   an opportunity to interview Mr. Brown, correct?

1  A   I did.

2  Q   Okay.  And as of this moment, you're not aware of that he

3  misused the funds in any way, correct?

4  A   No.

5  Q   He never told you that, right?

6  A   No.

7  Q   And if you'll see, you have your screen there.  On July

8  14th, 2015, Mr. Laforte contacts Mr. Brown and objects --

9          THE COURT:  Sir, where did you mark this?  Where you

10  mark this?

11          MR. COROZZO:  I'm sorry, your, Your Honor.  This is

12  --

13          THE COURT:  No, no.  What letter am I up to?

14          MR. COROZZO:  This would be E I'm sorry, Your Honor.

15          THE COURT:  Alright.  Not a problem.  I'm just make

16  sure we're identifying.  Thank you.

17  BY MR. COROZZO:

18  Q   For identification.  Defendant's Exhibit E is an email

19  from Joe Mack, Joe at Par funding to William Brown, Will Duke

20  Barber company.

21  A   Yep.

22  Q   And in this email Mr. Laforte is accusing Mr. Brown of

23  fraud, correct?

24  A   That's what it looks like.

25  Q   And it's an allegation that Mr. Brown took the funding

1  from Par, did not invest it in his business and used it for a

2  money market account.  Correct?

3  A   That appears to be what your client is alleging here.

4  Yes.

5  Q   And sometime after that, are you aware that Mr. Brown's

6  payments were being sent returned because there was

7  insufficient funds in his accounts?  Were you aware of that

8  at all?

9  A   I know at one point in time he was -- he had the

10  insufficient account.  The insufficient funds returns.  I

11  don't know when it was, as I say here.

12  Q   But you would -- would you agree it was after this text?

13  I can show it to you.

14  A   I can't agree with that.

15  Q   Okay, fair enough.

16  A   But you very well could be right.  I just don't know.

17  Q   This would be marked as defendants F for identification.

18  Draw your attention to Exhibit F.  This is an email from [ph]

19  Ken Calcagnini and you know Ken to be part of the collections

20  department in Par funding.

21  A   Yes, sir.

22  Q   And it's sent to William Brown and Joe Mack is CC'd on

23  it, correct?

24  A   Correct.

25  Q   And in this email, which is dated February 26th, 2016,

1    [ph] Mr. Calcagnini is saying that the business is having

2    issues because all -- because Mr. Brown's payments are being

3    sent back as insufficient funds, correct?

4    A    Yep.

5    Q    And Mr. Calcagnini is also citing that he was already on

6    a reduced payment, correct?

7    A    Mm-hm.

8    Q    And that he's not returning the calls. He left voicemail

9    messages earlier in the week.

10   A    Yep.

11   Q    So, Mr. Brown, who misuses the funds then has

12   insufficient funds to pay, never pays, correct? At the end

13   of the day.

14   A    Well, I don't --

15   Q    He has a balance.

16   A    I, I don't know what his balance is. Like most of these

17   merchants, I'm assuming that he didn't pay the full amount,

18   but I don't know that. And I don't know that he misused the

19   funds that your client's accusing him. He very well could

20   have. I don't know.

21   Q    But this person is the, is the merchant who accuses Mr.

22   Gioe of threatening him and Mr. Gioe denied it, correct?

23   A    Well, Mr. Gioe admitted to showing up unannounced

24   demanding cash payments, regularly showing up there to

25   collect cash. And, you know, being -- I think he, I think he

1  even said something like, we could take this outside, or

2  something like that.  But he did deny making the, the threats

3  about breaking the legs.  Actually, he said something like,

4  that doesn't sound like something I would say, I think is

5  what he actually said.

6  Q   And Mr. Gioe was being truthful with you as far as you

7  understand.  Correct?

8  A   As far as I understand, he's being truthful to the best

9  of his recollection.

10 Q   Okay.  Drawing your attention to Mr. Perrillo, now, you

11 stated that Mr. Perrillo informed you that Joseph LaForte had

12 made threats to him such as, I will kick your ass and I'm

13 coming to see you.  Correct?

14 A   Something like that?  Yes.

15 Q   And when was -- was this reflected in a report of yours

16 that he said this?

17 A   It should be.

18 Q   Okay.  You have multiple 302's with Mr. Perrillo?

19 A   Yes.  There's the initial 302, and there was some follow

20 up about -- I think some -- there was, there was a follow up

21 302 about the Rolex watch.

22 Q   Okay.  Did Mr. Perrillo suggest to you or indicate to you

23 when these threats were made?

24 A   Believe they were in 2018, but I, I, I'd be guessing.

25 I'd have to defer to his -- I believe it happened in -- I

1   think 2018 was when things kinda went off the rails, if I

2   recall.

3   Q  Okay.  And we've, we've gone through a number of texts

4   specifically in March and June of 2018, correct?

5   A  Yes.

6   Q  And in what manner or what vehicle did Mr. Perrillo say

7   these threats were made?

8   A  Over the phone?

9   Q  Over the phone.  He had texted with, with Mr. Laforte

10   quite frequently, correct?

11   A  Yes.

12   Q  And were there any of these threats indicated in the

13   texts?

14   A  No.

15   Q  And drawing your attention to M13, there were situations

16   beginning in March -- on March 14th, 2018, where Mr. Perrillo

17   put a stop order payment on his ACH, correct?

18   A  Yes.

19   Q  Okay.  And is this the situation -- was it with, with Mr.

20   Perrillo where you say, good cop, bad cop was being played

21   and Gino -- Gioe was the good cop?

22   A  It seemed like -- yeah.  It's -- well, it seems like Gioe

23   started as the bad cop, and as he hung around, they sort of

24   almost film -- formed some sort of rapport or something.  And

25   then, ultimately, Joseph LaForte was the, the bad cop at the

1  end of the day, I guess.

2  Q    And the report, the rapport including that Mr. Gioe and

3  Mr. Perrillo would spend social time together, correct?

4  A    After this?  Yeah.

5  Q    Well, did they spend social time in California around the

6  same time as this in June of 2018?

7  A    I don't know the specifics on that meeting.  I thought

8  that was like a business meeting, but, but I don't know.  And

9  if the text messages say different, then you can tell me I'm

10 wrong, but I don't remember ever discussing the California

11 meeting with Perrillo.

12 Q    Well, Perrillo, you never discussed it with Perrillo, but

13 it's in the text messages that he went to California to meet

14 up with Gio when Gio was in California.

15 A    Yes.  I didn't understand that to be like, like I don't

16 think they were taking a vacation together.  I don't know

17 what -- but I don't, yeah, I don't want to guess.  I honestly

18 don't know anything about that meeting other than what's

19 reflected in the text messages.  So I shouldn't, I shouldn't

20 just guess.

21 Q    And what's reflected in the text messages is in June, in

22 June of 2018, June 2nd, 2018, I'll draw your attention to

23 page 70, marked page 71 of Exhibit M 13.  Mr. Perrillo is

24 saying that he voluntarily traveled to California to hook --

25 to meet up with Mr. Gioe, correct?  On the top of the page.

1    A   71.

2    Q   The bottom, the bottom is listed as page 71.  It's the

3    third page of Exhibit M13.

4    A   Oh, yeah, sorry.  Yes, he says, I, and even met him in

5    California last week.  I've been, I've been calling him and

6    almost updating him on what's going on and even met him in

7    California last week.

8    Q   And Mr. Perrillo lived in Florida.  He didn't live in

9    California?

10   A   Yes.

11   Q   He didn't work in California.

12   A   I have no idea.

13   Q   Okay.  Well, do you have any indication that he worked in

14   California?

15   A   I, I know that he had a real estate company that had

16   properties.  I, I just -- I sort of assumed they were in the

17   Florida area.  For all I know, they were in New Mexico.  I, I

18   don't know.  So, I, I, I know that he -- now I say that.  So

19   the answer is I, I don't know if he had business there.  The

20   way I, I read that text message was something like they had a

21   -- they both were in California.  I don't think they did,

22   like, went to Disneyland together.  So that wasn't the

23   impression I got.  But I, I, I never got into details with

24   about it.

25   Q   And it was -- and there's another report you interviewed

1  Mr. Perrillo at one point in time, he explains to you that

2  prior to June of 2018, he had purchased two Rolexes, one for

3  himself and one for his wife, correct?

4  A   Yes.

5  Q   And one of the Rolexes he gave to Gioe, correct?

6  A   Correct.

7  Q   And he, he characterized that as a gift, correct?  In, in

8  Mr. Perrillo's own words, he said, used the word gift?

9  A   Yes.  I think he -- correct.  I think Gioe said something

10  like, Hey, that's a nice watch he got there.  This is after

11  he'd been hanging around at the office all day and was kind

12  of like, here, take it.  I don't think he like put it in a

13  box and said, Merry Christmas.

14  Q   And the other watch, he hocked correct?  You were

15  informed.

16  A   He, he hocked.  Perrillo did?

17  Q   No, he did.  Who's the, he?

18  A   Gioe.

19  Q   I'm sorry, Perrillo.  The other watch, Mr. Perrillo.

20  A   We sold it

21  Q   A pawn shop.

22  A   I don't remember, but I believe you if that's what I

23  said.

24  Q   Do I need to --

25          THE COURT:  No, no.

1        MR. COROZZO:  Okay.

2        THE COURT:  Take your time.

3  BY MR. COROZZO:

4  Q   Thank you, Your Honor.  And have you, you've reviewed,

5  and part of it is in evidence, you reviewed some of the text

6  messages between Perrillo and Mr. Laforte, correct?

7  A   Yes.

8  Q   And Perillo had contacted Mr. Laforte on numerous

9  occasions to ask for funding, correct?  Yes.  And at times he

10 would say that he needed the funding within hours, correct?

11 A   Yes.

12 Q   And Mr. Laforte at times provided the funding within

13 hours as per Mr. Perillo's request, correct?

14 A   Correct.

15 Q   And in, in, in May of 2018, one month prior to Mr. Gioe

16 going to the business of Mr. Perillo, Mr. Perillo traveled to

17 Philadelphia to meet with Mr. Laforte.  Are you aware of

18 that?

19 A   Yes.

20 Q   Okay.  And he was there to discuss business deals that he

21 was proposing, he and Mr. Laforte going business together?

22 A   Yes.

23 Q   And if you recall, that trip was on, or the meeting was

24 on May 12th, 2018?

25 A   I remember the discussions.  If that's what I wrote, then

1    I'll go with that, but I don't, I don't -- I can't tell you I

2    know off the top of my head it was that May 12th.

3    Q   I can just show you a text if it, just to refresh your

4    recollection.

5              THE COURT:  Does it have anything to do with the

6    decision I need to make today?

7              MR. COROZZO:  Well, I'm, I'm going --

8              MR. NEWCOMER:  He's not contesting it, Your Honor.

9    It's, it's --

10             THE COURT:  Right.  Okay.  And then focus on what I

11   need to decide.  Credibility and bias is great, but focus on

12   what I need to decide.  May 15th or May 8th, they're not

13   going to make a deal.

14   BY MR. COROZZO:

15   Q   And shortly after the traveling to Philadelphia to meet

16   with Mr. Laforte to discuss business deals, two payments,

17   that were purportedly made by Mr. Perrillo to Par funding

18   came back.  Are you aware of that?

19   A   Sounds like par for the course, but sure.  But I'm not

20   personally aware of it, but I don't dispute it.

21   Q   And on May 24th, if the two payments came back, one

22   within a short period of time after the meeting, Mr. Perrillo

23   represents to Mr. Laforte that he needs a couple of days.  He

24   has 18 million in equities suggesting that he's going to, to

25   sell $18 million worth of property, correct?

1   A   Is that what he's texting?  Sorry.

2   Q   He's telling Mr. Laforte that I'm going to get funding

3   from the bank based upon my $18 million in real estate, and

4   I'll be able to pay all this back.

5   A   Is it -- I'm sorry.  Mr. Corozzo, what page are you on?

6   Q   I can pull it up for you.

7   A   I mean, I think that sounds right.  I just, just don't

8   want to --

9   Q   So Mr. Perrillo's, Mr. Laforte quite a bit of money and

10  he's making representations that he's about to get financing

11  from the bank, correct?

12  A   Yes, yes.

13  Q   And that he would be able to pay off his debt to Par

14  funding.

15  A   I apologize.  We read these earlier.  Yes.  I Just

16  completely -- yep.

17  Q   And Mr. Perrillo was, was lying at this time because he

18  was never in line to get the funding and he never did receive

19  the funding, correct?

20  A   I have no idea.

21  Q   Okay.  I'd like to show you the next page.

22          THE COURT:  Mr. Corozzo, let me ask you this.  Is

23  your theory that people who owe money and lie about owing the

24  money receive less credibility?

25          MR. COROZZO:  Absolutely, Your Honor.  I think,

1 think someone --

2 THE COURT: Thank you. Next question.

3 MR. COROZZO: Someone whom lies should be and is

4 proven to lie.

5 THE COURT: And admits lying.

6 MR. COROZZO: Admits lying. Needs to be considered

7 a little bit differently than someone else.

8 THE COURT: Good. Okay. Thank you.

9 BY MR. COROZZO:

10 Q   I'd like to show you the next page, and we have the next

11 page. And it's at this time when Mr. Perrillo is promising

12 payment for funding from a bank where he informs Mr. Laforte,

13 that he gave the watch the Gioe as a present. Correct? And

14 that's June 4th, 2018?

15 A   Yes.

16 Q   And drawing your attention to page 2237, a couple of

17 weeks later on June 15th, 2018, Mr. Perillo informs Mr.

18 Laforte that he got the wire from the bank, and he's asking

19 for more money. Do you see that at the top?

20 A   No. So --

21 Q   Mr. Laforte is telling --

22 A   LaForte is telling Mr. Perrillo, we got the wire, thanks

23 a lot is owed, enjoy the weekend. And then Mr. Perrillo

24 responds, I know we'll make it happen. Sorry for the late

25 text. Enjoy the weekend, bro. Happy Father's Day.

1  Q   And then the following week on, on the same page,

2  lowering the page --

3      THE COURT:  Sir, I've read all these.  What -- give

4  an offer of proof.  You -- you're burning time.

5      MR. COROZZO:  If, if you, if you --

6      THE COURT:  No, you're wasting a lot of time.  I've,

7  I've read all these times --

8      MR. COROZZO:  If you read all of them, Your Honor.

9  So it's fair to say --

10     THE COURT:  What's your offer proof.  I want to

11 know, seriously.  You just told me the person who lies

12 doesn't get as much credibility.  So tell me, you, you've

13 already shown you think he's lying.  So why are we burning

14 all time, all time with your client's money doing this?

15 BY MR. COROZZO:

16 Q   I can wrap, I can wrap it up by saying it's clear from

17 the review of the texts that Mr. Perillo is making false

18 promises and false representations to Mr. Laforte about

19 receiving funding to pay his debt, correct?

20 A   I don't know that that's true.  I know what he texted,

21 but I don't know whether a bank loan was coming or, or what.

22 Q   Well, he says the bank loan is coming, but he never says

23 he came and he never -- and he starts missing payments again.

24 A   I don't know that he applied and was intending to get the

25 funding and it, and, and the bank denied him.  I, I, I -- all

1  these text messages say it all be true.  That's all I know,.

2  Q   Okay, I'll move on to Mr. Mansouri.  Now, there comes a

3  point in time where Mr. Gioe goes to visit Mr. Mansouri

4  because Mr. Mansouri has stopped making payments to Par

5  funding, correct?

6  A   Yes.

7  Q   And he goes to Mr. Mansouri's office, correct?

8  A   Yes.

9  Q   And then they agree to meet at a Starbucks, correct?

10  A   Yes.  I, I -- he went to the location, I think Mansouri

11  wasn't there, and then they agreed to meet another location.

12  Q   And Mr. Gioe, in your interviews with him denies

13  threatening Mr. Mansouri, correct?

14  A   Correct.

15  Q   And in fact, he, he, he highlights that Mr. Mansouri was,

16  was taping him.

17  A   Yes.

18  Q   When, when they were meeting?

19  A   Yes.

20  Q   And you reviewed the tape, right?

21  A   Yes.

22  Q   And Mr. Gioe is dressed very nicely that day.

23  A   He usually is.

24  Q   And Mr. Mansouri is, is going after Mr. Gioe in a way to

25  record him and to even record the vehicle that he's going

1   into.  Correct?  He's pursuing Mr. Gioe on the video.

2   A   It's been a while since I've watched that.  I think

3   that's right.  I know that's in the parking lot.  I don't

4   remember the vehicle thing, but if you say it happened, well,

5   I think you're right.

6   Q   In, in that video, Mr. Mansouri is the aggressor.  He's

7   pursuing --

8   A   Well, I think he's --

9   Q   Gioe --

10  A   He's the one that's trying to film, you know, the way

11  people film these things when people show up, try to corrupt,

12  you know, prove that this guy was here.  I don't think

13  necessary was the aggressor as in like the physical.  I don't

14  -- I don't know.  I wouldn't agree with the characterization

15  of aggressor, but --

16  Q   Well after the meeting as Mr. Gioe is trying to leave.

17  A   Right.

18  Q   It's Mr. Mansouri pursuing him and videotaping him,

19  correct?

20  A   Right.

21          MR. NEWCOMER:  I, I think, Your Honor, we can

22  stipulate that there's no threat on the video,

23          THE COURT:  No threat from, no threat from Gioe.

24          MR. NEWCOMER:  No threat from Gioe on the video.

25  The threat from the video --

1    THE COURT:  I heard that the first time around a

2  couple hours ago.  Please go on.

3    MR. COROZZO:  And it's Mr. Mansouri, as Mr. Gioe,

4  Gioe is walking away, that's pursuing him to videotape him,

5  correct?

6    MR. NEWCOMER:  Ask and answered, Your Honor.

7    THE COURT:  Yes.  And, and, and, and -- understood.

8  BY MR. COROZZO:

9  Q   Okay.  Thank you.  And it was Mr. Mansouri's company,

10  radiant Images that had taken a total of $2. 6 million of

11  advances from Par funding, correct?

12  A   That sounds right.

13  Q   And Mr. Mansouri's company was a, a was a multimillion

14  dollar company that dealt with feature films, correct?

15  A   They're in the cinematography business.  So.

16  Q   For feature films out in California.

17  A   I think they do feature -- feature films, commercials.

18  Q   And the, the initial advance was in January, on January

19  5th, 2017.  And that there was a number of subsequent

20  advances, if you recall.

21  A   Sounds right.

22  Q   And in fact, Ms. Wolf was also involved with trying to

23  negotiate the terms of that transaction, correct?

24  A   Yes.

25  Q   And there was nothing unpleasant or untoward about the

1  negotiations.  Ms. Wolf contacted Par and they went over

2  numbers and they tried to work something out, correct?

3  A   Yes.

4  Q   And in fact, there was an amicable payment plan worked

5  out to deal with the large debt that Radiant images had

6  undertaken.  Yes?

7  A   Yes.

8  Q   But shortly after the deal was restructured, Mr. Mansouri

9  and Radiant images closed down their account, correct?

10  A   I think that's correct.

11  Q   And without warning, after renegotiating the deal, after

12  receiving consideration, unilaterally shut down their account

13  and Par funding was unable to collect any funds from Radiant

14  Images.

15  A   I think their position was that Par was over withdrawing,

16  but they did -- I, I think they did something to, to stop Par

17  funding from continuing to withdraw.  I, I think that their

18  argument was they hadn't got all the funding that they

19  thought they were entitled to or something like that effect,

20  but whatever their argument was, they, I think they stopped

21  payment on the account.

22  Q   And, and as a result of unilaterally closing the account

23  and stopped paying, Mr. Gioe visited the offices in February

24  of 2018, correct?

25  A   Yes.

1  Q   And on the first visit to the officers, Mr. Mansouri told

2  Gioe to get the F out of my office, correct?

3  A   I think so.

4  Q   And after Mr. Mansouri told Gioe to get the F out of my

5  office and chased him out of the office, there was a phone

6  call the next day where Mr. Laforte and Mr. Mansouri spoke on

7  the phone, correct?

8  A   Yes.

9  Q   And in that phone call, there was yelling and Mr.

10  Mansouri said, I'm not scared of you or anything, correct?

11  A   I don't recall that.

12      THE COURT:  Again.  Counsel, where's it getting --

13  I've heard this.  Where's it getting, what, what are you

14  trying to show me?

15      MR. COROZZO:  I'm trying to show you the person who

16  says that they're so afraid and that they had to arm

17  themselves.

18      THE COURT:  Isn't it really conduct?

19      MR. COROZZO:  I'm sorry?

20      THE COURT:  Isn't it really conduct or intent?

21      MR. COROZZO:  On my client's part?  It's really for

22  extortion.  It's the --

23      THE COURT:  He's not here for extortion.

24      MR. COROZZO:  Well, this is what we're talking

25  about.  The relevant, the relevant conduct --

1           THE COURT:  I'm well aware, I'm well aware of what

2     you're --

3           MR. COROZZO:  The relevant, relevant conduct of, of

4     extortion and, and --

5           THE COURT:  Is it intent or conduct then?

6           MR. COROZZO:  It's neither.  It's the, it's the --

7           THE COURT:  In other words, if your client did it

8     without intent, if your client's just got in a fight and, and

9     the other guy felt harassed and, and threatened, is that

10    enough?

11          MR. COROZZO:  Yes, it is.  But again, it's --

12          THE COURT:  Or whatever the make,

13          MR. COROZZO:  It's what the other person felt.  It

14    has to be the other person's reasonable understanding that

15    they were in danger and they felt threatened.  Now, Mr.

16    Mansouri is not acting himself, right?

17          THE COURT:  But I've already heard all that.  So

18    what, what are you telling me new that I didn't hear earlier?

19          MR. COROZZO:  You didn't hear anything about Mr.

20    Mansouri telling Gino to go F yourself?

21          THE COURT:  Well --

22          MR. COROZZO:  And get out my office and that Mr.

23    Mansouri tells Mr. Laforte while he's on the phone.

24          THE COURT:  Alright.  Get the testimony.  I'll, I'll

25    show you where I did.  Go ahead.  You, you keep going and

1  I'll --

2        MR. COROZZO:  Well, I'm not afraid of you.

3        THE COURT:  Okay.  Yep.  Let's tell you where, where

4  I saw that.  Go ahead.  You forgot that I read all this,

5  right?  So keep going.  I'll tell you where he said it.  Go

6  ahead.  You go.  Keep going.  Sir, do you remember that

7  discussion about I'm not scared you?

8        THE WITNESS:  I don't remember him, and I apologize.

9  I don't remember him telling LaForte that he's not afraid of

10  him, but, but I, I just -- I could be misremembering.  And,

11  and if he wrote it somewhere or I wrote it somewhere, then,

12  then, then I'll, I'll say that I was mistaken here.

13  BY MR. COROZZO:

14  Q   I'll, I'll just show you.  We'll mark this as --

15  A   And again, I'm not necessarily disagreeing with you.  I

16  just, I just, I just don't remember,

17        MR. COROZZO:  We have to go through, for the record.

18  I will mark this as defendant's G.

19        THE COURT:  Three, page declaration.

20  BY MR. COROZZO:

21  Q   And you're familiar with the three-page declaration.

22  A   Yes.

23  Q   That Mr. Mansouri created?

24  A   Correct.

25  Q   Okay.  And draw your attention to the last page, page

1  three, the middle of the paragraph when they talk about the

2  phone call.

3  A   Oh, okay.  Yep.  I said I, I, again yelled back.  I'm not

4  scared of you or anything.  Just -- you do what you need to

5  do, just stop threatening me.

6  Q   And all this is happening between February 15th and

7  February 16th of 2018, correct?

8  A   Yes.

9  Q   And on -- in addition to making a -- for trying to, or in

10  addition to speaking on the phone, Mr. Laforte also

11  instructed his employees on February 15th, which is M9, that

12  we should shoot an AR letter at.

13  A   Well, it's more than that.  It's a letter that was going

14  to third parties unrelated, not true accounts receivable in

15  this case.  They blasted, I think the American

16  Cinematographer's Guild.  Anybody that knew radiant images

17  just to basically embarrass them and make them look like

18  deadbeats.  But that's what he meant by the AR letter.

19  Q   And, and also to try to collect on any receivables that

20  radiant images have.  That's what the AR letter is.

21  A   That's what it should be.  Should be for, I don't know.

22          THE COURT:  Sorry, you saying the AR letter went to

23  third parties without a judgment?

24          WITNESS 2:  Oh, yeah.

25          THE COURT:  Was their confession to judgment?  Yeah.

```
 1          WITNESS 2:  Well, so, they would -- they sign a
 2   confession of judgment?
 3          THE COURT:  No.  No.  Was the judgment entered yet?
 4          WITNESS 2:  In this case?  I don't know that it was.
 5   It, it could have been --
 6          THE COURT:  Also, was the judgment entered already
 7   at the time of this AR letter?
 8          MR. COROZZO:  And the AR letter was drafted.
 9          THE COURT:  Question, sir.
10          MR. COROZZO:  I'm sorry, Your Honor.
11          THE COURT:  Was the judgment entered at the time of
12   these AR letters?
13          MR. COROZZO:  I don't know that, but it wasn't --
14          THE COURT:  Would that matter?
15          MR. COROZZO:  It was drafted and submitted by an
16   attorney.
17          THE COURT:  Yeah.  Okay.
18          MR. COROZZO:  I understand that.
19          THE COURT:  On behalf, on behalf of Mr. Laforte.
20          MR. COROZZO:  On behalf of Mr. Laforte.
21          THE COURT:  Okay.
22          MR. COROZZO:  And if Mr. Laforte is relying on
23   counsel that this is proper, this is what he's doing.  Mr.
24   Laforte didn't send the AR letter.
25          THE COURT:  Mr. Laforte was directed AR letter,
```

1    right?

2         MR. COROZZO: Number 26, yes.

3         WITNESS 2: The AR letters were generally sent up by

4    collections department. They were not sent by lawyers.

5         THE COURT: Right. Okay. So Mr. Laforte directs

6    the letter, even though he directs the letter to go to people

7    who aren't, aren't on judgment. Who, who are in cases that,

8    that, that there's not judgment in place yet. Am I correct

9    about that? I missed something different. I didn't --

10        WITNESS 2: Well, the answer, Your Honor --

11        MR. COROZZO: I don't -- we -- no one knows --

12        THE COURT: You know the timing of that?

13        MR. COROZZO: -- Whether there was a judgment or

14    not.

15        THE COURT: I got it. Okay. You would agree with

16    me that you send letters to third parties before a judgment

17    you'd have another problem. Right?

18        MR. COROZZO: I would also submit to you, Your

19    Honor, that a lay person if he's relying on counsel --

20        THE COURT: No, I get it. I know. I agree with

21    you. That's it. You're right.

22        MR. COROZZO: And I think there's a huge difference

23    if the letter is sent by counsel than if it's just sent by

24    the lay person.

25        THE COURT: By, by or, or Mr. Laforte directing it

1    by his, by his own employees as opposed to counsel.  Exactly.

2    There'd be a difference.  Right.

3            MR. COROZZO:  And it was sent, as you can see,

4    right, Norman, Val and Associates who were working for --

5            THE COURT:  And he directs, he directs it to persons

6    who are accounts payable rating.

7            MR. COROZZO:  And it's signed on the last page by

8    Mr.  Vals.

9            THE COURT:  Okay.  Thank you.

10           MR. COROZZO:  And also in Exhibit M14, again, Mr.

11   Laforte's reaction on page three on, on February 16th is to

12   hit radiant hard with AR letter first.  That was Mr.

13   Laforte's reaction to the situation while Mr. Gioe was near

14   and about the offices of Radiant Images, correct?

15           MR. NEWCOMER:  Objection.  You've already heard this

16   testimony.  This is just --

17           THE COURT:  Yeah, I, I, I, I'm just interested in,

18   I'm just interested in, in this goes -- this -- we're on

19   relevant conduct.  This is certainly relevant conduct.  Go

20   ahead.

21           WITNESS 2:  I mean, that was pretty typical.  They

22   would, you know --

23           THE COURT:  Send letters.  Mr. Laforte sent direct

24   letters to people who weren't debtors yet?

25           WITNESS 2:  No.  Well, no.  So to be clear, they

1   would send these accounts receivable letters, and in theory,

2   they're supposed to go to true accounts receivables of a

3   merchant.  But what they would also do is send them to non

4   accounts receivables, just random people such as their

5   relatives, or in this case the Cinematographer's Guild.

6            THE COURT:  What's the evidence?  Do you have

7   evidence of that?

8            WITNESS 2:  Oh yeah.  I mean, it's just like a -- I

9   mean, that's just a -- that's a whole other case together,

10  but, so they would send those letters out, but you know, it's

11  another tool in the toolkit of Par finding.  Right?  So

12  there's Gino and there's the AR letters.

13           THE COURT:  Okay.

14           WITNESS 2:  And there may have been a confession

15  judgment filed this time.  There may not have -- I don't

16  know.  But either way, they'd send these AR letters out to

17  kind of the world.

18           THE COURT:  And, and Sir, is that -- do you have

19  extortion outside physical extortion?  Outside physical, you

20  can have a threat of economic conduct.

21           MR. COROZZO:  Sure.  And again, it's the subjective

22  view of the victim.

23           THE COURT:  Right.  I agree.

24           MR. COROZZO:  And after this, after this --

25           THE COURT:  I agree in part, agree in part.

1  BY. MR. COROZZO:

2  Q  After these AR letters are sent out, Radiant Images

3  continues to fail to pay on their debt, correct?

4  A  I think so, yes.

5  Q  In fact, it's not until the following year in September

6  that there's a settlement on the account, correct?

7  A  I think that's right.

8  Q  In fact, as you know, the Mansour's hired Shane Haskin

9  and there was court actions brought over this debt, correct?

10 A  Yes.  Yes.

11 Q  And with the assistance of counsel in September of 2019,

12 some 17 months later, the, the matter was settled for

13 $500,000, correct?

14 A  I think that's correct.

15 Q  And after all that time, Radiant Images voluntarily paid

16 $500,000 on the debt?

17 A  I think that's correct.

18 Q  Now you also discussed

19 Q  Kara DiPietro and, and her businesses?

20 A  Yes, sir.

21 Q  Okay.  And you're, you're aware, are you not that in --

22 in December of 2018, Ms. DiPietro reached out to Mr. Laforte

23 thanking him for saving her business?  Yes?

24 A  I think I do recall that, yeah.  They were very friendly

25 early on.

1  Q   And in January of 2019, Ms. DiPietro actually sent Mr.

2  Laforte a gift of gratitude, a book, which showed all of the

3  good things she was doing with the monies that she was

4  advanced from Par funding.  Correct?

5  A   I, I don't think -- I wasn't -- I don't know if I was

6  aware of the gift of gratitude.  That sounds like something

7  that could have happened.

8  Q   Well, we'll show it to you.  It's up there as --

9        THE COURT:  I've already seen it.  [indiscernible].

10        WITNESS 2:  Yeah.

11        MR. COROZZO:  Not, not in this proceeding, but you

12  might have seen it.

13        THE COURT:  Was it attached?

14        MR. COROZZO:  Yeah, in might Memo.  I'm not, not --

15        THE COURT:  Yeah.  I've read it.

16        MR. COROZZO:  Okay.  And are you familiar with --

17        THE COURT:  Is it matter if he's familiar or If I'm

18  familiar?

19        MR. COROZZO:  It's more -- matters if you're

20  familiar.

21        THE COURT:  Yeah.  Next question.

22        MR. COROZZO:  Okay.

23        THE COURT:  I mean, if you want to make an argument

24  from it, you can, but I don't need evidentiary record of

25  something I've already read in the memo -- in a memorandum.

1    BY MR. COROZZO:

2    Q   Okay.  And continuing into April of 2019, on April 2nd,

3    2019, this is number one.  Ms. DiPietro writes to Mr.

4    Laforte, that HMC, her company is stronger than we have ever

5    been, and it's 90% because of Mr. Laforte and Par funding.

6    Are you familiar with that email?  I could just display it.

7    And this is defendant's H.  This is in April of 2019.

8    A   I see it.

9    Q   And then in May of 2019, we'll go to Exhibit I.  There's

10   more funding extended per Ms. DiPietro request on 5/7/2019.

11   Ms. DiPietro, after being told by Wendy Ferman from Par

12   funding that they should be able to help her in reference to

13   $200,000 continued financing.  Ms. DiPietro writes back on

14   May 7th, 2019.  Yay.  Call you in a few minutes with Melissa,

15   our office coordinator, correct?

16   A   Yes.

17   Q   So during this timeframe, May 7th, Ms. DiPietro is

18   actively negotiating with Par and receiving additional funds?

19   A   That's correct.

20   Q   And yet, sometime later, two weeks later, on May 23rd,

21   2019, Ms. DiPietro writes a complaint or calls in a complaint

22   that she was threatened on May 6th, 2019, the day before she

23   requested and received additional funding.  That's accurate,

24   correct?

25              THE COURT:  Is that the blow up the house?  I

1  haven't seen that one.  This is the blow up the house.

2        MR. COROZZO:

3        Yes.

4        THE WITNESS:  Alleged that happened on May 6th, the

5  day before new funding is requested, received, and accepted

6  with a, yay.

7        THE COURT:  I'm going to blow, I'm going to blow up

8  your house the next day to have a discussion.

9        MR. COROZZO:  Next day.  And he says, yeah.

10        THE WITNESS:  Was that the day of --

11        THE COURT:  I thought it was May 1st, but -- Go

12  ahead.

13        MR. COROZZO:  Your Honor, no, we have the report

14  where it says date of occurrence 5/6/9.

15        THE WITNESS:  Okay.  This is -- alright.  This was

16  5/23 is the report date.

17        THE COURT:  Right.  And the date of occurrence.

18        MR. COROZZO:  Is 5/6/9.

19        THE COURT:  Okay.  So nobody corrected the PSR on

20  that.  PSR says May 1.

21        MR. COROZZO:  We objected to the, the inclusion of

22  that completely in the PSR.

23        THE COURT:  Oh, I see.  Well, no, you objected to

24  the inclusion, but you didn't object to the correction, so

25  I'm just going to correct.  It's May 6th.

1        MR. COROZZO:  May 6th, Your Honor.

2        THE COURT:  Okay.

3   BY MR. COROZZO:

4   Q   So on May 6th, this alleged threat occurs on May 7th.

5   There's a request for more funds on May 8th.  Ms. DiPietro

6   specifically writes to Mr. Laforte, mapping out 16 weeks to

7   see where the income amount is and what she will be paying

8   for the next 16 weeks.  And that's defendant's J.

9   A   Okay.

10  Q   And Ms. DiPietro does not keep her promise.  And if you

11  know, on May 14th, 2019, there's a judgment filed against her

12  property for $12 million.

13  A   Was it her property or was it a COJ?

14  Q   I'm sorry.  COJ.

15  A   A COJ was filed on HMC for $12 million.

16  Q   For $12 million because Ms. DiPietro, after receiving the

17  additional funds, did not pay.

18  A   That sounds right.

19  Q   And then the next month in June of 2019, there is an

20  action filed in the US courts for the Eastern District of

21  Pennsylvania where CBSG sues HMC Incorporated and carried

22  DiPietro for the monies owed.  You're aware of that action,

23  correct?

24  A   Yes.

25  Q   Drawing your attention now to Joseph Canty, JRC painting?

1    A    Yes, sir.

2    Q    You spoke to him and he alleged a threat over the phone

3    from Mr. Laforte, correct?

4    A    Yes.

5    Q    And at the height of his debt to CBSG, Mr. Canty owed

6    CBSG between two and $3 million, correct?

7    A    Something like that?  Yep.

8    Q    And did Mr. Canty ever say when the threat happened over

9    the phone?

10   A    It was after he had missed a payment, but I don't, I

11   don't recall if he was able to narrow it down.

12   Q    And was the phone call ever corroborated in any way

13   through phone records or, or any other manner?

14   A    I know there was call and text records, call and text

15   records between Mr. Canty and Mr. Laforte, but it wasn't like

16   he said, you know, on January 15th, and that's my

17   anniversary, so I know it was that date that I got a call

18   from Joe LaForte.  So I wasn't -- there wasn't really

19   anything I could do to pinpoint that specific call.

20   Q    And the text messages that you reviewed between Mr. Canty

21   and Mr. Laforte were, were primarily friendly.  In fact, they

22   discussed getting together socially.

23   A    They were.

24   Q    Mr. Canty wanted to take Mr. Laforte to a Notre Dame

25   football game, correct?

1  A   Something like that.  Yep.

2  Q   And there's no threats in the text in any matter?

3  A   No.

4         MR. COROZZO:  Your Honor, that's my cross

5  examination on the people identified by the government.  I

6  have three other issues, and I'm asking for guidance from the

7  court how to handle it.  There are three victim impacts,

8  could be included in the PSR at the court's direction, but

9  there is additional information that contradicts or adds to

10 what's there.  I could just proffer that evidence or I could

11 ask --

12        THE COURT:  Well, it's your turn.

13        MR. COROZZO:  Okay.

14        THE COURT:  Or you can, you can ask him now because

15 he's not going to come back up.

16        MR. COROZZO:  Well, I'm saying I, I can do it now,

17 or I can --

18        THE COURT:  If you -- there's something you want to

19 ask him, go ahead.

20 BY MR. COROZZO:

21 Q   Okay.  Are you aware of the victim impact statements that

22 were submitted to this case?

23 A   Um --

24        THE COURT:  Are these the victims by the merchants

25 or by the investors?

1          MR. COROZZO:  Well, there are only a handful of
2    victim impact statements.  They're about 14.
3          WITNESS 2:  I think.  So if I -- you mentioned some
4    late additions, so, if you tell me their names, maybe.
5    BY MR. COROZZO:
6    Q   It's -- I, I have three instances to go over.
7    A   Okay.
8    Q   The first one is Aaron Boshart.  Are you, are you
9    familiar with Mr. Boshart?  In fact, you interviewed him?
10   Oh, no.  Yes.  You did interview him on July 19th, 2022.  It
11   was by phone where he was located at Big Timber, Montana.
12   A   Oh, yes.  Right.  Okay.
13   Q   Mr. Boshart?
14   A   Yes.
15   Q   And in Mr. Boshart --
16          THE COURT:  Is that an, is that an investor victim,
17   sir?
18          THE WITNESS:  He was a Merchant.
19          MR. COROZZO:  He's a merchant.
20          THE COURT:  Oh, okay.  Alright.
21          MR. COROZZO:  And this merchant references --
22          MR. NEWCOMER:  Your Honor, if this is just attacking
23   the credibility of these victim impact statements, like if he
24   -- if Mr. Corozzo gave offer of proof we 're not be able to
25   agree to it, I, you know, just to cut --

1          MR. COROZZO:  I, I can proof, I can proof a little -

2   -

3          MR. NEWCOMER:  Even before [indiscernible] came in

4   in the last week, we gave him to the court.  I don't think

5   Agent Murray has seen them.

6          THE COURT:  Where are they?

7          MR. NEWCOMER:  These are --

8          THE COURT:  Oh, paragraph 184?  The PSR?  The guy

9   from Montana Grocery Store in Montana?

10         MR. COROZZO:  Yes.

11         THE COURT:  Okay.  So what do you want this

12  gentleman -- what, what -- he can't, he can't.  What do you

13  want him to do about it?

14         MR. COROZZO:  Well, in his report --

15         THE COURT:  Whose report?

16         MR. COROZZO:  In Mr. Murray's -- Agent Murray's

17  report on -- from July 19th, 2022.

18         THE COURT:  Okay.

19  BY MR. COROZZO:

20  Q   Mr. Bosshart told you on that day that someone visited

21  his home and discussed in person that Bosshart 's daughter

22  was going to college on a track scholarship and how she was a

23  really good athlete and that Mr. Bosshart should keep an eye

24  on her.  I'll draw your attention to page two of the 302

25  third paragraph.

1    A    Yes sir. I see that.

2    Q    So he specifically told you during your telephonic

3    interview that this threat was made in person, correct?

4    A    Yes.

5    Q    And are you aware that in his victim impact statement, he

6    states that this threat was made over the telephone? Are you

7    familiar with the victim impact statement?

8    A    I -- I'm -- if I could just read or see the victim.

9          THE COURT: Sorry, sir. We're not doing it that

10   way.

11          WITNESS 2: Okay.

12          THE COURT: It's not, it's not depositions.

13          WITNESS 2: Okay.

14          THE COURT: Did you, did you, did you ever see the

15   victim impact statement before today?

16          WITNESS 2: I, I don't think I did.

17          THE COURT: Alright. Next question.

18          MR. COROZZO: Okay.

19          THE COURT: You can't [indiscernible].

20          MR. COROZZO: No, I, I could just establish what was

21   told to him, Your Honor.

22          THE COURT: That's right.

23          MR. COROZZO: And then I could use it the rest of

24   the --

25          THE COURT: For argument. Yes.

1  BY MR. COROZZO:

2  Q   I got you.  And did you understand that Mr. Boshart was

3  telling you that Gino -- Gioe was, was the person who went to

4  his house when you interviewed him?

5  A   So, I, I, I -- if I recall, he wasn't a hundred percent

6  clear on who he was.  And, it didn't sound like he'd be able

7  to identify him.  So it sounded like Gino, but we also know

8  Jimmy would travel and others would travel.  It sounded like

9  it clearly, it was a Par funding representative, but it

10 didn't sound like it was enough certainty that it was Gino

11 that we certainly had a, you know, seemed like, seemed like

12 it was probably him.

13 Q   And he said that the male person that visited him, used,

14 used by the name Jean, correct?

15 A   Yeah.

16 Q   Which leads you to believe maybe it was Gino?

17 A   That's what I thought.  Right.

18 Q   But also he suggests that this visit occurred in

19 September, 2019.

20 A   Correct.

21 Q   Which was a time period where Mr. Gioe was estranged from

22 Par funding and the -- and Mr. Laforte.

23 A   Right.

24 Q   So that's where the confusion comes from.

25 A   It sounded like the time was off, or maybe someone was

1   using the name Gino, even though Gino is not in the picture

2   in case.  So because of that.  Right.  It wasn't enough

3   certainty to figure out who did it.

4   Q  Of what Mr. Boshart was talking about.  And, and it was

5   unclear to you what he was saying exactly.

6   A  Well, it was clear, it was clear that someone from Par

7   funding showed up to collect.  It just -- we weren't able to

8   establish, I guess you could say probable cause that it was

9   Gino that did it or an -- or, or who it was.  Right.  So it

10  was kind of an, an unsub, if you will.

11  Q  And just changing to my last subject, you're familiar

12  with the Mr.  Michael Fody?

13  A  Oh yeah.

14  Q  Okay.  And he agreed to consensually record certain

15  targets in this investigation?

16  A  He did.

17        MR. COROZZO:  I have no further questions.  I'll

18  pause for the rest, Your Honor.

19        THE COURT:  Thank you.  Mr. Newcomer, do you have

20  any redirect for the agent?

21        MR. NEWCOMER:  Just very briefly.  Well, briefly,

22  Your Honor,

23        WITNESS 2:  Just kind of hoping for very briefly.

24        THE COURT:  Just a couple of three --

25        MR. NEWCOMER:  Yeah.

1          THE COURT:  I'll get it back to you.

2          MR. NEWCOMER:  I'm going to mark this as Exhibit

3     M14.  Unfortunately, I don't have a copy for the court.  We

4     have one we can put up on the screen.

5          THE COURT:  You already had 14.  Is this 15?

6          MR. NEWCOMER:  15.  Apologies, Your Honor.  Mr.

7     Corozzo accidentally took my Exhibits.

8          THE COURT:  Government M15.

9                    REDIRECT EXAMINATION

10    BY MR. NEWCOMER:

11    Q   So M15.  Mr. Gioe, do you mind pulling this up?  Agent

12    Murray, do you recognize this document?

13    A   I do.

14    Q   What is it?

15    A   It's a FD 302 of the interview with Mr. Perrillo.

16    Q   This is the one that Mr. Corozzo was asking you about

17    previously?

18    A   Yes.

19    Q   He was asking you about what it is that Mr. Perrillo said

20    specifically about the threats he received from Joseph

21    LarFort.

22    A   Yes.

23    Q   And if you look at the front page, who, who authored this

24    report?

25    A   My partner Rob -- Robert Lithgow.

1  Q   Mr.  Lithgow is sitting right here in the, in the front

2  row.

3  A   He is.

4  Q   You're familiar with the report?

5  A   Yes.

6  Q   Are you present for the interview?

7  A   Yes.

8  Q   And can you just read and we'll, on page four, first of,

9  let me move into -- move, move to mid Exhibit M15, Your

10  Honor.

11        THE COURT:  Yes.  Any objection at 302?  Counsel?

12        MR. COROZZO:  No objection, Your Honor.

13        THE COURT:  Thank you.  Without objection, M15 is

14  admitted.

15        (Plaintiff Exhibit M15 admitted in evidence)

16  BY MR. NEWCOMER:

17  Q  Can you read and then just stop?  Before you get to the --

18  I'll tell you when to stop.  Can you read the paragraph

19  please?

20  A  Where it says, when Mr. Perrillo?

21  Q  Yes.

22  A  When Mr. Perrillo was late on payments or payments were

23  returned, LaForte called Perrillo and threatened him on the

24  phone.  LaForte never told Perrillo that he would kill

25  Perrillo, but he threatened to quote, beat him to a pulp and

1   beat the out of Perrillo.  Perrillo -- Excuse me.  LaFortE

2   warned Perrillo that if he does not pay LaForte would come

3   down to Miami.  LaForte stated, wait till I see you in Miami.

4   I'm going to crack your head.  LaForte said, "I've dealt with

5   people bigger than you.  I'm coming down to see you and see

6   you and will show up at your house."  Perrillo remembers the

7   insults more than the threats.  LaForte called Perrillo a

8   piece of and used, you know, stop other.

9   Q   And you can take it down Mr.  Gill.  Does that refresh

10   your memory of what Mr.  Priya said about the threats made

11   directly by Mr. Laforte?

12   A   It does.

13   Q   Now, would you agree with Mr. Corozzo that many of the

14   MCA victims here, including the victims we you testified to

15   about today were financially strapped

16   A   Them -- all were financially strapped.

17   Q   And is it fair to say many of MCA CSOs and Par funding

18   were financially strapped

19   A   With few exceptions we're financially stressed.

20   Q   Fair to say that the victims you talked about today, many

21   of them had spiraling debt?

22   A   Yes.

23   Q   Also, fair to say that many of Par funding's MCA,

24   businesses they invested in had spiraling debt.

25   A   Yes.

1    Q   Is it also true, as Mr. Corozzo pointed out, many of the

2    victims that we talked about today, extortion victims had

3    multiple existing loans, pre-existing loans, before they even

4    got to Par funding?

5    A   Yes.

6    Q   And is it fair to say about many of Par funding's MCA

7    customers, they had multiple loans prior coming into Par

8    funding?

9    A   Yes.

10   Q   Is it fair to say that some of the victims today may have

11   lied to Mr. Laforte about making promise -- and made false

12   promises about repayment that they couldn't keep because the

13   businesses were failing?

14   A   Yes.

15   Q   Fair to say?

16   A   Yes.

17   Q   Is that also a fair characterization of many of power

18   funding's MCA customers loan sharks?

19   A   Yes.

20   Q   Do they typically prey on financially vulnerable

21   businesses?

22   A   Of course.

23   Q   And were many of the victims here financially vulnerable?

24   A   Yes.

25   Q   Agent Murray, Mr. Corozzo asked you about times when

1  people have lied to the FBI?

2  A   Yes.

3  Q   And, and to you specifically?

4  A   Yes.

5  Q   You've had a case, I'm sure where people have lied to

6  you?

7  A   Yes.

8  Q   Including in this investigation.  People have lied to

9  you.

10  A   I'm sure somebody has.

11  Q   But we've charged people with lying to you.

12  A   Oh yeah, sure.

13  Q   And is it also true that in the course of this

14  investigation of investigators, people lie under oath?

15  A   Yes.

16  Q   In fact, Mr. Laforte plead guilty to lying under oath in

17  the edge HMC deposition involving Ms. DiPietro.

18  A   He did.

19  Q   So while Ms. DiPietro may have had some lies, Mr. Laforte

20  is on record with some admitted lies as well.

21  A   Yes.

22  Q   Ever had a case where nearly a dozen individuals, maybe

23  even more, came forward and made allegations of being

24  extorted.  That turned out not to be true.

25  A   No.

1  Q   Any of a case where the defendant's brother admits to
2  working with him to extort victims, it turns out that the
3  other brother didn't do it.  The, the first brother lied
4  under oath and pled guilty to a crime that didn't happen.
5  A   No.
6  Q   All those factors?  And then also a person working for
7  the -- a defendant came forward and said, Hey, I work for
8  this guy.  I extorted on his behalf.  We both threatened
9  people.  That guy pled guilty.  That guy was also lying.  In
10  addition to the defendant's brother lying, in addition to
11  multiple victims coming forward and saying they were
12  threatened.  Ever have a case anywhere near that?
13  A   No.  I've never seen a case like this either, sir.
14  Q   Fair enough.
15          THE COURT:  Sir.  Was it pattern in practice in
16  your, when you saw that there was this AR letter to sort of
17  economic extortion embarrassing you in the community sending
18  letters to your vendors and your AR, and your AR?
19          WITNESS 2:  Oh, yes.  It, it was out of control.  It
20  was, it was out of control.
21          THE COURT:  You saw quite a few instances of that?
22          WITNESS 2:  I mean --
23          THE COURT:  For people who hadn't paid Par funding.
24          WITNESS 2:  They, they sent a letter by the, the
25  thousands.  I think they had to get like an extra server to

1    accommodate the email version of it, and they would just --

2    we did surveillance.  They would send out stacks of letters.

3        THE COURT:  That was one indication where I saw Mr.

4    Laforte directed an AR letter.  Right?  Did you see any other

5    incident where Mr. Laforte directed the AR letter?

6        WITNESS 2:  Yes, they would, they would call them

7    the bluffs, the fake ones that were just going out to not

8    really AR parties.  And they would -- you'd see emails from

9    LaForte saying, hey, this guy stopped payment, send the

10   bluffs.  And then the collections team would then, you know,

11   scour the internet, Facebook, what have you, and then contact

12   those third parties saying this merchant defaulted on a loan.

13       THE COURT:  How are they bluffs?  They're not bluffs

14   then.  It's not actually what you're saying it, right?

15       WITNESS 2:  Well, no, the, the bluff would be, the

16   recipient was not an actual account receivable.  The

17   recipient could be like the merchant's mother or priest or,

18   you know, school principal, what have you.  And so those

19   would be the bluffs.  And then they'd actually send real AR

20   letters to actual accounts receivables.  And sometimes they'd

21   do both.  And then sometimes they would pretend that they

22   were sending AR letters.  So the merchant thought they were

23   being contacted, that their, that their accounts were

24   receivable were being contacted, even though they weren't.

25   That was just to kind of spook the merchant and make them

1  think that these AR were being sent out.  So.

2          THE COURT:  And other, again, the question was,

3  other than the instances you saw where I saw you showed.

4          WITNESS 2:  Yes.

5          THE COURT:  Mr. Corozzo educated me on.

6          WITNESS 2:  Yeah.

7          THE COURT:  That there was, that there was AR.

8  Send, send, send an AR letter, right?

9          WITNESS 2:  Mm-hm.

10          THE COURT:  Were there other instances like that

11  where Mr. Laforte was direct?  You said collections.

12          WITNESS 2:  Dozens -- right.  Dozens of examples.

13  Text or emails with Joseph LaForte directing his underlings

14  to send out AR letters.

15          THE COURT:  Whether they're bluff or --

16          WITNESS 2:  Whether they're going to actual --

17  whether they're pretend notices to merchants, whether they're

18  going to actual accounts receivables, or whether they're

19  going to these unrelated third parties.  Just for the point

20  of embarrassing, and he was involved in all every facet of

21  those.

22          THE COURT:  Did any of the merchants you interviewed

23  ever concern themselves with that, with that?  Did they ever

24  say, look, I got -- I saw these letters affected my, my

25  ability?

1    WITNESS 2:  That was probably the, that was probably

2  almost the most one of the -- one of the most egregious

3  things that these merchants had to experience because they

4  would, you know, these are small -- a lot of times they're

5  small businesses, they're in their community, and all of a

6  sudden everybody, their neighbor or their landlord or their,

7  their neighboring businesses now knows that they're quote

8  unquote, you know, a deadbeat, so to speak.

9    THE COURT:  And are you saying that's what you saw?

10  Did seem to tell somebody tell you that was happening?  Did

11  merchants tell you that?

12    WITNESS 2:  I think almost every merchant we

13  interviewed experienced that conduct in some way.

14    THE COURT:  Okay.  Thank you.  Counsel, you may

15  continue.

16    MR. NEWCOMER:  No further questions, Your Honor.

17    THE COURT:  Mr. Corozzo you -- and you can certainly

18  follow with my question Mr. Corozzo as well.

19    MR. COROZZO:  Sure.  Of course.

20    THE COURT:  That scope, sir.  Limited the scope of

21  MR. Newcomer and my questions.

22                    RECROSS EXAMINATION

23  BY MR. COROZZO:

24  Q   When Jose Parello was asking for advances from Par

25  funding, he wasn't honestly saying he was in financial

1  trouble.  Was he?

2  A   Sorry.  When -- did he tell -- when he was asking for

3  funding from Par funding, did he say that he was in financial

4  -- Oh, no, I don't think so.  No.  He -- it, it appears that

5  what we reviewed today, that he represented that he was --

6  had business coming in or something like that.

7  Q   And that he owned millions upon millions of dollars in

8  real estate that he could borrow off of from the bank.

9  A   I -- something along those lines.  Yeah.  Right.

10  Q   So it wasn't a distressed company that Mr. Laforte was

11  taking advantage of?

12  A   He may have actually -- he certainly looks at the end of

13  the day he was distressed, but I don't know what he

14  represented to Mr. Laforte.

15  Q   Well, you know, from the text messages that he

16  represented -- he, he possessed millions of dollars worth of

17  real estate and he was trying to get financing from the bank

18  on that property to pay back the advances.

19  A   Right.  I don't know what his initial application said.

20  Certainly in those conversations, he's representing that he's

21  going to be doing better, so to speak.

22  Q   And, and Tina Allegretta, Allegretta Electrical, as we

23  seen, was -- had income coming in, in September of 2017 of

24  $700,000 a month.  We saw that today,

25  A   Yes.

1  Q   That was not a company that was in distress being taken
2  advantage of.
3  A   I don't know.  As you said before, they had multiple
4  other MCA loans at the time they borrowed from Par funding.
5  Q   Right.
6  A   So it's kinda like having six open credit card accounts
7  and asking for a new credit card.  So you tell me whether
8  that's a successful company at the time.
9  Q   And what of the companies that you heard about today was
10 rated images in financial distress and vulnerable when they
11 took out millions of dollars in funding from, from Par?
12 A   Well, I don't know.  I'm assuming that they -- I, I, I'm
13 sure the initial funding wasn't for two, $3 million.  I'm
14 sure it was in the smaller amounts in the hundreds of
15 thousands.  And then it ballooned over time.  So at the time
16 that they initially borrowed that money, I don't know what
17 their financial health was.
18 Q   So, so you don't know if any of these people -- people's
19 companies, were particularly vulnerable and distressed at the
20 time of receiving the advances?
21        MR. NEWCOMER:  Objection.  It wasn't his testimony.
22        THE COURT:  I'm sorry.  On what -- are you re-
23 characterized -- mischaracterizing you say?  What was your
24 objection?
25        MR. NEWCOMER:  He's suggesting, Your Honor, there

1 | wasn't his testimony.

2 | THE COURT: Well, he's, he's certainly able to

3 | answer that. Overruled.

4 | WITNESS 2: I don't know the financial health of all

5 | these companies. I do know a number of them. I want to say

6 | many had pre-existing merchant cash advance or alternative

7 | lending loans outstanding at the time that they borrowed from

8 | Par funding. And so that to me, would not indicate a

9 | healthy, a financially healthy company. But I can say to you

10 | the, you know, the fincial-- the, the specific financial

11 | health of an individual company at the time without reviewing

12 | their file, you know, today, which would be a whole other

13 | project.

14 | MR. COROZZO: No further questions, Your Honor.

15 | THE COURT: Thank you. Agent Murray, you're welcome

16 | to step down from the stand. Thank you for your testimony

17 | today.

18 | WITNESS 2: Thank you, Your Honor.

19 | THE COURT: United States, do you wish to produce

20 | further evidence or argument, or how do you, how do you wish

21 | to proceed now, sir?

22 | MR. NEWCOMER: Yeah. No, no further witnesses or

23 | evidence from the government, Your Honor. I believe there's

24 | at least one --

25 | THE COURT: How are we, how are we going to address

1    -- do you have no evidence on restitution?

2         MR. NEWCOMER:  No, Your Honor.  It's, it's -- I can

3    present to you the --

4         THE COURT:  Through argument.  You'll do it?

5         MR. NEWCOMER:  What's that?  Excuse Me?

6         THE COURT:  Through argument.  You'll do it through

7    argument?

8         MR. NEWCOMER:  Yes.  Yeah, we explained the process.

9    I don't -- it's not being contested by defense counsel.

10   Either the amount or the payment structure.  We can walk you

11   through how we arrived at it.

12        THE COURT:  No, it's not being contested, but

13   there's four numbers, but Okay.  We'll go through it.  Yeah.

14        MR. COROZZO:  Well, Your Honor, we're, we're

15   accepting the numbers that were, the number that was

16   established at the hearing.  The number is a little higher

17   because not all of the credits that were --

18        THE COURT:  But that's not what --

19        MR. COROZZO:  That were given.

20        THE COURT:  That's not what's asked for.  I mean,

21   you should look at it.  That's not what's asked for.  The

22   number is much larger in the motion.  Right.  You, you

23   recognize that.  Right?  The motion, the motion asks for a

24   much larger number.

25        MR. NEWCOMER:  The motion being --

1          THE COURT:  The motion for LaForte, sir.  Oh no,

2    excuse me.  The motion for the, the restitution number in

3    your papers ask for a much larger number.

4          MR. NEWCOMER:  Larger than the number.  Correct.

5    And we can explain that numbers.  Yeah.

6          MR. COROZZO:  Not much larger.

7          MR. NEWCOMER:  No, that's not, not it.  It's --

8          THE COURT:  28 --

9          MR. NEWCOMER:  5 million.

10         THE COURT:  Right.  Yeah.

11         MR. NEWCOMER:  Yeah.  We can --

12         THE COURT:  That's a lot to make.

13         MR. NEWCOMER:  Yeah, we can explain.  We're happy to

14   address that now.

15         THE COURT:  No.  I just want to ask if you want to

16   proceed because I --

17         MR. NEWCOMER:  Yeah, we have a victim here.

18         THE COURT:  I don't, I don't want to hold up

19   witnesses.  You have more witnesses.  I don't want to hold

20   them up.

21         MR. NEWCOMER:  We don't have any more government

22   witnesses.  We have at least one victim in the audience that

23   Mr. Alfano, who would like to speak.

24         THE COURT:  Well, I'm, I'm certainly happy to hear

25   victims.  I mean, let's get, let's get the United States

1    position done and then the, then the defense has an

2    opportunity to present its time.

3              MR. NEWCOMER:  Alright.

4              THE COURT:  If you wish.  Next witness

5              MR. NEWCOMER:  Mr. Alfano.

6              THE COURT:  Are you going to question Mr. Alfano or

7    is he going to give a statement?

8              MR. NEWCOMER:  No, Your Honor.  Mr.  -- Mr. Alfano

9    is going to give a statement similar to what he did with Mr.

10   James LaForte's sentencing.

11             THE COURT:  Alright.

12             MR. NEWCOMER:  And I'm not, I'm not aware of any

13   other victims in the audience, but I'll certainly ask if

14   there's --

15             THE COURT:  Yeah.  Please inquire if there's other

16   victims.  Mr. Alfano, I have to ask you to take an oath at

17   this stage.

18             WITNESS 3 GAITAN ALFANO:  Of course, Your Honor.

19             ESR/CLERK:  Rise you right hand.  You do swear or

20    affirm that the testimony you give before this course shall

21    be the truth, the whole truth, and nothing truth tell, so

22    help you God.  You do so affirm?

23             WITNESS 3:  I do swear.  Thank you.

24             ESR/CLERK:  State your name for the record.

25             WITNESS 3:  Sure.  My name is Gaitan Alfano.  First

name is spelled G-A-E-T-A-N, and the last name is A-L-F-A-N-
O.

THE COURT:  Mr. Alfano, I want to reflect the fact
that, or report the fact that, I mean, we've heard your
statement before, and, and I, and I'm certainly not in any
way diminishing what you want to say.  What we're here for
today, though, is to focus as if you -- as best you can on
what you believe Joseph LaForte --

WITNESS 3:  Understood.

THE COURT:  As to your -- as, as to, as to how
you're victimized by it.

WITNESS 3:  Your Honor, thank you for the
opportunity to address you.  And I know when I was here on
the 13th, and, you know, I discussed James LaForte, I
discussed my background, my career as an attorney, my role
in the receivership, and I also discussed the impact of what
happened when the LaForte Brothers conspired to attack me on
February 28th.  I'm not going to go back into all of those
details.  I know that the court has it.  I know it's late in
the day.

THE COURT:  No, no.  You didn't have time.  I just
want to -- I just want to make sure that you are aware.

WITNESS 3:  No, and I aware of that, Your Honor.
But I do want to address one aspect of James LaForte
sentencing hearing that I think is relevant today.  And my

request at that hearing, the court asked James LaForte if he
would admit that he attacked me at the direction of his
brother. This defendant, Joseph LaForte and James LaForte
provided some muddled response about the attack being some
sort of emotional spur of the moment reaction to his fear of
me and the receivership. And when the court asked about his
brother Joseph's role, James LaForte downplayed it, claiming
that he supposedly was his own man. I think those were his
words. Your Honor, I, I -- as I mentioned earlier, I've
read years of emails and text messages between these
brothers, and nothing could be further from the truth. When
it came to anything involving Par funding, James LaForte
never had an independent thought in his head. He checked
with his older brother about everything, and he did whatever
his older brother wanted him to do, including attacking me.
You know, I've thought a lot about the events of February
28th. We know there was a scheduled Zoom conference with
Judge Ruiz to discuss evicting LaForte and Lisa McElhoe from
their Haverford mansion. The fact that that conference was
by Zoom that day is significant. The Par funding
receivership began in July of 2020, just months into the
Covid Pandemic. The court proceedings were held by Zoom,
and despite the pandemic, when I was appointed in July of
2020, I always went to my office to participate in every
Zoom conference. I was always on camera speaking, and it

was clear to anyone watching those proceedings that I was always at my office desk. Joseph LaForte routinely attended those conferences by Zoom. James LaForte never did. In fact, whenever we attempted to engage with him during the receivership, he would always avoid us. But Joseph LaForte knew exactly where I would be on the 28th of February. That morning, Joseph LaForte and his brother traveled from Haverford by separate cars into the city. They went together to a store where they purchased a second winter jacket for James. Why did he need a second winter jacket? That weather was well into the forties that day. Joseph went back to Haverford to attend the Zoom hearing, but James stayed in Philadelphia. Within a minute. Following the end of that hearing, this defendant called his brother. They spoke for a minute, and then James moved into an area on 19th Street just across from my office building. Your Honor, that move also was significant. My building has two entrances. One on 19th Street and one around the corner on Market Street that's closer to 18th Street, where the hotel is. If you are on the street standing in front of one entrance, you literally cannot see the other entrance. I could have left through either door that day, but how did James LaForte know to be waiting for me on 19th Street and not on Market Street? And the answer is because the LaForte have been stalking me for a while. They had to know that I

typically entered and left my office building on the 19th
Street side because it was closer to my nearby home. That's
where James LaForte was waiting to attack me. And what did
he do after he attacked me? He ran up the 20th in market
where he ditched the second winter coat in a trash
receptacle, undoubtedly, to change his appearance. It's a
common practice which street crimes, as Your Honor may know.
He also avoided the spectacle of running around town with my
blood on his jacket. The same jacket that he and this
defendant. This unquestionably was a deliberate, calculated
and premeditated attack by both LaForte Brothers. But
what's particularly appalling about this defendant's role in
attacking me is that he was on pretrial, supervised release
before Judge Sanchez at the time. The first rule of
supervised release is quote "that the defendant not commit
another federal state or local crime." Joseph LaForte
ignored that rule. So please remember this conduct if
LaForte's attorney tells you later today that you can
somehow believe him or trust him, because you certainly
cannot. Your Honor, while the immediate triggering event
for the LaForte Brothers attack was my request to evict this
defendant McElhoe from their Haverford estate, I believe
that his motive for attacking me developed long before the
eviction. I played a crucial role in dismantling the lies
that LaForte and others used to perpetuate the Par funding

1  fraud.  With the receiver and our team, I helped to expose
2  the facade of legitimacy that LaForte had worked for years
3  to build.  I was the local public face of the receivership,
4  and I believe that Joseph LaForte targeted me for my role in
5  helping to collapse his financial House of Cards.  For
6  instance, as part of our receivership responsibilities, we
7  were asked to get to the bottom of Par funding's business
8  and to present an accurate picture of its finances to the
9  receivership court.  What we found was astounding.  Although
10  LaForte and his henchman made a lot of misrepresentations
11  about Par funding, they had created two big lies that I
12  worked very hard to expose before the receivership court.
13  First LaForte was telling investors that PAR funding was
14  profitable.  It was in fact a money-losing Ponzi scheme.
15  LaForte would book a merchant cash advance deal as a paper
16  profit when the merchant cash advance deal was signed with
17  no accounting for the ultimate collectability of the
18  transaction.  The only time that Par funding was fully
19  audited by an outside firm, the auditors concluded that Par
20  funding was losing money.  That audit never saw the light of
21  day.  And it's not surprising that Par funding was losing
22  money.  LaForte advanced tens of millions of dollars to a
23  group of merchants that included a convicted bank fraudster,
24  a convicted securities fraudster, a convicted healthcare
25  fraudster, and an individual who's been charged with tax

fraud.  When we took over in 2020, this group made up well over 50% of Par funding's accounts receivable.

THE COURT:  You mean of those five people, four of them had -- three of them had been convicted and one was under investigation for it?

WITNESS 3:  Three convicted, one recently indicted for tax fraud of this group.

THE COURT:  Oh, that, that I remember correctly, the facts, or there's only about five or six left from the hearing.  How many people were made up that 50% at that time?  At the time you get about --

WITNESS 3:  There were about a 10 or 12, 12 individuals in that, in that group, Your Honor.

THE COURT:  No, no, no.  At the time, the different types of accounts.

WITNESS 3:  It was called the exception portfolio. I think that's what Mr. Laforte would've referred to.

THE COURT:  And how many were there?  There was only a handful, right?

WITNESS 3:  Yeah, 10 or 11, maybe 12.

THE COURT:  Okay.  And are you saying that 10 or 11 or 12 four of them had or about to have federal convictions?

WITNESS 3:  Three were, three were convicted at the time.

THE COURT:  Okay.  And one was under, under --

1    WITNESS 3:  And, and one is, is under indictment now

2    in, in this, in this court.

3         THE COURT:  Out of the 12.

4         WITNESS 3:  Yes, sir.

5         THE COURT:  Okay.  I didn't know that.  Go ahead,

6         WITNESS 3:  Your Honor.  You know, I've, I've spoken

7    to many of these scammers, unfortunately, and their

8    attorneys, and some have claimed that they actually kicked

9    back cash to LaForte as part of their transaction.  Some

10   have filed for bankruptcy going out of business or gone to

11   jail.  And that's where LaForte sent the investors hard

12   earned cash while skimming tens of millions of dollars for

13   himself to acquire three multimillion dollar homes, 22

14   investment properties, a jet, a yacht, luxury cars, jewelry

15   and artwork.  Your Honor, we also learned that the actual

16   default rate on the merchant cash advance accounts was

17   astronomical.  This default rate was the second big lie that

18   we exposed LaForte, Cole Barleta and others misrepresented

19   to investors that it was 1%.  it was far from it.  Because

20   of the litigation stay in the receivership order.  I

21   personally contacted the Court of Common Plea in

22   Philadelphia to see how many cases that court had docketed

23   that involved Par funding.  I learned that LaForte had filed

24   1800 confessions of judgment against defaulting merchants in

25   that court.  The vast majority of those confessions of

1  judgment were filed in 2018 and 2019.  Now, there were

2  approximately 9,000 merchant transactions in those two years

3  with almost 1800.  It was an astonishing level of defaults,

4  and it has grown even larger over time.

5           THE COURT:  These documents, they all had

6  Pennsylvania venue, even though --

7           WITNESS 3:  They did --

8           THE COURT:  Colorado or something?

9           WITNESS 3:  Pennsylvania venue and Pennsylvania

10  Choice of Law.

11          THE COURT:  Okay.  Who was the lawyer for that?

12          WITNESS 3:  They were generally done through in-

13  house counsel.

14          THE COURT:  And who was that funding?  That was that

15  name I saw earlier.  Okay.

16          WITNESS 3:  Walls or something.

17          THE COURT:  Walls.  Okay.  Go ahead.

18          WITNESS 3:  I, I just don't remember.

19          THE COURT:  Alright, go ahead.  It wasn't, it

20  wasn't, it wasn't.  Okay.  It wasn't, it wasn't the law firm

21  that has already paid into your receivership.  Wasn't there

22  just a law firm that had shipped in a significant hundred

23  tens of millions of dollars into the receivership, Ecker?

24          WITNESS 3:  You want me to get to that?  It had

25  nothing to do with Ecker.

1          THE COURT:  Okay.  That wasn't the same thing.

2     Okay.  I, I had some -- I thought that was the same

3     connection.  I'm sorry.

4          WITNESS 3:  Yeah.  It has nothing -- that has

5     nothing to do with Ecker.

6          THE COURT:  Okay.  Alright.

7          WITNESS 3:  Those, those confessions of judgment

8     were usually filed by in-house counsel.  I think Ms.

9     McElhone's sister signed them in some capacity.

10          THE COURT:  Okay.  Alright.

11          WITNESS 3:  And, and that's how they were handled.

12     And I, and I forgot the name of the --

13          THE COURT:  No problem.

14          WITNESS 3:  There was a series of in-house lawyers,

15     you know, that we --

16          THE COURT:  Okay, thank you.

17          WITNESS 3:  When I -- and we basically fired all of

18     them when we took over, and I can't tell you now any of

19     their names.

20          THE COURT:  Thank you.

21          WITNESS 3:  But, Your Honor, with, with respect to

22     this default rate, we, we brought this fact to Judge Ruiz's

23     attention very early in the receivership.  We explained that

24     the default rate was a complete fabrication, that it was a

25     made up number that was used to lure investors into a false

1  sense of security. We also explained to Judge Ruiz that

2  LaForte used reload transactions. And I think Your Honor

3  has heard about reload transactions previously with

4  merchants to facilitate both of these lies, namely to

5  overstate the profits and to understate the default rate.

6  Let me just spend a minute, if I can, about discussing that,

7  Your Honor. I mean, first he would advance new money to

8  existing merchants. The merchants would then use the new

9  money to pay back the old amounts that owed, thus avoiding a

10  default. In the banking industry, they have a saying, a

11  rolling loan gathers no loss. That's what occurred here. I

12  contacted many merchants and demanded the return of the

13  investors' money. Dozens told me that they could only pay

14  back the old money if we advance them new money, which of

15  course we refuse to do. And if that wasn't bad enough,

16  LaForte would book additional fees on the reloaded or new

17  amount, creating more uncollectible paper profits to

18  continue to defraud investors. This -- his reload practice

19  was a fraud within a fraud within a Ponzi scheme. Given

20  those circumstances, we urged Judge Ruiz to allow us to

21  expand the receivership over the only real wealth that

22  LaForte ever had created. The over $100 million in assets

23  that he and McElhone had diverted to themselves at the

24  expense of the investors recovering those stolen assets was

25  crucial in trying to make the investors whole I'd led that

effort.  And as I discussed on March 13th, I was attacked
and retaliated against for my primary role in recovering
those stolen assets.  Now, I've read Joseph LaForte
sentencing memo, and he claims to be sincerely remorseful.
I've studied years of his emails and text messages in the
Par funding records.  And I could tell you there is no
sincerity in him.  He speaks of other people, especially
racial, ethnic, and religious groups in the most vile terms
imaginable.  But even if you put his words aside, please
evaluate his so-called remorse by his own actions.  He
repeatedly has attempted to block our efforts to seize and
liquidate assets and to distribute funds back to investors.
He's filed three appeals to the 11th circuit.  One is
pending.  The circuit has brushed the other two.  The first
two aside.  Even as recently as last month, LaForte and
McElhone filed a frivolous objection to the receiver's
malpractice settlement with Ecker.  It's a matter that Your
Honor was referring to earlier.  That settlement will
provide as being too low.  No.  Because he, he, he took the
ridiculous position that somehow his claims against Ecker
were barred under Harrington versus Purdue Pharma.

        THE COURT:  Whose claims is this?  Mr. Laforte's
claims?

        WITNESS 3:  LaForte, LaForte.  Ecker never
represented Par funding, but LaForte and McElhone claimed

1    that they have claims against Ecker.  Now, they, they cited

2    Harrington versus Purdue Pharma, which I'm sure Your Honor

3    is familiar with, right?  Now -- but if I can just to play

4    it out, because Your Honor asked, now, you know, Harrington

5    essentially prohibits, you know, a bar order generally.  But

6    this settlement has an optout provision.  An opt-out bar.

7    And Judge Ruiz's response was, then just opt out.  Why are

8    you filing an objection?  And Your Honor, again --

9              THE COURT:  Was that going to stay?  Does that

10   result in a stay automatically there?

11             WITNESS 3:  Excuse me, Your Honor.

12             THE COURT:  That result in a stay of anything?

13             WITNESS 3:  No, it will not because it, it, it could

14   have, but Ecker has taken the position that they're going to

15   proceed with it, despite this frivolous objection.

16             THE COURT:  Have, have the objectors moved to a

17   stay?

18             WITNESS 3:  They have not.

19             THE COURT:  So the objection is filed, but it hasn't

20   slowed down the process.

21             WITNESS 3:  It, it hasn't, but it, but in terms of -

22   -

23             THE COURT:  It distracts, but it doesn't slow down.

24             WITNESS 3:  It, it's distracting.  Ecker could have

25   taken the position that if there was any objections, that

1    they wouldn't Proceed with the settle --

2              THE COURT:  Until, until such time as it's resolved.

3              WITNESS 3:  That's right.  Yeah.  And again, that's

4    a settlement that'll provide another $32 million for

5    investors.  And yet LaForte for reasons, I guess.  No, no

6    way to him and his attorneys objected to it.  Makes no

7    sense.  Your Honor, instead of acknowledging his wrongdoing,

8    LaForte blames others.  I mean, I've read the transcript of

9    the loss hearing that this court held in January, and Your

10   Honor is corresponding opinion.  Incredibly LaForte asked

11   you to accept the ridiculous notion that collections

12   would've been better and the loss to investors lower, had

13   the receiver use LaForte's collection tactics, which I think

14   Your Honor noted included extortion and threats of physical

15   violence.  Does that sound like a remorseful person to you?

16   It doesn't to me.  And finally, I read in his sentencing

17   memo that LaForte, while superficially acknowledging his

18   responsibility, went on to say that quote, he did not intend

19   or expect to cause a loss to the investors.  Amazingly, he

20   blamed any loss on the receiver.  Your Honor, Judge Ruiz

21   likely has spent thousands of hours reviewing the Par

22   funding case and hundreds of pages writing about it.  That

23   court has thoroughly analyzed Par funding.  Last year, Judge

24   Ruiz found that after careful review, the record evidence

25   overwhelmingly supports the conclusion that Par funding

1    operated as a Ponzi scheme.  Close quote.  So I understand

2    LaForte is not going to speak to you today, but if he speaks

3    through counsel, then please test his remorse and ask him if

4    he will acknowledge his Ponzi scheme fraud or if he's still

5    going to try to deflect responsibility.  Simple truth is

6    that LaForte operated a fraud.  He preyed upon senior

7    citizens.  He duped a plumber from the northeast, a baggage

8    handler from West Philadelphia, a carpet installer from

9    Delaware County out of their respective life savings amongst

10   so many other victims.  And the equally simple truth is that

11   I was attacked for trying to help those victims.   In

12   closing, Your Honor, I've disavowed, restitution or any

13   personal civil remedy, for the reasons that I discussed on

14   March 13th, my only justices before this court.  You know,

15   Joseph LaForte attempted to send a message by directing his

16   brother to attack me.  I again ask you to send the same

17   message back to him that I asked you to send to his brother.

18   Namely that physical violence, threats, intimidation, and

19   retaliation have no place in our system of justice.  And the

20   form of that message respectfully should be the maximum

21   sentence allowable under this plea agreement.  Although I

22   believe that he should be sentenced to a substantially

23   longer term followed by supervised release.  Thank you, Your

24   Honor.

25            THE COURT:  Mr. Alfano, let me ask you this.  I, I

1   asked the same question with the brother sentence and, and,

2   and you -- everybody keeps saying to discourage further

3   actions, but it seems to me from a chronology perspective

4   that everything was -- that most things were done by the

5   time of the attack on you.  That the house was already

6   moving away from the LaFortes that you were already -- I

7   mean, is it more retaliation or discouragement?  Everybody

8   keeps saying to try to stop us from going.  But aren't you

9   largely done by February 28th?

10          WITNESS 3:  We are.  So the receivership is expanded

11  over --

12          THE COURT:  Now, it is.  I'm talking then.

13          WITNESS 3:  No, back, the receiverships expanded in

14  2020.  Okay.  And we had control of many of the companies,

15  most of the properties we had achieved the ability to begin

16  to sell those properties, to start to liquidate some of the

17  assets post-judgment.  This is, this all occurs before I'm

18  attacked.

19          THE COURT:  Yeah.

20          WITNESS 3:  And what we were trying to accomplish at

21  that point was to evict them from Haverford and to be in a

22  position to market and sell that property.

23          THE COURT:  But it wasn't the hearing -- I, I, I may

24  have asked this last time.  That's why I'm -- and I may have

25  be confused last time.  Wasn't the hearing that it was

1  already done.  Essentially, you were having a hearing.

2  Judge Ruiz had already approved the sale of the Haverford

3  House or not.  How do you, how do you approve the sale of

4  the Haverford house?

5          WITNESS 3:  He approved the --

6          THE COURT:  You were evicting him out --

7          WITNESS 3:  He approved the sale of, of the, the,

8  the real estate, the assets.

9          THE COURT:  Yeah.  Right.  Had that, had that

10  already happened, though?

11          WITNESS 3:  I'm, I'm, I'm pretty confident it did,

12  Your Honor.

13          THE COURT:  Okay.  So what was left -- in all

14  fairness, what was left to discourage you as opposed to

15  retaliation?  In other words, why is the deterrence to you?

16          WITNESS 3:  To me --

17          THE COURT:  Well, I know, but if you have a, if you

18  have a mindset --

19          WITNESS 3:  I think it was a deterrent to, to

20  certainly to others.  I mean, I had -- I could tell you

21  after what happened to me.  I had buyers at the Haverford

22  home that when they learned about it, said that they

23  wouldn't proceed.  They were concerned because they were

24  concerned they would be retaliated.

25          THE COURT:  So that's to send the message.  It's

1  not, it's not --

2          WITNESS 3:  Sure.

3          THE COURT:  You -- I always thought it was

4  punishment for past conduct.  You're suggesting it's

5  actually deterrence perspectively.  Don't --

6          WITNESS 3:  It's both.

7          THE COURT:  Don't deal with us.

8          WITNESS 3:  I think it's both, Your Honor.  I think

9  it's absolutely both.

10         THE COURT:  Okay.  Right.

11         WITNESS 3:  I mean -- and certainly at that juncture

12  of, of the receivership as well as the criminal case.  There

13  were other witnesses whose, they, they used my attack as a

14  way to scare off other workers.

15         THE COURT:  Well, we heard about that as well.

16  Yeah.  I'm, I'm familiar with that.

17         WITNESS 3:  So, I actually think -- I, I think it's

18  both.  I think it's, you know, I know they've pled to

19  obstruction.  But I think that it is more appropriately

20  retaliation.  And I think it's retaliation for, for the work

21  that I had done at that point in time.

22         THE COURT:  As well as perspective deterrence.

23         WITNESS 3:  For sure.

24         THE COURT:  Okay.  Thank you, Mr. Alfano.

25         WITNESS 3:  Thank you, Your Honor.

1          THE COURT:  Thank you for your statement.  United

2     States, do you have any further victim statements?

3          MR. NEWCOMER:  No, Your Honor.

4          THE COURT:  Okay.  I also have received and reviewed

5     as, as Mr. Corozzo knows, we've been talking about them in

6     the memo, in the pre-sentence investigation memo.  So Mr.

7     Corozzo, I've received from you, sir, some very helpful

8     letters, from a great number of people.  Family members,

9     people, lifelong friends, convicted felon, his wife, the co-

10    defendant, Ms., Ms. McElhone, as well as people who wrote

11    letters to a different Judge who sent it to me.

12         MR. COROZZO:  I apologize.

13         THE COURT:  That's okay.

14         MR. COROZZO:  I apologize.

15         THE COURT:  I know what he was talking about.  So,

16    I'll leave it to you, sir.  How do you wish to proceed as

17    far as arguing 3553?

18         MR. COROZZO:  Your Honor, I, I would proceed to the

19    argument for 3553, but at first I'd like to just address

20    those issues with a number of -- there's just two of the

21    victim impact statements.

22         THE COURT:  Sure.  Let me ask you this.  Before I

23    clear the brush for a second, and, and, because maybe you can

24    address it altogether.  So don't waste time later, and maybe

25    Mr. Minni can help me.  Mr. Minni, I have four different

1  numbers for an order of restitution to folks.  Do you have an

2  in accurate number at all?  Do you have a number that you can

3  believe that, that you've run by Mr. Corozzo and Mr. Laforte

4  that I know is the actual number?  Mr. Minni, would you have

5  -- or unless MR. NEWCOMER, you can do it.  I have a number --

6          COUNSEL JOSEPH MINNI:  Mr. Newcomer can handle this

7  one, Your Honor.

8          THE COURT:  314 million 91304628.  Is that a right

9  number?

10         MR. NEWCOMER:  That's the right number, Your Honor.

11  That's not being -- and just a little background, the reason

12  that's different than the number Your Honor, found --

13         THE COURT:  Well, I know that that's a loss, but,

14  okay, go ahead.

15         MR. NEWCOMER:  Well, yeah, right, exactly, Your

16  Honor.  Because the restitution, they don't get credit till

17  the, the funds are paid.  So the receivers collected more

18  money that it's paid so far, and it tends to make more

19  payments as those payments come in, they'll get more and more

20  restitution credit.  So --

21         THE COURT:  Who, who is joint -- who is jointly

22  liable under your agreement with this debt?  Is James LaForte

23  jointly liable?

24         MR. NEWCOMER:  No.

25         THE COURT:  Is -- well he's --

1           MR. NEWCOMER:  Yeah, I can through --

2           THE COURT:  Okay.  Is Cole Barleta jointly liable?

3           MR. NEWCOMER:  Yeah.  So I can, I can go through the

4    list, Your Honor.  Joe Cole Barleta is, is joint and several

5    --

6           THE COURT:  On all of that.

7           MR. NEWCOMER:  Well, I, I think we'll address that

8    when we get to --

9           THE COURT:  Mr. Barleta.

10          MR. NEWCOMER:  Yes.

11          THE COURT:  Okay.

12          MR. NEWCOMER:  But he's -- it's clearly as for this,

13   this judgment.  Right.  It should be checked joint and

14   several, but the following defendants.

15          THE COURT:  Okay.

16          MR. NEWCOMER:  Okay.  And then we'll -- at those

17   sentencings downstream, we'll get to maybe up to a certain

18   level for each person.  Right?

19          THE COURT:  That's exactly what I'm asking.  Joint,

20   joint several as to whom?

21          MR. NEWCOMER:  So, Cole Barleta.

22          THE COURT:  Okay.

23          MR. NEWCOMER:  Perry Abbonizio.

24          THE COURT:  Okay.  So Perry Abbonizio is on for 314

25   million as well.

1        MR. NEWCOMER:  Oh, James, only up to two.

2        THE COURT:  James has a, has a cap on it or

3   something?

4        MR. NEWCOMER:  Yeah.  So it is, it is, it is also

5   joint and civil as a James.  But he's going to have a cap.

6   He has a, he has a cap already.  Right.

7        MR. MINNI:  But he's also saying 314.  Who would be

8   for the [indiscernible]

9        THE COURT:  That's the question.  Is it three?

10       MR. NEWCOMER:  Yeah.  Yeah, you're right.

11       THE COURT:  The Internal Revenue Service is not --

12  is only Mr. Laforte.  Correct?

13       MR. NEWCOMER:  Yeah.  Let me, let me just back up,

14  Your Honor.  So, Cole Barleta is joint and several, and the,

15  and the total number, you know, it's a, it's a total number.

16  It's the IRS plus the, the securities fraud.

17       THE COURT:  Why is Mr. Cole Barleta led liable on -

18  -

19       MR. NEWCOMER:  He was charged in the tax scheme as

20  well --

21       THE COURT:  For Mr. Laforte's personal income tax.

22       MR. NEWCOMER:  He, he charged in conspiring to, to

23  defraud the IRS.

24       THE COURT:  Okay.

25       MR. NEWCOMER:  Yes.

1          THE COURT:  Alright.

2          MR. NEWCOMER:  It was a tax -- now again, he --

3    there might be a cap there, Your Honor, we address that at,

4    at the time of Mr. Barleta's sentencing.  Fine.

5          THE COURT:  Okay.  Alright.

6          MR. NEWCOMER:  Perry Abbonzio though, he's only in

7    for the 304.  He's not involved in the tax case.

8          THE COURT:  Okay.  So he stops on the, on, on the

9    304 number.  Got it.  Okay.  Mr.  -- So the 10 million 487,

10   it's owed to the IRS.  Mr. Cole Barleta has some

11   responsibility for that -- could have some responsibility for

12   that as well.  Is right and summary.

13         MR. NEWCOMER:  Right.

14         THE COURT:  Okay.  How about -- but, and if I read

15   it correctly, then Mr. Abbonizio is responsible for the

16   Commonwealth of Pennsylvania restitution.

17         MR. NEWCOMER:  Oh, no.  Good point.  Your Honor.

18         THE COURT:  16 is in the 304.

19         MR. NEWCOMER:  Right.  No, you're right.  That's --

20   so that, that -- so it's the -- I don't have a calculator

21   here with me.

22         THE COURT:  All right.  But it's that number.

23         MR. NEWCOMER:  So it's that number.  It's 304 minus

24   --

25         THE COURT:  304 or less.  1,655,000.

1        MR. NEWCOMER:  Right.  Good spot, Your Honor.  The,

2  the -- he's not implicated in the --

3        THE COURT:  Alright.

4        MR. NEWCOMER:  Abbonizio was not implicated in the,

5  in the Commonwealth.

6        THE COURT:  Let me get this right here.  Cole is

7  everything including Pennsylvania?

8        MR. NEWCOMER:  Correct.

9        THE COURT:  Okay.  Abbonizio is no IRS and no PA,

10  right?

11        MR. NEWCOMER:  Correct.

12        THE COURT:  Of course.  Joint -- Mr., Mr., Mr.

13  Joseph LaForte.  Got it.  Is there anyone else?

14        MR. NEWCOMER:  Ms. McElhone is on the IRS number.

15        THE COURT:  Which is 10487? .

16        MR. NEWCOMER:  Yep.  As well as the Commonwealth

17  number.

18        THE COURT:  Okay.  So 1,000,655.  Okay.  So

19  McElhone, McElhone is the tax, the two tax bills, is that

20  right?

21        MR. NEWCOMER:  Right.

22        THE COURT:  10 million 487 plus 1655.

23        MR. NEWCOMER:  The one, but full.  This is -- right.

24  We'll, we'll address it as it, it comes up.  Okay.  James

25  LaForte we talked about.

1          THE COURT:  But James LaForte is in, but he's got a
2    cap.
3          MR. NEWCOMER:  Yes, he's in for the 304 securities
4    piece, but not the tax piece.
5          THE COURT:  So he should be joint several in that.
6    Okay.
7          MR. NEWCOMER:  Yeah.  Capped at the 2. 5 million or
8    so we had in his.
9          THE COURT:  Okay.  Is that it?
10         MR. NEWCOMER:  Mr. Gioe is a separate number.
11         THE COURT:  Is he, is he part of this?  He joins
12   several on any of this?
13         MR. NEWCOMER:  No.  Not Mr. Geo is not.
14         THE COURT:  Okay.
15         MR. NEWCOMER:  And then we have Mr. Bacon.
16         THE COURT:  Yes.  Mr. Bacon.  What -- Is he in the
17   tax numbers?
18         MR. NEWCOMER:  Yes.  He's the same as Lisa in that -
19   - Ms. McElhone in this case.
20         THE COURT:  Okay.
21         MR. NEWCOMER:  It's the Commonwealth and the IRS.
22         THE COURT:  And, and if Mr. Irma was convicted, is
23   he --
24         MR. NEWCOMER:  He'd be same -- it'd be the same
25   thing, but we haven't gotten that far yet.

1          THE COURT:  Same as Bacon.

2          MR. NEWCOMER:  Right.

3          THE COURT:  He would be the same as Bacon.  Okay.

4   Alright.

5          MR. NEWCOMER:  Am I missing?

6          THE COURT:  So the order of judgment for Mr. Laforte

7   reads joint and several by, by tranches.  Joint several for

8   an amount that's about 302 million with, with people, and

9   then joint several on additional ten four and 1655 with, with

10  his wife and Bacon.  Excuse me.  With Bacon and Abbonizio is

11  only in, on a 302.  Approximately.  302 -- 1 -- 3 0 4 minus

12  16.  Which you time around two eight somewhere?

13         MR. NEWCOMER:  Correct, Your Honor.  And I believe

14  that's all the defendants that have, that have pled guilty.

15         THE COURT:  Okay.  Alright.  So, so then tell me

16  quickly, what is the forfeiture number of 12 --124484677.

17         MR. NEWCOMER:  And I'll, I'll, I'll try this one

18  too, Your Honor.  And actually, we stipulated prior to, and

19  we'll amend the preliminary order forfeiture.  That number

20  unlike restitution forfeiture is driven off the amount of

21  proceeds received by.  So that is the number, the number, the

22  correct number is 120 million.

23         THE COURT:  120.

24         MR. NEWCOMER:  $851,790. 72 cents.  That is the

25  number that you heard testimony when about in the fraud loss

1    hearing.

2           THE COURT:  Okay.

3           MR. NEWCOMER:  You heard testimony from her agent,

4    that's the amount of proceeds that Mr. Laforte person have

5    been received.  So that's a forfeiture money judgment plus

6    the assets that are listed in the notice of forfeiture.  And

7    we'll amend that, that notice of forfeiture.  Correct, Mr.

8    Minni?

9           MR. MINNI:  Yeah.  Or if it's easier, Your Honor --

10   if Your Honor, just interline, interline, the, the, the

11   number change we can submit easily submit revised order, Your

12   Honor.

13          THE COURT:  No, I have an order right here.  I, I

14   just, I just want to get the right number.  120 million --

15   120,851,792. 72 cents.

16          MR. NEWCOMER:  Correct.

17          THE COURT:  Okay.  That's the forfeiture.  Alright.

18   Is any -- that's just money that -- did Ms. -- did Ms.  Lisa

19   McElhone have any share of that?

20          MR. NEWCOMER:  Well, yes it was for the, it was --

21   but, but I think there's a separate agreement as to Ms.

22   McElhone forfeiture.

23          THE COURT:  Okay.  Alright.  This is --

24          MR. NEWCOMER:  She was not charged in the security

25   scheme.  I mean, she was the beneficiary in that it was her

1    husband getting the money, but she's not charged in that

2    scheme.  So, no, Your Honor.

3              THE COURT:  Okay.  So this is just Mr. Laforte is

4    forfeiting under preliminary.  Mr. Corozzo, have you seen

5    those numbers, sir?  120,851,792.

6              MR. COROZZO:  I have Your Honor.  I agree.

7              THE COURT:  Any objection to that number?

8              MR. COROZZO:  No objection.

9              THE COURT:  Okay.  Alright, so we just corrected

10   that we –

11             THE COURT:  Now I understand the, the forfeiture is,

12   is corrected.  I now understand the restitution, the

13   restitution.  We -- and Mr. Minni, you have sent over as of

14   yesterday a list of people that gets to us -- that gets us to

15   that number of essentially 304425565.  Yep.

16             MR. NEWCOMER:  And that's correct, Your Honor.  And,

17   and the -- apologies for the multiple submissions.  We were

18   working with the receiver to get these right in terms of, you

19   know, the victims and who they're payable to.

20             THE COURT:  Am I reading this right?  Is, is one of

21   the persons who is -- one of the people who is recovering

22   monies here, and she is very well could be a victim.  I just

23   don't know.  Is, is it right that Tina LaForte is listed

24   here?

25             MR. NEWCOMER:  And that's Mr. Laforte's mother, Your

1   Honor. We tried not -- I mean , it's -- she has a claim.

2   She invested money, and she was, you know, while she worked

3   for Par funding at its inception, she didn't work since then.

4   So, you know.

5         THE COURT: Well, that's, that's, that's investor.

6   That's somebody -- that's investor money, not --

7         MR. NEWCOMER: That's, that's investor money.

8         THE COURT: Not wages or anything. Right. That's

9   investor money.

10        MR. NEWCOMER: Right. And, and what's also included

11   in the spreadsheet is the distributions of the receiver has

12   made to date.

13        THE COURT: Yes.

14        MR. NEWCOMER: So these are up to date as of today.

15        THE COURT: Okay.

16        MR. NEWCOMER: As I said, that's -- our

17   understanding is the receiver is going to distribute

18   additional funds, which point the clerk will credit those

19   payments against the restitution map. But this is the

20   current state of play.

21        THE COURT: When you say -- when Mr. -- you and Mr.

22   Minni say receivers have authorized to distribute, that means

23   authorized but not distributed yet?

24        MR. NEWCOMER: No, it means authorized. It means

25   both. It means that those, those --

1          THE COURT:  Okay.

2          MR. NEWCOMER:  The receiver has been authorized to

3     distribute funds on behalf of these entities.  It has and

4     will continue to do that.

5          THE COURT:  Okay.

6          MR. NEWCOMER:  And it, it would just -- it basically

7     for these entities where the check from the clerk's office is

8     going to be written to the receiver, will take care of the

9     administration because it's, it's been authorized to control

10    these entities.

11         THE COURT:  And the remaining, say people on the

12    later pages, maybe there's 50 or so.  60, 70 something.

13    Beginning with somebody, Bromley, that's what I have.  And

14    going all the way down to Pebble Spring.  Those people have

15    not been authorized yet by the Judge Ruiz, is that right?

16         MR. NEWCOMER:  Correct.  Correct.  Yeah.

17         THE COURT:  Okay.  And when, when that is

18    authorized, who will cut that check to them?

19         MR. NEWCOMER:  Well, right now, if the money comes

20    into our court, our clerk's office will cut a check to those

21    people.

22         THE COURT:  So, Mr. Minni, you then alert the clerk

23    of our court to distribute that --

24         MR. MINNI:  That's correct, Your Honor.  We've

25    already apprised the clerk's office downstairs of what's

1  happening in this case.

2  THE COURT: Okay. Is the remaining money coming in

3  here too, or where -- all this was already authorized to

4  distribute? Is that coming into the clerk of court here, or

5  is that sitting in Miami?

6  MR. NEWCOMER: It's -- that's in Miami, Your Honor.

7  The -- what, what would be coming in, in this case is, is

8  relatively limited. It's the assets that we seized for Mr.

9  Laforte, the plane. It's the plane and the, the Charles

10  Schwab account. It's also some other defendants are selling

11  properties to, to contribute to restitution. In the process

12  of doing that. That money is going to come through this

13  court. But for the most part, as Mr. Alfano said, the

14  receiver has collected almost all the assets in the process.

15  Those assets are going to be distributed independent of us.

16  We have no control over that, but we're just going to keep

17  track of what they do that, so when those payments are made,

18  you know, Mr. Laforte is getting credit for it.

19  THE COURT: There's also a reference by our officer

20  with no objection or no, or no correction to it, about a

21  trust that people couldn't find anything about. But Mr.

22  Laforte candidly said, has quite few substantial assets. So

23  what status that is, let me get you the name of that. It's,

24  it's, it's in, in a footnote. In the PSR.

25  MR. MINNI: Yes, Your Honor. That's towards the end

1    of the PSR.

2           THE COURT:  Yes, sir.  Let me find it for you.  Here

3    it is.  Yeah.  Some LME Family Trust 2017.  Mr. Laforte

4    claimed he can't, he can't tell.  He did, he couldn't

5    determine the assets noting that there is voluminous and

6    substantial assets within trust.  What's the status of the

7    collection on that?  Is that something that goes to receiver

8    or is that you or who?  Who, who's that?

9           MR. NEWCOMER:  Yeah.  I'm -- what, what page are we

10   on?

11          THE COURT:  That's page 65.  Note 28, maybe.  Page,

12   page 65.  Note 28.

13          MR. NEWCOMER:  Oh, the, the -- I'm sorry.  28 is the

14   --

15          THE COURT:  Note -- footnote 28.  Footnote 28.

16          MR. NEWCOMER:  Right.  The jet and the --

17          THE COURT:  A65.

18          MR. NEWCOMER:  Charles Schwab account?

19          THE COURT:  Unless does Mr.  --

20          MR. NEWCOMER:  Actually, the defendant also --

21          THE COURT:  It says is receiver here.  Maybe he

22   knows.

23          MR. NEWCOMER:  It's a receivership.  Oh, it's a

24   receivership.  You know, it's already been handled by the

25   receivership.  We're not collecting that.  That's, that's

1   already part of the receivership or the receivership's

2   pursuing it.

3           THE COURT:  The defendant is also a beneficiary to

4   the LME Family Trust 2017.  That can't be the receivership.

5   He's not beneficiary to the receivership.

6           MR. NEWCOMER:  So the trust receives -- the way I

7   understand it, Your Honor, and then, and the foot is a bit

8   confusing, but the trust was seized by the receivership.

9           MR. NEWCOMER:  I Confer with that.

10          THE COURT:  Yeah, why don't you check with -- I, I,

11  I see the receiver's counsel back there.  Why don't we see

12  what's going on there before I start calculation here.  I

13  don't want Mr. Laforte to be hit with more than

14  [indiscernible].

15          MR. NEWCOMER:  I think, and I could -- the officer

16  can -- officer may confirm you don't know anything about it.

17  My understanding is this -- as it says --

18          THE COURT:  Hold on guys, we're on the record.

19          MR. NEWCOMER:  This was seized by the receivership.

20  Right.  So the receiver --

21          THE COURT:  I got that.

22          MR. NEWCOMER:  The receivership has this asset, what

23  they're doing with it.  I can't tell you.  Joseph LaForte has

24  no -- like, he's not getting it back.  It's going to go to

25  the, it's going to go to the -- in the receivership case.

1  He's saying -- I think he's --

2          THE COURT:  I'm a beneficiary of it.

3          MR. NEWCOMER:  Right.  He's saying, I don't, I

4  don't, I Joe LaForte don't control it anymore.  I know

5  there's a lot of money in it.  I don't know how much it is,

6  but the receiver's got it.  In part -- it, it -- per Judge

7  Ruiz's, you know, orders.

8          THE COURT:  Okay.  Has that -- that's not listed a

9  check.  Maybe I missed it, but that doesn't seem to be listed

10 on this identity.

11         MR. NEWCOMER:  No, that's more in the way of an

12 asset, Your Honor, as opposed to --

13         THE COURT:  No, no.  Has it been collected against?

14 I mean, in other words, I, I -- I'd have no idea what the

15 number is.  Is it possible that there's going to be money

16 left over after Mr. Laforte -- after this payment is made and

17 Mr. Laforte's obligation will be extinguished?

18         MR. NEWCOMER:  No, we don't believe that's going to

19 happen, Your Honor.

20         THE COURT:  Okay.  So during the course of

21 litigation, I thought that was a sort of a theory that

22 there's going to be enough money recovered that these folks

23 are not going to have any restitution obligation.

24         MR. NEWCOMER:  Yeah, that's not going to -- as far

25 as we understand, You Honor, there's no way that the receiver

1　is going to collect another 288 million or so.

2　　　　　THE COURT:  That's what I'm asking.  That's not --

3　that, that trust is not that size.

4　　　　　MR. NEWCOMER:  No, no, no.  No, Your Honor.  It's,

5　it's, I think in the, you know, between 10, 15 million range.

6　　　　　THE COURT:  Okay.  I just had -- it's just, all

7　right.  So, so the, the point is, it, it doesn't -- it's not

8　coming back into --

9　　　　　MR. NEWCOMER:  It's not coming back into this court.

10　　　　　THE COURT:  It's not coming back into this court.

11　So anything that's coming in this court is asked literally

12　real estate or such bank account assets or planes that have

13　been sold in this district.

14　　　　　MR. NEWCOMER:  Yes.

15　　　　　THE COURT:  Okay.

16　　　　　MR. NEWCOMER:  Or it will be sold in this district?

17　　　　　THE COURT:  Or will be sold in district?

18　　　　　MR. NEWCOMER:  Yeah.

19　　　　　THE COURT:  Okay.

20　　　　　MR. NEWCOMER:  Once the, once the, the sentencing

21　has concluded and we --

22　　　　　THE COURT:  And then, and then what happens if, if

23　after everything's collected in this district, we don't have

24　enough funds -- you don't have enough funds to pay the

25　restitution, what happens?  How does the rest of these people

1   get paid? That are, that are restitution victims in this

2   case?

3         MR. NEWCOMER:  It just -- it stays open, Your Honor.

4   And they get their, they get --

5         THE COURT:  Are they not victims in the -- in, in

6   Miami, in the Florida case?

7         MR. NEWCOMER:  There is, yeah.  There -- there's

8   overlapping victims in, in both cases, Your Honor.  But this

9   is, you know, our loss number was higher because we have a

10  larger number of victims we identified.  The receiver had its

11  own reasons for protecting claims and things like that.  But

12  at the end of the day, Mr. Laforte is going to owe a massive

13  restitution judgment that's probably never going to get paid.

14  You know, unless he, unless he somehow comes into a lot of

15  money when he is released.

16        THE COURT:  But there's no -- what I'm getting at

17  is, some of these people could be on both the list in the

18  Eastern District and on a receiver list, and the Southern

19  District, Florida.

20        MR. NEWCOMER:  You know, correct, Your Honor.  And

21  anybody who has a payment in the distribution to date column

22  --

23        THE COURT:  Sure.  They've already, in Florida.

24        MR. NEWCOMER:  They're, they're in both columns.

25  They're, they're victims and they're also victims in --

1    THE COURT:  I got it.  But I'm talking about the

2    rest of the people.  There could be people here, for

3    instance, in Aspen, Colorado, people getting money.  They

4    also could be on the receiver's list in Miami.

5        MR. NEWCOMER:  Correct.  And, and, and if they're

6    paid in Miami, out of Miami, then they're going to get credit

7    on our list.

8        THE COURT:  That -- and how are we doing that?  How,

9    how's that coordinated?

10       MR. MINNI:  We expect -- Your Honor, we intend to

11   obtain the periodic reports that the receivership submits

12   down in Florida.  That those accountings within those reports

13   will be submitted to our clerk's office so that they can give

14   credit for the payments on the restitution accounts for these

15   cases.

16       THE COURT:  Is, is the receiver obligated to do so

17   under a Judge Ruiz's order?  Or somehow?  How's that

18   happening?  Are you just getting it voluntarily?

19       MR. NEWCOMER:  We've, we've been working closely and

20   we continue --

21       THE COURT:  Alright, I don't want to, I don't want

22   to -- I'm certainly not going to interfere with Judge Ruiz's

23   jurisdiction, but I want to make sure that we don't have

24   anybody on this list that Mr.  -- that Mr. Laforte has -- Mr.

25   LaFort and others now have some type of judgment against him

1  that's already been satisfied by the Miami action.  How, how

2  are we going to, how are we going to protect him that way?

3  How are we going to make sure that he's not -- he's not going

4  to still some money in Aspen, Colorado.  It's already been

5  paid.

6       MR. NEWCOMER:  The receiver is going to -- I mean,

7  the receiver will let us know when there's another Toronto

8  payments.

9       THE COURT:  Okay.

10      MR. NEWCOMER:  And that's also public information.

11 It's on their receivership website.  But [ph] Mr. Rosenblum

12 and his team, they've notified us every time there's been a

13 payment.  So we'll get that information, make sure the

14 clerk's office has it.  They'll compare the two lists and

15 update it.

16      THE COURT:  Then what happens, Mr. Minni?  They get

17 crossed off a list downstairs or something?

18      MR. MINNI:  What they'll do, Your Honor, is, is

19 that, we'll have the complete restitution victim list, which

20 includes the investor victim from the receivership.  Once

21 [ph] Mr.  Bullock l downstairs and his staff sees what the

22 receiver paid to the victims, which the restitution accounts

23 in this -- for these defendants.

24      THE COURT:  Okay.  So the point of a, of a judgment

25 commitment order is going to be as of today, these are the

 1  folks, it could be a modified, these people could be later

 2  getting money.  Getting -- they could be getting -- some of

 3  these people are getting paid off by the Miami receivership.

 4          MR. MINNI:  The judgment amount stays the same, Your

 5  Honor.  It's, it's just that the balance that gets adjusted

 6  periodically.

 7          THE COURT:  Is, is, is there an interest component

 8  in the Miami case?

 9          MR. NEWCOMER:  I don't, I don't know the answer to

10  that, Your Honor.

11          MR. MINNI:  Neither do I, Your Honor.

12          THE COURT:  [indiscernible] for the receivership,

13  sir.

14          MR. MINNI:  If I may have a second, Your Honor.

15          THE COURT:  Yeah.

16          DOUGLAS ROSENBLUM:  Your Honor, good afternoon.

17  Douglas Rosenblum on behalf of the court appointed receiver

18  Ryan Sumer

19          THE COURT:  And, and counsel for the defendant

20  Complete Business Solutions in this case?

21          MR. ROSENBLUM:  That is correct, Your Honor.

22  Alright.

23          MR. ROSENBLUM:  There's no interest component for

24  the money.

25          THE COURT:  Okay.  So, so nobody owes on that money

1  that's owed to these investors in, in Florida.  There's no

2  interest obligation attached to that, just principle, is that

3  correct?

4  　　　　MR. ROSENBLUM:  Correct.

5  　　　　THE COURT:  Or whatever the amount is.  I shouldn't

6  say principle because it's a bad word in this case.  But that

7  -- the amount that's owed, that's it.  This is it.  There's

8  no, there's no increasing number.

9  　　　　MR. ROSENBLUM:  No, Your Honor.

10  　　　　MR. NEWCOMER:  This is it.  Okay.  And certainly Mr.

11  Minni -- Thank you, sir.  Mr. Minni, there's no interest

12  here, correct?

13  　　　　MR. MINNI:  Correct.

14  　　　　THE COURT:  Okay.  Alright.

15  　　　　MR. MINNI:  Your Honor, if I just want to also

16  clarify one thing.  We talked about the forfeiture order of

17  the 120 somewhat million dollars.  The forfeiture order also

18  lists specific property subject to forfeiture, such as the

19  citation jet, the Charles swab and account in various

20  firearms.

21  　　　　THE COURT:  Yes, I see it, right.  Yes.

22  　　　　MR. MINNI:  So I just want to clarify that for the

23  record.  The Schwab account and the, the Jet we -- Specter

24  value is somewhere in a round of $20 million.  We can

25  liquidate that through the forfeiture process and the

1  government would intend to make restoration request to have

2  main justice approve those funds to be paid to this court for

3  restitution for the victims here.

4          THE COURT:  Fine.  Okay.  Mr. Rosenblum, I'm sorry,

5  I'm, I'm, I'm interrupting your, your, your main thing.  I

6  just want to clear up with Mr. Corozzo.  Mr. Corozzo, there's

7  a, there's a -- as I understand it, some of these weapons

8  were, were licensed to Lisa, right?  Lawfully owned by Lisa.

9  Correct?

10          MR. COROZZO:  Well, they were licensed to Lisa, but

11  they were --

12          THE COURT:  Owned by -- okay.  So, so, so the --

13          MR. COROZZO:  Controlled by my client, consent to

14  the forfeiture of the, of the weapons.

15          THE COURT:  Your client's with the forfeiture of

16  these weapons?

17          MR. COROZZO:  Yes, Your Honor.

18          THE COURT:  Okay.  Alright.  I just want to make

19  sure we're all on the same page.  Okay.  Alright.  So that

20  takes care of the forfeiture and the, and the restitution.

21  Unless Mr.  -- unless MR. NEWCOMER, do you have any other

22  concerns?  Because that's, that's the numbers I'm going with.

23  Any other concerns?

24          MR. NEWCOMER:  No, Your Honor.

25          THE COURT:  Okay.  Mr. Corozzo, I, I, I deferred you

1  there, sir, but you wanted to, you wanted to talk, talk about

2  these two victims that were identified in the PSR or victim

3  statements, or identified in the PSR.  You, you don't have

4  to, but you --

5          MR. COROZZO:  Your Honor, I -- I'll waive the

6  objection to the fact statements.

7          THE COURT:  Alright, sir.  What -- do you -- you

8  proceed as you wish.  I want to do -- I do again, commend you

9  and your client for very helpful letters, character letters

10  from several folks.  So thank you very much.  They were very

11  helpful.  Mr. Laforte, I mentioned to your brother, and I

12  mentioned to you that, the time you spent with your father as

13  he passed, you get considerable credit for sir.  And I, I

14  can't, I can't appreciate how difficult that must've been for

15  you.  So, I certainly, and I appreciate your family raising

16  that to me and reminding me of that because I, I, I saw it

17  with your brother, but your, your -- anyway.  But I, I, I

18  knew it was you, although the other guy was talking about

19  him, but we kind of all knew you were the guy that was taking

20  care of your dad.  It's okay.  But, but it, it didn't -- he,

21  he, he didn't, he didn't say so candidly, but we knew it was

22  you taking care of your dad.  Okay.  Mr. Corozzo, sir.

23          MR. COROZZO:  Your Honor, first, I, I want to

24  explain that the purpose of this hearing was, was because of

25  the objections.  It's because PSR is a very important

1  document that follows my client. And it's, it's the need for

2  a defense attorney to ensure that his client is followed by a

3  complete and accurate and fair report.

4  THE COURT: So you would agree with me, would you

5  not that I, that, that, that I could ignore all of the -- I

6  could ignore all of the extortion theories, economic and

7  physical, and still sentence within that guidelines. Right?

8  Within the recommended range. Right?

9  MR. COROZZO: And you can still go to the high end.

10  THE COURT: Yeah. Yeah. I mean, I just want to

11  make sure we're not --

12  MR. COROZZO: I totally, I totally respect. Again,

13  the only purpose --

14  THE COURT: Was to challenge those --

15  MR. COROZZO: And it was not to argue that there's

16  never been provable extortion.

17  THE COURT: Right.

18  MR. COROZZO: It's what was in the report.

19  THE COURT: I understand.

20  MR. COROZZO: And why some hasn't even been

21  established. There were a number of victims listed in the

22  report that we did not contest today. And they argued they

23  should be removed. There were a couple of victims that I,

24  that I would submit to your court were incredible and they

25  should be removed at the end of the day what I'm asking for

1   is reasonably and logically find extortion as you cited with

2   the accounts -- with the accounts receivable letters,

3   extortion in certain matters.  But I think there needs to be

4   a particularized.  And fair finding.

5          THE COURT:  Alright.  So you'd like me to make

6   findings as to those paragraphs as to each of them.  For

7   example, Duke Barber Radiant images, one by one

8          MR. COROZZO:  Only to the extortion, Your Honor, and

9   --

10         THE COURT:  No, no.  Yeah, yeah.  I just --

11         MR. COROZZO:  And I, and I, and I submit that there

12  was no evidence today presented on or fine bush.

13         THE COURT:  Right.  I don't think --

14         MR. COROZZO:  Code green and health acquisitions,

15  those should, those should be removed.

16         THE COURT:  Right.  Or, or the OF is the -- that's

17  a, that's a different -- that's a different count.  That's a

18  structured one.  Right?  So you, you, you're asking to be

19  stricken, but what's the significance of -- it's, it's, it's

20  -- well, let ask you.  United States, your position on

21  striking them, the references of paragraphs, example 134 to

22  139.

23         MR. NEWCOMER:  Well, yeah, I have starting at

24  paragraphs 97, I think starts with --

25         THE COURT:  Well, no, I'm talking about OF right

1   now.

2           MR. NEWCOMER:  Oh, OF yeah.  Those can be stricken,

3   Your Honor.

4           THE COURT:  That's Stricken from the report.

5           MR. NEWCOMER:  Yes.

6           THE COURT:  Okay.  Alright.  Okay.  That's going to

7   -- now you're starting at 98.  I'm sorry, go ahead.

8           MR. COROZZO:  97

9           THE COURT:  Oh, before that 97.

10          MR. NEWCOMER:  I agree with Mr. Corozzo.  We'd ask

11  for a ruling on each of these.  Each of these victim.  And

12  then we can strike the ones, the ones, Your Honor doesn't

13  find that we met our burden, you know, by preponderance on

14  this evidence, then we can strike them.  Otherwise they stay

15  in.  I don't think it's worth quibbling about individual

16  language in each of these paragraphs.  I think it's --

17          THE COURT:  I understand.

18          MR. NEWCOMER:  Quote them yes or no, up or down.

19          THE COURT:  I see.  How about the -- there's another

20  one here.  There's the victim's -- I've heard nothing today

21  about Abbonizio.

22          MR. NEWCOMER:  That's correct.  Mr. Laforte was not

23  charged in that piece of obstruction.  He was charged in the

24  --

25          THE COURT:  Oh, he wasn't convicted in that.  Okay.

1       MR. NEWCOMER:  Yeah.  And also, the, the --

2  obviously we presented evidence about his involvement in the

3  attack on Mr. Alfano.  Those, those phone calls that happened

4  a couple days later.  We've got no direct evidence linking

5  those phone calls to Joe LaForte.  Other than the general

6  atmospherics of, you know, nothing happened without Joe

7  Laforte's knowledge and approval.

8       THE COURT:  Okay.  So paragraphs 143 and 144

9  reference your daughter and, and all the conduct we talked

10  about James LaForte.

11       MR. NEWCOMER:  They, they can be stricken, Your

12  Honor.  I mean --

13       THE COURT:  All right.  Upon consent.  Okay.  Any

14  objection from the defense?

15       MR. COROZZO:  No, of course not.

16       THE COURT:  Alright.  Let's just take care of the

17  ones we can right away.

18       MR. COROZZO:  I think we would agree, Your Honor on

19  paragraphs 124 to 127.

20       THE COURT:  Oh, let me get to those, sir.

21       THE COURT:  Code green.

22       MR. COROZZO:  Code green and health acquisition one.

23       MR. NEWCOMER:  You said 147?

24       THE COURT:  124 to 127.

25       MR. NEWCOMER:  Yes, Your Honor.  We didn't, we

1   didn't put that evidence.  We did not put that evidence on.

2         THE COURT:  We're going to take a break here.  We're

3   bring in our second -- bring in our night crew.  Thank you.

4         MR. COROZZO:  You also agree to 120 to 130?

5         THE COURT:  Thank you, Nelson.  Welcome Christian.

6   Welcome to night court.

7         MR. COROZZO:  I'm sorry.  128 is -- okay.  I'm

8   thinking --

9         THE COURT:  So 124 to one -- I'm sorry, Christian.

10   Let me know when we're back on.

11         ESR/CLERK:  We're on record.

12         THE COURT:  Okay.  124 to 127.

13         MR. NEWCOMER:  No, Your Honor.  Those state, those,

14   those -- oh, those we struck.  Yes.  The CK and Code Green.

15   We, we can strike those.  I think the --

16         THE COURT:  Officer, officer, are you getting these

17   down?  Because --

18         UNIDENTIFIED SPEAKER:  I am.

19         THE COURT:  Right.  Because, because I, I, I want to

20   make sure we're accurate.  So 124 to one -- I can go through

21   it again, but I just want to make sure.  Okay.  Go ahead.

22   And, and --

23         MR. NEWCOMER:  Anything else Joseph?  You're

24   proposing?

25         MR. COROZZO:  That would be the only on consent, I

1  believe.

2         THE COURT:  Okay.  Let me see.

3         MR. COROZZO:  No, we're going to -- we'll address

4  that now.

5         THE COURT:  Okay.  How about the persons that were

6  not -- how about the -- okay.  I heard about.  Okay.

7  Alright.  Okay.  I'm sorry.  You can work it out.  You find

8  out.  Anybody else?

9         MR. COROZZO:  Your Honor.  We'll also agree, by

10  consent of both parties to strike one -- paragraphs 128 to

11  130.

12        THE COURT:  Okay.  128 to 130 is out of the PSR.

13  Okay.  Alright.  So how do you wish to proceed, Mr. Corozzo?

14        MR. COROZZO:  Your Honor, I, I just have arguments

15  on, on some of the other alleged extortion victims.  I think

16  especially, Ms. Allegretta, the one extortion victim to

17  testify.  I, I think that there, there is enough to question

18  the veracity of her statements.  There was the phone call

19  that originally said that the bomb threat was three weeks,

20  weeks earlier in November.  She tells the government it

21  actually started in February and there's a lot of

22  inconsistency.  And I think she was intentionally deceptive

23  to both the government and the court in, in a lot of issues,

24  including the MCA.  I, I, I would request that Allegretta's

25  information be stricken.

1          MR. NEWCOMER:  Your Honor, the issue comes down to

2    her is, you know, did you find her credible when she

3    testified in her oath today that she was threatened multiple

4    times by Joseph LaForte.  And her explanation that the

5    precise dates and the precise chronology are not at the front

6    of her mind.  What's at the front of her mind is she was

7    threatened and her children were threatened.  And that's up

8    to you, Your Honor to make that credibility determination.

9    We have nothing further to add.

10          THE COURT:  Okay.  I've made that determination.

11   The advantage of live testimony is that I get to see the

12   person as opposed to some of the others.  I found her

13   credible.  She did have some questionable aspects about her

14   testimony, but on preponderance of the evidence, particularly

15   this doesn't raise the level of offense, such that we need a

16   clear and convincing or other standard under some guidance.

17   I'm going to find her credible and to keep in the Allegretta

18   Electrical as the three, as the three instances that she was

19   very credible about, including, reporting it earlier, not

20   just today.  Next one.  Mr. Corozzo.

21          MR. COROZZO:  Your Honor, I, I would just refer to

22   the other situations.  Obviously it's a preponderance of the

23   evidence standard and the court has reviewed the testimony

24   of, of Agent Murray.  There were instances where Mr. Gioe

25   said that it's just not, not true.  That there was --

1          THE COURT:  Yeah.  Which one was that?  That, that,
2     that was Buck, wasn't it?
3          MR. COROZZO:  That was Duke Barber.
4          THE COURT:  Oh, duke Barber.  That, that's right.
5     Duke Barber.  Buck is the hardware guy.  Right.  Okay.  Mr.
6     Newcomer, let's go to Duke Barber for a minute.  it is
7     interesting, what's the connection to Mr. Laforte with Duke
8     Barber relative to, unless there's some kind of economic
9     extortion.  I don't know if they, if they sent AR letters to
10    them, but what was --
11         MR. NEWCOMER:  No, we're not -- just to be clear,
12    we're not asking the, the economic, you know, that's not our,
13    that's not our -- that's what we charged.  That's a, that's a
14    -- AR letters are, are concerning in their own.  Right?  But
15    the, but the extortion we're doing here is by threat of
16    violence.  That's what we're relying on for the extortion
17    piece.
18         THE COURT:  Okay.
19         MR. NEWCOMER:  So just to make that clear.
20         THE COURT:  Alright.  I, I, I read it to be
21    extortion, not necessarily physical.  Not necessarily
22    physical violence.  So I looked at the indictment.  Okay, go
23    ahead.
24         MR. COROZZO:  No, Your Honor.  But -- and that's
25    been our objection, because if it was economic harm, if there

1    was evidence --

2           THE COURT:  Yeah.  Okay.

3           MR. COROZZO:  That the alleged persons were, were,

4    were concerned and, and intimidated by the economic harm, it

5    would be a completely different issue.  Each one of these

6    instances have brought forward a specific threat of, of

7    violence.

8           THE COURT:  Okay.

9           MR. NEWCOMER:  Which I've argued throughout the

10   today's hearing are incredible.

11          THE COURT:  Okay.  I got you.

12          MR. NEWCOMER:  For all of these, Your Honor, we can

13   consider them one by one, but they're also --

14          THE COURT:  Well, no, I want to deal with hardware.

15   I, I, I'm not -- yeah, I -- what this -- not Duke hardware.

16   Duke, Duke, the Duke, Mr. Brown

17          MR. NEWCOMER:  Duke Barber.  Yes.  Right.  William,

18   William Brown.

19          THE COURT:  I mean, I, I don't hear -- maybe, maybe

20   -- what was the testimony that you found, or, or if you read

21   what the report on him is that?

22          MR. NEWCOMER:  Mr. Brown said Gioe threatened to

23   break his legs.  And the evidence was --

24          THE COURT:  But that was Mr.  -- that was Mr.  --

25          MR. NEWCOMER:  Gioe.  Right.  Mr. Laforte directly

1   sent Gioe out and Gioe threatened to break his legs.  And

2   the, the evidence we've been putting on here today is that

3   Mr. Laforte was knowledgeable about what Mr. Gioe was doing.

4   He was sending him out.  Sometimes he'd threatened -- let Mr.

5   Gioe make the threats.  Sometimes he'd make them themselves.

6   But this is part of the conspiracy.  This is part of the

7   scheme to extort victims.  So, you know, I can -- we can

8   examine these one by one, but they're really -- you need to

9   be -- consider them all together in terms of the, evidence of

10  Mr. Laforte's direction of Mr. Gioe.

11          THE COURT:  You, you believe it was a -- well, the

12  testimony is not that way.  The testimony, I think is that,

13  in fact showed us emails, one of your exhibits that told Mr.

14  Gioe where to go.  Like, these are the guys you're going to

15  go and let's assume they're the guys you're going to go

16  threaten just for, for Par.  I'm not saying that, but let's

17  assume.  Okay.  It would seem to me that the evidence would

18  suggest then that unless Mr. Laforte told Gioe to go there,

19  Gioe just was not riding the countryside surprising people.

20  He was told to go certain places.

21          MR. NEWCOMER:  Correct.

22          THE COURT:  Okay.  Is there any evidence that Gioe

23  was told to go see Mr. Brown?  That's what I'm getting at.

24  Because the evidence is clear that when, when LaForte, when

25  LaForte wanted Gioe to go somewhere, he went there.

1          MR. NEWCOMER:  Yeah.  It's Mr. Gioe's testimony that

2     he was directed.  Any place he went to was directed by Mr.  -

3     - by Mr. Laforte.

4          THE COURT:  Wait, you think Gioe said to, to the

5     agent?  I was told to go see Mr. Brown?  Yeah.

6          MR. NEWCOMER:  We had, we had the email.  Keep,

7     keep, keep Gioe within 80 miles today.  I wanted him to go

8     see Duke later.  That was Exhibit --

9          THE COURT:  The defense concedes that an email

10    existed.

11         MR. NEWCOMER:  Yeah.

12         THE COURT:  Oh, that's, that's, that's --

13         MR. NEWCOMER:  That was -- that, that -- the Duke in

14    that email was Duke Brown.  Yeah.  Duke --

15         THE COURT:  Robert Brown.

16         MR. NEWCOMER:  Duke Barber, Mr. Brown.

17         THE COURT:  Okay.

18         MR. NEWCOMER:  So that, and that's, that's one piece

19    of evidence.  It's also the larger, you know, that did --

20         THE COURT:  But I think if you're going to keep it

21    in, we have to be -- I hate to do this to you, but we have to

22    show, because it appears to me that Mr. Laforte meticulously

23    managed this effort.  He had emails weekly.  The ones we saw

24    telling this is the guys you're going to go visit this week.

25    Okay.  So we can't just say that Gioe is out there doing it

1    on his own.  So, so I do have the one for, for -- okay.  So I

2    overrule the objection to Duke Barber because we have him

3    telling, we have that particular email about staying around

4    for Duke.  Okay.

5            MR. NEWCOMER:  Okay.  So we go on to Radiant Images,

6            THE COURT:  Radiant Images is, is our, is the people

7    down in, in out the, the movie star?  The movie, the movie --

8    the cinematographer.  Not the movie star.  The

9    cinematographer.  That he, that he lied to -- that he lied

10   about his background, his financial condition.  Okay.  How's

11   that get to Gioe doing it?  Okay.  Use the speaker because --

12           MR. NEWCOMER:  Because Gioe, they spoke by telephone

13   while Gioe was there.  This is one of the episodes where --

14           THE COURT:  LaForte states --

15           MR. NEWCOMER:  Puts him on -- Oh, sorry.

16           THE COURT:  Yeah.  Go put him on speaker phone.

17   That's the one --

18           MR. NEWCOMER:  Put him on speaker phone.  That's --

19   I mean, I don't know how it's about as direct as you can get

20   evidence that he knew he was there and was being directed to

21   go there.  Oh, right.  And then the text messages as well.

22   Radiant Mike was scared, could not believe I arrived.  That's

23   when Gioe texted Joseph LaForte.

24           THE COURT:  How about the -- what to do with this

25   guy --

1        MR. NEWCOMER:  About Radiant Mike?

2        THE COURT:  Radiant Images, what to do with this

3    guy?  That's Mr. Laforte telling -- stated that Gioe knew

4    what to do with this guy and to take care of him.

5        MR. NEWCOMER: Right.  But you -- you're honest,

6    original point too.  I mean there is a clear nexus there

7    between Joe LaForte and the -- and this visit and the threat.

8        THE COURT:  Okay.  So that, so that objection's

9    overruled.  There is a direct connection to Mr. Laforte.

10   Okay.  The next one is Buck.

11       MR. NEWCOMER:  Buck hardware.  This is the

12   individual that --

13       THE COURT:  The guy goes the backward --

14       MR. NEWCOMER:  Yeah.  And this is the one where Mr.

15   Gioe said, I had Mr. Laforte on speakerphone and the guy five

16   years later can't remember the speakerphone piece.  He

17   remembers that he was crying piece.

18       THE COURT:  But I don't remember him saying that,

19   that he remembers that Mr. Laforte was on the phone.

20       MR. NEWCOMER:  Mr. Howell didn't remember that.

21   Gioe remembered putting Mr. Laforte on the phone.

22       THE COURT:  Okay.  Alright.  Well, I'm not finding

23   that sufficient.  Because if, if -- Mr. Howell doesn't -- if

24   the victim doesn't remember it, and I don't -- I didn't hear

25   from Gioe and I'm not suggesting anything on that.  But other

1   than that, I think it does not meet the preponderance.  Okay.
2   So I'm going to strike the Buck hardware.  Absent evidence
3   as, there's no evidence that Mr. Laforte directed Gioe at
4   Buck Hardware at least, or spoke to him there.  I'm sure he
5   directed him, but what, what was essentially said there, you
6   would agree with me, I think we should come over that.  In
7   some cases Gioe went there and just had a visit.  I mean, I
8   don't -- I'm sure it wasn't just, you know, cookies and
9   stuff, but there was a visit, right?  That would not raise
10  the level of what extortion threat would be.
11          MR. NEWCOMER:  Correct.  Not every visit, Mr. Jim,
12  was extortion.
13          THE COURT:  So until we see the, until we see the,
14  the, the visit, the, the threat, then the title LaForte, I'm
15  uncomfortable. So you've done that on several of them.  Okay.
16          MR. NEWCOMER:  So now we're at [ph] Jose Korea, and
17  Invest Quest.  This one, I mean, this one is [indiscernible]
18  right.  We have text messages setting it up.  We have the,
19  the conversation when they're down there.
20          THE COURT:  This is staying in my beach house.
21          MR. NEWCOMER:  Yeah.  And, you know, this is the --
22  and we also have the direct threats from Mr. Laforte for
23  Priya's interview with the government agents about getting
24  kicked, you know, crap kicked out of him and head crushed it
25  and that kind of stuff.  So, yeah.

1          THE COURT:  Yeah.  I'm going to -- there is a

2     connection to Mr. Laforte there, and I'm going to overrule

3     the objection on Invest Quest Partners and JP.  The next one

4     is --

5          MR. NEWCOMER:  We have Kara DiPietro, Josh Persing

6     and, and HMC.  This is another direct --

7          THE COURT:  Oh, this is -- I'm going to blow up your

8     house.

9          MR. NEWCOMER:  Yeah.  This is not Gioe, this is

10    straight LaForte.

11         THE COURT:  Yeah.  Even though, even though there's

12    been -- even though counsel raised questions concerning why

13    she was continuing to negotiate and, and doing, these various

14    things.  I, I --

15         MR. NEWCOMER:  One, again, this wasn't just one

16    victim, it was two victims independently confirming the same

17    conversation.  Same direct --

18         THE COURT:  DiPietro and --

19         MR. NEWCOMER:  Josh Persing per CFOI think.

20         THE COURT:  Okay.  That's, that's over -- that

21    objection Is Overruled.  Okay.  Allegretta, I've already

22    ruled on, she was sufficient.

23         MR. NEWCOMER:  Right.

24         THE COURT:  I, I, I find her, in fact, the fact that

25    -- I mean, I, I found her more credible than I found in

1    connection than, than was in the report.  So, yes, I, I, I do
2    find that, that objection is overruled.
3            MR. NEWCOMER:  And then last --
4            THE COURT:  The code is out and, and JP is out.
5            MR. NEWCOMER:  Yep.  And then, so I think it takes
6    us to paragraph 131.
7            THE COURT:  JRC.
8            MR. NEWCOMER:  Canty.  Just Canty and JRC paintings.
9    These are, again, direct Joe LaForte's threats.  I'll break
10   your legs if you stop making payments.
11           THE COURT:  And that's Mr. Laforte directly?
12           MR. NEWCOMER:  Yes, Mr. Laforte directly.
13           THE COURT:  Alright.  I'm going to overrule the
14   objection there.  Evidence was sufficient -- evidence was
15   presented.  It wasn't -- it was not frivolous.  It was fair
16   questioning to the credibility.  But there is direct evidence
17   of Mr. Laforte's contact there to the, to the person.  And,
18   and evidence that the person would be threatened by the idea,
19   I'll come up and break your legs, and they paid it back.
20   That tells that the fact that people write nice letters and
21   pay it back does not mean that they didn't feel threatened or
22   extorted.  So I'm going to overrule the objection to that
23   one.  Okay.  Mr. Corozzo, I think that addresses all the
24   objections as to the victims.  Am I correct?
25           MR. COROZZO:  That addresses -- I'll -- we can

1  withdraw the other or at least not address the other

2  objections as they will not affect.

3         THE COURT:  They will not affect.  Okay.  That's,

4  that's the ones, the new ones that came in.  The victim

5  statements?

6         MR. COROZZO:  Yes.

7         THE COURT:  Okay.  Yeah.  Alright.  Okay.  So I'll

8  hear from you.  Anything else as, as you wish.

9         MR. COROZZO:  If you want me to proceed to the 3553

10  --

11         THE COURT:  If you wish.  As you wish, sir.  Yes.

12  And, and, and you, you can call witnesses or, I, I certainly

13  read the letters that again, were very helpful.

14         MR. COROZZO:  No, Your Honor, I'm prepared to go

15  forward --

16         THE COURT:  Please.

17         MR. COROZZO:  In the sentencing.  Your Honor, 13 and

18  a half years is, is quite a bit of time.  It's in some

19  people's lives a lifetime.  And we don't take it lightly the

20  range that you have to decide upon today, whether it's 13 and

21  a half or 15 and a half.  We understand that there's a great

22  deal of conduct here that requires punishment.  Mr. Alfano

23  testified that needs to be addressed.  There are the

24  misrepresentations, there are -- I won't say maybe, but there

25  is evidence of the threat of economic harm with the accounts

1    receivable as you cited.  And, and I think all this needs to

2    be taken into consideration and everything needs to be

3    decided to whether to do the 13 and a half to the 15 and a

4    half years.  But the one thing I want this site, Your Honor,

5    and, and Mr. Alfano took offense to it, Your Honor, might

6    take offense to it, but I stand by my position that Mr.

7    Laforte never intended for his investors to lose money.  He

8    may -- he might have -- and he might not have.  He did a lot

9    of things improperly and illegally, but his intent was to

10   always satisfy his, his investors.  As much as people want to

11   call this case a Ponzi scheme, I still -- no one has

12   addressed my very simple basic question.  If the business

13   took in -- I'm sorry, Your Honor, I have the exact numbers

14   here.  If, if the business took him $457 million total coming

15   in from investors to put out for advances, and then they put

16   out, because that's the testimony from Ms.  Davis on direct

17   examination.  Out the door went $1. 362 billion.  It's 800,

18   800 million more.  Not only that, but as you know, from the

19   forfeiture order, another $150 million went to insiders.  So

20   this business was generating that money.  And again, the

21   court cites that it's maybe easy to collect money if you use

22   illegal tactics.  And again, what I'm saying about those

23   tactics, those were few and far between.  We're talking about

24   a company that had 17,000 accounts.  And as Mr. Gioe even

25   says, the government's cooperating witnesses as, as evidence

1    came in between Agent Murray when he went out, he only went

2    out for seriously delinquent customers.  And he didn't always

3    threaten people.  Sometimes he let a merchant say, Hey,

4    you're not paying us, but we're still here and we're not

5    going away.  There was questionable legal avenues taken, but

6    they were done by licensed attorneys.  The exception

7    portfolio, the court has cited that there was questionable

8    assets that were aligned to the accounts, but that was all

9    done under the supervision of attorneys.  And my point is

10   that Mr. Laforte operated this business, not as a Ponzi

11   scheme, but as a business where he was enriching himself

12   considerably, but that he always intended and was successful

13   up until COVID of paying investors back with interest.

14   You've heard testimony --

15        THE COURT:  Was he running out of -- but, but the,

16   but the theory of the, of the expert back in January was that

17   he was running out of line, so to speak.  That, that he, that

18   he kept -- that this would've eventually ran out because he

19   was going into smaller, smaller, smaller groups that he

20   eventually would've run out of investors.  Do you see any

21   evidence of that?  In other words, in other words, his

22   investors became consolidated.

23        MR. COROZZO:  If he ran out of investors, he's still

24   collecting a million dollars a day.  He still has thousands

25   of accounts, even if the exception portfolios go bad.  And,

1    and you have to understand that again, there's

2    misrepresentation and there's fraud.  But in running the

3    business, you don't need to satisfy your investors.  You

4    don't need to enrich yourself and recoup a hundred percent of

5    the contract.  These contracts were, were legally at such a

6    high percentage that you could collect 50, 60, 70% and still

7    satisfy your investors.  These contracts coming in were, were

8    at such a high rate of interest that you didn't have to live

9    up to your representations to make your investors hold.  And

10   that's where the fraud obviously comes in.  That certain

11   things are told to investors that are not accurate.  But

12   again, the intent, Mr. Laforte ran this business locally in

13   Philadelphia.  He was in the office 15 hours a day.  He

14   worked every day.  He had an open-door policy, not only to

15   some of the complaining victims who went to the offices to

16   meet with Mr. Laforte, not only to undercover FBI agents who

17   went to the office and met with LaForte and, and examined the

18   offices.  This is not a Ponzi scheme hidden on -- in, in, in

19   dark somewhere.  This is not Madoff who has two levels of a

20   business.  This is a business.  And you know, from the

21   letters that I submitted to you on his behalf, there were

22   investors who still are friendly with Mr. Laforte, who went

23   to the offices.  This was an open business.  There were 70

24   employees.  What was submitted to today, to -- Your Honor,

25   which you might have seen for the first time, was there

1    organization charts.  There was people working in every

2    aspect of the business, whether it's underwriting, due

3    diligence, whether it's collections, whether it's contracts.

4    And, and I'm only trying to say that because I truly don't

5    believe this was a Ponzi scheme.  I don't see how, how -- no

6    one has ever explained it to me.  How can this --

7              THE COURT:  But does it matter?  In other words --

8              MR. COROZZO:  No, it, it doesn't.

9              THE COURT:  I mean, in other words, I don't have to

10   call it a Ponzi scheme to find liability for securities,

11   fraud and racketeering.

12             MR. COROZZO:  And again, this goes to the sentencing

13   range and, and the proper -- appropriate sentence.

14             THE COURT:  I got you.  I mean, when you compare it

15   to other cases where there was a demonstrated Ponzi.  Is that

16   your point? For disparity of sentences?  Is that your point?

17             MR. COROZZO:  Yes.

18             THE COURT:  For instance, for instance --

19             MR. COROZZO:  Just not to victimize --

20             THE COURT:  United States gives me that famous case

21   from out west, the Holmes case, you know, the, the --

22             MR. NEWCOMER:  Theranos.

23             MR. COROZZO:  Theranos.

24             THE COURT:  Theranos, yeah.

25             MR. COROZZO:  Just cases where investors are preyed

1  upon that at the end of the day, someone is going to get --

2          THE COURT:  Stuck.

3          MR. COROZZO:  -- holding the bag.  And there's no

4  way, because there's the only money that's coming in and the

5  only money that's going out is the same amount of money.

6  Here, there was an incredible business, an incredible

7  generation of funds.  Again, Your Honor, it doesn't go to

8  guilt or any, as I'm saying, there was misrepresentations and

9  maybe the goal was not to live up to the representations, it

10 was to enrich themselves, was to make the investors whole.

11 But you didn't have to collect a hundred percent of the

12 contract.  You didn't have to have 1% of defaults, which was

13 shown throughout the years.  And in fact, when COVID hit --

14         THE COURT:  And why would you say -- that's always

15 struck me.  I, I -- Mr. Corozzo, you hit right ahead.  It's

16 always struck me that why would somebody say -- they don't

17 need to say that.  Because you're right, the margins are so

18 large, you don't need to say, you could say I'm losing 30%.

19         MR. COROZZO:  There's so many people involved, Your

20 Honor.  The fun and the fund representatives.  Mr. Laforte is

21 not the one necessarily out there.

22         THE COURT:  I know.  I know.

23         MR. COROZZO:  Making claims -- making these

24 symposium.  He was at one meeting, but he --

25         THE COURT:  He's not on KYW.

1          MR. COROZZO:  And there's a lot.

2          THE COURT:  Lot's of news radio here.

3          MR. COROZZO:  Yeah.  And there know, it's a

4     collective effort.  People are asking or requesting or

5     deciding what to do for their own purposes.  There's the

6     funds and the representation the funds have to make to the

7     investor --

8          THE COURT:  Well, I see what you're saying.  So,

9     okay.  So it has to be done for marketing purposes.  But he -

10    - your view is he recognizes at 1%, it's kind of immaterial

11    to him.  He, he, he, he needs 1% default rate.  Doesn't

12    matter to him.  He could, he could default on a lot of it and

13    still make money.

14         MR. COROZZO:  He wanted to make sure his investors

15    were paid back.

16         THE COURT:  Yeah.  But, but, but that's what you

17    must realize.  That's what problem is with creating this type

18    of conduct where you continue to lie about it.  And then you

19    -- Mr. Gioe, he didn't need to collect.  Now, you know, I

20    know you want to collect your debts, but he didn't know you

21    need to go out and collect that amount of money from every

22    person with those threats to make money.  To pay, to repay

23    his investors.  You don't have to do that.

24         MR. COROZZO:  Your Honor.  But when you're operating

25    a business and you have obligations, you want to collect

1    everything you, you can collect.

2             THE COURT:  No, I agree.

3             MR. COROZZO:  You want to collect everything you can

4    in most cases, legally.  And in this case, Mr. Laforte does

5    cross the line and it's, and it's clear that he does, but he

6    wants to collect as much as possible.  There's a lot of back

7    and forth.  You, you see just from the, the, the sighted

8    extortion victims.  There's a lot of back and forth.  There's

9    a lot.  I'll give you more time.  There's a lot.  Okay, let

10   me know.  And my client is reactionary.  So when someone is

11   telling him, I have Mr. Perillo, I have $17 million worth of

12   real estate.  I'm waiting on a bank loan.  Give me a, a, a

13   little bit more money.  I'm getting the, I'm getting the

14   funding in a week, I'll pay it all back.  And then ghosts my

15   client.  Shuts the accounts.  It caused a reaction in my

16   client.

17            THE COURT:  And he's paying.  As, as it would at

18   Bank of America.  I mean, Bank of America would

19   [indiscernible]

20            MR. COROZZO:  Different -- would cause different

21   reactions.

22            THE COURT:  No, but they, but they, they wouldn't

23   like it either.  I mean, I'm not suggesting he's wrong not to

24   react.  That's not the question.  No.  The question is, what

25   did he do to get the money in, in the first place?  And the

1    question is, did he, did he misrepresent to investors?  He

2    said he did.  So that's really -- and then you have the wire

3    fraud on the way out and around that.  So I think the, the

4    reality is, he could go to jail for, you know, I'm going to

5    talk about the C Plea in a minute, but he could go to jail

6    for 30 years on each count of just the ones he's admitting.

7    The racketeering and the wire.

8              MR. COROZZO:  That's what the guidelines called for.

9              THE COURT:  No, no.  That's what the Congress calls

10   for.  The guidelines have 360 altogether.

11             MR. COROZZO:  Right.

12             THE COURT:  So what I'm getting at is, when I, when

13   I, when I have a tough time and, and Mr. Alfano previewed it,

14   and I was going to ask anyway, I asked his brother the same

15   question.  And that is, it doesn't seem -- what, what is your

16   view or your client's view about the attack?  Why make the

17   attack on Mr. Alfano?  It's already over.  See, I, I just --

18   the, the whole, it, it just reeks of retaliation to me.  And

19   what's the theory there other than retaliation?  You're going

20   after an officer of the court to retaliate.  Just tell me

21   where I'm wrong.  Just help me out there.  Tell me where I'm

22   wrong there.

23             MR. COROZZO:  Your Honor, I can't say that you're

24   wrong.  I, I, I agree with Your Honor that there's no benefit

25   to the future.

1          THE COURT:  Yeah.

2          MR. COROZZO:  And I, and I don't necessarily put any

3    stock into, someone might buy the house, the house is gone.

4          THE COURT:  Yeah.  Forget that.

5          MR. COROZZO:  They're going to find the buyer for

6    the house.  They're going to, they're going to discount the

7    house.  The house is gone.

8          THE COURT:  Nice house.  Yeah.

9          MR. COROZZO:  Your Honor, Might --

10         THE COURT:  So, so, so the point is, it, it -- is

11   your client -- I don't quite get it.  Is, is your, your

12   client -- you, you weren't here and I, and, and frankly had -

13   - but for what turned out to be a rather smaller storm, I

14   would've heard your client first and had a different view of

15   James because you weren't here.  Okay.  It was your brother.

16   I don't think.  Maybe, maybe Lisa was here, but, but the

17   brother was like, I -- my brother really -- my brother Joseph

18   wasn't really involved in it.  I'm thinking, wait a second

19   here.  You know, sort of protecting his brother, Joe.

20         MR. COROZZO:  Well, Your Honor --

21         MR. COROZZO:  It seems to me the evidence is pretty

22   clear that there was some -- at least encouragement going on

23   to go after Mr. Alfano.

24         MR. COROZZO:  Well, my client pled guilty and

25   admitted to the counseling.

1    THE COURT:  Right.  Okay.

2    MR. COROZZO:  And of threats.

3    THE COURT:  Okay.  So, so, so in, in fairness, in

4  fairness, your client's admitting that he played a role, it

5  wasn't just his brother out there on a lark.

6    MR. COROZZO:  Without a doubt, Your Honor.  And

7  that's why I said in the beginning of my, my presentation,

8  that Alfano was the most serious conduct and has to be taken

9  into consideration.  However, Your Honor, my client, Joseph,

10  has shown himself to be controlled. To be more artful to a

11  point.  Gioe, he always says, don't put your hands on

12  someone.  When he talks to someone, everyone, even in the

13  text and everything is certain type of language.  In this

14  case, he admitted to counseling Eden in a betting.  And it

15  was with the use of threats.  And it has to be considered.

16  And the issue in, in my opinion, is that we're here today.

17  The government has agreed to it.  The 13 and a half and 15

18  and a half year, year sentence.  Even Mr. Alfano was

19  consulted about it beforehand.  It's an incredible amount of

20  time.  And my client has been sitting in the FDC for quite

21  some time knowing that he left his wife out here, knowing

22  that he's losing everything.  And he -- he's here before Your

23  Honor to be sentenced.  And I think that as serious and as

24  offensive, the conduct is for the wire fraud.  I think that

25  the court has to consider the Alfano situation.  I think if

1    someone -- if for similar conduct, on a standalone case, it

2    wouldn't rise to the level of a 13 and a half year sentence.

3    No.  But -- and, and again, and, and that's why I'm saying

4    one is that the range is reasonable.  I'm saying two, that 13

5    and a half years is quite some time.  There's a lot of

6    factors.  It's not just the wire fraud.  You also have the

7    gun case.  You also have the tax case.  You're dealing with

8    13 -- three indictments.

9         THE COURT:  Right.

10        MR. COROZZO:  And what, what -- all I'm saying is

11   that it's, in my opinion, it's the very rare case that

12   requires the top of the sentencing range.  And I don't think

13   my client rises to that level.

14        THE COURT:  Sir, what is the ground when I do the

15   JNC?  You as an experienced criminal lawyer, what's the

16   ground I'm checking off for a variance from 360?  Start at

17   360 to 160.  I -- I've been wrestling with that.

18        MR. COROZZO:  Well, I think, I think we start with

19   that the guidelines overstate the series of the conduct.

20   Because as you know, from all the comparable cases, including

21   Theranos, including Madoff, no one gets, no one gets life.

22   And how many, and how many cases --

23        THE COURT:  They get 360.

24        MR. COROZZO:  Well, very rare.

25        THE COURT:  What of Madoff, I guess?

1          MR. COROZZO:  I think that the, the Theranos

2     sentences --

3          THE COURT:  Madoff was much different situation.

4     That's not a fair one, but go ahead.  But there -- I, you

5     know, one of the things we did when I came in this morning

6     is, we have every single indictment that was cited by the

7     United States.  Not a single one.  Not a single one involves

8     threats, extortion, physical harm, economic harm.  It's all

9     securities, fraud, corruption kind of thing.  You know,

10    lying, the, the Holmes kind of conduct Ponzi schemes.  Now,

11    I, I, I know why you're on not a pardon scheme, but this has

12    a little something different.  I agree with you.  And, and

13    360 months, as a guidelines range would be the bottom of it.

14    Not the top.  It would be the bottom.  So, I'm asking you as

15    a lawyer, tell me, because you're asking me to take a

16    sentencing range as a variance.  So I got to explain to folks

17    why I am giving this gentleman a variance from 360 down to a

18    number that's less than half of it.

19         MR. COROZZO:  And, and I'm, I'm starting again, Your

20    Honor.

21         THE COURT:  With what word though?  What, what's

22    that?

23         MR. COROZZO:  With, with the, the guidelines

24    overstate of the conduct.  That's the starting point.

25    Because I'm, I'm also explaining to you, Your Honor, what

1  we're learning today in the, in the era of compassionate

2  release, that old cases, narcotics cases, violence cases that

3  required mandatory sentences of life of 40, 50 years are all

4  -- or to a great extent are being reversed 15, 20 years down

5  the line.

6        THE COURT:  Or about not reversed, not reversed

7  being, being released.

8        MR. COROZZO:  Being released.

9        THE COURT:  The case [indiscernible] Right.  Right.

10        MR. COROZZO:  So I, I don't think you could just

11  mechanically apply those guidelines.  And I do think, and I

12  do think that there is an issue of his age.  I do think

13  there's an issue of his family circumstances.  I do think

14  there's an issue of the potential for the investors to be

15  made whole through the restitution.  I do think there's --

16        THE COURT:  How does him getting out and 13 and a

17  half as opposed to 15 and a half help the investors?

18        MR. COROZZO:  It doesn't at all.

19        THE COURT:  Okay.

20        MR. COROZZO:  Doesn't at all.  The investors are

21  going to be helped through the SEC action.

22        THE COURT:  Right.

23        MR. COROZZO:  And, and that's it.  It's, it's not

24  going to help.

25        THE COURT:  Okay.  How about, how about, how about

1   the, how about the effect on the, you know, respect for the

2   rule of law here?  This unfortunately had served time in, in

3   prison and came out and, and really multiplied his conduct.

4   What, what does that tell us about respect for the law?  How,

5   how do I factor that in?  It goes against you, but tell me.

6          MR. COROZZO:  It does, it does --

7          THE COURT:  Tell me your argument then.

8          MR. COROZZO:  My, my argument is, Your Honor, and

9   I'm, I'm pushing 60 now.  I, I don't want to -- I don't know

10  if you're older or younger than me at this point, but there's

11  a big difference when someone comes out over 65.

12         THE COURT:  Yeah, I agree.

13         MR. COROZZO:  I've seen it.  I've seen it with

14  clients, I've seen it with people.  And some people don't

15  make it out at that age.

16         THE COURT:  Sure.

17         MR. COROZZO:  But there is something to be said.

18  And the, the statistics say that, that the older ages, the,

19  the lower the rate of recidivism is.

20         THE COURT:  What's the family concern, sir?  You

21  said family circumstances.  What's the family circumstances?

22         MR. COROZZO:  Well, Your Honor, he, he, he put his

23  wife into the situation.

24         THE COURT:  Oh yeah.

25         MR. COROZZO:  He, he had, had everything taken --

1          THE COURT:  Tell me about that.

2          MR. COROZZO:  He had, he had everything taken from

3    his wife.  His, his wife is starting, starting anew.  And

4    that's another -- we're ultimately going to make a request on

5    behalf -- well, for the benefit of Ms. McElhone for a BOP

6    recommendation if the court is inclined to do it.  And that

7    would be for the resident, for south Florida, because that's

8    where Ms. McElhone is relocating to.

9          THE COURT:  Oh, you mean for, for his -- well, Ms.

10   McElhone has to wait to get sentenced first.

11         MR. COROZZO:  Well, Ms. McElhone, presumably

12   whatever happens to her, she's going to be home while Mr.

13   Laforte serves a great deal of a sentence.  Her home will be

14   in South Florida.

15         THE COURT:  I see.  Okay.  I don't know that, but

16   okay.  That's suggest.  Okay.

17         MR. COROZZO:  And, and, and I appreciate that you

18   cited my client's care for his father.

19         THE COURT:  Yeah.

20         MR. COROZZO:  You know, Mr. Laforte has his family

21   here today.  His mother, his sisters, and, and you, you can

22   imagine where I'm going with this.  His mother is not a young

23   woman.

24         THE COURT:  She wrote a terrific letter and, and she

25   wrote a great letter for her other son, and she wrote a great

1   letter.

2          MR. COROZZO:  You know, there's an issue of whether

3   she'll ever see them free again.  And that's always an issue

4   when you're being incarcerated in your fifties and your

5   sixties, and you have an elderly person at home and you're

6   not -- and you will no longer have the ability to care for

7   them.  Most likely my client will, will not have the ability

8   to care for his mother like he did for his father.

9          THE COURT:  Right.  Right.  So that's the family

10  system.  Okay.  So your, your main one is the overstate that,

11  that the -- okay.  So that you, you think three, six -- that,

12  that the guidelines are overstated in this offense and that,

13  that gives us a ground to vary down to, to start of 168 or

14  one -- yeah.  168.

15         MR. COROZZO:  And I think most courts have found

16  that throughout the country, even with the Sam Bankman freed

17  case, there was billions of dollars.  I think the sentence

18  was 25 years because the guidelines overstated.

19         THE COURT:  Right.  They're, they're -- they jumped

20  to 360 pretty quick.  Right.  Okay, sir, continue, please

21  continue.  I don't want to hold you up,

22         MR. COROZZO:  Your Honor.  We ask for any

23  consideration under the 15 and a half years.  My client,

24  whether it's 13 and a half or 15 and a half, we'll be coming

25  home one day.  He will be a much older man.  And sometimes it

1   takes age to acquire wisdom.  And 13 and a half or 14 year

2   half sentence is, is a serious sentence.  And something that

3   will give him a very long time to think about it.

4           THE COURT:  What's the nature of this business?

5   Some guy wrote a -- somebody wrote a letter about who's going

6   to go to work.

7           MR. COROZZO:  This was the former client who became

8   a personal friend.

9           THE COURT:  Right.  What, what -- who, who, who --

10  this is Mr.  Anthony Jones.  What is Trio Business Solutions?

11  It's a range.  This sounds like something that's -- I don't

12  know, a range of solutions for small businesses, including

13  security, business financing, operational efficiency.  I

14  mean, I appreciate the taglines, but what exactly is this guy

15  doing?

16          MR. COROZZO:  Well, it's, it's similar to a business

17  that my client was exploring while he was on release advising

18  small companies on how to operate.

19          THE COURT:  Like more, not a financial, more from an

20  operational.

21          MR. COROZZO:  Operational meaning how do you deal

22  with your suppliers?  How do you deal with inventory?  How do

23  you deal -- And what my client has learned through his many

24  years of being in business is that a lot of small companies,

25  privately held companies do not know how to run their

1   operations. I think that's what probably happened with

2   Allegretta Electric, that they -- any business that starts

3   off very small, yes. That grows exponentially if you don't

4   hire the right professionals. And if you're still running it

5   like a mom and operation. It's bound to fail.

6        THE COURT: You know, his case reminds me of the old

7   film about the gentleman who was the great forger of, of

8   financial documents. He, he later turned frank. Anyway, he

9   later turned into FBI expert and witness.

10       MR. COROZZO: That's Wall Street, Your Honor?

11       THE COURT: No, that wasn't the Wall Street.

12       MR. COROZZO: Okay.

13       THE COURT: If you catch -- if you can catch the

14   movie. But I can't remember. The Frank or something. But

15   this case reminds me of it. Because I could see Mr. Laforte,

16   you know, the old saying is, you know, Mr. Corozzo, you know

17   better than I do. The old saying is that if, if, if these

18   guys could go out and, and help the things they know to

19   running a business because they ran his -- they manage it so

20   illegally, they know how to do it legally could help so many

21   people. And I'm thinking of that guy who's then waited to

22   work for the FBI. Made more money than he ever dreamed of,

23   was writing books and making movies. Because I could see Mr.

24   Laforte, you know, SBA kind of guy, like helping, helping

25   the, helping the mom and pops.

1    MR. COROZZO:  He really learned --

2    THE COURT:  You don't have to borrow money.  Just

3    know how to negotiate with banks.

4    MR. COROZZO:  And the one thing, what we hope he

5    learned, and I can tell you this, with the foundation of his

6    wife Lisa, who's a remarkable woman, the one thing he has to

7    be disavow of is this thrive to get rich.  Which, which

8    controls a lot of people.  It happens a lot in our country.

9    You need to live within your means.  You should be

10   comfortable making a good living.  And what people strive for

11   in this country is not always beneficial to them, their

12   families or, or, or their communities.  And I think after

13   acquiring so much wealth, which is astronomical.  Something

14   that I couldn't even imagine having those assets, having that

15   type of money, but then losing it all.  It's, it's, it's a

16   humbling experience.  And I think nine out of 10 people would

17   be humbled by it.  There's always the one person that's not.

18   But I think there's a very good chance that this will finally

19   humble my client.

20   THE COURT:  Mr. Laforte, I once represented a guy

21   that lost a billion dollars in an afternoon on the market.

22   He was well known in Philadelphia.  Everybody knows who he

23   was.  A company out in Valley Forge, Safeguard Scientifics.

24   And he -- a guy, a guy named Musser, and I remember when

25   representing him afterwards, and I, and I used to say to him,

1  say, oh my gosh, he lost a billion.  It's almost like Musk,

2  he's losing now, whatever, in a stock market cap.  He said he

3  lost a billion dollars in eight hours.  And he said

4  something, Mr. Laforte, that, that struck me now for 30

5  years, almost 28 years.  He said, you know, he said, I was

6  never, I was never in the game for -- I never really

7  understood the dollars.  I understood the game.  Like you, he

8  was a baseball player.  I understood the game.  I was playing

9  a binary game, win or lose.  I wasn't -- money was just the

10  whatever.  Money was just what came along with it.  And he

11  did pretty well.  And so he lost a billion dollars overnight.

12  His only concern was, I hope I'm not -- I didn't do anything

13  illegally.  He wanted to have a check because he says,

14  because I will bounce back.  I know how to do this.  I just

15  lost this game.  I lost the first end of a double header.  I

16  will come back and play the second end.  And that's -- your

17  council is giving you very sage advice in my view.  You know

18  that there is second and third and fourth acts that people

19  who are skilled enough, to know how to do it the right way

20  can do very well.  I'm sorry, I, I digressed Mr. Corozzo.  Go

21  ahead.

22          MR. COROZZO:  No, Your Honor, I, I, I think we've --

23  between the two of us, we've said everything that I would

24  like to say.

25          THE COURT:  Well, I, I, I don't, I don't want to

1   hold up any more time, but it just, it just strikes me that

2   every time I see cases like this, it, it is frustrating

3   because people are so talented and they, and they use it for

4   the wrong reason.

5          MR. COROZZO:  I think it's more also just to add, I

6   think it's just every case that we come across of someone

7   who's truly successful in whatever they're doing.  It's, it's

8   through intelligence and hard work.

9          THE COURT:  Yeah.  And they -- and it's misapplied.

10         MR. COROZZO:  Yes.

11         THE COURT:  Mr. Carozzo, anything further?  So does

12  anybody, anybody --

13         MR. COROZZO:  No, Your Honor.  Mr. Laforte's family

14  is here.  They've submitted letters --

15         THE COURT:  I have them, yes.

16         MR. COROZZO:  They'll rest on their letters.

17         THE COURT:  Okay.  Mr. Laforte, I have to ask you,

18  sir, your counsel already told me, but you have the, you have

19  the ability if you wish to all you to speak to me.  Your,

20  your counsel has told me that you wish to decline that you

21  certainly.  Is that correct, sir?  You wish to decline

22  speaking to us?

23         THE DEFENDANT:  No, I'd like to, I'd like to speak

24  to you, Your Honor.

25         MR. COROZZO:  If I could, Your Honor, there was a

1    difference of opinion during our lunch break.  So if you

2    could swear him in, he'd just like to --

3            THE COURT:  Okay, sure.  That's why I ask.  That's

4    why we ask.  Alright.  Mr. Deputy, could you kindly swear

5    Mr. Laforte.

6            ESR/CLERK:  Please rise.  Please raise your right

7    hand.  You do swear or affirm the testimony you shall give to

8    the court shall be the truth, the whole truth, and nothing

9    but the truth.  So help you, God or you affirm.

10           THE DEFENDANT:  I affirm.  Thank you.

11           ESR/CLERK:  Please state your name for the record

12   and spell your last name.

13           THE DEFENDANT:  Joseph LaForte.  Last name L-A

14   capital F-O-R-T-E.

15           ESR/CLERK:  Thank you.

16           THE COURT:  Mr. Laforte, with the gentleman behind

17   you, his permission.  I can't really see your face with the

18   screen.  Would you, would you stand, sir, if you could.  I'm

19   not trying to make it difficult for you.  Would you stand?

20   Sir, are you okay with that?

21           THE COURT:  Okay.  Thank you very much.  You may

22   stand or sit as you wish.  Thank you.  Mr. Laforte.  What,

23   what, what should I understand, Mr. Laforte?

24           THE DEFENDANT:  I can stand or sit, Judge.

25           THE COURT:  Whatever you prefer.  What should I

1  understand?

2  THE DEFENDANT: Your Honor, first of all, I, I, I

3  just feel terrible. I mean, I just want to thank you for

4  taking all this time. I know that it's been, it's been

5  hectic on the schedule. You asked great questions. You

6  stayed late for us many times, and you really -- you really

7  went out of your way to listen to every side of the argument.

8  I, I do appreciate that a lot of times, especially in, in

9  some cases, you don't get, get a fair shake. You've stayed

10 late for us, and I think you've really taken in the

11 information. And I humbly ask you if you'll continue to let

12 me speak. I'm a little nervous right now.

13 THE COURT: Take your time, sir.

14 THE DEFENDANT: If you could like you maybe

15 interject and ask me questions.

16 THE COURT: I will.

17 THE DEFENDANT: Before you do, Mr. Corozzo, will you

18 help me a little bit?

19 THE COURT: Mr. Corozzo may tell you don't do that,

20 but -- okay.

21 THE DEFENDANT: On top, I've been --

22 THE COURT: You don't have to, by the way, Mr.

23 Corozzo, you can tell Mr. Laforte. He -- you don't have to

24 answer any question that you, that you -- Mr. Corozzo.

25 Right? Mr. Corozzo, step up if you --

1       MR. COROZZO:  I've advised my client, Your Honor.

2       THE COURT:  Okay.  So, yeah.  You don't have to

3  answer any questions, sir.  You, you, you know, you have full

4  protection from the conviction, but I -- you don't have to

5  answer any question that you think in any way, shape, or form

6  would incriminate you in any other context.  Okay?  So, you

7  have good counsel.  He's sitting right behind you.  He'll

8  jump.  But when I ask questions, don't feel like you have to

9  answer.

10       THE DEFENDANT:  No, I won't.

11       THE COURT:  I'm being serious.  Alright?  I'm not

12  here to ask you stuff that's going to get you in any further.

13  You know, today I went off this thing about AR payments

14  because I was a bank lawyer.  I was a bank general counsel.

15  I understand what that is.  Alright.  So.

16       THE DEFENDANT:  Those questions are good.  Yeah.

17       THE COURT:  Well, no, I don't know if they are.

18  United States said they were, but okay.  Go ahead.  I was, I

19  was off, I was off base.  That's I wasn't, I wasn't -- they

20  weren't bad questions.  Go ahead, sir.

21       THE DEFENDANT:  I just wanted to say, I wanted to

22  tell you some things that maybe aren't in the PSR.  Maybe I

23  could give you a little bit more explanation, a little

24  insight about me and, you know, my family and kind of what

25  stuff I've been through.  You know, I've been -- I'm a little

1  nervous right now.  I've been --

2          THE COURT:  Take your time.

3          THE DEFENDANT:  -- in jail for two years on this

4  case.  A little rattled about that.  So.

5          THE COURT:  Please, it's a big day for you.  Take

6  your time.

7          THE DEFENDANT:  Yeah.  I just want to say that

8  before, so, when this case began in July of 2020, I have to

9  admit that I was disturbed.  I was very angry.  I read the

10  indictment.  I didn't really understand the nuance.  I can't

11  -- I couldn't understand the nuance.  Maybe it's my technical

12  side.  I was reading the case and reading the counts and

13  saying, well, that's not a crime.  That's not a crime.

14  Looking at, at a nuanced.  And I looked it through a very

15  narrow lens.  So that created a lot of anger for me

16  personally.  I was very frustrated.  So, as you could see,

17  some of the gentlemen to my left have said, you know, they

18  filed this, they filed that, you know, I'm a fighter.  So,

19  you know, they're coming up with things that I didn't think

20  that I did wrong.  Whether I did them wrong or not.  I had to

21  kind of go through my own process with that.  That took me a

22  lot of years.  I mean, literally, this has been on since

23  2020.  It's no secret to anybody in here that I filed over

24  2000 Judgements in the SEC case, when I was home on an anchor

25  bracelet, I would stay in my garage and for literally days at

1    a time without hardly any sleep writing reports for my

2    lawyers in Florida.  So I was really -- I had to get a better

3    understanding of things.  Like, for example, you know, hiring

4    a representation manager, I would just look at that specific

5    count and say, well, that's not a crime.  I'm not

6    understanding what I did wrong.  So it took me a lot of time

7    to, to go through this process.  So, but after, you know,

8    after as time went on, I started to open up my mind and

9    listen to my account to get a better understanding of how

10   the, how these specific nuanced counts could arrive at, at a,

11   a larger crime.  But I spent years at the FTC Philadelphia,

12   working with my lawyers on this case.  My thoughts, that

13   process did start to change.  I had to take accountability

14   because I was the leader of Par funding period.  Like, you

15   know, if I said -- if I went over every nuance, like, like

16   Mr. Corozzo had said, like, you know, we had accounting

17   departments.  We had, I could say, oh, well I got reports

18   from the accounting division.  There's 17 staff accountants.

19   Or I could place blame on attorneys.  We had SEC counsel.  We

20   spent millions on securities counsel.  Is it a security or

21   not?  I don't -- I mean, I don't know if it's a security or

22   not.  I'm not a securities lawyer.  I'm a finance guy.  I'm a

23   sales guy.  So, with that being said, I had to get over the

24   fact that, you know, that I got it wrong and I had to take

25   account of it.  Because I'm the leader of the company.  So,

you know, I went back to, believe it or not, I really went
back to my college days when I had a coach.  His name was Boy
Coffee.  He was a famous catcher.  He was, he was at rolls
with me.  And he used to say, just accept -- make the
adjustment and accept responsibility.  It just makes life a
little bit easier.  But it took me a lot of years to do that.
So I'm at a place now where I can get a better understanding
of the law.  I can't -- I couldn't understand how you could
hook -- how, how could you hook, you know, like on the -- for
example, on the wire fraud charges an email into the all
powerful.  I couldn't understand that.  Something be a
conspiracy if I wrote something.  If we were all trying to
work in the same direction.  I just couldn't get it.  So my
thought process did start to change.  And Mr. Corozzo helped
me out a lot because I didn't understand -- I understood the,
the, the civil side a little bit better.  The criminal side I
became, was really complex.  I learned that there's 4,500
criminal codes.  I think that everybody in this room, and no
disrespect to anybody, if we all sat and tried to figure it
out, and I'm not a lawyer, but I, I include me, it would be -
- we'd have a hard time understanding the nuance of every,
every single criminal code.  It's just impossible to fully
understand.  And the way that the indictment was so loaded,
you know, I kept getting hit with new indictments.  So I was
-- every time another new indictment would come or something

else would come, I would start my mental process again of
trying to figure out how to solve a problem that maybe wasn't
solvable.  So I had to take accountability.  And like I said,
Mr. Corozzo helped me with that.  We were shut down under my
leadership.  You know, I was the CEO of the company.  So I
had to let go of, of my own nuance.  I had to analyze in
every single count.  And I had to look at the bigger picture.
And I had to let go of my own victimization, regardless of
the fact that I felt some of the government's tactics were
truly appalling.  You know, I, I looked at some of the things
they did, and I, I couldn't help but feel that.  But I had to
start -- stop giving such a good account on myself mentally.
So what I was doing, I was giving a better account of myself
and, you know, some of the things that, you know, are just
part of life in business.  Because this is also -- I had to
look at it as a business.  You know, it's a, it's a, it's a
heaver, it's -- them versus us type thing.  So I had to, I
had to let that go and everybody has a job to do.  But I
learned that anyone who gives such a good account of himself
is probably lying.  So I want to tell you that, you know, I
had to come to terms with the fact that my own self-
centeredness and my own ambition attributed to our demise,
probably because I have such a low self-esteem.  I didn't
think that I was like that, but I had to kind of soul search
myself and figure out, like, why do -- why do I keep trying

1   to have to be the biggest?  Like you guys touched on before,

2   I really wanted to interject.  The guy's name was Frank

3   Abigail, you guys were talking about.

4          THE COURT:  Yeah.  Frank.

5          THE DEFENDANT:  Yeah.  So I know the, I know the

6   movie.  Matter of fact, they, they made us watch it in our --

7   I took a class here.  What was it?  NR DAP.  So they, they

8   made us watch that specific movie.  And I said to the

9   counselor after the, after the movie, I said, what does this

10  have to do with drugs?  You know, Mr. Weaver?  And he says,

11  well, it doesn't have anything to do with drugs.  It has to

12  do with criminal conduct.  And you should know about that.

13  But it really -- I took it to heart.  So it's funny that you

14  said that.  It was kind of coincidental, but I just threw

15  sidebar.

16         THE COURT:  Same idea.

17         THE DEFENDANT:  It is.  And they showed that movie

18  in the NR DAP class.  I don't know if -- Well, for good

19  reason in the NR DAP class.  Think about who's in there.

20         THE DEFENDANT:  Yeah.  So self-centered.  This --

21  and my ambition attributed to our demise, probably because I

22  have such a low self-esteem.  My concentration was always on

23  profitability.  And I -- that's where my -- that's where I

24  kind of probably took my, my eye off the ball.  Because, you

25  know, instead of just looking at profitability, you have to

1   look at every sector of the business.  And if you're doing it
2   compliantly, you know, I even went out of my way and I hired
3   a person from Homeland Security to be a compliance officer in
4   the company.  Like, you know, I was trying to do everything I
5   could to, to fill this out.  And I'm not making excuses, but
6   that doesn't matter.  I still have to look over what he's
7   being told.  So it's a little bit more, I think it's harder
8   to run these types of businesses.  I would never try to
9   venture into this again, than I had thought.  Because you're
10  going to be responsible also for some of the other
11  departments.  And I do take responsibility for those
12  departments because I was there.  I put the 15 hours a day
13  and I worked every day for 15 hours.  So that makes me even
14  more accountable.  I don't look at it as a badge of honor.
15  Mr. Corozzo was saying, well, Your Honor, you know, give him
16  a downward because he did -- he worked 15 and a half hours.
17  No, I should -- that's not the reason I should get it
18  downward.  I should get it down because I was -- I shouldn't
19  get a downward because I was there 15 hours a day.  I'm
20  smart.  I should know better.  And I should see what's going
21  on with the insurance policy.  That was a debacle that went
22  on for months.  Or, you know what, with these AR, these AR
23  letters you're talking about, which, we'll -- maybe we can
24  get into, but every single aspect of the business I have to
25  know about because that's what a CEO does.  My wife wasn't

1  the CEO of the company.  She was a nominee.  And, you know,

2  that was a -- I'll get into that in a second, but that was a

3  big mistake that I made when I formulated the company.  I was

4  so scared when I got out of jail that I would be Judged.

5  because it's hard to even get a job.

6          THE COURT:  You mean when you got out in 2000 --

7          THE DEFENDANT:  Yeah.  When I got out in 2011.  You

8  know, I was so afraid that the banks would shun on me.  I

9  mean, I never even had a bank account when I got out.

10  Because I was so afraid of being Judged.  And the truth of

11  the matter is, Judge, it wasn't even the money.  I didn't

12  care.  It got to the point where we were making, so it didn't

13  even matter.  It was the juice.  It was the day-to-day hours,

14  because I didn't, and I don't think you've seen one person in

15  here to tell you that.  I went on some -- my wife wants to

16  probably kill me for it.  We never even went on a fancy

17  vacation or anything like that.  Because I was so embedded

18  the business.  And I probably, I probably made a mistake

19  doing that.  But, but my concentration was always on

20  profitability.  And as a CEO, I think you should be -- have

21  a, have your eye on every aspect of the, of the, of the

22  business.

23          THE COURT:  But sir, you, you know, that's -- what

24  you say is, they would teach somebody, the school of hard

25  knocks would teach them.  You have to outwork your

1  competition.  Right.  That's the way you did it.

2          THE DEFENDANT:  Yes.

3          THE COURT:  Okay.  The difference here is that at

4  some point, you, you cheated the game because you got so

5  driven by it.  I mean, you have to agree with that.  I mean,

6  to, to go and, and, and turn to the tactics of the street, at

7  least in part, at time to time, and have Gioe do it from time

8  to time.  It's just, you know, you realize there's Bank of

9  America and there's city and then there's this.  At some

10  point, sir, it must have hit you and saying, wait a second,

11  this is not going to happen.  Eventually these people, I

12  can't, I can't beat up everybody and eventually somebody is

13  going to come forward.

14          THE DEFENDANT:  I'd be remiss if I didn't mention

15  this.  If I -- I'm, I'm treading dangerous ground right now

16  going into this.  But I, I take full accountability for Gioe.

17  When the business is small, when you have a business that is

18  small, when you first just start, we started with our own

19  money, a couple dollars, nothing big.  And then we got our

20  first investor, and unfortunately is on one of your sheets.

21  Hallahan was one of our first investors in our company.

22  Right.  So, so, you know, when you're that small, you have

23  to, you have to get that money back. The first moves have to

24  be your best moves.  And I was still learning the nuances of

25  the cash advance business, how to underline a file, who to

1    give money to.  It's not an easy, easy thing to do.  And it's
2    hard enough to collect from some of these people.  So, you
3    know, the first moves have to be asked.  So I -- when
4    originally we brought Gioe in, in hindsight, which is only 20
5    -- which is 2020, I -- it was a big mistake.  I mean, I
6    didn't need -- looking forward 2019, I didn't need Gioe.  I
7    was happy he was gone.  I hired Fox Rothchild.  Fox Rothchild
8    was our collection arm of funding.  They didn't need Gioe.  I
9    mean --

10            THE COURT:  They were collecting, but my, my numbers
11   showed that they were -- as your, as the expert said, you
12   were collecting more efficiently.

13            THE DEFENDANT:  Yeah.  Much efficiently.  Much more
14   efficiently.

15            THE COURT:  After 2019.

16            THE DEFENDANT:  Exactly.  And also, you know, with
17   all due respect to the emails that you got being pulled there
18   from 2015 to 2016 when the, the company was on, on Volatile
19   Ground like any company is in the beginning.  By, by 2019, we
20   were, we were doing phenomenal.  In 2020, obviously Covid
21   hurt us because small businesses closed their doors.
22   Everybody knows that if anybody watched TV, they would see
23   everybody who was shut down.  So we got -- we did get through
24   that though, but, but getting back to this Judge, I, I had, I
25   had to, I had to --

1          THE COURT:  But what's the game?  So, so explain to

2     me that, and you don't have to, but just explain -- what I

3     never can understand about this case is, why does it need to

4     be so big?  I mean, I, I, I mean, very seriously.  I If you

5     had just done this in Delaware County.

6          THE DEFENDANT:  Yeah.

7          THE COURT:  Right.  You were just a guy lending

8     money and making a nice little life.  What, what was the

9     trick?  Why did you get so big?

10          THE DEFENDANT:  It is like 2000 companies in this

11     space right now that are small just like that.

12          THE COURT:  Because I can see where.

13          THE DEFENDANT:  1 million, 50 million under

14     management, they do great.  And they're phenomenal.

15          THE COURT:  And they make good numbers.  I see them

16     and they make good --

17          THE DEFENDANT:  It's my ego.  It's my ego.  I wanted

18     to be the biggest and the best.

19          THE COURT:  That's the answer.  Because I couldn't

20     figure out --

21          THE DEFENDANT:  You know, I wanted to be in front

22     and center.

23          THE COURT:  But not really because you hit -- you

24     didn't, you didn't want to be front.  You had, you had your

25     friend.  I shouldn't call him your friend.  You had the guy

who came on KYW selling it.  You had, you know, you had

Abbonizio in the $2,000 suit walking around, right?

THE DEFENDANT:  In the NCA world.  Under all

companies --

THE COURT:  Oh, I see.

THE DEFENDANT:  I was, I wanted, you know, what I

mean?

THE COURT:  Two people who knew.  The insiders.

THE DEFENDANT:  Yes.  A hundred percent.  Everybody

knew it was my company.  There was no -- there's no secret.

So everybody knew it was my company, and I wanted to, I

wanted to be the biggest.

THE COURT:  But you weren't going to those pitches

with Abbonizio and [indiscernible].

THE DEFENDANT:  I did.  I went, I went once.  They

asked me to come one time, I went.

THE COURT:  Okay.

THE DEFENDANT:  But then, you know, they, they

brought me up on stage.  I said some stuff.

THE COURT:  Okay.  But just once out of what, how

many they in?

THE DEFENDANT:  Yeah.  Once.  And, you know, we, we

took a, we took a few meetings, like guys would, like Mr.

Corozzo stated, guys, we had an open-door policy in the

office.

1          THE COURT:  Right.

2          THE DEFENDANT:  So people would come in all the

3    time, and we would give them -- they would sit down with us.

4    We'd show them -- We had some really cool technology.  You

5    know, similar to, I guess, and I -- I say this.  I -- I'm so

6    saddened by Ms. Allegretta that was up there before, like, to

7    the advantage of the government, you know, she got up there

8    and, and she, she, she was crying.  She -- that was -- I was

9    sad.  I was sick that she thinks that I would do something,

10   you know.  But if you had the opportunity to see how our

11   operations worked and what it looked like, it looked like

12   NASA in this office.  You know, we had the, the best

13   technology.  I thought we had the best people around us.  And

14   yeah, it, it -- I wanted to be the biggest and the best.  I

15   mean, I could have just stayed, stayed small to your point.

16   And done very well.

17         THE COURT:  Yeah, yeah.  Because you didn't need to

18   feed the dragon.  You didn't need to keep --

19         THE DEFENDANT:  Of course.  My email.  Yeah.

20         THE COURT:  You need to get more money.  Okay.  Then

21   let's take us to the last thing.  The thing that's sort of is

22   the cherry.  And that it's not -- I don't mean disrespect to

23   Mr. Alfano when I say that, but it's the whole idea that

24   there's this attack on Mr. Alfano.  But do you understand

25   what happens here and how that affects people and how it

1  sends a message?

2  THE DEFENDANT: Oh yeah. A hundred percent, yes.

3  THE COURT: Okay. I mean, you, you appreciate that

4  you cannot intimidate the justice system.

5  THE DEFENDANT: Yes, a hundred percent.

6  THE COURT: Okay. Because that's what it appears to

7  be.

8  THE DEFENDANT: No, I don't. Yeah, no, I understand

9  that. A hundred percent. I'm sick, I'm sick --

10  THE COURT: So what's the thinking? Without,

11  without -- what, what, what -- is the thinking there that I'm

12  going to harm him for hurting me in the past, or I'm going to

13  intimidate the justice system? Like do you think Judge Ruiz

14  is going to react favorably to that?

15  THE DEFENDANT: No.

16  THE COURT: Yeah. That's where I'm getting at.

17  THE DEFENDANT: No, it was, it was -- it's like

18  throwing, throwing fuel on the fire. The worst, the worst

19  thing possible. It hurt us in the SEC case.

20  THE COURT: And you have no -- the record show no

21  alcohol addiction, no drug addiction, nothing.

22  THE DEFENDANT: No, I don't --

23  THE COURT: Your mind is not fueled by this. It's

24  just --

25  THE DEFENDANT: No, no, I don't --

1    THE COURT:  It's just what, just ego.

2    THE DEFENDANT:  I don't, I don't do drugs or --

3    THE COURT:  Right.  I saw that.

4    THE DEFENDANT:  Or anything like that.  No.

5    THE COURT:  So it's just ego.

6    THE DEFENDANT:  It's my ego.  Yeah.  I'm self-

7 centered.  I have a big ego, and I wanted to be the biggest

8 and the best.

9    THE COURT:  Right.  What -- how has that changed,

10 sir, when you get out?  I mean, you're not going to change

11 that.  You're going to get out.  You'll still be a relative -

12 -

13    THE DEFENDANT:  I'll change.

14    THE COURT:  You're a relatively, you're relatively

15 young man as most of us in the room.  Now, you're relatively

16 young man.  How does, how does that change?  I know.  Don't

17 laugh at us.  How, how has that changed?  I mean, how --

18 people who have been driven their whole lives don't just wake

19 up one day and say, okay, I'm okay.  I'm okay sitting.  I'm

20 okay batting, batting eighth when I used to bat second.

21    THE DEFENDANT:  Well, I think everybody has to get,

22 get -- everyone has to come to terms with that.  Especially

23 analogy is going to be sports.  But yeah.  I mean, I don't --

24 my, my, my motors a dip.  I've been here for two years now.

25 I mean, I'm sick to leave my wife at home every day.  You

know, I wanted to talk to, talk about Lisa a little bit, if I could too.

    THE COURT:  Please.

    THE DEFENDANT:  You know, I selfishly put my wife Lisa in this terrible legal position.  She's also a victim of me.  And I deserve to go to prison for that.  Above all, I put her in this position and used her trust and loyalty to my own selfish advantage.  I put her in this compromising position.  I think one, one thing we can all agree on is that I was the CEO of Par funding.  And I called the shots.  I dealt with the accountants, set up par strategy.  I dealt with securities counsel.  I asked Your Honor, in advance of Lisa's sentencing, to have leniency on Lisa, whose only crime is truly just marrying me.  And a husband who truly I don't deserve her, in the face of me hurting her and leaving her once again to go to prison.  She still honors a sacrament of marriage.  And she never asked for any of this.  She never cared about money.  Only me, because now she has no money, nor do I.  And she's still sitting behind me here today, which I find completely amazing.  So, to prove that she never cared about the money, to the point -- to your point, Your Honor, it's only my own ego.  It had -- there's nothing to her.  I would tell her what to do.  I -- she -- I was -- she was led by me.  She stood by my side for the past four and a half years through prison, home confinement, losing her home

1    and legal issues that are all my doing.  She's even taking

2    care of my two dogs.  I have, I have dogs that I, I love so

3    much.  And she takes care of them, which is a lot of hard

4    work.  They're not normal dogs.  They're big.  So she even

5    takes care of them for me and every and every day.  And I'm,

6    I'm embarrassed about that, but I'm not a quitter, Your

7    Honor.  And in spite of my endless shortcomings, I'm going to

8    use this time to find who I am.  I create who I am.  My own,

9    my own handy work.  So I'm 54 years old, Your Honor, I'm late

10   in life.  And in my time in FDC Philadelphia, I've

11   experienced a lot of change.  I realize that all great men

12   are not good men.  And I'm going to move on to embrace a new

13   path, to try to be someone good.  Since any life when viewed

14   from the inside of a jail cell is a series of defeats.  And

15   I've been through a lot.  I'll take these losses and learn

16   from them and figure out how to be better.  In the time I

17   serve.  I'll prepare to live -- learn to live in two

18   dimensions at once, realizing that greatness is for self

19   gratification, but goodness is for family and humanity.  So

20   your question, Your Honor, how do I juggle both and still be

21   in harmony and promise you at this court, that if you give me

22   the low end of the guideline, I'll do something good with my

23   life.  It's because I won't -- if I don't think that, if I

24   don't think that I could live in harmony, and I can't coexist

25   having both, when I'm confronted with that choice, I'm going

1  to choose goodness.  I'm not going to choose the other way.

2  So when confronted with that choice, living in two

3  dimensions, I, I swear by God, I'm, I'm not going to choose

4  the other way.

5      THE COURT:  When you came out, sir, you had faced

6  time in custody before.  What, what's -- what, what, what

7  comfort can you give me that you won't be the same way?  I

8  mean, you came out in 2011, you spent quite a, you know, a

9  few years in prison.  What's different now?  What's

10  different?  Not now, but what's different 13 to 15 years from

11  now?

12      THE DEFENDANT:  Well, I always -- I, I started on

13  Wall Street, and I always just kind of led myself towards

14  finance.  I always wanted to be in finance.  I guess I'm just

15  not good at it.

16      THE COURT  Alright, good.  Alright.  Apparently good

17  at it.

18      THE DEFENDANT:  You know, I'm just going to probably

19  change my occupation and try to do something different.

20      THE COURT:  No, but I mean, what -- I'm talking

21  about mentally custody, you must have for some of it.  You

22  come out, you come out, you're going to start a little

23  business.  The business explodes on you.  What's, what's the

24  risk for -- what, what should I be concerned about when you

25  get out again on the back time?  What, what, what?  I mean,

1  you can appreciate that. I'm going to sit there and go, oh

2  my God. If I had to see, if I had to see Mr. Laforte again

3  in 20 years, I'm going to be kicking myself.

4      THE DEFENDANT: Yeah. I think the first -- I, I

5  think now that as I'm older, I thought that, I thought that I

6  would be accepted more by my people and by, by having more

7  and being bigger. I think now that I'm older, I think I look

8  at more things that are more important. Like my wife, my

9  family, who I've disappointed now. And not looking at my

10  colleagues, how they look at me. I really don't care

11  anymore. I think that's the biggest thing for me. I, I, I

12  really don't care. You know. ,It's like, you know, I'm

13  humbled. You know, I'm sitting here today humbled. You

14  know, I don't -- the money is not, not going to be my God.

15  And, you know, and it really wasn't before, but that, that

16  ego was. So I'm going to work hard on -- in prison to get

17  rid of it. But to answer your question, that was the big

18  thing. I think I didn't drop that. I still eat that ego. I

19  still felt I had something to prove.

20      THE COURT: Okay, I'm going to -- you don't have to

21  do this, and Mr. Corozzo can tell you, but do you have

22  anything you wish to say to your family or to Mr. Alfano or

23  to any of the other victims?

24      THE DEFENDANT: I'm sorry for everybody in this

25  courtroom just being a pain in the neck today. Just being

1    here, dragging my family through this, dragging Mr. Alfano

2    through this, dragging everybody through this mess.  And it's

3    my -- by my doing, I'm, I'm top of the indictment.  I -- I'm

4    the CEO of the company.

5              THE COURT:  You know, if my order, you will never be

6    CEO of another company.  You appreciate that, right?

7              THE DEFENDANT:  Yeah.

8              THE COURT:  I mean, unless it's, you know, unless

9    it's something, you know, you would least a CEO of a, of a,

10   of a nice nail loan salon.  But you're not going to be a CEO

11   of any kind of fin-- finance company.  You appreciate that.

12             THE DEFENDANT:  I might want to do that.

13             THE COURT:  That's right.  You might want to, but

14   you're not going to be a CEO of a finance company.  You

15   understand?

16             THE DEFENDANT:  I do.  Yeah.

17             THE COURT:  I mean, for the rest of your life.

18             THE DEFENDANT:  Okay.

19             THE COURT:  You understand that?

20             THE DEFENDANT:  I, I agree.  Yes.

21             THE COURT:  Because he -- it's, it's too dangerous

22   for you.

23             THE DEFENDANT:  That's fine.

24             THE COURT:  It's, it's your, it's your dopamine.

25             THE DEFENDANT:  Yeah, it is.  Yeah.  I don't, I

1   don't want to do that.

2           THE COURT:  It'll, it'll fuel you.

3           THE DEFENDANT:  Yeah.  I don't want be a senior.

4           THE COURT:  I'm not saying you can do something

5   else, but you can't be running financial business.

6           THE DEFENDANT:  But I can run a business.

7           THE COURT:  Well, yeah.  Well, you can run a

8   business, but not, not -- you're not running a finance

9   business.  Right?  You, you, you know, you can run something

10  else.

11          THE DEFENDANT:  Okay.

12          THE COURT:  If, if you could -- if you can turn --

13  if you turn Lisa's lounge into a chain of, you know, south

14  Florida lounges, then go get it.  Do it legally.

15          THE DEFENDANT:  We talked about that too.

16          THE COURT:  I bet.  That's what I'm getting at.

17  You, you, your drive, your drive is going to fuel you.  And

18  you have to learn how to, how to, how to channel that drive.

19  I'm not here as a preacher.  I'm not here as a therapist.

20  I'm just telling you, it's so apparent, every time I see this

21  case, you're so apparent to me that you just blew by every

22  stop sign that anybody would know.  And you just blew by --

23  and you dragged your brother and you dragged -- I don't know

24  what -- I'll figure about Cole later.  But you, but you

25  dragged your brother anyway.  Now I know more about him.  You

1  dragged these people along.  You dragged your wife along.

2         THE DEFENDANT:  Yeah.  That -- that's --

3         THE COURT:  Sure.  You know, and, and, and you know,

4  these other people, that, that tsunami of, of go get it, has,

5  has created a lot of victims.  Mr. Alfano being one.  Mr.  --

6  all these folks that lost their life savings and, and you

7  know, who knows what they get back.  You know, I, I, I --

8  your counsel gave me a letter, showed us a letter here today

9  that you were accusing somebody else of fraud.  And it was

10  written early in the term.  You said, you know, that's fraud.

11  Some guy was using the money for money market rather than for

12  his business.

13         THE DEFENDANT:  Yes.

14         THE COURT:  And I looked at it and said, you know,

15  this guy knows exactly what fraud is, and you just kept

16  blasting because you're feeding your ego.  I'm not indicting.

17  I'm not, I'm not, I'm not accusing you, sir.  You already

18  admitted to this.

19         THE DEFENDANT:  Yeah.

20         THE COURT:  What I'm, what I'm getting at is, is I

21  have to have some grasp that you appreciate two things.  One,

22  there is a limit in, in our community, in our society.  That

23  limit is you can't break the law.  You can't lie on, on, on -

24  - to obtain money.  And you can't beat up, threaten, direct

25  your brother to beat up officers of the court simply because

1  you're not getting what you want. There's another way. You

2  know, Fox Rothschild, they were the people helping you

3  collect it. They were hopefully doing it the right way. I

4  don't know. I don't have it. They're not here. So I don't

5  know. I, I interrupted you, sir. Anything else you wish to

6  say to me?

7       THE DEFENDANT: I just would like to add that, some

8  of the stuff that was said about Lisa respectfully by Mr.

9  Alfano, there's, there's more to what Lisa's participation in

10  the receivership is. And I know you're going to get to it in

11  her sentence, but she did a lot of great things to help the

12  receivership, including last week alone, signing over her

13  house in Florida and eliminating her homestead in order to,

14  to feed the --

15       THE COURT: You're still fighting receivership. Is

16  fighting accurate and stuff?

17       THE DEFENDANT: I am. But I don't -- it's not that.

18  It was, it was the lawyer. I'm in jail, so I really don't

19  talk to lawyers too much. There's a bar order, and they made

20  a decision to do something with a bar order or something like

21  that. I'm not -- I don't even understand what that is. I'll

22  leave it to them. But, you know, as far as Lisa goes, I just

23  wanted to put on the record to you, Your Honor, that since

24  the receivership has started, when they expanded the

25  receivership before they expanded the receivership, Lisa had

1    access to all the properties. She managed those properties

2    every single nickel and handed over $11 million to the

3    receivership from the collection of rents and all kinds of

4    checks that were coming to a PO box. She went out of her way

5    to make sure he got every dollar. She drove down all of our

6    cars to make sure they were -- she even cleaned them before

7    she handed them over to the receiver. She had -- we have two

8    watches that I bought her right before the receivership. I

9    would've -- I mean, if I were my way, I probably would've

10   kept them at the time. Before I came here. I was, you know,

11   I was upset with the government. She said, no, she took them

12   and she brought them to the receiver. She had a check for

13   $300,000 that was made out to the company. She went down

14   there and dropped it off. So Lisa is an honest, good person.

15   I did this to her. I put her in this position. She did

16   nothing wrong. And she's been sitting there like a trooper

17   staying with me, you know, delivering, coming up on every

18   single visit. So I really -- I just -- I, I really hurt my

19   wife, and I just wanted to put down the record with you that

20   she's really been trying. She, she will continue to honor

21   the receivership and do whatever she can to help these -- the

22   victim investors get paid from them.

23           THE COURT: What do I take, sir? As somebody who

24   used to run a business? Not -- and you had to make decisions

25   instantly, a thousand times a day. Probably hundreds of

1  times a day.

2          THE DEFENDANT:  Yes.

3          THE COURT:  So I know how to make a decision.  How

4  do, how do you look at the fact that you're still fighting

5  this?  How would -- how if it -- how, you know, I saw what

6  you did when your borrowers weren't paying you back.

7          THE DEFENDANT:  Yes.

8          THE COURT:  And, and you got angry.  And I

9  understand you reacted at time to time.  I don't get angry,

10 but what -- how do, how do I take the fact that if you're

11 remorseful, you're still battling various events in Florida?

12 How do I look at that?

13         THE DEFENDANT:  Well --

14         THE COURT:  Take, take me as a -- give me to a

15 business matrix.  Like I'm your student.  Tell me how I

16 should look at that.

17         THE DEFENDANT:  As far as what aspect of the case in

18 Florida.

19         THE COURT:  Like, I don't know.  You're fighting, I

20 heard you're fighting some kind of thing.  Ecker, Ecker has

21 got some money, or Ecker is going to pay some money or --

22         THE DEFENDANT:  I don't really understand it really.

23 I, I know something was filed.  It's a bar, something called

24 a bar order.

25         THE COURT:  And you're directing it, I guess.

1          THE DEFENDANT:  No.

2          THE COURT:  Okay.  Things are happening without your

3    direction.

4          THE DEFENDANT:  Yes.

5          THE COURT:  Okay.  Are you doing anything to

6    interfere with a collection of what's going on?

7          THE DEFENDANT:  No.

8          THE COURT:  Okay.

9          MR. COROZZO:  Your Honor, if I just might explain

10   from the beginning of the SEC action, Joe and Lisa have been

11   relying on counsel.  It's extremely convoluted -- that it's

12   so complicated that it was even hard for me to understand.

13         THE COURT:  That's not you though, right?  That's

14   some lawyer down there.

15         MR. COROZZO:  Yes.  Lawyers down there.  They're --

16   and, and they've advised Joe and Lisa that what the law, at

17   least their interpretation of the law, what their

18   expectations of what, what were going to happen.  And they're

19   directing a lot of the, the litigation.  As Joe stated, I

20   think now he's maturing, but in the beginning, when, when

21   lawyers who lose motions come and say, oh, you got screwed by

22   the court.  Or this isn't supposed to happen.

23         THE COURT:  Right.

24         MR. COROZZO:  Well, That's not supposed to --

25         THE COURT:  It's the Judge's fault.  I know.

1          MR. COROZZO:  But we'll appeal and we'll change it.

2    Or when they promised me.  It was a very convoluted situation

3    that it was settled, but the settlement was bifurcated so

4    that they can argue over the penalty.  So liability was

5    decided, which was a very questionable tactic.  And didn't

6    turn out the way that the --

7          THE COURT:  So they're still dealing with -- they're

8    still dealing with damage.  They're still dealing with

9    collection.

10         MR. COROZZO:  That's the only thing that's happened.

11   They admitted liability early on.  And this has all been

12   about representations of, of what the damages should be.  And

13   it's more -- I think it's the, the -- argument is more geared

14   towards Lisa and Lisa's responsibility than Joe's

15   responsibility.

16         THE COURT:  Okay.

17         THE DEFENDANT:  If I could add, Your Honor.

18         MR. COROZZO:  Joe -- Joseph understands he's never

19   getting out from under this financial liability.  And he

20   personally has no chance of recuperating anything from that

21   action.  He doesn't expect that.

22         THE COURT:  Yeah.  I think I -- the trust question

23   bothered me until I heard from Mr. Minni and, and, and, and

24   the receiver.  So I, I, I -- I'm glad you answered that

25   question.  I'm sorry I interrupted you, Mr. Laforte.

1          THE DEFENDANT:  That's alright, Your Honor.  I think

2    the biggest, the biggest thing with the SEC case was we, you

3    know, when we bifurcated settlement, we never contemplated

4    the, the attorneys never contemplated to us that the monies

5    that were collected would be applied towards Lisa's balance

6    that she's owed her restitution.

7          THE COURT:  That would not be --

8          THE DEFENDANT:  Or discouragement.

9          THE COURT:  That would not be.

10          THE DEFENDANT:  It's not being.

11          THE COURT:  Okay.  Alright.  I don't, I don't need -

12    - I'm not trying to dry fire the case.

13          MR. COROZZO:  But just what was represented was that

14    by bifurcating the sum, at the end of the day, Lisa's

15    liability would be absorbed --

16          THE COURT:  Reduced.

17          MR. COROZZO:  By, by the -- what's proved.

18          THE COURT:  Right.

19          MR. COROZZO:  So that the hopes were that Lisa could

20    start her life.

21          THE COURT:  Right, right, right.

22          MR. COROZZO:  Without overwhelming debt.  Joseph

23    understood that he wouldn't have a chance of that, but -- and

24    that's really the thought process of, of where they are at

25    this point, I believe.

1          THE COURT:  And, and, and Mr. Laforte.  I'm going
2     to, I'm going to -- because you're so wise about these
3     things, I'm going to give you the devil's advocate for you
4     for a minute.
5          THE DEFENDANT:  Okay.
6          THE COURT:  The reality is that you don't need your
7     own name because you are so -- that you, you already used
8     Lisa to create an entity that generated over a billion
9     dollars.
10          THE DEFENDANT:  Yes.
11          THE COURT:  Right.  So the fact that you can't do
12     anything has not stopped you.  The question is, and I'm not
13     suggesting Lisa be blame at all, but you know how to use
14     other people to create businesses.  You did it.
15          THE DEFENDANT:  Sure.
16          THE COURT:  So, I, I guess my, my business question
17     to you is, you, you, you say to me, Judge, I appreciate the
18     fact that we're still fighting whatever's going on in
19     Florida, but I'm still remorseful for what I did here.  Is
20     that what you're suggesting?
21          THE DEFENDANT:  No.  I'm saying that I don't want to
22     fight anything in Florida.
23          THE COURT:  You don't what?
24          THE DEFENDANT:  I'm, I'm not trying to fight
25     anything in Florida.  I'm not saying that.  All was -- the

1  only thing when we, when we bifurcated settlement, it was --

2  we thought, and we were told, we were under the assumption

3  just by common law that monies that were paid would be

4  applied towards the discouragement, which would seem to be

5  common sense.  Maybe I'm wrong.

6          THE COURT:  The money that Lisa would have to pay

7  back.

8          THE DEFENDANT:  Yes.

9          THE COURT:  Okay.

10          THE DEFENDANT:  And again, it's not about -- but,

11  but does any of that --

12          THE COURT:  How do I take the fact, I mean, I sit

13  here today, you pled guilty.  I started this hearing hours

14  ago.  I'm frustrated with the idea that we weren't accounting

15  for what I thought was the full amount of the, of the number.

16  And I looked at the case law.  I'll talk about it a bit.  But

17  I'm now comfortable with what I've heard from the United

18  States and the evidence today that the range is appropriate.

19  But what I'm asking you is, sir, in your mind as a, as a

20  business matrix, as a guy who looks at these things all the

21  time, what is the one factor that in your mind, that tells

22  you, Judge, it should be the lower end as opposed to the

23  higher end?  If you had to pitch me, what would it be?

24  Because United States has given me a lot -- your lawyer is

25  very effective.  You tell me why you think it should be lower

1   end rather than higher end.

2           THE DEFENDANT:  I think it should be the lower end

3   because I, I, I think it's all about my thought process while

4   this was going on.  I know I was self-centered.  I know I had

5   a big ego.  But I, I never woke up every day.  I put a suit

6   on everything and went to work.  I never woke up and tried to

7   intend to lose people money.  My ego is too big for that.

8   First of all, my -- in the community --

9           THE COURT:  Oh, to have the investors lose money,

10  you mean.

11          THE DEFENDANT:  I never would've.  I never woke up

12  and said, Hey, I want to get these investors.  Matter of

13  fact, I didn't even know what was coming in.  It didn't

14  matter to me.  We had 50 PPMs running.  I didn't -- it didn't

15  matter to me.  So I think I, I would ask you for the low end

16  of the guidelines so I could have a chance again, so I could

17  have a chance to go out there and do something better.  I

18  will give you my word that I will never be in your courtroom

19  again.  And B, I will not be in finance if you deem possible.

20  It doesn't matter what I do.  I'm going to be good at what I

21  -- I'll do the best I can, whatever I do.  But I, I never

22  woke up with trying to steal people's money.  And I think

23  that when I read, I read books about a lot of these cases

24  that I mentioned, they woke up and tried to steal people's

25  money.  I wasn't -- I was really trying to run a business.

1    If not, I would've lessened the employees.  I put -- I went

2    from three employees to 70 employees, and then I went through

3    about a thousand employees, including all my ISO groups.  I

4    mean, I was constantly trying to build the business.  Now,

5    why would I go through audits?  I mean, why would I hire an

6    auditor if I was trying to steal people's money?  I was proud

7    of the company.  I thought that we were maybe, you know,

8    maybe it was just my ego blocking my, my mind.  I, I would've

9    invited them into our offices.  Some smart people looked at

10   these books and records.

11            THE COURT:  Well, you, you, you thought -- I'm not

12   going to argue.  Okay.  I, I got it.  Anything else, sir?  I,

13   I, I don't want to cut you off.  You waited a long, you

14   waited a long time for this discussion.

15            THE DEFENDANT:  I just want to thank you so much.  I

16   appreciate it.

17            THE COURT:  Okay.  You waited a long time for this

18   discussion, sir.

19            THE DEFENDANT:  Thank you.  No, it's fine.

20            THE COURT:  And, and, and I don't want to cut you

21   off.

22            THE DEFENDANT:  No, no.  Fine.  Thank you so much.

23            THE COURT:  Mr. Corozzo, anything further, sir?

24   Thank you, Mr. LaForte.

25            THE DEFENDANT:  Thank you.

1    MR. COROZZO:  No, Your Honor.  Your Honor.  Well,

2  the, the one thing I, I would like to say, because the true

3  answer to your question is Lisa.  It's the one difference

4  from 2011.  He didn't have Lisa.  It's one difference.

5    THE COURT:  Really?  I thought, I thought you were

6  married in 2005.

7    MR. COROZZO:  Well, the -- he is, he is putting Lisa

8  in this position, in my opinion, is what -- is what's

9  changing everything.  I've seen her and her interaction.

10    THE COURT:  Okay.  That's a fair point.  Let me

11  start.  It is now -- Mr. Laforte, the way sentencing works

12  is, you may recall, is that, it's now -- I'm sorry, MR.

13  NEWCOMER.  Yes.

14    MR. NEWCOMER:  Your Honor, if I may briefly respond

15  to some of these items.  I know you --

16    THE COURT:  I wasn't taking to be like evidence

17  professor.  I wasn't taking --

18    MR. NEWCOMER:  If I can make a few points, Your

19  Honor --

20    THE COURT:  If you wish, but I'm not, I'm, I'm not

21  going to reopen it.

22    MR. NEWCOMER:  We've had to sit here and listen to

23  some of this, and, and we've had our own visceral reaction to

24  it.  I'm not going to a million notes piling up here, Your

25  Honor.  We could, we could spend all week here.

1          THE COURT:  I know.  Trying to --

2          MR. NEWCOMER:  Getting back --

3          THE COURT:  I know.

4          MR. NEWCOMER:  Pull him around on each of these

5   alleged, you know, positives and we could hit him right back.

6          THE COURT:  If you want to summarize, but again, I'm

7   not taking Mr. LaForte saying as being truthful.

8          MR. NEWCOMER:  Understand, Your Honor.

9          THE COURT:  I'm taking, I'm not -- I'm just saying,

10  I'm taking it to see, see how he's feeling.

11         MR. NEWCOMER:  And, and we stand by the 15 and a

12  half years.  None of that --

13         THE COURT:  I understand.

14         MR. NEWCOMER:  -- backs off this.  But I mean, the

15  idea that this is a nuanced crime, that Mr. Laforte was

16  confused by the complicated nature of this charging

17  instrument.  There's no nuance in hiding your name to hide

18  your past fraudulent activity that would've made sure no

19  investor would've invested in Par funding.  Not a single

20  investor would've invested in Par funding if they knew he was

21  a fraudster, a convicted fraudster, who, by the way, page 65

22  foot to a 26 of the PSR, he owes 14 million from that last

23  fraud.  He didn't use any of the 120 million he got, or any

24  Par funding's money to pay his old victims.  He didn't care

25  about those old victims.  He didn't care about these victims.

He didn't care about those victims.  He cares about no
victims.  He cares about himself.  There's no nuance of
threatening MCA victims.  No nuance there.  That should have
been a 32nd conversation with his lawyer.  You did it.
That's a crime.  That's extortion.  It's a RICO predicate.
It's a serious RICO predicate.  End of story.  And, and Mr.
Laforte, I can't -- I don't even where to begin with Mr.
Alfano.  The idea that that was some sort of nuanced crime.
I agree, Your Honor.  I mean, he seems closer today to
getting it.  He still has a long, long way to go.  A long way
to go, in our estimation, to truly getting the scope of what
he built here and the amount of people he's victimized,
different buckets of victims.  And it's also remarkable, Your
Honor.  And you, and you, you, you, you prompted him and
appreciate that there was no mention of any apology to the
victims or Mr. Alfano until you prompted him.  Hey, by the
way, you know, you -- and, and, you know, he said the right
thing, kind of sorry for being a pain in the neck.  Pain in
the neck.  Is that how you've described a $400 million
financial fraud, extorting at least a dozen victims and
attacking a member of the court, or officer of the court, you
know, being a pain in the neck.  He was a menace, Your Honor.
Joe LaForte was nothing short of a menace for almost a
decade.  I'm, I'm not going to belabor and go through all the
predicates here, Your Honor.  It's hard to overstate the

1    seriousness of this crime.  It's hard to, to understate how,
2    how many victims have been victimized here.  Mr. Corozzo said
3    it.  They've been saying it in the SEC case for five years.
4    He's been saying in this court, I don't understand.  There
5    was all this money coming in.  You, Your Honor, heard the
6    testimony.  You heard it from our expert.  You made the
7    findings.  There was not enough money coming in to keep the
8    lights on bottom line.  And it wasn't for years.  And they
9    lied about it.  It wasn't a -- I'll call it a pure Ponzi, it
10   wasn't a pure Ponzi where there was no business activity
11   going on.  But they were horrendous at this MCA industry.
12   They were just not good at it.  And that's why they weren't
13   generating enough profit to keep the lights on.  They weren't
14   having enough profit to keep the investors happy, and they
15   weren't having profit because they were taking -- they
16   weren't recognizing their profit to, to, to counter the over
17   a hundred million dollars they were taking out of the
18   company.  That's already a finding of the court.  I don't --
19   I'm not sure what we're still talking about today.  You know,
20   at the sentencing here of Joe LaForte, you know, this, my,
21   this mystical notion that, that somehow Par funding was a
22   successful business, and that the receiver came in and, and,
23   and screwed everything up.  I want to say, on the extortion
24   piece, Your Honor, if there's any doubt that this was a loan
25   sharking operation, on the front end of the business, you

heard about from Ms. Davis. You heard about it from Bradley
Sharp. You heard about it from Ms. Allegretta, you heard
about it from Mr. -- from Agent Murray. They were loaning
money at incredibly high rates of interest to businesses that
were in financial distress to begin with. And doing reload
after reload to keep these businesses afloat when they were
circling further and further in debt. That's classic loan
sharking, Your Honor. And then if there's any doubt on the
front end, the back end when they're, when, when, when the
customers inevitably, and it's almost inevitable, they can't
pay. What do they do? They return to the street crime, the
crime family tactic of threatening the victims. It's classic
loan sharking. That's what they built this alleged MCA
empire on. I don't think I can say anything about the attack
on Mr. Alfano that he hasn't said himself. And Mr. Fort
wisely has pled guilty to his involvement in that. I will
say that simply and accurately describe the evidence of, of
Mr. Joseph LaForte's involvement. And you asked Mr. -- his
brother, Jimmy LaForte, whether that crucial call to call
that, you know, caused Jimmy to move into position outside
Mr. Alfano's office and wait for him there before he left his
office at critical call. That happened right after the call
with the receiver. And Jimmy said, no, that, that was -- I
talked to my brother, you know, five times. I did. There's
actually only three calls that day, Your Honor. It was the -

1    - that one, and then two more late at night when, when --

2            THE COURT:  [indiscernible].

3            MR. NEWCOMER:  Right.  That was a lie.

4            THE COURT:  But Mr. Laforte today recognized, if

5    there -- if we get one thing out of this, Mr. Laforte

6    recognized that he played the role.  He, he directed his

7    brother to, to attack an officer of the court to drop on him.

8            MR. NEWCOMER:  He, he did, Your Honor.  But, but

9    the, you know, it -- it's indicative of the way that Mr.

10   Laforte ran this business and his role in the, in the, in the

11   enterprise that his brother, you know, played his role to the

12   very end.  Lied to the court about that phone call.

13           THE COURT:  Yeah.  That's right.

14           MR. NEWCOMER:  And, you know, it's not, not a

15   surprising lie, right, Your Honor, because Jimmy LaForte was

16   the soldier.  He was the muscle.  He's the younger brother.

17   And he went straight to the family crime family playbook.

18   You know, you don't rat on your friends.  You don't snitch on

19   your relatives, on your, on your family members.  You pay

20   tribute to the boss.  You keep the boss happy, all those

21   things.  He played his role as a soldier to the very end.

22   And that doesn't, in any way, excuse Mr. Laforte's conduct.

23   I'm not going to get into the perjury, the tax crimes, Your

24   Honor.  I mean, in any, any traditional case, in a normal

25   case, a $10 million tax loss.  I mean, that's an incredible

1    fraud on the IRS standing alone.  And it's, it's, it's

2    testament to how severe the other conduct is in this case.

3    That, that $10 million tax loss almost seems pedestrian.  It

4    -- it's almost like a footnote because of the, the, the, the

5    amount of, of fraud on the other end.  Your Honor, there's

6    just no way we don't see anyone on this side of the room.

7    And 15 and a half years, we think it's sufficient.  We think

8    it's just, but anything lower than that on this record, we

9    don't see it, Your Honor.  It's just not there.  The fraud

10   itself, arguably.  The, the securities fraud and amount of

11   loss itself that could independently justify the range.  Then

12   you add on the extortion, then you add on the obstruction.

13   Jimmy LaForte was sentenced appropriately to 11 and a half

14   years in large part because of that attack on Alfano.  You

15   have that attack on Alfano, plus you have extortion, plus you

16   have --

17           THE COURT:  He was sentenced to more than that, sir.

18           MR. NEWCOMER:  Plus the supervisor -- term

19   supervised release --

20           THE COURT:  At the time.  Yeah.

21           MR. NEWCOMER:  Yeah Your Honor.  Thank you.

22   Correct.  Plus an additional year of, of supervised release

23   and some other conditions.

24           THE COURT:  In his house.

25           MR. NEWCOMER:  In his house.  Plus you have the,

1   the, you know, you have the extortion, which he was

2   quarterbacking, right?  It wasn't just one off thing.  He was

3   systematically sending out Gioe to shake people down.  He was

4   independently doing it on his own.  He had his brother Jammie

5   LaForte also committing acts of extortion.  Then you have the

6   tax crimes, then you have the perjury.  Let's not forget

7   about the gun case, Your Honor.  It's a 922G.  Now, that's

8   not the most serious crime in the world, but you add it on

9   top of everything else, you get to 15 and a half years pretty

10  easily.  You're pretty easily there.  And why we continue to

11  support the downward variance to get to 15 and a half years.

12  But anything short of that, Your Honor, I think does not meet

13  the goals of this -- of the sentencing guidelines and does

14  not have a deficient -- sufficient to turn effect.

15          THE COURT:  Does not -- what, what would be the

16  argument?  I asked Mr. Corozzo, and he -- are you agree with

17  Mr. Corozzo that the reason we can -- when I check the boxes,

18  when I go to the national -- when it goes to Washington, I

19  check the boxes for a variance and you know, if they ever

20  look at it, but it says, reason for variance overstated, that

21  your reason for going down --

22          MR. NEWCOMER:  That, that is the age.  We also think

23  it's a factor.  You know, I, I will -- you've, you've heard

24  it all.  You've seen in the sentencing memo, our sentencing

25  submission.  You've heard all arguments all along.  I'm not

1  going to, I'm not going to go through this memo, memo again,
2  but let me just focus briefly on the reasons why we think the
3  sentence of 15 and a half years is appropriate.  It's a lot
4  of time by any measure, any objective measure.  It's, it's,
5  it's a lot of time, Your Honor.  He is 54 years old.  He's
6  going to be in jail until his mid sixties by almost any
7  account.  And that is -- sets this case a little bit apart.
8  His empire has been stripped.  Right, Your Honor?  The -- he,
9  he's, he's name is Mud.  His wife has pled guilty to a tax
10  crime.  His brother is going to jail for, you know, a dozen
11  or more years.  His business is neutralized.  He owes -- he's
12  going to owe a restitution, a forfeiture judgment.  He has no
13  realistic way of ever crawling out of.  All that factors into
14  why I think 15 and a half years is appropriate here.  Because
15  of the way that the threat of Mr. Laforte and his family, not
16  just Mr. Laforte and his brother.  So I, I think on those
17  facts, it's sufficient.  Also finality and, and closure to
18  the victims.  We heard one, one victim today, I think pretty
19  moving testimony.  We, we had a lot of victims like that,
20  Your Honor, that didn't want to take the stand.  Mr.
21  Allegretta, Ms. Allegretta, to her credit, was courageous
22  enough to do it, but it was not easy to get her, to get here,
23  here today, Your Honor.  And, and Mr. Mansouri, we weren't
24  able to get here today.  People were not looking for a reason
25  to come here and expose themselves in public -- in, in, in

1  federal court.  The investor victims wanted closure.  They

2  got a first round.  Some of them got a first round of

3  payments from the receiver.  They want those payments to come

4  in.  They want this all behind them.  They want to get the

5  money they can get.  We, we, we crafted a sentencing range

6  that both parties could agree to, knowing that it would move

7  this case forward towards resolution and repayment of the

8  victims, it would not result in a lengthy trial.  A lengthy

9  set of appeals is Mr. Laforte appellate rates are essentially

10  gone.  You know, the exception of ineffective counsel, which

11  I don't think is even remotely an option here, given Mr.

12  Corozzo's excellent counsel.  I will also say, Your Honor,

13  not all, not all guilty pleas are created equal.  And I do

14  credit Mr. Laforte for, for, for -- who's self-described

15  fighter.  We agree with that a hundred percent.  If none of -

16  - if this doesn't tell you anything else, and said, Mr.

17  Laforte is a fighter, and he is a fighter to the very end.

18  He doesn't always play fair, often plays dirty, but he's a

19  fighter.  The fact that he was willing to plead guilty to a,

20  to a crime, a series of crimes that would involve him going

21  to jail for a minimum of 13 and a half years, and most likely

22  15 and a half years, that is something substantial just not

23  your ordinary plea, Your Honor, where you're kind of throwing

24  yourself and maybe you can make an argument for something

25  lower, or you're holding out hope.  It took a degree of self-

1   reflection and I think of, of, of realization how cooked he

2   was, that you don't often see in fraudsters.  Right?  Your

3   Honor, I mean, a lot of times the fraudsters still don't get

4   it to the very end.  They're going to weigh in handcuffs, and

5   they're still -- they still don't get it.  It does reflect

6   some level of self-awareness.  We saw today.  I said, he's

7   got a long, long way to go.  And I mean that, Your Honor.

8   But he's -- at least he's going in that direction.  So I

9   think the level of acceptance of responsibility here, it's a

10  maybe a little bit more than three points in additional

11  grounds for a downward variance.  It's, it's a, it's a

12  significant concession.  It's a significant concession of

13  defeat, Your Honor, for a, for a fighter like Mr. Laforte.

14  Also, Your Honor, these are unusual facts.  We agree with Mr.

15  Laforte.  It's not the pure Ponzi where the money was just,

16  you know, going into an account and not being used for

17  anything.  They did try to run an MCA business, not very, not

18  very well.  And then they hid the fact that it wasn't doing

19  well from investors and lied about nearly every aspect of the

20  business, but wasn't a true Ponzi.  And that's borne out by

21  the fact that the receiver has been able to, to, to recover a

22  good deal funds.  Now the receiver gets the line share of the

23  credit.  In fact, 99% of the credit for clawing back the

24  assets that Mr. Laforte and his wife had purchased with the

25  proceeds of the crime.  That's all on the receiver.  But it

1   does -- it's a fact that sets this case apart from some of
2   the other comparables we had.  Yeah.  At least in this case,
3   money is going back to the investors.  Okay.  Then that's the
4   point.  The, the amount of fraud is, sort of on Par with
5   those other cases.  But here, you know, thankfully the
6   government was able to intervene in time in a way, and there
7   were some assets and some bank accounts that it can make some
8   of the victims hold.  So that's an additional reason why we
9   think the, the recommended sentence is appropriate.  And I
10  think, Your Honor, and listen, none of those cases are
11  particularly in point, and no case is ever a hundred percent
12  poignant of the case.  And these, these large financial crime
13  cases are often very, very back specific.  There was a case,
14  I, I -- iron Workers Case versus John Dockerty.  It's John
15  Dockerty?

16          THE COURT:  Yes.  Joe Dockerty.

17          MR. NEWCOMER:  Oh, Joe Dockerty.  Joe Dockerty.  I
18  don't have the case.  I don't have the EDPA number.  It was a
19  trial.  It involved a RICO conspiracy.  It was a labor case,
20  Your Honor, and it did involve extortion and arson and
21  assaults to sort of, you know, force companies to hire union
22  workers.  It did have that element of violence.  Dockerty got
23  19 years, I believe, after a trial.  So, I agree with you,
24  Your Honor, the cases we cited didn't involve violence, but
25  there are cases out there that do involve the violence.  And

1    I think they're still in the, in the range we're talking

2    about here, Your Honor.  So for all those reasons, Your

3    Honor, we don't think anything less than 15 and a half years

4    is appropriate.

5         THE COURT:  Alright.  Mr. Laforte, it terms -- it's

6    compelling to me through all this information.  I want to

7    start by where we started.  And, and that is that when I came

8    in and I looked at this evidence and thought that there was a

9    -- and, and I, I, I want to let, let the record be clear that

10   the law is not as directly as supportive under my

11   understanding of a case called Blakesley.  And of course, the

12   Supreme Court case in Hyde, as suggested about the acceptance

13   of a C plea.  The difference here is, as I said, I would

14   think about it today under that Blakesley case.  So counsel,

15   as you go through, as you do this, again, be mindful of

16   Blakesley in the third circuit, it's still good law.  The

17   difference in this case is, I use the term back on September

18   11th of accepting the recommendation.  Had I just accepted

19   the plea, I clearly would not have been bound by the C plea.

20   I use the word acceptance of the recommendation, which I

21   believe requires me to hold to my obligation, but that I

22   would've taken that holding my nose, except that I was

23   persuaded through the evidence today.  Well, presented by all

24   sides, by the evidence today that there, there is, the

25   counsel who know the case better than we do, came to a

1   reasoned recommendation for a variance down from essentially
2   a 40 offense level down to a 33 or 32, a 32 or so, an eight,
3   seven or eight level variance downward.  And, and, and I am
4   going to accept a recommendation, not only because I said I
5   would based on a recommendation, a lesson learned from me,
6   but also because under Blake's lead, but also because I think
7   that, I think there's sufficient basis here to find that a
8   sentence in that range is appropriate.  I don't want anyone
9   to leave here today. Mr.  LeFort, what's so extraordinary
10  about your case is, I hope that in your time, I'm sure you --
11  your last time too, you ran into guys who didn't have the
12  advantage of your drive and your, your intellect who got
13  caught up with like one of these crimes.  And the one I'm
14  thinking about, sir, is I sentenced people so often for felon
15  in possession of a firearm.  And oftentimes there are 22-
16  year-old people of minority backgrounds that have nowhere
17  near the intelligence or drive that you do.  And I'm looking
18  at 7, 8, 9 years, 10 years sometimes.  And the -- this whole
19  case to me comes down to disparity.  It comes down to what is
20  fair for Mr. Laforte compared to everyone else that committed
21  offenses.  Your case is unique.  The United States makes a
22  point that I think is a very, very well taken point that no
23  one's disagreed with.  In fact, your counsel, because he's
24  has respect to the court in candid, kind of recognized the
25  fact we're talking about a mountain of things.  He did a

tremendous job today wrestling with the idea of extortion.
But extortion is like picking out one piece of it.  There's
still a lot of other things that in, of, of themselves would
warrant a sentence of 13 and a half to 15 and a half years.
The tax fraud, the, the, the felon in possession of a
firearm, the direction of Mr. Laforte, you wouldn't have much
of a community.  You wouldn't have much of a society to come
back to if we didn't punish people who lie under oath, who
are caught lying under oath.  How many people go, ha, ha, I'm
just going to tell the jury I don't just lie in a deposition.
Well, that's not going to happen, at least not under my
watch.  And so I am adding these things up in my head.  And
so even if I said, okay, even if I take everything you say
and say, okay, well, it's only, you know, it's all business
and business people be business people, and these are all
sloppy business people.  And I was sloppy and everybody was
sloppy.  We made bad business decisions.  You are suborning
perjury.  You're telling other people to lie.  You're
directing your brother to beat a court officer over the head
to leave him with seven staples in his head.  Your, your
decision to lie on your taxes in and of itself, in of itself
is worth a sentence that may be more than 15 and a half
years.  Then we throw in the whole conspiracy in the
racketeering for wire and security stuff.  So I could not
start this without reminding everybody what we're talking

1    about here, particularly those folks who wrote these very

2    thoughtful letters for you, who are here for you and here,

3    wherever they are for you.  This is not just you being a bad

4    business guy, right?  I don't want anybody to walk out and

5    say, oh, you know, the Judge, the federal courts go after you

6    because you're a bad business guy.  That's not what this is

7    about.  This is about street crimes lying under oath and

8    disrespect for judicial officers to the highest level

9    possible.  And thinking you're going to away with it.  You

10   know what fraud is.  You accused somebody else of fraud.  You

11   know that you have -- you owe millions of dollars in another

12   case you haven't paid back.  You know, all these obligations.

13   And as you said to me, and to your great credit, sir, to your

14   great credit, which is why I'm willing to accept, mainly why

15   I'm willing, well not fight this 13 and a half or 15 and a

16   half.  When you said to me, Your Honor, it's all driven

17   through me.  It's not Lisa, when you say that to me, I'm

18   saying, okay.  And even, even MR. NEWCOMER has to recognize

19   that there is some growth there.  Maybe it takes the 54,

20   maybe longer, but that's some growth there.  That is -- you

21   can't be driving yourself this way.  So the United States

22   Congress tells you, sir, I want to get everybody home

23   tonight.  And you've been so kind with me to give me this

24   much time to work my way through this.  This case, the

25   congress States, Congress tells me how to figure out the

1   nature and circumstances of the offense.  Congress used the
2   word offense.  This is offenses.  This is a company that you
3   came out of custody and right away formed 20, in 2011, formed
4   a company, as you said, with three people in Delaware.  Thank
5   God, I'm not suggesting Lisa wouldn't get -- won't get a
6   penalty for her conduct.  But in many ways, thank God for
7   Lisa, because you jumped and you able to get a company up and
8   running again.  Eight months later, the state of Delaware,
9   you began funding merchants through short-term financings
10  known as merchant case advances.  You know, I, I want to say
11  something about the woman who testified just briefly.  I
12  digressed very briefly because I want to say this earlier
13  about her testimony.  To take a shot at her because she
14  doesn't know the difference between merchant cash advances
15  and whatever Yellowstone was doing.  I think I, I, I found
16  her credible that she didn't think it's the same thing.  It
17  may have very well been the same thing between lawyers and
18  financial people, people who were smart, Mr. Laforte, but
19  doesn't seem to me.  She didn't mention what you actually
20  called her, which is at 1. 1 dumb blonde.  But if you take
21  advantage of those people, and I don't think in any way,
22  shape or form, she was dumb at all.  She appeared blonde, but
23  I don't take advantage.  She's dumb.  That I, I, I don't, I
24  don't think she's dumb.  I just think she didn't live in the
25  world that you live in.  In any event, you use this company

to purchase accounts receivable at a discounted price.
Customer then agree to repay par the purchase price.  Plus,
you know, 30% usually collected through daily or weekly
automatic debits from merchant account bank accounts.  You
may remember, Mr. Laforte, you have been the model party
charge.  You've been at every hearing and you've watched me
and listened.  I've watched you carefully listen to what I
say.  And there was an argument early on in this case about
whether this is illegal per se.  No one's made that decision.
There are, as you pointed out, and I know there are lots of
small businesses that run around in various counties and do
very well with a $50 million portfolio, you know.  You know,
they do, you know, you see them cruising around in their nice
cars and they're doing okay.  I know how that works.  And so
they, they compete against banks all the time.  These, these
loans are then reloaded when people can't pay them back.  In
the banking world, sir, they call that refinances.  You know
that.  And they, and, and they go back and they say, okay,
you owe me a hundred thousand.  I'll give you 125.  I'm going
to take the 25 fees and you owe me a hundred again on new
terms.  Okay?  That's reloading.  They call it refinancing.
You know, the white shoe calls a refinancing and give a
different word, but's the same thing, except in your world,
it came with much more problems.  And that's because you owed
it so quick.  And these people were already in a bank world

1  that's being supervised and regulated.  You can't lend money

2  on a reload or a refinance to those folks.  They don't

3  qualify under underwriting -- under, under underwriting.

4  Excuse me.  So how did Joe LaForte get this money?  How does

5  he get the kind of money to lend out?  Well, he has to go out

6  and get investors.  He finds people who are smooth.  I don't,

7  I don't know one of the guys, but I saw Abbonizio.  He came

8  in front of me.  I think he was the first guy.  He was from

9  New come in front of me.  I'm look at this guy going,

10  remember we were trying to sell his house in Avalon?  It was

11  like, how much money does this guy have and what's he

12  involved in?  I had no idea of this at that time.  And I'm

13  thinking, where's -- how's this guy involved?  What's he

14  involved in?  Abbonizio, right?  Smooth as can be, at least

15  to me, appeared to be.  So you get him, you are the leader.

16  You have final say.  You structured part of [indiscernible]

17  that email today, I had not seen before that you wrote and

18  say, put Lisa, you know, so people know, get used to her name

19  being on the title.  I thought it was, I thought that was

20  pretty compelling evidence about what you're trying to do.

21  Mr.  -- MR. NEWCOMER is absolutely right that there's nothing

22  nuanced about what you did with Lisa, and I think you would

23  agree with that.  I think Lisa would agree with that.

24  There's nothing nuanced.  You, you put Lisa out there and

25  say, go ahead.  You hang, I'm going to hang back here, so to

1    speak.

2              THE DEFENDANT:  Absolutely.

3              THE COURT:  Yeah.  Alright.  So you, you did these

4    things, and you used these people out front to protect what

5    you were doing.  But you and your brother and Mr. Cole, the

6    evidence has shown me, raised approximately $550 million from

7    you.  A lot of money.  You and your wife form two companies,

8    receive your income all through your wife, use consulting

9    agreements.  You have quarterly compensation.  What I said to

10   you about [ph] Frank Abagnale, I really mean it.  You could

11   teach people how to create businesses and, and, and

12   compensation agreements and consulting agreements.  It's

13   amazing.  And, and so now could Lisa, unfortunately for her,

14   how that works.  You -- it works because you get incentive

15   from as many people as possible to buy into, you know, years

16   ago.  I don't know if they're still in the business.  They

17   used to call this [indiscernible] right?  They used to build

18   pyramids.  I'm, I'm not using the word Ponze because I didn't

19   find it, but -- and, and they'd find everybody, oh, you sell

20   it, you sell it, you sell it, right?  And I'll be at the top

21   and I get money.  Through that program, as we've agreed to

22   today, you and your wife received $120 million in consulting

23   payments.  You used your brother, you used for a letter.  You

24   used Abbonizio, you used a guy who was not in front of us for

25   whatever reason, named Dean Vagnozzi to meet with potential

1  investors, which Vagnozzi, of course, is well, well, well

2  known as the guy that's on the radio.  Described de par

3  business, and he made representations about the manager's

4  expertise.  By early 2018, you got a subpoena and you

5  restructured the company and Mr. Laforte, I mean, no

6  disrespect when I say this to you, I don't mean to insult

7  your intelligence, but I don't think it's that.  I think

8  there's other people who are telling you how you're going to

9  restructure this thing with these sort of agent fund managers

10 going on.  It's a pretty creative way that I had never heard

11 of to this case about how to get around what was going on

12 there.  I mean, I, I -- when I started studying this case

13 months ago, I was like, wait a second, what was this program?

14 Pretty good about getting around, around unregistered sales

15 agents?  I mean, I'm not saying good, I'm not saying good in

16 a, in facetious sense, pretty sophisticated.  The funds

17 managers offered and sold promissory notes sold to investors.

18 The funds then funneled the investor money to Par funding.

19 Our funding, issued notes to the agent, funds higher

20 interest.  Everybody was running off of these promissory

21 notes.  Vagnozzi, Barletta, Abbonizio and others created,

22 manage, and promoted these new process.  They solicited

23 investors.  Except for you told me today one meeting I didn't

24 even know about the one meeting, but except for the one

25 meeting that you were behind the scenes steering it all,

these other folks knew what was -- in my view, knew what was
going on.  We'll find out with, with one person still going
to trial.  From January 18 and March of 2020, as you said, I
think you told me 50 today or 50 PPMs.  We had --I don't know
what it was, at least 40 different kind of PPMs were running
around, through which you raised investor money, just, you
know, really, really sophisticated things going on.  And
that's not the most articulate way of saying it, but it was
pretty, it was sophisticated work.  In December, 2018.
Bloomberg publishes articles disclosing your role.  All of a
sudden it comes out and here's the risk.  You then say, okay,
I got to cover it up.  Here's where ego comes in.  You're
going to cover it up.  You're going to block it.  And Mr.
Laforte, you know this better than I do.  It's always the
cover up.  It's always the lie.  If he just came forward,
then what a different world we'd have for you and Lisa and
your family.  It's the alias.  I got to keep doing it.  I
gotta keep doing it.  I gotta feed the dragon.  The dopamine
hit.  July 24th, 2020.  The SEC catches up.  I now know.  I
didn't know this before until I heard the agent's testimony.
I didn't quite understand the grasp it about the amount of
evidence about what was being gathered in 2019, etc.

THE COURT:  All very significant matters being
gathered up and, and it just seems to me the SEC beat the FBI
to what was going on.  That sometimes happens.  They filed a

civil complaint in Florida against you, your brother
Barletta, your wife, your company Par funding, Mr. Abbonizio
and Mr. Vagnozzi. The court approved Mr. Alfano. Attorney
Alfano to enter his appearance as counsel for receiver on
July 31st, 2020. By November 22nd, 2022, there was a final
order. You and your wife were liable. $142 million
approximately discouragement, 10 million in pre-judgment
interest, 437 and civil penalties total of $196,924,738 and
24 cents owed to the receiver. Mr. Barletta, you admitted
your role before me. An racketeering conspiracy consisting
of wire and securities fraud. You admitted your role in
subordinating perjury. You admitted your role in tax fraud.
So let's talk about what these items are. Your wire in
securities fraud. You lied about the underwriting process.
You lied about par funding's divorce, divorce, divorce
portfolio. You lied about how the merchant cash advances
were working. Default rate was much higher. Your counsel
makes a very good argument. I have to comment on this. I,
I, I hadn't thought about today Mr. Corozzo. You said it and
it's very true. You didn't have to do that. It didn't. I
know you wanted to do it, but you didn't have to. The
greatest lesson about securities fraud that I'm sure the
council will tell you now, you know, if you write on a black
margin on Wall Street and you write, I'm a fraud man, come
buy my stock. People will still buy your stock because they

like you.  I mean, it's the oldest lesson to see as Judges
all the time.  I'm not guilty, Your Honor.  I told them I was
a thief and they still bought it.  Oh, okay.  No, no
securities fraud.  We have other problems, but no securities
fraud.  You lied about Par funding success and profits.  You
had a net cash shortfall as I found some months ago.  You
represented being the quote, the most profitable cash
advanced company in the United States, or maybe the world for
that matter, pound for pound.  You lied about Par fundings
MCA being insured.  You just said you, you knew that was a
problem.  While knowing the policy would not cover all those
losses, but you're not correct.  You lied about self-dealing.
You lied about consulting fees.  You lied about obtaining
personal ownership interest.  You lied about payments of, of
commissions for COVID-19 face masks.  You lied about payments
in other matters.  In total, recently we , we calculated
total gross loss of approximately $404 million from the wire
and securities fraud after applying to credit for funds and
collateral calculated the net loss of $288,395,088.  Okay.  I
heard today about the extortionate efforts to collect debt.
And I find credible that you directed persons to go and harm
people.  I'm going to blow up your car and, you'll be gone.
A mother of 6-year-old twins is told by you.  She remote
started her car thereafter.  You threatened her that 6-year-
old tins would not be there at school one day.  You know the

letters, the reason I say this, Mr. Laforte, is not to beat
you up.  I really don't.  You know all this.  The reason is
because, so the people who love you, who maybe don't know all
these things, should hear it.  Just so they can accept us.
Who, who we are.  Just so when you come out, they know who to
accept you as so that you can be yourself and not be
superstar Joe.  That you can be Joe LaForte, as you said, who
wrestles with steam problems like everybody does and doesn't
need to be the biggest boy on Wall Street.  You threatened
her, you threatened others, you threatened them across the
board.  You threatened to blow up somebody's house if they
not sign a new agreement in Maryland.  I mean, the evidence
was repeated and repeated and repeated.  You told the
principal in Miami Quest that you're going to come to and
beat them to a pulp or beat the out of them.  And I will
crack your head.  You see, you can't do that at Bank of
America or Citibank because as you know, as you told Gioe,
don't put your hands on people.  So you weren't actually
going to put hands on people until it came to Mr. Alfano,
until it came to Mr. Alfano.  Because I have no other
evidence anywhere that you personally harmed or beat up
anybody until Mr. Alfano.  And so we talk about what happens
here with Mr. Alfano.  The world is crumbled, the world has
crumbled around you.  It's over, it's over.  You lost your
house in Haverford and somewhere that ego that drives you,

1    Mr. Laforte, it's going to drive you for a long time.  That

2    ego that drives you says, I'm going to retaliate against the

3    court.  Now, Mr. Laforte, I want to understand one thing.

4    When you told me about the nuance, I knew you weren't talking

5    about your conduct.

6              THE DEFENDANT:  No.

7              THE COURT:  I know, I know you weren't.  Counsel

8    made a fair passioned argument.  I know you were talking

9    about the indictment.

10             THE DEFENDANT:  I got it.  Yes.

11             THE COURT:  The indictment is nuanced.  I get it.

12   If you're not a skilled criminal lawyer, you might look at it

13   and say, what are they talking about?  That's what I meant.

14   I know what you meant there.  I did.  Your conduct was not

15   nuanced.  Indictment are nuanced.  That's reality of them.

16   But, but you got angry and you got angry that things were

17   going against you.  That the world that you controlled for so

18   long, the world that you grew up on, the Wall Street world

19   control it.  The world you grew up in and you gave -- and you

20   fought back.  You directed along with your brother.  You

21   coached your brother and worked with him to find a time to

22   attack an officer of the court.  You suffer in some sense,

23   sir, from the timing of your sentence, because attacks on

24   judicial officers in the month of February were 40 times more

25   than they were in November of 2024.  Now I'm not -- that

1   doesn't have to do with your sentence.  It doesn't.  I'm just
2   telling you in some sense we have to stop this, that people
3   believe that they can walk up to a house or walk up and beat
4   a judicial officer with the head and intimidate an officer.
5   You said it.  I'll tell you what, Mr. Laforte, you said a lot
6   of things that were really candid to me and I really
7   appreciate it.  But when you smiled at me, you said you think
8   that was going to affect Judge Ruiz and you looked at me,
9   said, I didn't let that happen.  Judge Ruis was not going to
10  think nicely of that kindly of that, right?  It wasn't going
11  to affect Mr. Alfano.  He's been around a long time.  He, as
12  a former district attorney, he knows exactly what's going on
13  here.  And so it was really, really rash and, and it was the
14  only time in this case where you look at it, where you say,
15  okay, he's not just bravado, he's not just empty threats.
16  He's going to do it.  And he went after a judicial office.
17  He chose the worst guy to go after.  He couldn't get to Miami
18  to get released.  So you got a guy right on 19th Street and
19  that even before we get to the tax fraud and everything else
20  is a massive problem.  And, and when we talk about the
21  interest of the perfection of the rule of law, that is really
22  what we're talking about.  Today, you've recognized that you
23  must take accountability.  I think you said accountability
24  like four times, sir.  It's the right word.  If you had taken
25  accountability earlier, if you let your ego go away and let

1   your dopamine walk, boy where you and Lisa be right now on a

2   sunny evening, on a sunny evening in southern Florida where

3   it'd have been, but you couldn't fight back.  You had to

4   fight back and you had to take on Mr. Alfano and you had to

5   take on the courts.  I'm not going to go into the details of

6   that.  It's well known.  Mr. Alfano provided an articulate

7   testimony as he did with your brother.  Unlike your brother,

8   and I suspect sir, that there are other people that are

9   involved in this.  In fact, we know that Mr.  Mr.  Bacon has

10  already pled guilty to this.  This whole idea of you hiding

11  your information on tax statements and everything doesn't

12  seem to me to be your style in all candor.  I don't know.

13  Maybe it is, but it doesn't seem to be that you're -- that

14  while you're sophisticated in finance, I don't necessarily

15  get the impression because there's no evidence.  I've seen

16  that you've been doing tax fraud for 30 years.  Guys who

17  commit tax fraud typically have been doing it a while.  They

18  come back and they come back and they come back.  Just do it.

19  You know, it's, it's their thing.  We sentence accountants

20  all the time for this.  I don't have -- you may have, but I

21  don't have indication of that.  A gentleman paid you more

22  than 9 million in kickbacks from borrowing over a hundred

23  million.  You did report his income.  You do not report any

24  income for 2018.  You paid bonuses of cash in the fourth

25  quarter of 20 or most of the fourth quarter of 2019 with

affiliates such as full spectrum. You did not report this
income on quarterly employment tax returns. You do not pay
trust fund taxes doing with employees. Sir, I sentenced a
guy very recently to 72 months just for that. That was it,
just for that. Hiding the employment taxes. Well, more
recently than a couple, a couple years ago. Then you have
the other crimes that come up in case 2465. Mr. Arnold
provided tax preparations for your services for you and your
wife, for Mr. Bacon and you and Par beginning in 2014, we
found out that Par would pay a company a sub S known as
Heritage owned by Lisa. A 6. 4% of the value. Its MCA on a
quarterly basis. Par paid heritage, tens of millions of
dollars in consulting income. The tax evasion account as
well. You, along with Lisa Barletta and accountants, you
admitted conspired to conceal millions of dollars in taxable
income. You paid them extra for their fraud and Mr. Bacon
at least will pay for his fraud. And other person through
your ego tsunami is going to go to jail because of your
conduct or could go to jail because of your conduct. So now
we've got your brother, we've got your wife, you've got Cole
Barletta, you've got Bacon and Irma is going to trial. And
you of course, course still to be determined and maybe
others, but the IRS determined the tax loss just from this
scheme at over $8 million. Again, people have been sentenced
for jail for years just for that conduct. You're also

1    charged and committed -- and admitted to using wires.

2    Consult with Bacon and Irma to prepare false tax returns,

3    wire transmissions on August 14th, 2019.  July 13th to 2020,

4    July 14th to 2020.  Mr. Laforte, I'll tell you as again, an

5    editorial sidebar that, that -- when I see these cases all

6    the time, I realize that one, one email.  One phone call

7    hooks you, you know, two phone calls hook you.  And that's,

8    and that's prob that's the nuance, right?  You think, oh my

9    God, I didn't do anything here.  I made a phone call.  Well,

10   that's the hook under federal law.  You, you and your wife

11   lied about non residency in Pennsylvania.  You lied about

12   where you resided.  It's funny that you said this, and I'm

13   going to repeat it now because I'm going to sentence Ms.

14   Mcelhoe later.  But Ms.  Mcelhoe apparently told her

15   accountants that she actually lived in Pennsylvania.  She was

16   honest.

17              THE DEFENDANT:  Yes.

18              THE COURT:  And, and, and, and those accountants

19   just decided ado her, maybe your director or someone else,

20   but the Pennsylvania Department of Revenue lost $1,655,299.

21   And then of course, felon in possession July 28th, 2020, the

22   case that was before here.  First, a search warrant at your

23   home.  Your wife had a license to carry firearms in the

24   house, to possess them, but the agents found seven firearms.

25   Most of which were purchased by your wife legally.  One gun

1  Beretta 84 Fs was found in your desk and two handguns on a

2  nightstand next to your bed.  Okay.  So let's not kid

3  ourselves, sir.  We're talking about, there is no comparable

4  for this kind of conduct that is under a RICO conspiracy.  I

5  don't -- and, and I've already ruled this way.  I'm not

6  suggesting in any way, shape or form, sir, you ran any kind

7  of -- that you ran any sort of family or any type of thing

8  that had anything to do with anybody else.  It's just you did

9  that.  Everything you did was designed to make to, to -- you

10  may say, to pay investors, I say to enrich the Lafortes and I

11  guess the investors being repaid.  Your background though un

12  is, you know, is, is so atypical for what we see in this.

13  You know, a young man, 54 years old, your parents

14  unfortunately divorced from at 21.  You just lost your dad.

15  I heard about it.  You spent some time with your dad with

16  leukemia.  Your mom lives in Bedford.  You're both, your

17  parents.  And, and sir, it doesn't affect me.  Your parents

18  had spent time before in connection with your conspiracy.

19  Your parents, whatever reason were involved in your conduct

20  back in 2005 and 2006.  You have three siblings, including

21  your brother who's sentenced for well over a decade in

22  prison.  Your two sisters wrote letters to me, and I

23  appreciate their letters.  You received your high school

24  diploma, you played baseball in colleges in the mid 90's.

25  You actually played baseball over the -- I guess the winter

leagues were the Mariners.  That's the way it would work out,
I guess.  You obtained license of cell securities in Wall
Street in the beginning of 95.  You're self-trained in
business operations, real estate and stock trading.  You
married Lisa 10 years after you started selling securities.
You met her in Florida and she now owns the nail salon around
the corner and is opening one in West Palm Beach.  Your wife
says, she doesn't know this side of Joe.  That's the quote.
Well, I'll figure out later whether I believe that.  But what
I do know is I'm certainly don't think she understood this
side of Joe to the full extent.  You know, I'm going to blow
up your car.  I'm going to, I'm going to kidnap your kids or
my, or I have 501 quote.  I have 500 people on the street.
Those type of things.  I don't think she knew that.  I don't
know.  I'll find out later.  You live on Staten Island under
-- for a while.  Then Lisa and you moved to Fort Lauderdale.
You were incarcerated again until 2011 for a conviction for
fraudulent business.  Losses.  Fraudulent losses, more than
14 million.  Again, that has not been paid back.  You didn't
care about paying that back.  So we're going to put penalties
on you to make sure you pay.  You received another federal
sentence for illegal gambling with a 10 month sentence there.
You were incarcerated for about four years.  You were
released from custody and started Par funding eight months
later.  You relocated to Philadelphia and then moved out to

1   Haverford. You then moved to center city park down on the

2   parkway. Franklin Parkway in May of 2023 after all this

3   occurred. You -- Lisa, of course now lives with her sister

4   in South Philadelphia and splits time in Florida. You have

5   not -- you do not suffer from physical, mental health issues

6   other than over inflated view of dopamine. You know, as you

7   call it, self-centeredness. There are -a lot of people are

8   narcissistic. A lot of people who are self-centered. They

9   don't threaten people's lives and beat court officers over

10   the head with -- and, and owe people millions of dollars who

11   don't defraud the United States. You have no present assets.

12   You owe $11 million --10 million. You, you owe millions -- a

13   million -- $14 million from two -- from the 2005 case. You

14   owe the IRS $10,487,000. You owe the Pennsylvania 1,000,655.

15   You have a judgment over $219 million owed to the Par

16   receiver. You've not met your burden to show me an inability

17   to pay a fine. But I'm going to get to that later about what

18   that -- whether that's warranted. I need to consider the

19   reflect, the seriousness of the offense. This is a offense

20   that it does not have a parallel that I can think of. I

21   asked the United States specifically to give me cases that'd

22   be similar, and they gave me quite a few. And we at them,

23   they're not similar. They're similar in a sense. They're

24   fraud and they're, you know, they're people that are frauds

25   men, but they don't have everything going on. They don't

1  have perjury, they don't have obstruction of justice, they
2  don't have tax lying and then they don't have securities
3  fraud wire on top of it.  But these people weren't around
4  beating people over the head and, and, and threatening this
5  kid, take their kids and beat you to a pulp.  But then again,
6  but then again, you were getting money back to people, which
7  is different than some of those folks.  This is a serious
8  offense.  It is, it is, it is an offense, sir, that had there
9  not been a motion for the United States and counsel and, and
10 United -- and your, and your lawyer and you had been
11 convicted, I would've been very hard to find a sentence that
12 would've been much below 360 months.  So give your counsel in
13 the United States credit.  You may not like the way they did
14 this.  No one likes being pursued.  But in that sense, sir,
15 had this come to -- had this gone to verdict on these
16 charges, it, it -- what I've seen here would've warranted a
17 sentence certainly within the guidelines range.
18 Notwithstanding, these other cases, even, even, the case in
19 the Friedman case in New York.  Those cases are different
20 cases.  The big thing I told your counsel, and it's so true,
21 is to promote respect for the law.  You just blew by the law.
22 You just didn't care.  It was Joe LaForte, Joe LaForte, Joe
23 Mack, Joe Mcelhoe.  You didn't care.  And, and that's got to
24 stop.  And I know that because you didn't pay back the -- you
25 haven't paid back any debt you ever owed.  You, you paid back

1   your investors, but you haven't paid back anybody else, at

2   least that I can tell.  To afford just punishment for the

3   offense.  Yes, a sentence between 13 and a half and 15 and a

4   half months, years, excuse me, is substantial.  It is.  But

5   is it just given the fact that other men and women in your

6   shoes get similar sentences for conduct that's a lot less, a

7   lot less.  So, I, I wrestled with that.  That's what I kept

8   wrestling with.  How is this just when I have to sentence a

9   23-year-old black kid from North Philadelphia to 10 years for

10  having a gun.  This guy's only getting three years more for

11  having a gun and everything else.  That's what I've wrestled

12  with today.  Let it clear on the record.  To afford adequate

13  deterrence, that will be done.  There will be a supervised

14  release on you to make sure that you're not involved in any

15  of this kind of conduct, as well as protecting the public

16  from your further crimes.  It struck me that typically I

17  would say to you, Mr. Laforte, well with all the family here,

18  I'd be surprised that you do this.  But they let -- it

19  happened once before.  You were in jail with all these same

20  people, not with them, but you were in jail when they all

21  knew you, Lisa and your mom, etc.  And it happened again.  So

22  I've got to be sure that you don't engage in this conduct.

23  There is no need to keep you in prison longer to get

24  educational vocational training.  That's not going to happen.

25  You may end up, you may end up running a business in prison.

I mean, I, I, I have no doubt that you're, that you're going to be the smartest, one of the smartest business guys that walks into these facilities. I mean, you should see the people have the census. And so, there's no need to keep you there longer to get more education or vocational training. We got to get you out to get back to work in a manner that's appropriate. The kind of sentences are available. I have agreed to accept a sentence of 13 and a half to 15 and a half years. That's what the council's recommended. That's why I agreed to accept. Okay. That's -- okay. That's what I agree to accept. This is a variance from 360 months, but counsel has persuaded me only today that that's warranted. The need to provide victims' restitution. That's a big one. The reason I asked you so much about the SEC matter, sir, is because I want to make sure you're not doing anything either directly or through Lisa or through any lawyer that is in any way impairing the way to recover restitution. Mr. Alfano helped me there, correct? Tremendously because it -- because he said to me, it's not staying what's happening down there, it's just legal machinations to protect whatever rights Lisa wants to protect. And that's good. You can protect yourself from appellate courts. That's not a problem in any sense. But it is a problem if you're trying to slow down the money going into people who have been harmed. There are people who lost their life savings. There are people you solve the

statements.  I don't have to go through it.  I don't want to
make this into a tear jerker.  There are people that lost
their entire life savings because they, they lost it once on
the American business financial system.  That poor guy lost
it in the two, the Battle Kenwood scheme back in the, back in
the, what was that, late 90's or whatever.  And then, and
then he comes back and gives it to you.  So, that's a, that's
a big issue for me.  Of course, the other one that balances
considerably is a need to avoid unwarranted sentence
disparities among defendants with similar records, guilty of
similar conduct.  There is no body that I've seen that has
the litany.  I'm not going to use the word that MR. NEWCOMER
used.  I wouldn't call it menacing, but I would call it a --
there is a litany of conduct here.  Your, your -- I called
your, I called your brother a thug, essentially.  The other
day.  You are in, in many ways, the, the schemer behind all
that.  And there's no way to find a sentence that would be
sufficient for all that conduct, except that the next phrase
is but not greater than necessary.  And so, when I think
about not greater than necessary, I think, okay, what is
necessary for this gentleman to get it back together to
understand that the punishment is serious here?  And given
the fact that, that the, that through the efforts of
receiver, through the efforts of its counsel, there's been
substantial recovery, or at least efforts, substantial

recovery through the efforts of Mr. Minni and his team.
There'll be efforts to get recovery. I am comfortable that
there -- that we can go down here. I want to say to you, Mr.
Laforte, that had you impaired or interfered or at least
impaired or interfered with that ability and there was no
money to be paid to anybody, it'd be a much different day.
You used enormously good judgment. Say, let's partice--
let's make sure they -- people get back to this. Get the
money back. Because had the -- had I had people out of 400
million bucks or 328 million bucks and sitting there with no
chance of recovering, we'd be talking to these other folks,
you know, 30 years. There is no, of course no 5K motion or
anything here. And so having considered all those terms,
sir, and having considered all those factors, give me one
second here, please. It's the -- and having found that I am
going to accept the, the sentencing ranges recommended by
your counsel, accepted by me on the September 11th with the
proof today, I don't necessarily think under Blakely I
would've done it. But today, being, being persuaded by it,
is the judgment of this court that Joseph LaForte is
committed to the -- is committed to the custody of the Bureau
of Prisons to be imprisoned for a term of 186 months as
follows, a total 186 months on counts one and 21 of docket
number 23198. That is a variance down from 360 months. They
should be run concurrently a sentence of 36 months on count

1    31.  A sentence of 60 months on counts 44, 45 and 52, turning

2    the count to case 2465, which we know is the tax case for

3    count one 60 months for count 7, 186 months.  That should run

4    concurrent to all the other sentences.  For the felon in

5    possession, 180 months.  Consistent with what I've done --

6    what we do in the case as similar, of course to run

7    concurrent with the other sentences.  Thereafter, he shall be

8    placed on a term of supervised release for three years.  The

9    first year of which you shall spend in home confinement able

10    to work, and hopefully with Lisa and hopefully in Florida, if

11    that's where Lisa is for a period of 12 months following your

12    release from custody during that period of time, you shall

13    comply with location monitoring program directed by probation

14    office.  You are restricted to your approved residence,

15    whether that be here in Philadelphia, in this district, or in

16    Florida or wherever you and Lisa May move.  That's

17    appropriate in the United States, except for employment,

18    education, religious services, medical substance abuse and

19    mental health treatment, courted obligation, and at such

20    other times, specifically authorized by the probation

21    officer.  The location monitoring technology will be at the

22    discretion of the probation officer at a time.  My hope is

23    not to be the lowest level, sir.  My hope is that in that

24    period of time that you have come to your concept of what you

25    need to do.  You will pay the cost of the monitoring, the

1  reasonable cost, the monitoring during that 12 months while

2  you're on home confinement.  Thereafter you have two years

3  of, of, of supervised release thereafter.  While you're

4  unsupervised release, you shall not commit another federal,

5  state, or local crime.  You -- you're prohibited from

6  confessing a firearm or dangerous device, cannot possess no

7  legal controlled substance.  You will, you are -- you -- I am

8  not going to, you have persuaded me, sir, that you're not

9  suffering from any type of drug illness, drug testing.  Not

10  necessary.  So I'm waiving that.  You may be requested to

11  submit a drug testing.  If the probation officer determines a

12  risk of a substance abuse, you shall participate in a

13  collection of DNA as, as directed by probation officer.

14  You'll owe sir, as you know, hundreds of millions of dollars

15  or at least tens of millions of dollars for the rest of your

16  life.  So therefore, while you're on supervised lease, you

17  shall provide your probation officer full disclosure of your

18  financial records to include yearly income tax returns upon

19  request of a probation officer.  You shall cooperate with a

20  probation officer in investigation of your financial

21  dealings, provide truthful monthly statements of your income.

22  You're prohibited from incurring new credit cards or opening

23  credit lines without the approval of probation officer unless

24  you're in compliance with a payment schedule, which we'll

25  talk about in a moment.  You shall not encumber or liquidate

1    any interest in assets unless it's to serve down a

2    restitution obligation.  It is further ordered that I'm, I'm,

3    I'm granting the motion for preliminary forfeiture and that

4    you shall upon consent for the United States $120,851,792 and

5    72 cents, as well as among other items, assessing plane, all

6    funds in a Charles Schwab identified account and several

7    weapons.  A Beretta, three Berettas 235 -- 23 live rounds of

8    300 -- 38 caliber, a Smith and Wesson handgun, five rounds of

9    38 caliber ammunition, a Smith and Wesson model M&P 38038

10   caliber handgun, eight live rounds of 38 caliber ammunition,

11   A Smith and Wesson model M&P 15, which is a rifle, 30 live

12   rounds of caliber for that rifle, A Smith and Wesson puddle

13   model 19, which is a 3 --357 caliber handgun with a

14   identified serial number and six live rounds of a 357 caliber

15   ammunition.  In addition, sir, you shall be jointly and

16   liable for the obligation of restitution in the amount of

17   yourself.  Well, well let, let's be clear here.  In the --

18   we'll get the exact amount, but you shall be yourself liable

19   for $314 million.  314,913,046. 28.  You'll be jointly in

20   several on that debt with several persons, which will

21   separate out.  Part of it will be your wife and people

22   involved in the tax claims.  Others will be your brother, and

23   others will be Mr.  Abbonizio.  We'll separate that out later

24   on the joint and several so we have an accurate for all

25   counsel's review.  In addition, we are imposing a fine upon

1    you.  It's not a fine to, to in some sense because you're

2    being -- you're at the -- all you're doing right now is

3    repaying and giving back what you stole.  There should be

4    some more penalty here for a guy that's motivated, was

5    motivated by money.  In white collar crimes.  I find a fine

6    is effective $2,000.  So I am imposing a fine that $50,000

7    shall be paid in, in increments.  Well, it depends what's

8    left, but shall take precedent and should be, shall be paid

9    depending on where we are on the restitution.  Perry, pursue

10   with the, and I'll hear from Mr. Minni on this, in connection

11   with the -- during, during the term of supervised release,

12   for any balance remain outstanding at the time of your

13   release from custody, it should be paid at a rate of $1,000 a

14   month for the 36 month with a balloon payment for the balance

15   at the end of 36 months, unless extended by the probation

16   officer based upon your good behavior during probation.  I

17   take great solace from the fact you've been a model inmate

18   during the prom during the time you've been in custody.  Mr.

19   Minni, how does that work?  So we can be clear for purposes

20   of privacy of fines versus restitution versus forfeiture upon

21   supervised release, sir.

22        MR. NEWCOMER:  We were just discussing that issue,

23   Your Honor.

24        THE COURT:  Mr. Minni, how's that work?  Can you,

25   can you guide me on that?  No?

1    MR. NEWCOMER:  Your Honor.  The fine will not get

2  paid until all restitution is paid in full to the penny,

3  including the rest, the 10, the 8 million to the --

4    THE COURT:  It's the last thing then.  Am I right?

5    MR. MINNI:  Yeah, it's a very last thing.  So it's

6  not Perry pursue, it's the last thing.

7    MR. NEWCOMER:  Correct.  And that the only other

8  item regarding restitution as a reminder the court as it

9  normally does, is that restitution should be ordered to be

10  due immediately.

11    THE COURT:  Yeah, I'll do that.  Yeah, I was going

12  to say fine, but that's what I wanted to ask you.  The fine

13  is payable after the restitution and forfeiture,

14    MR. NEWCOMER:  Correct.  And, and the, the

15  restitution should be due immediately.

16    THE COURT:  That's right.  Okay.  Yeah, I was going

17  to get there.  I just wanted to see what the fine primacy

18  was.  The restitution and forfeiture are due immediately.

19  It's recommended that Mr. Laforte participate in the

20  financial -- in Inmate Financial Responsibility program,

21  provide a minimum payment of $25 per quarter towards the rest

22  -- towards the -- whatever comes first.  Towards the --

23  towards the debt.  In the event fine is not paid before the

24  commencement of supervision, you shall begin to satisfy any

25  amount outstanding and monthly installments of not less than

1    $1,000 to commence 60 days from the date of this -- commence

2    60 days from the date of your release.  You shall notify the

3    United States attorney for this district within 30 days of

4    any change of mailing address or residence that occurs while

5    any portion of the restitution and or forfeiture remains

6    unpaid.  In addition, you shall pay the United States a total

7    special assessment of $900 which is -- $100 per account which

8    is due immediately.  United States, any questions as the term

9    is sentence?

10           MR. NEWCOMER:  No, Your Honor.

11           THE COURT:  Mr. Corozzo, any questions to determine

12    is sentence?

13           MR. COROZZO:  I do have a question as to the fine.

14    If you are ordering the fine to be paid as per condition of

15    supervised release.

16           THE COURT:  No, no.  I'm sorry.

17           MR. COROZZO:  If my client attempts to pay, they,

18    they won't collect.

19           THE COURT:  No, no.  I'm not -- no, no -- I'm not.

20    No, no.  It's being paid.  No, no.  It's not a condition.

21    I'm opposing a fine today.  The prob -- the problem is

22    doesn't get paid until at the end.

23           MR. COROZZO:  Right.  Any monies the government

24    collects or the clerk's office collects will be apportioned

25    to the other issues.

1          THE COURT:  That's right.

2          MR. COROZZO:  Before the fine.  So, so if you, if,

3     if it's a condition or it's a monthly required payment, it

4     will cause confusion.

5          THE COURT:  Yeah, it's a monthly required payment

6     towards the restitution and towards the forfeiture at this

7     time of supervised release.  The fine will be out there.  I

8     mean, if, if everything is paid, I mean --

9          MR. COROZZO:  Of course, of course.

10          THE COURT:  If everything's paid, then the gentleman

11     will have a fine.

12          MR. COROZZO:  Of course, Your Honor.

13          THE COURT:  Otherwise, the fine may never get paid

14     because it's the end.

15          MR. COROZZO:  I just wanted to make sure that the

16     GNC doesn't say that.

17          THE COURT:  That's what I'll say.

18          MR. COROZZO:  It'll cause a lot of problems.

19          THE COURT:  No, you're right.  It would.

20          MR. COROZZO:  The other issue I have, Your Honor, is

21     a judicial recommendation for designation.  If you could

22     kindly recommend FCI Miami so that he could be close to Lisa.

23          THE COURT:  Okay.  United States.  Any concern with

24     a, with a custody in, in FCI?

25          MR. COROZZO:  No, you have the right to the

1  recommendation, Your Honor.  It's obviously up to the BOP

2  where they designate him.

3          THE COURT:  Okay.  Mr. Corozzo, just very briefly,

4  is other than Lisa, is anybody else in Miami?

5          MR. COROZZO:  Lisa's sister.

6          THE COURT:  Oh, that's right.  That's where they

7  live, right?

8          MR. COROZZO:  Yeah.

9          THE COURT:  Okay.  Alright.  Okay.  Officer, any

10  questions to determine sentence?

11          OFFICER MEGAN MEIER:  None that I can think of, Your

12  Honor.

13          THE COURT:  Okay.  Thank you for your work.  Mr.

14  Laforte, you have the right subject to a plea agreement.  We

15  should consult with your counsel to appeal this sentence

16  within 14 days or a United States Court of Appeals.  As I

17  understand your plea agreement, which we've studied at

18  greater length now, you can only appeal at this stage if we,

19  if you --well, you can always challenge the effectiveness of

20  your lawyer if you believe your lawyer provided

21  constitutionally ineffective assistance of counsel.  That's

22  not -- that does not have to be done within 14 days.  But any

23  claim that challenges that you -- your counsel believes you

24  can bring under your plea agreement must be filed within 14

25  days.  Mr. Corozzo cannot do that on your behalf.  You should

1 | notify the court and will appoint a counsel to do so on your
2 | behalf.
3 |         THE DEFENDANT:  No, I'll take care of it, Your
4 | Honor.
5 |         THE COURT:  Alright.  Do you understand that right,
6 | sir?
7 |         THE DEFENDANT:  Yes, sir.
8 |         THE COURT:  Okay.  Anything further from the United
9 | States?  I'm sorry.
10 |         ESR/CLERK:  Yes, Your Honor.
11 |         THE COURT:  Oh, yes.  I had to dismiss.  Yeah.
12 |         ESR/CLERK:  Yes.  Have a seat.  I have a list, Your
13 | Honor of counsels.
14 |         THE COURT:  Get that list out.  I have that list.
15 | Go ahead.
16 |         ESR/CLERK:  Starting with the 23198 matter, the RICO
17 | case government moves to dismiss counts two through 20, 22
18 | through 30, 32 through 43.  46, 49, 50, 51, 53, and 54
19 | through 59.  That's on 23198 on 2465.  We're moving to
20 | dismiss counts two through five and eight through 11.  And
21 | there's no count.
22 |         THE COURT:  What's the status count six through 23,
23 | 24, 65.
24 |         ESR/CLERK:  Oh, I'm sorry.  It counts -- You're
25 | right, Your Honor.  Two through six and then eight through

1   11.  We're keeping counts.  One and seven.

2              THE COURT:  One and seven.

3              ESR/CLERK:  One and seven.

4              THE COURT:  That's why I sentence him.

5              ESR/CLERK:  Yes, you're right, Your Honor.

6              THE COURT:  Alright.  And that no opposition that's

7   been agreed to that motion is granted and those counts as

8   identified with the United States are dismissed as to Mr.

9   Laforte.  Anything further from the United States?

10             ESR/CLERK:  No, Your Honor.

11             THE COURT:  Mr. Corozzo?

12             MR. COROZZO:  No, Your Honor.  Have a good evening.

13             THE COURT:  Thank you.  I appreciate your patience,

14  both of you with the court today.  Took a while and I

15  appreciate your time.

16             MR. COROZZO:   It's a pleasure to appear before you,

17  Your Honor.

18             THE COURT:  Mr.  LeFort.  I, I wish you well, sir.

19             THE DEFENDANT:  Thank you, Your Honor.  I appreciate

20  everything --

21             THE COURT:  To your family, to all those people who

22  came to support you, Lisa and your family, you might want to

23  turn around and thank them for being here.  Alright, court is

24  adjourned.  Thank you very much.

25             ESR/CLERK:  All rise.

1          (Court adjourned at 7:14 p.m.)

                        CERTIFICATE

I, Pam Flores, court approved transcriber, certify that the

foregoing is a correct transcript from the official electronic

sound recording of the proceedings in the above-entitled

matter.


            *Pam Flores*

April 7, 2025